**JENNER & BLOCK LLP**
Kenneth K. Lee (Cal. Bar No. 264296)
klee@jenner.com
Alexander M. Smith (Cal. Bar No. 295187)
asmith@jenner.com
633 West 5th Street Suite 3600
Los Angeles, CA 90071-2054
Phone:      (213) 239-5100
Facsimile:   (213) 239-5199

**JENNER & BLOCK LLP**
Dean N. Panos (*pro hac vice*)
dpanos@jenner.com
353 N. Clark Street
Chicago, IL 60654-3456
Phone:      (312) 222-9350
Facsimile:   (312) 527-0484

Attorneys for Defendant
Kellogg Sales Company

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEPHEN HADLEY, on behalf of himself, all others similarly situated, and the general public,<br><br>Plaintiff,<br><br>v.<br><br>KELLOGG SALES COMPANY<br><br>Defendant. | Case No. 5:16-cv-04955 LHK<br><br>**NOTICE OF MOTION AND MOTION TO EXCLUDE OPINION TESTIMONY OF STEVEN P. GASKIN**<br><br>**(REDACTED FOR PUBLIC FILING)**<br><br>Hearing Date:    November 8, 2018<br>Hearing Time:    1:30 p.m.<br>Judge:          Hon. Lucy H. Koh<br>Courtroom:       8 |

\* \* \*

PLEASE TAKE NOTICE that, on November 8, 2018, at 1:30 p.m., or as soon thereafter as the Court is available, in Courtroom 8 of the federal courthouse located at 280 South 1st Street, San Jose, CA 95113, Defendant Kellogg Sales Company ("Kellogg") will and hereby does move the Court to exclude the opinion testimony of Steven P. Gaskin submitted in support of Plaintiff Stephen Hadley's Motion for Class Certification on the basis that Mr. Gaskin's testimony fails to satisfy the standards set forth by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

Kellogg's Motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the Omnibus Declaration of Kenneth K. Lee and exhibits attached thereto, any additional briefing on this subject, and the evidence and arguments that will be presented to the Court at the hearing on this matter.

Dated:  June 11, 2018

JENNER & BLOCK LLP


By: /s/ Kenneth K. Lee
Kenneth K. Lee

Attorneys for Defendant
Kellogg Sales Company

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................1

BACKGROUND ...........................................................................................................3

ARGUMENT .................................................................................................................6

I.      Mr. Gaskin's Conjoint Analysis Cannot Reliably Assess Price Premium Because It Fails to Account for Market-Based and Supply-Side Factors That Affect Price ................6

II.    Mr. Gaskin's Methodology Violates Well-Established Principles of Conjoint Analysis and Consumer Surveys, and Thus His Conjoint Survey Cannot Reliably Measure Price Premium ...........................................................................................9

     A.     Mr. Gaskin's Conjoint Survey Does Not Mimic Real-World Shopping Conditions Because It Artificially Highlights the Challenged Statements ................9

     B.     Mr. Gaskin's Failure to Show the Packaging or Any Nutritional Information Will Deprive Survey Respondents the Ability to Accurately Value the Statement ..............................................................................................................13

     C.     Mr. Gaskin's Proposed Conjoint Survey Will Not Be Reliable Because It Does Not Test Other Critical Factors That Consumers Consider in Breakfast Products ...........................................................................................................14

     D.     Mr. Gaskin Admitted That Conjoint Surveys Cannot Accurately Measure Willingness-to-Pay for "Repeat Purchase" Products ..................................................17

     E.     The Conjoint Survey Suffers from Pervasive Focalism Bias, Rendering It Unreliable ........................................................................................................18

III.   Mr. Gaskin's Demand Modeling Survey Is Irrelevant, Biased, and Unreliable ...............20

IV.   Mr. Gaskin Should Not Even Be Accepted as an Expert Witness In Light of His Lack of Expertise in Consumer Behavior ....................................................................22

V.    This Court Should Not Permit Mr. Gaskin to "Amend" His Report ................................23

CONCLUSION...............................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Apple, Inc. v. Samsung Elecs. Co.,*
No. 11-1846, 2014 WL 976898 (N.D. Cal. Mar. 6, 2014) .............................................................passim

*Beller ex rel. Beller v. United States,*
221 F.R.D. 696 (D.N.M. 2003)...................................................................................................23

*Componentone, L.L.C. v. Componentart, Inc.,*
No. 05-1122, 2008 WL 4790661 (W.D. Pa. Oct. 27, 2008) .........................................12, 13

*Daubert v. Merrell Dow Pharms., Inc.,*
43 F.3d 1311 (9th Cir. 1995) .......................................................................................................6

*Daubert v. Merrell Dow Pharms., Inc.,*
509 U.S. 579 (1993).............................................................................................................passim

*EEOC v. Freeman,*
778 F.3d 463 (4th Cir. 2015) .......................................................................................................9

*Gallagher v. S. Source Packaging, LLC,*
568 F. Supp. 2d 624 (E.D.N.C. 2008)......................................................................................23

*Gibson v. County of Riverside,*
181 F. Supp. 2d 1057 (C.D. Cal. 2002) .....................................................................................9

*Hansen Beverage Co. v. Cytosport, Inc.,*
No. 09-31, 2009 WL 5104260 (C.D. Cal. Nov. 4, 2009) ......................................10, 13, 14

*In re NJOY, Inc. Consumer Class Action Litig.,*
120 F. Supp. 1050 (C.D. Cal. 2015) ..................................................................................7, 14

*In re NJOY, Inc. Consumer Class Action Litig.,*
No. 14-428, 2016 WL 787415 (C.D. Cal. Feb. 2, 2016) ......................................................7

*Instant Media, Inc. v. Microsoft Corp.,*
No. 07-2639, 2007 WL 2318948 (N.D. Cal. Aug. 13, 2007) ................................................9

*Keener v. United States,*
181 F.R.D. 639 (D. Mont. 1998)...............................................................................................23

*Kumho Tire Co. v. Carmichael,*
526 U.S. 137 (1999)......................................................................................................................6

*Laumann v. NHL,*
117 F. Supp. 3d 299 (S.D.N.Y. 2015).......................................................................................22

*Luke v. Family Care & Urgent Med. Clinics*,
   323 F. App'x 496 (9th Cir. 2009) ...................................................................23

*Lust ex rel. Lust v. Merrell Dow Pharms., Inc.*,
   89 F.3d 594 (9th Cir. 1996) ..........................................................................6

*M2 Software, Inc. v. Madacy Entm't*,
   421 F.3d 1073 (9th Cir. 2005) .......................................................................9

*Malletier v. Dooney & Bourke, Inc.*,
   525 F. Supp. 2d 558 (S.D.N.Y. 2007).............................................................9

*Medism Ltd. v. BestMed LLC*,
   861 F. Supp. 2d 158 (S.D.N.Y. 2012)...........................................................10

*Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*,
   752 F.3d 807 (9th Cir. 2014) .......................................................................22

*Saavedra v. Eli Lilly & Co.*,
   No. 12-9366, 2014 WL 7338930 (C.D. Cal. Dec. 18, 2014)...............................7

*Simon Prop. Grp. L.P. v. mySimon, Inc.*,
   104 F. Supp. 2d 1033 (S.D. Ind. 2000).........................................................18

*Solaia Tech., LLC v. ArvinMeritor, Inc.*,
   361 F. Supp. 2d 797 (N.D. Ill. 2005) ............................................................23

*Townsend v. Monster Beverage Corp.*,
   --- F. Supp. 3d----, 2018 WL 1662131 (C.D. Cal. 2018)...........................18, 21

*Water Pik, Inc. v. Med-Systems, Inc.*,
   726 F. 3d 1136 (10th Cir. 2013) ..................................................................10

*WE Media, Inc. v. Gen. Elec. Co.*,
   218 F. Supp. 2d 463 (S.D.N.Y. 2002)...........................................................12

*Weisgram v. Marley Co.*,
   528 U.S. 440 (2000).....................................................................................6

*Wolf v. Hewlett-Packard Co.*,
   No. 15-1221, 2016 WL 7743692 (C.D. Cal. Sept. 1, 2016) ..............................22

**OTHER AUTHORITIES**

Federal Rule of Civil Procedure 26(e) ................................................................3, 23

Federal Rule of Evidence 702.........................................................................1, 6, 22

## INTRODUCTION

Plaintiff's expert Steven Gaskin — a mathematician with limited background in consumer behavior and the breakfast foods market — offers two methods of calculating damages in this case:  (1) a proposed conjoint analysis survey which will supposedly measure the subjective value consumers assign to the challenged statements on Kellogg products; and (2) a "demand modeling survey," which purportedly assesses the effect of an inflammatory warning label on the box of each product and concludes that it would reduce demand for the Kellogg products by approximately 13.7 percent.

Perhaps owing to Mr. Gaskin's lack of familiarity with the breakfast foods market and consumer behavior generally, he violated the most basic tenets of conducting a consumer survey, and neither of his models comes remotely close to approximating the real-world conditions under which consumers buy products.  Further, he committed a host of other methodological defects that violate accepted standards in the field of consumer behavior and makes his models wholly unreliable, as detailed in the expert reports by two giants in the field of consumer marketing, Dr. Itamar Simonson of Stanford University and Dr. Ron Wilcox of the University of Virginia.  Dr. Simonson and Dr. Wilcox — who have written dozens of peer-reviewed articles, conducted hundreds of surveys and research projects, and have received many awards for their work in the field of consumer behavior — explain that Mr. Gaskin's methods fall far short of the acceptable standards in the field of consumer behavior and survey research.  As Dr. Wilcox points out, he has never "seen any similar studies to Mr. Gaskin's 'demand modeling survey' in academic research." Likewise, Dr. Simonson notes that Mr. Gaskin's design choices for his conjoint are "bizarre" and that it is the "first time" in his 30 years as an academic that he has encountered such design choices.

In short, Mr. Gaskin's opinion does not come close to passing muster under Federal Rule of Evidence 702 or the *Daubert* standard.  His methodology does not come close to meeting the accepted standards for consumer behavior and survey research, and his results are therefore wholly unreliable.

At the outset, Mr. Gaskin's conjoint analysis methodology fails because it is not an appropriate method of reliably assessing the price premium associated with a single product attribute. A conjoint analysis may be useful in assessing the relative weight that consumers assign to multiple product attributes. But as this Court and numerous others have recognized, a conjoint analysis cannot accurately assess the price premium for a single attribute because conjoint only measures the subjective willingness-to-pay

1   amount that a consumer places on that attribute (*i.e.*, demand).  A conjoint survey does not take into account

2   other market and supply-side factors that determine a price (*e.g.*, competition between companies, a

3   company's pricing strategy, the market positioning of the product).

4           Even if Mr. Gaskin's conjoint analysis could theoretically measure the price premium associated

5   with the challenged statements, it is plagued by numerous defects that violated well-established standards

6   for conducting a consumer survey, all of which render his methodology defective and inadmissible:

7           First, Mr. Gaskin's proposed conjoint survey is completely divorced from the real-world shopping

8   experience, which is critical in a conjoint survey to obtain accurate answers.  Instead of showing consumers

9   actual images of the packaging that they would see at a store, Mr. Gaskin's proposed survey merely shows

10  them the text of the challenged statements, and then directs consumers to read those statements before they

11  are asked to assess the value of the hypothetical product. This is an egregious error that violates basic

12  principles of conducting a consumer survey.  This flawed design ensures that survey respondents will

13  notice the challenged statements and force them to place value on it when, in reality, most consumers may

14  not even notice them and therefore place no value on them.  Amazingly, Mr. Gaskin admitted that because

15  consumers in real life may not notice the challenged statements on the packaging, he intentionally designed

16  his survey to avoid that real-life situation.  As Dr. Simonson explains, that justification is "bizarre" because

17  it "misrepresent[s] reality," as it skews the results to include only survey respondents who notice and place

18  value on the challenged statements.

19          Second, Mr. Gaskin's proposed conjoint survey does not reflect the real-life shopping experience

20  because he does not provide nutritional or any other information to provide context to the meaning of the

21  challenged statements.  For example, a consumer in real life who notices the term "Heart Healthy" or

22  "wholesome goodness" may turn to the Nutrition Facts panel or ingredient list on the packaging to assess

23  the nutritional value of the product or to better assess what those terms mean.  But Mr. Gaskin denies his

24  survey respondents that ability because he does not show them the packaging or any nutritional

25  information.  Again, this error violates fundamental precepts of consumer survey design and would lead to

26  distorted results.

27          Third, Mr. Gaskin's proposed conjoint does not test numerous other attributes that drive sales of

28  breakfast food products.  For instance, it does not measure taste ███████████████████

MOTION TO EXCLUDE OPINION TESTIMONY OF STEVEN P. GASKIN

1   ███████████████████████████████████████████████████████████

2   ██████ Because Mr. Gaskin's survey does not account for the value consumers assign to attributes other

3   than the one tested, it artificially (and inaccurately) inflates the importance consumers assign to the

4   challenged statements in making their purchasing decisions.

5       <u>Fourth</u>, Mr. Gaskin's survey suffers from pervasive focalism bias.  The overwhelming majority of

6   the statements tested by the survey relate to the health, nutrition, and ingredients of the products, which

7   makes clear to survey respondents that the survey is testing the effect of certain "health and wellness"

8   statements and induces them to select answers suggesting that there is a price premium associated with

9   those statements.  There were many other distractor statements Mr. Gaskin could have used in his survey,

10  and his failure to do so resulted in a biased survey that was rigged to ensure the outcome he wanted.

11       Mr. Gaskin's so-called "demand modeling" survey fares no better.  Like his conjoint survey, Mr.

12  Gaskin's demand modeling survey — which asks consumers how they would react to an inaccurate and

13  inflammatory warning about the purported dangers of added sugar — conceals vital context from

14  consumers that would affect how they view that warning.  For example, it warns them of the dangers of

15  Raisin Bran's "high added sugar" content, but does not show the packaging or any other information that

16  would reveal the actual sugar content.  It also warns that eating Raisin Bran may exceed the USDA's daily

17  added sugar recommendation, but does not disclose that amount (50 grams). By asking consumers how

18  they would react to a warning statement without presenting the full context of the package, Mr. Gaskin's

19  demand survey invites focalism bias that renders his findings unreliable.

20      In short, Mr. Gaskin's proposed conjoint survey and his demand modeling survey suffer from

21  conceptual and methodological defects that render his opinion inadmissible under *Daubert*.  Mr. Gaskin

22  cannot simply submit a "supplemental" opinion that cures these defects, as Rule 26(e) is not a free pass to

23  amend one's opinion in response to criticisms levied by opposing counsel.  This Court should accordingly

24  exclude Mr. Gaskin's opinion.

25                              **<u>BACKGROUND</u>**

26      Mr. Gaskin is a principal at Applied Marketing Science, Inc., where he has served as an expert

27  witness for the past 15 years.  Prior to that, he worked at various private companies, where he served as an

28  "expert in mathematical modeling for market research."  Lee Decl. Ex. 3 ("Gaskin Dep.") 51:19-52:3.

Although he asserts that he has "enough" expertise in marketing "for his field, he admits that he has never provided expert testimony about "marketing principles generally, without regard to [his] expertise" in the "field [of] mathematical modeling." *Id.* 52:7-53:7.  Drawing on his supposed expertise in mathematical modeling, Mr. Gaskin proposes two methods of calculating class-wide damages:

Mr. Gaskin's first method of calculating damages involves a "choice-based conjoint analysis" in which survey respondents will be shown three hypothetical product profiles that each feature (1) a brand name, (*e.g.*, Kellogg, Post, General Mills), (2) a variety that exists within the Kellogg product only (e.g., "Raisin Bran," "Raisin Bran with Omega-3"), (3) largely health and wellness statements, including the challenged statements, and (4) a hypothetical price.[1]  Critically, survey respondents will *not* be shown actual images of the packaging, the ingredient list, the Nutrition Facts panel, the actual name of the non-Kellogg products (*e.g.*, Total Raisin Bran), the actual prices at which the products retailed, or any other non-"health and wellness" statements or pictures that may appear on the packaging (*e.g.*, "Two Scoops!," image of an anthropomorphic sun wearing sunglasses, promotional offers). Instead, they will be shown text that describes three hypothetical products, as reflected in this example provided by Mr. Gaskin in his report:

---

[1] Because Mr. Gaskin has not yet conducted this survey, any conclusions about whether the survey will reveal a price premium associated with the challenged statements are premature at best.  Indeed, Mr. Gaskin even concedes that, without conducting the survey, he cannot determine whether a "challenged statement is material or not" — let alone the price premium that might be associated with any such statement.  Gaskin Dep. 51:1-5.  And because there is no survey data from actual respondents yet, "it is not possible to determine whether such a survey will be reliable."  Lee Decl. Ex. 8 ("Wilcox Report") ¶ 59.

Figure 1. Sample Choice Set

Lee Decl. Ex. 4 ("Gaskin Report") ¶ 14.  Each respondent "will be forced to view each description," and compelled to choose one of the three options. *Id.* ¶ 39.  They are not allowed to provide a "none of the above" option.  Based on the responses to this survey, Mr. Gaskin asserts that he will be able to calculate the relative worth consumers assign to the challenged labeling statements vis-à-vis other product attributes.

In addition to his conjoint survey, Mr. Gaskin also ran a "demand modeling survey" in which he separated a group of Raisin Bran consumers into a test and control group.  In addition to the challenged statements, the control group was shown a warning that stated:

> WARNING: DUE TO ITS HIGH ADDED SUGAR CONTENT, CONSUMPTION OF RAISIN BRAN MAY LEAD YOU TO EXCEED THE USDA'S RECOMMENDED DAILY ADDED SUGAR MAXIMUM, WHICH CAN CAUSE TYPE 2 DIABETES, HEART DISEASE, FATTY LIVER DISEASE, AND TOOTH DECAY.

Gaskin Report ¶ 53 & n.34.  Neither group was shown a copy of the packaging or the ingredient list or any nutritional information.  Based on the findings of that survey, Mr. Gaskin concluded that the group who saw the warning consumed 13.7% less Raisin Bran.  *Id.* ¶ 53.  Mr. Gaskin proposes to run a similar survey for the other challenged products in this case.  *Id.* ¶ 54.

## ARGUMENT

The Ninth Circuit has made clear that the proponent of expert testimony "has the burden of *proving* [its] admissibility."  *Lust ex rel. Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996) (emphasis added).  To satisfy this burden, the party relying on an expert's testimony must establish that it is "based on sufficient facts or data" and that it is "the product of reliable principles and methods" that the expert has "reliably applied . . . to the facts of the case."  Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993) (emphasizing that expert testimony must be "not only relevant, but reliable").

To be reliable, an expert's testimony must reflect "scientific knowledge," findings "derived by the scientific method," and work product that amounts to "good science."  *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995) (citing *Daubert*, 509 U.S. at 589).  Rule 702 and *Daubert* impose "exacting standards of reliability," *Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000), and require this Court to perform a gate-keeping function to exclude any expert opinion that fails to meet these standards.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

## I.   Mr. Gaskin's Conjoint Analysis Cannot Reliably Assess Price Premium Because It Fails to Account for Market-Based and Supply-Side Factors That Affect Price.

Conjoint analysis is typically used to ascertain the relative weight consumers assign to particular attributes of a product relative to one another.  For example, a company may test whether consumers prefer one feature of a television set vis-à-vis other features.  But a conjoint analysis, by its very nature, cannot reliably predict an alleged price premium that a company charges for a single labeling statement or feature.  At best, a conjoint analysis can only assess a consumer's subjective *willingness to pay* for a particular attribute (*i.e.*, demand).  But as this Court noted, a willingness to pay amount is not the same as a price premium because "the ultimate price of a product is a *combination* of market demand and market supply."  *Apple, Inc. v. Samsung Elecs. Co.*, No. 11-1846, 2014 WL 976898, at *11 (N.D. Cal. Mar. 6, 2014)

1    (emphasis added) (rejecting use of conjoint analysis to show that a particular feature increased the price of

2    tablets and smartphones).

3         Other courts in California and elsewhere have repeatedly rejected conjoint analysis, ruling that it

4    measures only demand-side willingness to pay and does not consider competitive market factors. *See, e.g.,*

5    *In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 1050, 1122 (C.D. Cal. 2015) (rejecting

6    proposed conjoint analysis as "provid[ing] only a model for testing what a consumer is willing to pay,

7    without considering other factors in a functioning marketplace"); *In re NJOY, Inc. Consumer Class Action*

8    *Litig.*, No. 14-428, 2016 WL 787415, at *7 (C.D. Cal. Feb. 2, 2016) (different judge rejecting motion for

9    reconsideration because the conjoint "still only look[ed] to the demand side of the market equation, and

10   ignore[d] the price at which . . .  e-cigarette manufacturers[] would be willing to sell their products.");

11   *Saavedra v. Eli Lilly & Co*., No. 12-9366, 2014 WL 7338930 (C.D. Cal. Dec. 18, 2014), at *5 ("By looking

12   only to consumer demand while ignoring supply," the conjoint analysis "converts the lost-expectation

13   theory from an objective evaluation of relative fair market value to a seemingly subjective inquiry of what

14   an average consumer wants.").

15         Dr. Ronald Wilcox — a Professor of Business Administration at the University of Virginia's

16   Darden Graduate School of Business who has written about and conducted conjoint surveys — explains

17   why Mr. Gaskin's approach misapplies conjoint analysis standards and therefore cannot reach reliable

18   results.  The market price of a given product is not simply a function of consumers' willingness to pay for

19   that product; instead, it is the "outcome of a competitive equilibrium between the demand and supply sides

20   of the market."  Wilcox Report ¶ 62.  That equilibrium reflects a wide variety of market factors, including

21   both supply-side factors (such as the product's supply chain and production costs) and demand-side factors

22   (such as product availability and the substitutability of other competing products).  *Id.*  Indeed, Mr. Gaskin

23   conceded in his deposition that market prices are determined by a range of factors, including "competition

24   among different companies," "the company's pricing strategy," "product positioning," and the costs of

25   production.  Gaskin Dep. 86:9-87:13.

26         Likewise, Dr. Itamar Simonson, a Professor of Marketing at Stanford University's Sebastian S.

27   Kresge Graduate School of Business and one of the nation's foremost experts on consumer decision-

28   making process, points out that Mr. Gaskin's proposed conjoint analysis "ignores the question of whether,

MOTION TO EXCLUDE OPINION TESTIMONY OF STEVEN P. GASKIN

from the seller's perspective, competitive conditions would allow the company to charge a higher price based on the speculated [willingness to pay]."  Lee Decl., Ex. 7 ("Simonson Report") ¶ 167.  He notes that, to his knowledge, "there has never been any study that confirmed that customers were *in reality* willing to pay the price for a given feature (or willing to pay more due to an advertising label on a package) that was derived from a choice-based conjoint study."  *Id.* ¶ 177.

Accordingly, even if Mr. Gaskin could show that a given consumer was willing to pay a premium for a product with a "heart health" statement (or any other statement), there are competitive pressures that restrict Kellogg's ability to price its products based on consumers' willingness to pay.  *See* Wilcox Report ¶¶ 62-64.  For example, numerous other companies — ranging from ██████ to General Mills to Quaker — use "heart health" statements on the packaging of their cereals. That competitive pressure would affect Kellogg's supposed ability to charge the willingness-to-pay amount measured in a conjoint analysis.

This Court's decision in *Apple, Inc. v. Samsung Electronics Co.* illustrates the critical importance of considering competitive market factors.  There, Apple's damages expert offered a conjoint analysis designed to assess consumers' willingness to pay for certain smartphone features.  2014 WL 976898 at *10-11.  This Court held that the expert's conjoint analysis was deficient because it simply "measure[d] the market demand for the . . . features in a vacuum, without relation to the actual price or value of the devices."  *Id.* at *11.  In other words, the Court explained, the expert's "willingness to pay metrics" were insufficient to explain the "real-world interaction of supply and demand," wherein the "serious market competition in the smartphone and tablet industry works to depress prices."  *Id.*

Like the expert in *Apple*, Mr. Gaskin focuses narrowly on the question of how the use of the challenged statements impacts consumer demand without considering the effect of supply and other market factors; in fact, Mr. Gaskin does not use the word "supply" once in his 180-page report.  In his deposition, Mr. Gaskin took the position that there was no need to account for supply-side factors because "supply is fixed as a matter of historical fact" and prices in his study were "based on the actual marketplace."  Gaskin Dep. 101:18-24.  This is a facile excuse that makes little sense.  Because "the introduction of hypothetical products without contested labels would induce important changes in purchasing," Dr. Wilcox explains, "these adjustments in demand would necessarily induce a competitive response by manufacturers, which would change market supply."  Wilcox Report ¶ 66.  In other words, Mr. Gaskin is not attempting to

MOTION TO EXCLUDE OPINION TESTIMONY OF STEVEN P. GASKIN

determine how the use of the "heart healthy" statement historically affected the pricing of Kellogg's products relative to other real-world products. Instead, he is applying real-life prices to *hypothetical* products, and he does nothing to explain how Kellogg (or its competitors) would have changed their pricing in response to these hypothetical products. *See, e.g.,* Gaskin Report ¶ 41 (stating that he is testing "three different, hypothetical cereals or breakfast bars"). This omission renders his analysis fatally flawed.

## II. Mr. Gaskin's Methodology Violates Well-Established Principles of Conjoint Analysis and Consumer Surveys, and Thus His Conjoint Survey Cannot Reliably Measure Price Premium.

In his report, Mr. Gaskin asserts that his proposed conjoint analysis, which he plans to execute through a 12-question survey, would "enable [him] to assess the market price premia resulting from the affirmative misrepresentations on boxes of Kellogg's" challenged products. Gaskin Report ¶ 8. As the proponent of this conjoint survey, Plaintiff bears the burden of showing that Mr. Gaskin's method "accord[s] with generally accepted survey principles." *M2 Software, Inc. v. Madacy Entm't*, 421 F.3d 1073, 1087 (9th Cir. 2005). "[S]ubstantial deficiencies in the design . . . of a survey . . . is grounds for its complete exclusion." *Gibson v. County of Riverside*, 181 F. Supp. 2d 1057, 1067 (C.D. Cal. 2002).

Here, Mr. Gaskin's proposed conjoint survey is riddled with numerous flaws, each of which precludes the use of his conjoint analysis to measure class-wide damages and renders his opinion inadmissible. Even if one or more of these deficiencies were not fatal standing alone, they nonetheless render his survey inadmissible because they "cumulatively undermine [its] relevance and reliability." *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 562-63 (S.D.N.Y. 2007); *see also EEOC v. Freeman*, 778 F.3d 463, 467 (4th Cir. 2015) (explaining that "[t]he sheer number of mistakes and omissions" in an analysis may "render it outside the range where experts might reasonably differ") (citation and internal quotation marks omitted).

### A. Mr. Gaskin's Conjoint Survey Does Not Mimic Real-World Shopping Conditions Because It Artificially Highlights the Challenged Statements.

As numerous courts have made clear, a consumer survey — including the choice-based conjoint survey that Mr. Gaskin proposes — lacks probative value unless it accurately mimics real-world purchasing conditions. *See, e.g.*, *Instant Media, Inc. v. Microsoft Corp.*, No. 07-2639, 2007 WL 2318948, at *15 (N.D. Cal. Aug. 13, 2007) (noting that a proper survey should "be designed to examine the

impression presented to the consumer by the accused product" and "roughly simulat[e] marketplace conditions") (citations and internal quotation marks omitted); *Hansen Beverage Co. v. Cytosport, Inc.*, No. 09-31, 2009 WL 5104260, at *13 (C.D. Cal. Nov. 4, 2009) ("Survey evidence . . . should only be considered probative to the extent that the survey replicates the real world setting."); *Medism Ltd. v. BestMed LLC*, 861 F. Supp. 2d 158, 166 (S.D.N.Y. 2012) ("The failure of a survey to approximate actual marketplace conditions can provide grounds for inadmissibility.").

Likewise, Dr. Simonson of Stanford University — one of the preeminent consumer behavior experts and the rare recipient of two separate O'Dell Awards given to the authors of the most influential consumer marketing research publications — emphasizes that it is critical that a consumer survey "approximate market conditions as closely as possible" to achieve reliable results.  Simonson Report ¶ 144 (noting that "market research firms are going to great lengths to approximate reality in order to generate more accurate estimates of consumer behavior").

Despite this clear requirement under the law and consumer survey principles, Mr. Gaskin's choice-based conjoint survey fails to show the actual product packaging and instead highlights several challenged statements that survey respondents must read.  *See* Gaskin Report ¶ 14; Gaskin Dep. 116:15-24.  Accordingly, his survey respondents will not see the package's layout and design, its color, or all the images or the text that appear on the packaging — even though all of these aspects of the packaging play a critical role in convincing consumers to purchase one product over another. For instance, Plaintiff's marketing expert, Bruce Silverman, explained that consumers are more likely to notice statements in larger font or contrasting colors than they are statements in small font or in colors that blend in to the background. Lee Decl. Ex. 6 ("Silverman Dep.") 219:2-15, 222:21-24.  He also explained that the images on the front of the packaging are important, as they "convey appetite appeal" and "help[] consumers understand what the product is."  *Id.*

Critically, by showing consumers the text of the challenged statements as opposed to the packaging itself, Mr. Gaskin's survey highlights those statements and *assumes* that consumers will notice the statements on the packaging, which renders it fatally defective.  *See Water Pik, Inc. v. Med-Systems, Inc.*, 726 F. 3d 1136, 1146-47 (10th Cir. 2013) (affirming exclusion of survey whose design emphasized aspects of the packaging "that might not be noticed by the actual shopper").  In a stunning admission at his

deposition, Mr. Gaskin said that he *intentionally* designed his survey to be unrealistic so that it would compel the survey respondents to read the challenged statements that they may not notice in real life:

> Q: Would they – would a survey respondent see any packaging or any of their images in the conjoint survey?
>
> A: We decided no, because we wanted to look purely at the effect of these labels and because putting on a package, **you'd have issues about finding them and their placement on various brands and the amount of mental work it would take to look over each of these packages over and over and over.** So we think it best to do it this way.
>
> Q:  And when you say there would be issues about finding them, you're saying there would be an issue of whether they can locate statements on the box?
>
> A:  Right.  **Some of them are rather small print sometimes – or at least some of the labels on a cereal box are pretty small.  We don't want it to be an exercise about finding them.**  We want it to be an exercise about their meaning.

Gaskin Dep. 116:15-117:11 (emphasis added); *see also* Gaskin Report ¶ 39 (stating that his survey "[r]espondents will be forced to view each" statement).  Mr. Gaskin's admission demonstrates that Plaintiff cannot provide proof that class-wide damages are capable of being calculated consistent with Plaintiff's theory of liability, as Plaintiff's claims are based on his allegation that the *actual packaging consumers see* is what misleads them.  And Mr. Gaskin's admission that he needed to highlight the challenged claims for survey respondents to ensure that they would notice them implicitly concedes that the underlying assumption of Plaintiff's lawsuit— *i.e.*, that consumers see and rely on the challenged statements — is not true (which, of course, is exactly what Dr. Simonson's survey found).

In short, the supposed problem Mr. Gaskin was trying to avoid in his survey is that "[s]ome people don't even look at the package" before deciding which cereal to purchase.  Gaskin Dep. 91:2-10.  But that "problem" — as vexing as it may be to Mr. Gaskin's task — is a reflection of real-life consumer behavior: many consumers do not review the packaging or may not notice certain statements on the packaging.

Dr. Simonson of Stanford University points out that Mr. Gaskin's "singled-out labels will be made very prominent, thus completely misrepresenting what consumers see and consider in reality."  Simonson Report ¶ 185.  That will lead to "a gross overestimation of the highlighted labels," according to Dr. Simonson.  *Id.* ¶ 181.  As he explains, "this biased design will necessarily 'find' that the labels on which

the respondents would be effectively forced to focus would 'prove' to be very valuable." *Id.* ¶ 168.  Dr. Simonson, who has conducted over 2,000 marketing research projects, stated that it is the "first time" he has ever heard such a "bizarre 'justification' for mispresenting reality." *Id.* ¶ 156.  As Dr. Simonson explains, "designing a study about consumer decision-making requires a good understanding of how consumers make decisions in real life." *Id.* ¶ 182.  But "a person who lacks such understanding is unlikely to design a proper survey . . . because such a study is likely to make the wrong assumptions or rely on improper measures." *Id.*  And that is exactly the case with Mr. Gaskin's proposed conjoint survey.

For example, Mr. Gaskin admitted that some consumers would not notice the "Lightly Sweetened" language on the box of Frosted Mini-Wheats because it is in a small font.  Gaskin Dep. 158:3-20; ███████

███████████████████████████████████████████████████████

███████████████████████  Accordingly, those consumers, by definition, did not consider the "lightly sweetened" statement when they bought it and thus valued it at zero.  Yet Mr. Gaskin will intentionally excise that group of consumers from his survey, and he will only effectively select consumers who will be forced to read and consider the challenged statements in their decision-making process.[2]  Dr. Simonson warns that "studies should not be designed in the way that gives his client the 'best results'" if they are to be reliable and scientifically defensible.  Simonson Report ¶ 156.

In sum, because Mr. Gaskin's survey does not show the packaging and instead highlights the challenged statements, it is not probative of the weight (if any) consumers would assign to those statements in making their purchasing decisions.  *See, e.g.*, *WE Media, Inc. v. Gen. Elec. Co.*, 218 F. Supp. 2d 463, 474 (S.D.N.Y. 2002) (holding that survey was inadmissible when it "did not use pictures or advertisements that approximate what a potential consumer would encounter" and thereby "essentially measured respondents' word associations devoid of context"); *Componentone, L.L.C. v. Componentart, Inc.*, No. 05-

---

[2]  Most of the other challenged statements in this case likely will not be noticed by most consumers because they are not prominently featured on the box.  For example, the term "wholesome goodness" appeared on the back panel of some of the Nutri-Grain box, which led Plaintiff's marketing expert, Mr. Silverman, to opine that such a statement is less likely to be noticed by consumers.  *See* Silverman Dep. 210:11-17, 222:21-24 (noting that statements in small font or on the back panel are less likely to be noticed by consumers).  Other statements, such as "Invest in Yourself, Invest in Your Health" and "Eat a Healthy Spoonful," also appeared on the back panel of the box.

1122, 2008 WL 4790661, at *24-25 (W.D. Pa. Oct. 27, 2008) (excluding survey that "presented the parties' marks on a plain background in large block letters" because it was "completely divergent from the conditions that potential purchasers encounter in the parties' marketplace").

**B.    Mr. Gaskin's Failure to Show the Packaging or Any Nutritional Information Will Deprive Survey Respondents the Ability to Accurately Value the Statements.**

Another fatal flaw arising from Mr. Gaskin's failure to show the packaging to the survey respondents is that his proposed survey will omit key context that appears on the package and that informs consumers' understanding of the challenged statements.  As Dr. Simonson notes, "[c]ereal packages . . . present a great deal of information," including "a detailed list of ingredients as well as the nutrition information."  Simonson Report ¶ 184.  But "the participants of the proposed Gaskin conjoint study will not have the benefit of seeing any package, nor will they be provided with the ingredient list (or at least the main ingredients) and the nutrition information."  *Id.*

For instance, even though Mr. Gaskin's survey will test how much weight consumers place on the term "lightly sweetened," it does not tell consumers how much added sugar (or total sugar) is in each serving.  In real life, a consumer who wanted to assess the meaning of "lightly sweetened" may have looked at the ingredient list or the Nutrition Facts panel (or the front of the Frosted Mini-Wheats box, which prominently discloses the amount of sugar).  A consumer would see the full context of that phrase: "Lightly Sweetened Whole Grain Cereal" with an image of only one-side of the mini-wheat being frosted.  But in Mr. Gaskin's survey, respondents are left in the dark and forced to assess the value of the term "lightly sweetened" without any context or nutritional information that consumers would have in real life.

Likewise, while the survey will purportedly assess the importance consumers attach to the slogan "Nutrients for Every Day," it does not disclose how many nutrients — or what nutrients — are in each serving.  And the survey does not allow consumers to review the Nutrition Facts label, ██████████████

██████████████████████████████████████████████

██████████████████████     ██████████████████████

██████████████████████████████████████████████

██████████████████████████████████

Mr. Gaskin's survey also fails to include language that qualifies or clarifies some of the challenged

1    statements in this case.  For instance, the "heart healthy" statement on each box of Raisin Bran is followed

2    by the following language: "While many factors affect heart disease, diets low in saturated fats and

3    cholesterol may reduce the risk of heart disease."  *See, e.g.*, *id.* Ex. 24.  By omitting that context, Dr.

4    Gaskin's proposed conjoint survey will inevitably produce results that are unreliable and inaccurately

5    exaggerate the weight consumers place on the challenged statements.  *See, e.g., Hansen Beverage Co*, 2009

6    WL 5104260, at *13 ("Survey evidence . . . should only be considered probative to the extent that the

7    survey replicates the real world setting.").

8         As Dr. Simonson explains, it is critical to "approximat[e] the information available to consumers

9    in reality" when conducting consumer surveys because "a great deal of research has shown that when

10   making decisions and evaluating products, consumers rely on attributes and values that are both available

11   and easy to process." Simonson Report ¶ 181.  But Mr. Gaskin violated this fundamental precept in

12   designing his conjoint survey by refusing to show the packaging and quoting challenged statements out-

13   of-context.  Perhaps this failure was due to Mr. Gaskin's admitted lack of training and expertise in

14   consumer behavior.  But as Dr. Simonson points out, "designing a study about consumer decision-making

15   requires a good understanding of how consumers make decisions in real life.  A person who lacks such

16   understanding is unlikely to design a proper survey (unless guided by a consumer behavior expert) because

17   such a study is likely to make the wrong assumptions or rely on improper measures." *Id.* ¶ 182.  And that

18   is exactly the case here.

19         C.     **Mr. Gaskin's Proposed Conjoint Survey Will Not Be Reliable Because It Does Not**

20                **Test Other Critical Factors That Consumers Consider in Breakfast Products.**

21         Mr. Gaskin's proposed conjoint survey is inadmissible because it fails to account for numerous

22   factors that consumers consider in making purchasing decisions.  "The very essence of a conjoint analysis

23   is that it includes the attributes that are important drivers of choice."  Wilcox Report ¶ 87.  As Dr. Simonson

24   explains, a "study designed to predict actual consumer choices in the marketplace must present the product

25   options as they are seen by consumers in the marketplace and include all of the important

26   attributes/features."  Simonson Report ¶ 170.  If a survey fails to consider all relevant attributes, or

27   "selectively present[s] just a few of the relevant attributes," the survey will be unreliable because it will

28   artificially inflate the importance of the attributes that *are* tested.  *Id.*

1    This Court, as well as others, has recognized the potential folly of testing only a select number of

2    attributes in a conjoint survey.  *See Apple,* 2014 WL 976898 at *12 (noting that, if certain features "had

3    been included in [the expert's] survey, the . . . features would account for an even smaller percentage of

4    the price premium"); *NJOY,* 120 F. Supp. 3d at 1121 (holding that proposed conjoint analysis was deficient,

5    as it did not consider several factors bearing on consumers' decisions to purchase the products at issue).

6    Yet Mr. Gaskin (who was advised by Dr. Hauser, whose conjoint survey was rejected by this Court

7    in *Apple v. Samsung*), committed the same mistake here.  *See* Gaskin Dep. 27:7-17.  There are at least three

8    key factors Mr. Gaskin failed to consider:

9    <u>Taste</u>.  █████████████████████████████████████████████████

10   ███████████████████████████████████████████████████████████████████

11   ███████████████████████████████████████████████████████████████████

12   ███████████████████████████████████████████████████████████████████

13   ████████████████████████████████████████  When Dr. Simonson conducted a

14   series of surveys to test the various attributes that consumers consider when buying Raisin Bran, Frosted

15   Mini-Wheats, and Nutri-Grain bars, more consumers of all three products cited taste than any other factors.

16   *See* Simonson Report ¶¶ 69, 87, 105.

17   But despite the primacy of taste as a factor consumers consider when deciding which cereal to

18   purchase, Mr. Gaskin did not include taste as an attribute in his conjoint survey.  *See* Gaskin Dep. 170:20-

19   171:1 ("Taste is not one of our attributes.").  While Mr. Gaskin attempted to brush this concern off by

20   stating that taste is "implied to a degree in the brand and flavor," (*id.*), he does not articulate how brand

21   and flavor are an effective proxy for taste — especially when some of the cereals tested in his conjoint

22   survey *do not even exist* (and hence do not have any taste with which consumers can associate the product).

23   Common sense suggests that "brand" cannot be an effective proxy for taste because the Kellogg brand

24

---

25   [3] Notably, even Plaintiff's own marketing expert admitted that taste is one of the top two factors consumers

26   consider when purchasing cereal — and that, for certain consumer segments, it is the single most important factor.  Lee Decl., Ex. 5 ("Silverman Report") ¶ 33; Silverman Dep. 193:4-7, 195:20-196:19.  And while

27   Mr. Gaskin refused to acknowledge that taste is the top factor consumers consider when purchasing cereal, he conceded that "taste is a consideration that some consumers consider in buying a cereal."  Gaskin Dep.

28   96:2-10.

would cover everything from Raisin Bran to Crispix to Honey Smacks to Frosted Flakes, all of which have vastly different taste profiles.  Dr. Wilcox accordingly concludes that this failure to include taste, a "key characteristic of the cereals that [consumers] will be selecting between in Mr. Gaskin's conjoint exercise," makes "his survey [] yield unreliable results that are divorced from real-world decision-making."  Wilcox Report ¶ 75.

Product Names.  Independent of the brand name, the name of the product itself is also significant to consumers.  Names like "Frosted Mini Wheats," "Nutri-Grain," and "Smart Start" are a distinct part of the appeal of the challenged products, as they have a significant amount of history and name recognition. ████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████  But Mr. Gaskin's survey does not reflect the actual product names used by Kellogg's competitors.  Thus, even though General Mills labels its Raisin Bran analog "Total" and its Frosted Mini-Wheats product "Cinnamon Toast Crunch Blasted Shred," Mr. Gaskin simply refers to them as "General Mills Raisin Bran" and "General Mills Frosted Mini Wheats."  *See* Gaskin Dep. 121:6-20, 152:19-153:24.  By omitting the names of competing products (which are less recognized than the challenged products), Mr. Gaskin's survey distorts the decision-making process of survey respondents who will be confronted with product names that do not exist in real life (*e.g.,* "General Mills Frosted Mini-Wheats").

Promotions.  Many consumers are motivated to purchase the challenged products due to promotions. ████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████  Indeed, even Mr. Gaskin admitted that "sales promotions can be a factor in people selecting cereal."  Gaskin Dep. 97:12-17.  But Mr. Gaskin's conjoint survey does not account for promotions in any way.  *See* Wilcox Report ¶ 78 (noting that Mr. Gaskin's survey discounts the effect of promotions on purchasing).  By discounting the importance of promotions, Mr. Gaskin exaggerates the importance of the challenged statements, which renders his findings unreliable.

### D. Mr. Gaskin Admitted That Conjoint Surveys Cannot Accurately Measure Willingness-to-Pay for "Repeat Purchase" Products.

Mr. Gaskin explained in his deposition that his proposed conjoint analysis is designed to determine "what people would purchase at one point in time — a specific purchase opportunity." Gaskin Dep. 69:17-19. But because conjoint analysis only focuses on a "specific purchase opportunity," it necessarily cannot account for the effect of repeat purchasing. *See* Wilcox Report ¶ 60. Indeed, Mr. Gaskin explicitly conceded that one of the "major limitations" of his proposed model is that it "doesn't address repeat purchases." *Id.* 69:6-7, 19-20. ███████████████████████████████████████ ███████████████████████████████████████ Kellogg derives a significant portion of its sales from repeat consumers because Raisin Bran, Frosted Mini-Wheats and other products are iconic brands that millions of people have eaten for decades; indeed, many consumers' *parents* grew up eating these products. *See supra* at 16.

Critically, repeat purchasers exhibit distinctive purchasing behavior. ███████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████ Indeed, Plaintiff's own marketing expert explained that even if a repeat consumer *does* look at the packaging, he or she is more likely to look for certain elements — the brand name, the product logo, and a picture of the product — so that he or she can "grab it and go." Silverman Dep. 220:11-19. Mr. Gaskin's failure to account for the distinct purchasing behaviors of repeat buyers renders his proposed conjoint analysis unreliable and inadmissible under *Daubert*.[4]

---

[4] Mr. Gaskin's admission that his proposed conjoint analysis does not adequately account for repeat purchasing was so damning that he later attempted to retract it after taking a break. *See* Gaskin Dep. 74:16-75:8. When Kellogg's counsel asked Mr. Gaskin whether he spoke to Plaintiff's counsel about his general testimony during the break, Plaintiff's counsel improperly instructed him not to answer — even though the question posed by Kellogg's counsel plainly did not require Mr. Gaskin to divulge the substance of their conversation, but rather asked whether they generally talked about his testimony. *See id.* 75:13-76:21.

**E.      The Conjoint Survey Suffers from Pervasive Focalism Bias, Rendering It Unreliable.**

A cardinal rule of survey design is that, when testing the importance consumers assign to different product attributes, the survey must not telegraph to respondents that they are only being tested about a single attribute.   This is called "focalism bias," which leads to "demand effects," whereby survey respondents use cues provided by the survey procedure and questions to figure out the purpose of the survey and what they perceive to be the 'correct' answers to the questions they are asked.   *See* Simonson Report ¶¶ 146, 151.   As Dr. Simonson notes, "focalism bias can produce highly unreliable and skewed responses and estimates, which tend to greatly overestimate the impact of the singled-out (i.e., focal) aspects while artificially decreasing the real impact of other product attributes."   Simonson Report ¶ 146.

For that reason, and as many courts have made clear, focalism bias renders a consumer survey inadmissible and "useless for the purpose of determining price premiums attributable to the challenged statements."   *Townsend v. Monster Beverage Corp.*, --- F. Supp. 3d ----, 2018 WL 1662131, at *29 (C.D. Cal. 2018).   This Court, too, recognized that focalism bias can lead to distorted results. *See Apple*, 2014 WL 976898 at *16 (holding that "extra attention" given to certain features due to improper survey design "likely inflated the[] price premiums" attributable to those features); *Simon Prop. Grp. L.P. v. mySimon, Inc.*, 104 F. Supp. 2d 1033, 1048-49, 1051 (S.D. Ind. 2000) (discussing "so-called 'demand effects' that bias the survey" by making the desired "answer . . . perfectly obvious").

Here, the design of the survey telegraphs to respondents that the survey is testing the weight attributable to certain health and nutrition statements.   Almost all of the "distractor" statements used in the survey related to the ingredients, nutritional benefits, or health properties of the challenged products:

- "EXCELLENT SOURCE OF FIBER"
- "Good Source of POTASSIUM"
- "Delicious Raisins Perfectly Balanced with Crisp, Toasted Bran Flakes"
- "MADE WITH REAL FRUIT"
- "Made with WHOLE GRAIN"
- "Protein helps you rebuild and carbs help you refuel"
- "NATURALLY AND ARTIFICIALLY FLAVORED"
- "CONTAINS WHEAT INGREDIENTS"

- "Antioxidant Vitamins A, C, & E, Including Beta-Carotene"
- "No colors from artificial sources"
- "NO HIGH FRUCTOSE CORN SYRUP, ARTIFICIAL FLAVORS OR COLORS"
- "NATURALLY FLAVORED"
- "No high fructose corn syrup"
- "It's the perfect combination of tasty real fruit and whole grains to give you a satisfying way to make the most of your morning"
- "Rise and shine with the tart taste of fresh picked fruit snuggled in a whole grain hug"

Gaskin Report ¶ 40.  In fact, in the "sample choice set" Mr. Gaskin depicts in his report, *every single statement* relates to the healthiness, nutrition, or ingredients of the products.  *Id.* ¶ 14.  Survey respondents will quickly figure out that the survey is focused on assessing the importance of these types of statements, and they will select answers that suggest that there is a price premium associated with these statements.

Mr. Gaskin could easily have avoided this problem.  There are dozens of statements on the packaging of the challenged products that have nothing to do with their ingredients, their nutritional qualities, or the purported health benefits of consuming them.  They include, for example:

- "Two Scoops!"
- "Feed your inner kid"
- "The fun doesn't stop here.  Try 'em all!"
- "YOU COULD WIN MOVIE TICKETS"
- "Rise Eat Shine Repeat"
- "Make Mornings Amazing!"
- "Our Best in Every Bite!"

Lee Decl. Exs. 25-27.  Given the wealth of distractor statements Mr. Gaskin *could* have included, the fact that virtually all of the distractor statements relate to the products' health, nutrition, and ingredients is suspicious, and one could easily infer that he chose the distractor statements he did because he knew it would signal the purpose of the survey to respondents.  But whether his choice of distractor attributes was intentional or not, it causes significant focalism bias and renders his survey fatally flawed.

**III.**     **Mr. Gaskin's Demand Modeling Survey Is Irrelevant, Biased, and Unreliable.**

In addition to his conjoint survey, Mr. Gaskin also presents the results of a "demand survey," which concluded that showing consumers a warning about the dangers of added sugar reduced consumption of Raisin Bran by 13.7%. Gaskin Report ¶ 53. But Mr. Gaskin's demand survey suffers from massive defects that contravene accepted standards in the field and render its findings unreliable. As Dr. Wilcox points out, "Based on my experience, I have not seen any similar studies to Mr. Gaskin's 'Demand Modeling Survey' in academic research." Wilcox Report ¶ 95. The "serious issues" plaguing this model include:

<u>First</u>, like his conjoint survey, Mr. Gaskin's demand survey conceals absolutely critical context and facts for the apparent purpose of stacking the deck and trying to achieve preordained results. The proposed warning reads:

> WARNING: DUE TO ITS HIGH ADDED SUGAR CONTENT, CONSUMPTION OF RAISIN BRAN MAY LEAD YOU TO EXCEED THE USDA'S RECOMMENDED DAILY ADDED SUGAR MAXIMUM, WHICH CAN CAUSE TYPE 2 DIABETES, HEART DISEASE, FATTY LIVER DISEASE, AND TOOTH DECAY.

Gaskin Report ¶ 53 n.34. But the survey does not provide respondents with critical information that they would need to place this warning in context — and that they would have in real life.[5] *See* Simonson Report ¶ 161 (criticizing Mr. Gaskin's demand survey because "respondents were not shown any product," "were not shown the ingredients," and "were not shown the nutrition information"). For instance, respondents do not have access to the Nutrition Facts label or any other information, so they do not know the actual amount of sugar in Raisin Bran and have no way to determine for themselves if the amount is "high." Instead, the survey asserts that the added sugar content in Raisin Brans (9 grams) is "high." Had survey respondents been told that the added sugar amount in Raisin Brans is 9 grams, many respondents likely would have disagreed with the warning's assessment that the amount is "high."

Likewise, respondents are not told exactly what the "USDA Daily Added Sugar Maximum" is, so they cannot intelligently determine whether consumption of the product is likely to lead them to exceed

---

[5] Mr. Gaskin testified in his deposition that this warning was designed by Plaintiff's counsel and was similar to a warning used in San Francisco on the labeling of sugary drinks. Gaskin Dep. 190:3-9. But unlike the respondents in Mr. Gaskin's survey, an individual who purchased a sugary beverage in San Francisco would be able to review the Nutrition Facts label to determine whether he or she viewed the amount of sugar as "excessive."

that maximum in the context of the rest of their diet.  As a result, consumers will *assume* that consumption of Raisin Bran will likely lead them to exceed the USDA requirement.  Had they been told that the USDA recommendation is 50 grams of added sugar and that the added sugar content in Raisin Bran is 9 grams, many respondents likely would have disagreed with the warning's ominous claims.

Indeed, as Dr. Rippe explains, the warning statement "is not scientifically valid" as there are "no research studies supporting that the consumption of Raisin Bran or any other of the products mentioned in the plaintiff's Complaint leads to individuals exceeding the WHO's recommended daily added sugar maximum."  Lee Decl. Ex. 23 ("Rippe Report") ¶¶ 11, 32.  Further, the warning does not "indicate how much consumption of Raisin Bran or other Kellogg's products might be required to reach this excessive sugar consumption."  *Id.* ¶ 32.  It is "vague and from a scientific standpoint, not valid."  *Id.*

Not only is the warning invalid from a scientific basis, it is also invalid from a consumer survey viewpoint.  As Dr. Simonson explains, the warning was "blatantly leading" and "so unusual that respondent could easily figure out that this was the focus of the study and was designed to test essentially if they were stupid enough to buy a product that can (according to this warning) lead to the long list of illness."  Simonson Report ¶ 160.  As a result, Dr. Simonson concludes that the "control" group was "fatally flawed," making the survey "unreliable and completely meaningless."  *Id.* ¶ 162.

<u>Second</u>, Mr. Gaskin's demand survey is unreliable because it presents respondents with an inflammatory and hyperbolic warning statement, rather than the packaging itself.  By presenting respondents only with the text of the statement, the survey has the effect of drawing their attention to the warning and causing them to assign it more weight than they would under real-world purchasing conditions.  Both Dr. Simonson and Dr. Wilcox point out that this error undermines reliability of the survey and that experts knowledgeable in the field of surveys and consumer behavior design their surveys to avoid this problem.  *See* Simonson Report ¶ 160 (noting that the text of the warning created a "strong demand effect" and induced respondents to answer that "they would eat less of this 'hazardous' product"); Wilcox Report ¶ 97 (noting that the design of Mr. Gaskin's demand survey causes respondents "to place much greater emphasis on health and wellness considerations than they otherwise would in making cereal purchase and consumption decisions").  This design flaw results in severe demand effects and focalism bias, which render the findings of his survey inadmissible.  *See Townsend*, 2018 WL 1662131 at *29;

*Apple*, 2014 WL 976898 at *16.

Finally, Mr. Gaskin's demand survey measures the effect of the warning label on demand by measuring the amount of cereal that respondents poured into simulated cereal bowls.  But as Dr. Simonson notes, this is a "strange" way of measuring the effect of the warning: it assumes that consumers will know in advance how the warning will affect their consumption, and it assumes that individual consumers will react to the warning by consuming a lower quantity of Raisin Bran (as opposed to switching to another product).  Simonson Report ¶¶ 163-64.  And Mr. Gaskin fails to explain, without any evidence, how consumption of cereal corresponds to purchase behavior.  Wilcox Report at ¶¶ 92-94.

**IV.   Mr. Gaskin Should Not Even Be Accepted as an Expert Witness In Light of His Lack of Expertise in Consumer Behavior.**

To establish that his testimony is reliable, Plaintiff must show that Mr. Gaskin is qualified by "knowledge, skill, experience, training, or education" to provide an opinion on the subject matter in which he has been designated as an expert. Fed. R. Evid. 702; *see generally Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 814 (9th Cir. 2014) (noting that the witness's "expertise and experience" must be "relevant to the issues on which [the expert] opine[s]").  Notably, even if an expert has expertise in mathematical modeling or statistics, that technical expertise does not necessarily make him an expert in modeling how consumers react to labeling statements — especially if he does not have any background in consumer behavior in the relevant product market.  *See, e.g., Laumann v. NHL*, 117 F. Supp. 3d 299, 310 (S.D.N.Y. 2015) (excluding statistical expert whose opinion "relie[d] too heavily on mathematical assumptions . . . and too little on actual data about consumers and their preferences").

Here, although Mr. Gaskin claims that he is an "expert in mathematical modeling for market research," he admits that he has no training or expertise in "marketing principles generally" — at least not "without regard to [his] expertise" in the "field [of] mathematical modeling." Gaskin Dep. 51:19-53:7.  His lack of expertise in consumer behavior was apparent in how he designed his surveys.  For example, as Dr. Simonson explained, Mr. Weir's claim that he highlighted the challenged statements in his survey (instead of using the packaging) to avoid the reality that some consumers may not notice them was "first time" he has ever heard such a "bizarre 'justification' for mispresenting reality."  Simonson Report ¶ 156.  As Dr. Simonson explains, "designing a study about consumer decision-making requires a good understanding of

how consumers make decisions in real life." *Id.* ¶ 182.  But "a person who lacks such understanding is unlikely to design a proper survey . . . because such a study is likely to make the wrong assumptions or rely on improper measures." *Id.*  And that is exactly the case with Mr. Gaskin's proposed conjoint survey.

In short, Mr. Gaskin lacks the expertise in consumer behavior to be deemed an expert here.  *See Wolf v. Hewlett-Packard Co.*, No. 15-1221, 2016 WL 7743692, at *6 (C.D. Cal. Sept. 1, 2016) (holding that expert's "impressive credentials" and experience in adjacent statistical fields was insufficient under *Daubert* because he "has no background in consumer psychology, nor in statistical methods for predicting consumer behavior").

## V.    This Court Should Not Permit Mr. Gaskin to "Amend" His Report.

Faced with these criticisms (and others), Mr. Gaskin may attempt to submit an amended report that attempts to remedy the deficiencies Kellogg has identified.  This Court should not permit him to do so.

The Ninth Circuit has made clear that Federal Rule of Civil Procedure 26(e)(2), which requires an expert to supplement his report if he or she learns that it is "incomplete or incorrect," does not "create a loophole through which a party who . . . wishes to revise her disclosures in light of her opponent's challenges to the analysis and conclusions therein[] can add them to her advantage . . . ."  *Luke v. Family Care & Urgent Med. Clinics*, 323 F. App'x 496, 500 (9th Cir. 2009); *see also, e.g.*, *Gallagher v. S. Source Packaging, LLC*, 568 F. Supp. 2d 624, 631 (E.D.N.C. 2008) ("Courts distinguish 'true supplementation' (e.g., correcting inadvertent errors or omissions) from gamesmanship, and have therefore rejected attempts to avert summary judgment by 'supplementing' an expert report with a 'new and improved' expert report."); *Solaia Tech., LLC v. ArvinMeritor, Inc.*, 361 F. Supp. 2d 797, 806 (N.D. Ill. 2005) (noting that a revised expert report "prompted solely by [the defendant's] summary judgment motion . . . is not the proper role for supplementation").

Put more simply, "Rule 26(e) creates a 'duty to supplement,' not a right." *Luke*, 323 F. App'x at 500.  "To rule otherwise would create a system where . . . each side, in order to buttress its case or position, could 'supplement' existing reports and modify opinions previously given." *Beller ex rel. Beller v. United States*, 221 F.R.D. 696, 701 (D.N.M. 2003).  Here, there are no new facts that merit the submission of an amended or supplemental expert report, and Mr. Gaskin cannot plausibly claim that any errors in his report were inadvertent. *See Keener v. United States*, 181 F.R.D. 639, 640 (D. Mont. 1998) ("Supplementation

under the Rules means correcting inaccuracies, or filling the interstices of an incomplete report based on information that was not available at the time of the initial disclosure.").  Instead, the many errors in his report reflect fundamental flaws with his methodology and survey design.  It would be wildly inappropriate for Mr. Gaskin to sandbag Kellogg with an "amended" or "supplemented" report after Kellogg has already deposed Mr. Gaskin and filed its opposition to Plaintiff's class certification motion.  This Court should accordingly reject any attempt to submit an "amended" report that corrects the deficiencies identified in this motion.

<strong><u>CONCLUSION</u></strong>

For the foregoing reasons, this Court should exclude the opinion testimony of Steven P. Gaskin.

Dated:  June 11, 2018                                                JENNER & BLOCK LLP


By: /s/ Kenneth K. Lee
                                                                        Kenneth K. Lee

                                                                        Attorneys for Defendant
                                                                        Kellogg Sales Company