1

**THE LAW OFFICE OF JACK FITZGERALD, PC**

2

JACK FITZGERALD (SBN 257370)
*jack@jackfitzgeraldlaw.com*

3

TREVOR M. FLYNN (SBN 253362)
*trevor@jackfitzgeraldlaw.com*

4

MELANIE PERSINGER (SBN 275423)
*melanie@jackfitzgeraldlaw.com*

5

Hillcrest Professional Building
3636 Fourth Avenue, Suite 202

6

San Diego, California 92103
Phone: (619) 692-3840

7

Fax: (619) 362-9555

8

*Counsel for Plaintiff and the Putative Class*

9

10

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA**

11

12

STEPHEN HADLEY, on behalf of himself, all
others similarly situated, and the general public,

Case No. 5:16-cv-04955-LHK-HRL

13

Plaintiff,

**PLAINTIFF'S OPPOSITION TO KELLOGG'S
MOTIONS TO EXCLUDE OPINION
TESTIMONY OF STEVEN P. GASKIN**

14

v.

15

KELLOGG SALES COMPANY,

Judge:      Hon. Lucy H. Koh
Date:       November 8, 2018
Time:       1:30pm
Location:   Courtroom 8

16

Defendant.

17

18

19

20

21

22

23

24

25

26

27

28

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................ii

INTRODUCTION .......................................................................................................... 1

FACTS .......................................................................................................................... 1

    I.      Mr. Gaskin's Conjoint Survey Designs ...................................................... 1

          A.      Background on Conjoint ................................................................ 1

          B.      Mr. Gaskin's Proposed Conjoint Surveys ................................... 3

          C.      Mr. Gaskin's Proposed Market Simulation ................................. 5

    II.     Mr. Gaskin's Test-And-Control Demand Survey ....................................... 7

LEGAL STANDARDS ................................................................................................. 8

ARGUMENT ................................................................................................................ 9

    I.      Mr. Gaskin's Proposed Conjoint Analysis Properly Accounts for Supply-Side Factors and is Capable of Reliably Calculating Classwide Damages ..................................... 9

    II.     Kellogg's Criticisms of Mr. Gaskin's Design Choices go to Weight, not Admissibility ................................................................................................ 15

    III.   Kellogg's Criticisms of Mr. Gaskin's Conjoint Design Choices are Unfounded ................. 15

          A.      Mr. Gaskin's Supposed Failure to "Mimic Real-World Shopping Conditions" by Showing the Full Packaging ............................... 15

          B.      Packaging Context ..................................................................... 17

          C.      Exclusion of Taste, Product Names, and Promotions ................. 18

          D.      Measuring for Repeat Purchasers ............................................. 21

          E.      Focalism bias .............................................................................. 22

    IV.   Mr. Gaskin's Demand Modeling Survey is Reliable ................................ 23

    V.    Mr. Gaskin is Qualified to Render his Opinions ...................................... 24

    VI.   Rule 26 Disclosures are Due in September .............................................. 24

CONCLUSION ............................................................................................................ 25

*Hadley v. Kellogg Sales Company*, No. 16-cv-4955-LHK-HRL
PLAINTIFF'S OPPOSITION TO KELLOGG'S MOTION TO EXCLUDE OPINION TESTIMONY OF STEVEN P. GASKIN

1

# TABLE OF AUTHORITIES

**Cases**

*Brazil v. Dole Packaged Foods, LLC*,
   2014 WL 5794873 (N.D. Cal. Nov. 6, 2014) ...................................................... 29

*Briseno v. ConAgra Foods, Inc.*,
   674 Fed. Appx. 654 (9th Cir. 2017) ......................................................... 3, 18

*Brown v. Hain Celestial Group, Inc.*,
   2014 WL 6483216 (N.D. Cal. Nov. 18, 2014) .................................................. 18

*Chavez v. Blue Sky Natural Beverage Corp.*,
   268 F.R.D. 365 (N.D. Cal. 2010) ............................................................ 28

*Chen-Oster v. Goldman, Sachs & Co.*,
   114 F. Supp. 3d 110 (S.D.N.Y. 2015) ....................................................... 11

*Classic Foods Int'l Corp. v. Kettle Foods, Inc.*,
   2006 WL 5187497 (C.D. Cal. Mar. 2, 2006) ................................................. 20

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993) ....................................................................... 10

*Davidson v. Apple, Inc.*,
   2018 WL 2325426 (N.D. Cal. May 8, 2018) ......................................... 11, 12, 16

*Dukes v. Wal-Mart, Inc.*,
   222 F.R.D. 189 (N.D. Cal. 2004) ........................................................... 11

*Dzielak v. Whirlpool Corp.*,
   2017 WL 1034197 (D.N.J. Mar. 17, 2017) ................................................... 17

*Ellis v. Costco Wholesale Corp.*,
   240 F.R.D. 627 (N.D. Cal. 2007) ........................................................... 11

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt.*,
   618 F.3d 1025 (9th Cir. 2010) ............................................................. 19

*Guido v. L'Oreal USA, Inc.*,
   2014 WL 6603730 (C.D. Cal. July 24, 2014) ............................................ 18, 29

*In re ConAgra Foods, Inc.*,
   90 F. Supp. 3d 919 (C.D. Cal. 2015) .................................................. 3, 18, 19

*In re Dial Complete Mktg. & Sales Practices Litig.*,
   2013 WL 6798929 (D.N.H. Dec. 20, 2013) .................................................. 10

ii

*In re Dial Complete Mktg. & Sales Practices Litig.*,
   320 F.R.D. 326 (D.N.H. Mar. 27, 2017) ..........................................................................passim

*In re Lenovo Adware Litig.*,
   2016 WL 6277245 (N.D. Cal. Oct. 27, 2016) ................................................ 12, 16, 18

*In re MyFord Touch Consumer Litig.*,
   291 F. Supp. 3d 936 (N.D. Cal. 2018) ......................................................... 12, 14, 18

*In re NJOY, Inc. Consumer Class Action Litig.*,
   120 F. Supp. 3d 1050 (C.D. Cal. 2015) ............................................................... 16

*In re Scotts EZ Seed Litig.*,
   304 F.R.D. 397 (S.D.N.Y. 2015) ........................................................................... 18

*In re Zurn Pex Plumbing Prods. Liab. Litig.*,
   644 F.3d 604 (8th Cir. 2011) ............................................................................... 11

*Jinro Am. Inc. v. Secure Invests., Inc.*,
   266 F.3d 993 (9th Cir. 2001) ............................................................................... 10

*Khoday v. Symantec Corp.*,
   2014 WL 1281600 (D. Minn. Mar. 13, 2014) ...................................................... 18

*Khoday v. Symantec Corp.*,
   93 F. Supp. 3d 1067 (D. Minn. 2015) .................................................................. 26

*Microsoft Corp. v. Motorola Inc.*,
   904 F. Supp. 2d 1109 (W.D. Wash. 2012) ........................................................... 19

*Miller v. Fuhu Inc.*,
   2015 WL 7776794 (C.D. Cal. Dec. 1, 2015) ........................................................ 17

*Odyssey Wireless, Inc. v. Apple Inc.*,
   2016 WL 7644790 (S.D. Cal. Sept. 14, 2016) ...................................................... 17

*Saavedra v. Eli Lily & Co.*,
   2014 WL 7338930 (C.D. Cal. Dec. 18, 2014) ............................................... 16, 17

*Sanchez-Knutson v. Ford Motor Co.*,
   181 F. Supp. 3d 988 (S.D. Fla. 2016)........................................................... 25, 29

*Southland Sod Farms v. Stover Seed Co.*,
   108 F.3d 1134 (9th Cir. 1997).............................................................................. 19

*Tait v. BSH Home Appliances Corp.*,
   289 F.R.D. 466 (C.D. Cal. 2012) ......................................................................... 11

iii

*Hadley v. Kellogg Sales Company*, No. 16-cv-4955-LHK-HRL
PLAINTIFF'S OPPOSITION TO KELLOGG'S MOTION TO EXCLUDE OPINION TESTIMONY OF STEVEN P. GASKIN

*Troublé v. Wet Seal, Inc.*,
    179 F. Supp. 2d 291 (S.D.N.Y. 2001) ................................................................. 20

*Wendt v. Host Int'l, Inc.*,
    125 F.3d 806 (9th Cir. 1997) ............................................................................. 19

*Williams v. Gerber Prods. Co.*,
    552 F.3d 934 (9th Cir. 2008) ............................................................................. 22

*Zakaria v. Gerber Prods. Co.*,
    2017 WL 9512587 (C.D. Cal. Aug. 9, 2017) ...................................... 16, 25, 29

**Rules**

Fed. R. Evid. 702 ...................................................................................................... 10

*Hadley v. Kellogg Sales Company*, No. 16-cv-4955-LHK-HRL
PLAINTIFF'S OPPOSITION TO KELLOGG'S MOTION TO EXCLUDE OPINION TESTIMONY OF STEVEN P. GASKIN

**INTRODUCTION**

Steven P. Gaskin is an eminently qualified survey expert whose proposed conjoint analyses have led several courts to certify consumer fraud classes. Not only do Kellogg's criticisms of his proposed conjoint surveys in this case, as well as his treatment and control model to determine change in demand, primarily go to weight rather than admissibility, but they are simply misguided. The Court should deny Kellogg's motion to exclude Mr. Gaskin's testimony in considering class certification.

**FACTS**

Mr. Gaskin is a Principal of Applied Marketing Science, Inc. Dkt. No. 134, Gaskin Decl. ¶ 2. He holds both a Bachelors of Science and Masters of Science degree from the Massachusetts Institute of Technology and its Sloan School of Management. *Id.* Mr. Gaskin has worked in marketing science for 36 years, and has co-authored numerous, peer-reviewed, award-winning papers. Gaskin Reply Decl. ¶¶ 2, 48; *see also* Weir Decl. ¶ 108 (Mr. Gaskin "has worked in the field of market research and marketing science models since 1982" and "is an award-winning, published practitioner of conjoint analysis."). Mr. Gaskin has been admitted as a survey expert by courts throughout the country.[1]

**I.    Mr. Gaskin's Conjoint Survey Designs**

**A.    Background on Conjoint**

"[I]ntroduced to the field of market research in 1971," conjoint analysis "is a tool that enjoys wide use and acceptance in the field of market research," and one that "is generally recognized by marketing science academics and industry practitioners to be the most widely studied and applied form of quantitative value measurement." Gaskin Decl. ¶ 12; *see also* Weir Decl. ¶¶ 96-97, 102; *compare In re ConAgra Foods,*

---

[1] *See, e.g., Sanchez-Knutson v. Ford Motor Co.*, 181 F. Supp. 3d 988, 994-96 (S.D. Fla. 2016) (calling Mr. Gaskin "an expert in the fields of market research and marketing science models," and denying *Daubert* motion to preclude Mr. Gaskin from testifying at trial); *Sanchez-Knutson v. Ford Motor Co.*, 310 F.R.D. 529, 538-39 (S.D. Fla. 2015) (relying on Mr. Gaskin's proposed conjoint analysis to certify class); *In re: Lenovo Adware Litig.*, 2016 WL 6277245, at *21 (N.D. Cal. Oct. 27, 2016) (finding conjoint model proposed by Mr. Gaskin (though unnamed in decision) did not suffer defects noted in other cases); *Khoday v. Symantec Corp.*, 93 F. Supp. 3d 1067, 1082-83 (D. Minn. 2015) ("The Court finds that Gaskin's conjoint analysis is generally a permissible method for calculating damages," and "allow[ing] Gaskin to testify to his conclusions reached by applying a conjoint analysis, and Defendants may cross-examine Gaskin to address the weaknesses they perceive in his analysis."); *Khoday v. Symantec Corp.*, 2014 WL 1281600, at *10-11, *32-33 (D. Minn. Mar. 13, 2014) (relying on conjoint analysis performed by Mr. Gaskin to certify class).

*Inc.*, 90 F. Supp. 3d 919, 1026 (C.D. Cal. 2015) ("Marketers and marketing researchers have used conjoint analysis since the early 1970's to determine the values consumers ascribe to specific attributes of multi-attribute products and to understand the features driving product preferences." (record citation omitted)). "Conjoint analysis is founded on rigorous statistical and economic principles." Weir Decl. ¶ 98 (citation omitted). For this reason, "conjoint analysis has been successfully used in litigation contexts to calculate damages for years." *See id.* (collecting cases).

"In a typical conjoint analysis, survey panelists are confronted with various choices of product attributes and prices, and asked either to rank their preferences, or to choose the most preferred attribute or combination thereof." Weir Decl. ¶ 99; *see also* Gaskin Decl. ¶ 15 ("Conjoint analysis provides respondents with realistic choices among hypothetical products that vary on multiple feature categories."). "The general idea behind conjoint analysis is that the market value for a particular product is driven by features or descriptions of features embodied in that product. Customers are shown product profiles made up of varying features and asked, as part of a series of 'choice tasks,' to indicate their preferred product profile. At no point are respondents asked to indicate directly how much they would pay; rather, the analysis is based on choices respondents make among alternatives . . . shown in the choice task presented . . . ." Gaskin Decl. ¶ 14. "By systematically varying the attributes of the product and observing how respondents react to the resulting product profiles, one can statistically measure information about the individual attributes." Weir Decl. ¶ 100. "Statistical methods (including regression analysis) are then applied to the survey responses to calculate attribute value." *Id.* ¶ 101 (citation omitted); *see also* Gaskin Decl. ¶¶ 15, 18-19 (describing use of Hierarchical Bayes regression to calculate partworths from the survey data).

"When price is one of the measured features in the conjoint analysis, the value (negative or positive) that the market places on the changes in features can be expressed in price and/or percentage terms. That is, the market price premium, or the additional price (measured in dollars and/or percentage terms) customers would pay, for the class, for the inclusion of a feature or better level of a feature can be calculated." Gaskin Decl. ¶ 22. "Similarly, the reduction in market value can be calculated as the price reduction (measured in dollars and/or percentage terms) needed to compensate, for the class, for the loss of a feature, or a change to a less desirable level of a feature." *Id.*

"Partworths" generated as part of a conjoint analysis represent for the respondents the "partial contributions of the [survey's] feature levels . . . to overall product utility," which is "an economic term referring to the total satisfaction received from consuming a good or service." Gaskin Decl. ¶ 17 & n.10. Calculating respondents' partworths "allows for the prediction of the probability that customers will choose any product profile that is described by the partworths and can do so for any competitive set of products." *Id.* Using this data will also allow Mr. Gaskin to "simulate how choice shares would change in a market based on a change in overall price." *Id.* Thus, "[b]y making use of these capabilities, [choice-based conjoint] allows us to determine the market price premia (measured in dollars and/or percentage terms) for these cereals and breakfast bars with the affirmative misrepresentations compared to the value of these cereals and breakfast bars without the affirmative misrepresentations." *Id.*; *see also id.* ¶ 22.

**B.    Mr. Gaskin's Proposed Conjoint Surveys**

Mr. Gaskin has designed conjoint surveys for all four products at issue in the case: Raisin Bran, Frosted Mini-Wheats, Smart Start and Nutri-Grain. *See id.* ¶ 21. In each survey, Mr. Gaskin "will show respondents three product profiles in each choice set." *Id.* In the Raisin Bran, Smart Start, and Nutri-Grain surveys, "product profiles will . . . be composed of 4 features: (i) brand; (ii) flavor; (iii) labels; and (iv) price." *Id.* The Frosted Mini-Wheats survey adds a fifth feature, "biscuit size," *see id.*; *see also id.* ¶ 40; Weir Decl. ¶ 111 ("Gaskin proposes to measure the price premium (measured in dollars and/or percentage terms) at the time and point of sale solely attributable to the Health Claims through the use of a 'Labels' attribute and price attribute along with several distractor attributes."). Mr. Gaskin chose these attributes and the levels within them "us[ing] the second amended complaint, . . . Kellogg's website, . . . cereal and breakfast bar boxes, . . . exploratory research among Kellogg's cereal purchasers, . . . market research presentations produced by Defendant, and . . . sales data produced by Defendant and IRI," Gaskin Decl. ¶ 21, 23.

Within the "labels" attribute are levels for both the challenged health and wellness claims, and "distractor labels," which "have been included to obscure which labels are of primary interest in the surveys," and to thereby "reduce[] demand artifacts." Gaskin Decl. ¶ 24. In addition, "Gaskin's proposed survey includes actual market-based price points derived, in part, from market research presentations produced by Defendant, and sales data produced by Defendant and IRI," Weir Decl. ¶ 111; *see also* Gaskin

3

Decl. ¶ 23 (Mr. Gaskin chose "prices that would be recognizable to a common audience and would simulate a cereal or breakfast bar comparison experience," and "mirror those actually observed in the market . . . based on actual sales data"). Otherwise, "[i]n the survey, all features other than the features and levels shown will be held constant." Gaskin Decl. ¶ 23; *see also id.* ¶ 38 n.19 (noting respondents may be instructed, for example, that the product "will be described by the set of features you were just shown," and "[a]ny other features beyond those shown in the exercise are assumed to be the same for all the [product] options presented").

As Mr. Gaskin explains, "[t]he randomization of the order and appearance of features and levels in the surveys will help prevent respondents from focusing on a single feature or attribute, which minimizes demand artifacts that might be induced." *Id.* ¶ 16 (explaining that "[a] 'demand artifact' is similar to a leading question that encourages respondents to answer a question in a way that the researcher would prefer"); *see also id.* ¶ 42 (further discussing randomization). Likewise, "[t]o avoid order bias, attributes will be shown in a different order, with the order chosen at random for each respondent (except for brand and flavor, which will always be first and second, and price, which will always be last)." *Id.* ¶ 26. Moreover, after making a selection in a given choice task, respondents will be asked, "Given your knowledge of the market, would you actually be willing to buy the [cereal/breakfast bars] that you chose above?" *Id.* ¶ 42. This "dual response none option" technique is "the state-of-the-art way to provide [respondents] with a none choice." *See* Gaskin Tr. 168:10-17.

Importantly, Mr. Gaskin's use of Hierarchical Bayes to estimate partworths from the raw survey data "enables [him] to appropriately balance the number of choice tasks in the survey with the number of partworths that need to be estimated," which he "ha[s] observed . . . limit[s] respondent wear-out." *Id.* ¶ 18; *see also* Weir Decl. ¶ 113 ("[A]fter the completion of the survey, the results will be calculated using Hierarchical Bayes regression," which "provides for . . . the ability to estimate better market-level results from a conjoint survey."). Because the surveys will be programmed and implemented online, they will also effectively be double-blind. *See id.* ¶ 27.

Before fully implementing the conjoint surveys, Mr. Gaskin will pretest his designs. *See id.* Because the surveys will be programmed and implemented online, *see id.* ¶¶ 25, 30-33, they will also effectively be double-blind, *see id.* ¶ 27. Mr. Gaskin "will test that respondents understand the written description of each

4

feature; that they do not have difficulty with the questions and instructions; that they understand the choice exercise they are asked to perform; that they look at all or almost all of the features in making their choices; and that they do not think the questions are leading or biased." *Id* ¶ 28. Mr. Gaskin will also "explicitly test for demand artifacts, asking respondents about their beliefs about the sponsor and purpose of the surveys." *Id.* This pretesting will "ensure[] that respondents understand and would continue to understand questions, instructions, and descriptions presented in the questionnaire, and that the interview flows smoothly." *Id.*

When he does finally implement the survey, Mr. Gaskin will use samples of 250-300 respondents, which "greatly exceeds the minimum requirements laid out by Sawtooth Software for sample size in a conjoint analysis survey," and is thus "more than sufficient for making scientifically valid conclusions on the basis of th[e] survey[s]." *Id.* ¶ 34. Mr. Gaskin will scrub the data collected from the survey "according to generally accepted data cleaning procedures," for example to exclude respondents who engaged in "speeding" or "straightlining." *See id.* ¶ 35.

### C.    Mr. Gaskin's Proposed Market Simulation

Conjoint analysis "has a front end and a back end," Persinger Decl. Ex. 3, Wilcox Tr. at 59:20-21. First, the researcher conducts a choice-based conjoint survey to obtain "conjoint-compatible data," *see id.* at 60:3-4. Then, the researcher uses that data in a "market simulation" to make predictions about the market. *See id.* at 60:5-61:2; *compare* Gaskin Decl. ¶¶ 18-20. As Mr. Gaskin explained during his deposition:

> In a conjoint analysis, you run the survey and have customers make tradeoffs between product profiles . . . .
>
> Then there's . . . a regression model that estimates part worths [sic], which are the contribution of each attribute level in a product to the overall utility of the product. You basically sum the part-worths of the attribute levels present in the product to get overall utility.
>
> Then, in a market simulator, you put in a number of products that are described using the attribute levels they've got, and a price. . . . And then . . . the simulator calculates, using a decision rule in the part-worths, what fraction of the sample would prefer each of the products; and that's a proxy -- sort of, a preference-based market share. And then you can adjust the attribute levels in the price for the product you're interested in . . . and judge how the market share would change.
>
> So that you can get some notion of what sort of business you can generate using a specific product configuration and price.

Persinger Decl. Ex. 4, Gaskin Tr. at 22:2-23:5; *see also id.* at 23:13-21 (

5

*Hadley v. Kellogg Sales Company*, No. 16-cv-4955-LHK-HRL
PLAINTIFF'S OPPOSITION TO KELLOGG'S MOTION TO EXCLUDE OPINION TESTIMONY OF STEVEN P. GASKIN

It involves putting the products in there described by their attribute levels and prices, incorporating the part-worths from the conjoint survey, the estimation, then running that algorithm that decides or estimates the probability that each person would prefer each of the products -- or how much they would prefer each of the products, and that results in a market share estimate.)

Thus, once Mr. Gaskin collects individual utilities data from the survey and converts it into partworths estimates using Hierarchical Bayes regression, he will feed those estimates into a market simulation designed to help him identify the marginal consumer, and thereby the price premia. *See* Gaskin Decl. ¶ 50; Gaskin Tr. at 174:1-20. Before doing so, however, "[i]n order to establish the appropriateness of using the partworths to forecast customer behavior," Mr. Gaskin "will test the fit and predictive ability of the conjoint analyses estimates," using holdout analyses, "which measure[] how well the partworth estimates predict the actual choices made by survey respondents when looking at a subset of the choice sets not used in the estimate." Gaskin Decl. ¶ 45; *compare* Wilcox Tr. at 51:8-13 (noting preference in determining validity of study of using "hold-out sample testing" in the era of "high speed computing [with] our ability to do many iterations"); *id.* at 62:16-22 ("Q. Are there objective measures for the accuracy of a conjoint analysis? A. Well, there are different ways that people try to evaluate the accuracy of a conjoint analysis. For example, the hold-out sample testing that I mentioned for the hedonic regression is a fairly common way in a conjoint framework to do it.").

\*                    \*                    \*

Mr. Gaskin's proposed conjoint surveys mirror those published in peer-reviewed literature cited by both plaintiff's and Kellogg's experts. For example, Mr. Weir describes a published conjoint analysis designed to determine "whether health claims (claims of health-promoting effects) of food products positively influence product price and consumer choices." Weir Decl. ¶ 103 (quotation omitted). Mr. Weir notes that the study "uses choice-based conjoint analysis to measure the effects of various product attributes on the price of a single product, green tea." *Id.* "The study examines only four product attributes: health claim, country of origin, the size of the product, and price." *Id.* (noting that the study found an approximately 20% premium associated with health claims on green tea). Similarly, Kellogg's expert, Dr. Wilcox, cites a peer-reviewed conjoint study by Greg M. Allenby et al., titled "Economic Valuation of Product Features." *See* Wilcox Report ¶ 62 n.78. As Dr. Wilcox testified, the paper "lay[s] out a method to quantify the value of a product attribute using conjoint analysis," *see* Wilcox Tr. at 89:9-90:9. To do so, it uses only four brands

of digital cameras, representing just a small segment of the market. *See id.* at 90:2-91:9. Mr. Gaskin's work here also mirrors that which led the courts in *Sanchez-Knutson*, *In re: Lenovo*, *Khoday*, and *Zakaria*, to certify consumer fraud class actions.

## II.     Mr. Gaskin's Test-And-Control Demand Survey

"The Test versus Control design has been the standard experimental design in thousands of studies across numerous fields, including consumer behavior." Dkt. No. 160-10, Simonson Report ¶ 38. Mr. Gaskin designed and implemented a survey of 660 respondents using the test and control methodology to measure the effect on consumption of a warning or disclosure of the type plaintiff alleges Kellogg was under an obligation to make once it made the challenged health and wellness claims accompanying that disclosure. *See* Gaskin Decl. ¶¶ 52-80. "The survey was designed and conducted in accordance with generally accepted principles of survey research, as set forth in the Federal Judicial Center's Manual for Complex Litigation 'Reference Guide on Survey Research.'" *Id.* ¶ 57.

In the design, "[r]espondents were randomly assigned to the Test Group or the Control Group." *Id.* ¶ 55. Use of a control group "is analogous to the use of a placebo in the test of . . . a new drug," and helps "account for guessing and other forms of noise (e.g., possible confounding factors, guessing, preexisting beliefs, yea-saying)." *Id.* Respondents in the Test Group viewed the challenged health and wellness claims, while respondents in the Control Group viewed those same statements, plus a warning that, due to its high added sugar content, Raisin Bran may lead the consumer to exceed the USDA's recommended daily added sugar maximum, which can cause type 2 diabetes, heart disease, fatty liver disease, and tooth decay. *Id.* ¶ 56. "Since the only difference between the Test and Control groups was this warning, any difference observed in responses between the groups is due to this warning." *Id.*

To measure each group's consumption, and thereby demand for Raisin Bran, respondents were asked, after viewing the statements, "which bowl, if any [shown], most closely matches in size and depth the bowl they will use when they eat Raisin Bran in the near future." *Id.* ¶ 68. Respondents could pick from among three bowl sizes (small, medium, and large), whose dimensions were demonstrated with rulers. *See id.* & Figure 2. After selecting a bowl, respondents "saw photos of the bowl . . . filled with varying amounts of Raisin Bran," and "were asked to select the serving size which most closely matches the amount of cereal

they plan to pour in their bowl." *Id.* ¶ 69. Finally, respondents "were asked how often they plan to eat bowls of Raisin Bran, like the one they chose . . . in the near future." *Id.* ¶ 70; *see also id.* ¶ 71.

After processing the data, *see id.* ¶¶ 74-76, the survey showed "respondents indicated that they would consume significantly fewer servings of Raisin Bran per year had they been informed about the dangers of sugar consumption when purchasing Raisin Bran," *id.* ¶ 77. That is, "respondents indicated that they would consume 17.8% less Raisin Bran had they been aware of the omitted information," *id.*[2] Kellogg's expert agrees that Mr. Gaskin's survey tested "the effect of the particular WARNING" used. *See* Simonson Report ¶ 15.[3]

## LEGAL STANDARDS

Pursuant to Federal Rule of Evidence 702:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Under Rule 702, the court is charged with a "gatekeeping" obligation, to ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell*

---

[2] "To be more conservative," Mr. Gaskin "examined the effect of outliers on the results," analyzing the data "using a 5% trimmed mean," which means "removing the bottom 2.5% and top 2.5% of servings of Raisin Bran per year in the Test and Control Groups." *Id.* ¶ 78. Using this technique, "[t]he remaining results again indicated that respondents would consume significantly fewer servings of Raisin Bran per year had they been informed about the dangers of sugar consumption," with "respondents indicat[ing] they would have consumed 13.7% less Raisin Bran had they been aware," *id.*

[3] Dr. Simonson frames this as a criticism, arguing that Mr. Gaskin did this "instead of testing the effect of the challenged label statements," *id.* This only reveals Dr. Simonson's failure to understand the nature of plaintiff's omission allegations in the case, or even that plaintiff makes such allegations. Indeed, Dr. Simonson says, pejoratively, "[i]t is unclear whether it is the Plaintiff's position that anyone selling a product containing sugar, such as smoothies, fruit juice, pancakes, and so on, must present the same WARNING, and presumably include comparable WARNINGS regarding all other ingredients that allegedly have any negative consequences if they are consumed in excess." *Id.* Because Dr. Simonson is a lay person, he does not appreciate that Kellogg's alleged obligation to disclose material information in this case arises as a result of its satisfying the *Falk* factors by making affirmative misrepresentations, not simply its use of sugar. *See* SAC ¶¶ 215, 222-23; *Hadley v. Kellogg Sales Co.*, 273 F. Supp. 3d 1052, 1097 (N.D. Cal. 2017) (Koh, J.) ("Once Defendant emphasizes that a product is healthy, the fact that the product contains excess added sugar that is unhealthy becomes '[m]aterial in light of other representations' that have been made." (quoting 21 C.F.R. § 1.21)).

8

*Hadley v. Kellogg Sales Company*, No. 16-cv-4955-LHK-HRL
PLAINTIFF'S OPPOSITION TO KELLOGG'S MOTION TO EXCLUDE OPINION TESTIMONY OF STEVEN P. GASKIN

*Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). "Rule 702 is applied consistent with the liberal thrust of the Federal Rules and their general approach of relaxing the traditional barriers to opinion testimony." *Jinro Am. Inc. v. Secure Invests., Inc.*, 266 F.3d 993, 1004 (9th Cir. 2001). As a result, "the burden is not especially onerous," *In re Dial Complete Mktg. & Sales Practices Litig.*, 2013 WL 6798929, at *2 (D.N.H. Dec. 20, 2013) ["*Dial*"] (internal quotations and citations omitted). Moreover, "the scope of the *Daubert* analysis is cabined by its purpose at this stage: the inquiry is limited to whether or not the expert reports are admissible to establish the requirements of Rule 23." *Chen-Oster v. Goldman, Sachs & Co.*, 114 F. Supp. 3d 110, 114 (S.D.N.Y. 2015) (internal quotation and citation omitted); *accord Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 489-96 (C.D. Cal. 2012). "At this early stage, robust gatekeeping of expert evidence is not required," and "the court should ask only if the expert evidence is 'useful in evaluating whether class certification requirements have been met,'" *Ellis v. Costco Wholesale Corp.*, 240 F.R.D. 627, 635-36 (N.D. Cal. 2007) (quoting *Dukes v. Wal-Mart, Inc.*, 222 F.R.D. 189, 191 (N.D. Cal. 2004)); *see also In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604 (8th Cir. 2011).

## ARGUMENT

## I.     Mr. Gaskin's Proposed Conjoint Analysis Properly Accounts for Supply-Side Factors and is Capable of Reliably Calculating Classwide Damages

Kellogg claims that "a conjoint analysis, by its very nature, cannot reliably predict an alleged price premium that a company charges for a single labeling statement or feature," and "[a]t best . . . can only assess a consumer's subjective *willingness to pay* for a particular attribute (*i.e.*, demand)." Mot. at 6 (emphasis in original). This is simply not true, as this Court recently recognized. *See Davidson v. Apple, Inc.*, 2018 WL 2325426, at *22 (N.D. Cal. May 8, 2018) (Koh, J.) ("Apple argues Boedeker based his analysis solely on survey respondents' subjective willingness to pay, or demand, without considering the supply side of the equation. . . . Apple's premised is flawed; Boedeker accounts for the supply side of the equation. Boedeker's report discusses the role of supply in conjoint analysis at length.").

In *Davidson*, the Court accepted that "'[t]he supply curve in the damages model is identical' whether Apple did or did not disclose the defect to consumers, because disclosure 'has no impact on the marginal costs of the supplier, and therefore, the supply curve remains unchanged.'" *Id.* (record citation omitted). Explaining that "[a] supplier's marginal cost is 'the cost the manufacturer incurred when producing an

9

additional unit of the product,'" *id.* (record citation omitted), the Court noted that Dr. Boedeker was "thus 'measur[ing] the difference in value by assuming that the supply—the quantity—was fixed. In terms of economic theory, the portion of the supply curve that concerns Boedeker's analysis is effectively vertical— supply is fixed regardless of price in this region of the graph.'" *Id.* (quoting *In re MyFord Touch Consumer Litig.*, 291 F. Supp. 3d 936 (N.D. Cal. 2018)).

The logic in *Davidson* applies equally here: neither removing labeling claims nor making a disclosure would impact Kellogg's marginal costs for its products. Thus, as did Boedeker in *Davidson*, Mr. Gaskin noted that his conjoint methodology "accounts for appropriate market conditions including the fact that the number of Kellogg's [products] purchased is fixed as a matter of history, which is to say their sale is a matter of historical fact." Gaskin Decl. ¶ 22; *see also* Gaskin Tr. 85:20-21, 106:21-23, 110:1-111:7 (discussing ways in which Messrs. Gaskin and Weir took supply-side factors and issues into consideration when designing the conjoint surveys);Weir Decl. ¶¶ 115-23 (same); Weir Reply Decl. ¶¶ 138-46; Persinger Decl. Ex. 5, Weir Tr. at 44:20-45:12, 46:9-19 (same).

Moreover, in order to tie the conjoint exercise to this historically-set market, Mr. Gaskin will use in his surveys prices reflecting actual prices for the products in the marketplace, Weir Reply Decl. ¶ 55, an accepted methodology for accounting for supply side factors baked into a historically-set market. *See In re Lenovo Adware Litig.*, 2016 WL 6277245, at *21 (N.D. Cal. Oct. 27, 2016) (approving conjoint model proposed by Mr. Gaskin because he "consulted pricing of the Lenovo models at issue, as well as comparable PC laptops to ensure that the results would reflect the market, and addressed the supply side of the market, determining that it was not at issue because all sales of the laptop models at issue have occurred in the past" (internal quotation marks and record citation omitted)); *see also* Wilcox Tr. at 82:3-11 (agreeing that historic retail prices reflect the supply and demand forces in the market that then existed).

Relying on the testimony of Dr. Ronald Wilcox, Kellogg nevertheless argues that Mr. Gaskin's proposed conjoint neglects supply-side factors because "the introduction of hypothetical products without contested labels would induce important changes in purchasing," since "these adjustments in demand would necessarily induce a competitive response by manufacturers, which would change market supply." Mot. at 8 (quoting Wilcox Report ¶ 66). This attempt to leverage a counterfactual world in which Kellogg could mitigate its liability, however, is legally inappropriate, and should be rejected, as did the court in *In re Dial*

*Complete Mktg. & Sales Practices Litig.*, 320 F.R.D. 326 (D.N.H. Mar. 27, 2017) ["*Dial*"]. As the *Dial*

court explained:

> [Plaintiff's expert] Boedeker's proposed model asks a different question than the one Dial's experts seemingly would pose, and Boedeker's question appears to be both more appropriate and better suited to determining full and complete damages tied to the actual number of offending products sold. That is, Dial's experts seem to argue that the market price of the product absent the allegedly false claims is best calculated by determining the demand curve, and then analyzing supply side forces to arrive at an intersection between demand and supply in a theoretical market. One apparent problem with that traditional approach (at least in this context) is that both supply and demand with respect to the product without the claimed feature can be expected to decline. Therefore, that approach can be expected to describe a price for the product at a point on the quantity sold axis below (perhaps significantly) the point that represents the actual number of offending products sold to class consumers in the actual market.

> Boedeker's model is one in which quantity (the number of products with the offending claims actually sold) is held constant on the demand/supply graph in determining the likely market price of the product without the offending claim if sold in the actual market. His model seeks to calculate the highest price in the actual market at which Dial could have sold the same number of products without the challenged claim. The difference in price as calculated, then, would seem to capture the full measure of damages suffered by consumers who actually bought the allegedly misrepresented product.

> The number of products Dial sold with the offending claims is known (or can easily be calculated). Those products were sold at a price determined by the intersection of demand and supply in the actual market. Boedeker's model asks, it appears, "At what price in that actual market in which Dial sold the offending products could Dial have sold the equivalent number of products without the false claim(s)?" By determining the marginal consumer's willingness to pay for the comparative product . . . Boedeker's model discloses that maximum price—and that price is not only tethered to the real and stable market, but, as noted, also accounts for losses attributable to all products sold that included a price premium associated with the misrepresented feature.

*Id.* at 336-337; *see also In re MyFord Touch*, 291 F. Supp. 3d at 971 (Noting "policy reasons to afford

Plaintiffs a reasonable opportunity to posit damages based on a more flexible approach to economic theory,"

since "modifying the supply curve," as would occur in "a traditional economic model" "could mean that a

projection will assume that fewer vehicles were sold than were in fact sold, thereby failing to account for

the fixed number of defective vehicles that *were* sold," which is problematic because "[a]ssuming that fewer

consumers were injured in the hypothetical world than were injured in the real world runs the risk of

undercompensating the real-world injured consumers.").

The *Dial* court explained the importance of the marginal consumer analysis to which it referred as

follows:

Dial's experts' criticism of Boedeker's model perhaps rests on a misunderstanding of what it purports to do. The model does not, as Dial contends, seek to determine an "average" or a "median" expression of consumer "willingness to pay" for the Dial Complete product without the claimed feature, unconnected to supply side market forces. Rather, Boedeker's model purports to calculate the "Marginal Consumer's Willingness to Pay"[9][*] for that product in the actual market in which the products with the allegedly false claims were sold. The distinction is important, for, as explained in a brief paper co-authored by Lisa Cameron, Michael Craig, and Nobel Laureate in Economics Daniel McFadden:

> Defendants have argued that WTP ["willingness to pay"] results emerging from the conjoint analysis do not directly address the value of the patents in question. However it is important to note that different research questions require different information about WTP. For example, if the researcher seeks qualitative information about how much consumers value the infringing level(s) of the attribute at issue, he can develop a conjoint survey that provides that average or median consumer WTP ....

> On the other hand, if the researcher wants to assess the price premium associated with the infringing feature, then he will need to develop a conjoint survey that assesses the WTP of the marginal consumer—i.e. the consumer who is indifferent between buying and not buying the infringing product. It is the WTP of the marginal consumer that is equivalent to the price premium associated with the infringing level of the attribute; this marginal consumer can be identified by offering respondents a "no buy" option.

> > [*] A demand curve is a visual depiction of the relationship between a product's price and the quantity demanded by consumers, e.g. the higher the price, the lower the demand, and vice versa. At a specific quantity demanded, or sold, the corresponding price depicted on the demand curve represents the willingness to pay of the "marginal consumer." The marginal consumer is the last consumer willing to pay for a product at a given price and, correspondingly, the first consumer to leave a market if the price is increased. In other words, a product's demand curve represents the willingness to pay of the "marginal consumer." So, if a total of 5 units of a product can and will be sold at $15, one can infer that the fifth customer— the "marginal consumer"—is willing to pay $15, but no more. If the price of the product increases, she is the first consumer to leave the market and, therefore, the total number of units sold at the higher price will decrease. At a given quantity to be sold by a willing seller, the marginal consumer's willingness to pay sets the market price.

*Dial*, 320 F.R.D. at 335-36 (citing Lisa Cameron, Michael Cragg, & Daniel McFadden, "The Role of Conjoint Surveys in Reasonable Royalty Cases," LAW360 (Oct. 16, 2013), http://www.law360.com/articles/475390/the-role-of-conjoint-surveys-in-reasonable-royalty-cases).

Like Boedeker did in *Dial*, here Mr. Gaskin proposes using the marginal consumer technique to find the price premium. As described in his declaration in relation to Raisin Bran:

12

[T]he market-based method of calculating the market price premium due to the presence of the affirmative misrepresentations sets up a hypothetical situation in which there are only two alternative Raisin Bran options in the choice set: one without the affirmative misrepresentations and the other with the affirmative misrepresentations. For each of the two Raisin Bran options in the simulation we hold all other features (except price) constant at specific levels; the exact levels we choose for these other features will not affect our calculations. The price of each of the two Raisin Bran options will be initially set at $3.29. We then will simulate markets with lower prices for the Raisin Bran without the affirmative misrepresentations. We will keep lowering the price of Raisin Bran until the market is indifferent between the two Raisin Bran options (i.e., each one has a market share of 50%). That is, we will find the lower price of the Raisin Bran option without the affirmative misrepresentations such that half of the market (i.e., as represented by the data from all of the respondents in our analysis) chooses the Raisin Bran options with the affirmative misrepresentation and half of the market chooses the Raisin Bran option without the affirmative misrepresentations. The market price premium equals the difference between the two prices that compensates for the presence or absence of the affirmative misrepresentations.

Gaskin Decl. ¶ 50; *see also* Gaskin Tr. at 173:19-175:4 (discussing technique).

Kellogg asserts that "courts in California and elsewhere have repeatedly rejected conjoint analysis, ruling that it measures only demand-side willingness to pay and does not consider competitive market factors." Mot. at 7. But it cites just three decisions in just two cases, *In re NJOY* and *Saavedra*, which are distinguishable, and which have been distinguished by several courts, including this Court. *See Davidson*, 2018 WL 2325426, at *22; *see also Dial*, 320 F.R.D. at 332; *Zakaria v. Gerber Prods. Co.*, 2017 WL 9512587, at *18-19 (C.D. Cal. Aug. 9, 2017); *In re Lenovo*, 2016 WL 6277245, at *21. *See also* Weir Reply Decl. ¶¶ 154-63.

In *In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050 (C.D. Cal. 2015), the expert did "not dispute that . . . his conjoint . . . analys[i]s provide[d] only a model for testing what a consumer is willing to pay, without considering other factors in a functioning marketplace," *id.* 1119. Because the methodology "lack[ed] any market-based component," the court found it "divorced from the marketplace," *id.* at 1121. And *Saavedra v. Eli Lily & Co.*, 2014 WL 7338930 (C.D. Cal. Dec. 18, 2014), is distinguishable as involving an irregular market, whereas here, "[t]he parties do not dispute that the [cold cereal] market at issue here is relatively stable," *see Dial*, 320 F.R.D. at 335. In *Saavedra*, the court explained that:

In an ordinary market, price is a proxy for value. Thus, the price paid for a good that was misrepresented to have a given characteristic can serve as a proxy for the value of a product with the misstated characteristic. Therefore, applying [plaintiffs' expert's] refund ratio to the price paid by consumers in such a market would yield a valid approximation of the value lost

13

*Hadley v. Kellogg Sales Company*, No. 16-cv-4955-LHK-HRL
PLAINTIFF'S OPPOSITION TO KELLOGG'S MOTION TO EXCLUDE OPINION TESTIMONY OF STEVEN P. GASKIN

due to the misrepresentation. Although the refund ratio determined via conjoint analysis still looks only to the demand side of the equation, applying this ratio to the market price at least tethers it to a functioning market and thus to the product's fair market value.

2014 WL 7338930, at *5 (citations omitted). "However, because 'the prescription drug market is not an efficiently functioning market,' and 'numerous complicating factors . . . sever the relationship between price and value,' the court in *Saavedra* determined that the expert's proposed methodology would not 'yield an accurate approximation of the difference between the consumer's subjective valuation of the drug as represented and the drug as actually received.'" *Dial*, 320 F.R.D. at 335 (quoting *Saavedra*, 2014 WL 7338930, at *5-6). Here, by contrast, "nothing presented . . . suggests that similar complications or anomalies in the [cold cereal] market might operate to sever the calculated relationship between price paid and value received." *See id.* (certifying class with conjoint as damages methodology).

While the courts in *NJOY* and *Saavedra* rejected the specific conjoint surveys proposed given the unique facts of those cases, generally speaking, "[c]onjoint analysis has won acceptance from courts and legal commentators," *Dzielak v. Whirlpool Corp.*, 2017 WL 1034197, at *6 (D.N.J. Mar. 17, 2017) (citations omitted), and "numerous courts . . . have accepted . . . [choice-based conjoint] . . . as [a] reliable method[] for calculating price premiums on a classwide basis in consumer class actions," *Miller v. Fuhu Inc.*, 2015 WL 7776794, at *21 (C.D. Cal. Dec. 1, 2015); *cf. Odyssey Wireless, Inc. v. Apple Inc.*, 2016 WL 7644790, at *9 (S.D. Cal. Sept. 14, 2016) ("conjoint analysis is a generally accepted method for valuing individual characteristics of a product"). Even the Ninth Circuit recently held "it was not an abuse of discretion for the district court to conclude that Plaintiffs' proffered model," which "use[d] conjoint analysis to segregate the portion of that premium attributable to" the challenged claim, "tracked their theory of liability and was therefore sufficient to survive class certification." *Briseno v. ConAgra Foods, Inc.*, 674 Fed. Appx. 654, 657 (9th Cir. 2017); *see also ConAgra*, 90 F. Supp. 3d at 1026 ("Marketers and marketing researchers have used conjoint analysis since the early 1970's to determine the values consumers ascribe to specific attributes of multi-attribute products and to understand the features driving product preferences."). Indeed, many courts have relied on conjoint analysis to certify consumer fraud class actions. *See, e.g.*, *In re MyFord*, 291 F. Supp. 3d at 965-76; *In re Lenovo*, 2016 WL 6277245, at *21; *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 413-15 (S.D.N.Y. 2015); *Sanchez-Knutson v. Ford Motor Co.*, 310 F.R.D. 529, 538-39 (S.D. Fla. 2015); *Brown v. Hain Celestial Group, Inc.*, 2014 WL 6483216, at *19 (N.D. Cal. Nov. 18, 2014); *Guido v. L'Oreal*

14

1  *USA, Inc.*, 2014 WL 6603730, at \*11-13 (C.D. Cal. July 24, 2014); *Khoday v. Symantec Corp.*, 2014 WL

2  1281600, at \*10 (D. Minn. Mar. 13, 2014).

3  **II.    Kellogg's Criticisms of Mr. Gaskin's Design Choices go to Weight, not Admissibility**

4          The Ninth Circuit has "long held that survey evidence should be admitted [if it is] conducted

5  according to accepted principles and [is] relevant." *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand*

6  *Mgmt.*, 618 F.3d 1025, 1036 (9th Cir. 2010) (internal quotation marks and citations omitted). "[T]echnical

7  inadequacies in a survey . . . bear on the weight of the evidence, not its admissibility." *Id.*; *see also Wendt*

8  *v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir. 1997) ("Challenges to survey methodology go to the weight

9  given the survey, not its admissibility."); *In re ConAgra*, 90 F. Supp. 3d at 949 (same); *cf. Microsoft Corp.*

10  *v. Motorola Inc.*, 904 F. Supp. 2d 1109, 1120 (W.D. Wash. 2012) (critiques of conjoint analysis went "to

11  issues of methodology, survey design, reliability, and critique of conclusions, and therefore . . . to the weight

12  of the survey rather than admissibility"). But "as long as they are conducted according to accepted principles,

13  survey evidence should ordinarily be found sufficiently reliable under *Daubert*. Unlike novel scientific

14  theories, a [finder of fact] should be able to determine whether asserted technical difficulties undermine a

15  survey's probative value." *Morales v. Kraft Foods Group, Inc.*, 2017 WL 2598556, at \*10 (C.D. Cal. June

16  9, 2017) (quoting *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1143 n.2 (9th Cir. 1997) (internal

17  citations omitted)).

18  **III.    Kellogg's Criticisms of Mr. Gaskin's Conjoint Design Choices are Unfounded**

19          **A.    Mr. Gaskin's Supposed Failure to "Mimic Real-World Shopping Conditions" by**

20                  **Showing the Full Packaging**

21          Kellogg argues vaguely that "a consumer survey . . . lacks probative value unless it accurately

22  mimics real-world purchasing conditions," Mot. at 9, but "no survey can construct a perfect replica of 'real

23  world' buying patterns," *Troublé v. Wet Seal, Inc.*, 179 F. Supp. 2d 291, 308 (S.D.N.Y. 2001). Rather, "[a]ny

24  survey is of necessity an imperfect mirror of actual customer behavior under real life conditions." *Classic*

25  *Foods Int'l Corp. v. Kettle Foods, Inc.*, 2006 WL 5187497, at \*7 (C.D. Cal. Mar. 2, 2006) (quoting J. Thomas

26  McCarthy, McCarthy on Trademarks and Unfair Competition, § 32:178 (4th ed. 2005)). Therefore such

27  criticisms go to weight rather than admissibility. *Id.* ("there is no such thing as a 'perfect' survey" and "[a]ny

28

15

flaws in the survey may be elucidated on cross-examination, so that the finder of fact can appropriately adjust the weight it gives to the survey's results.").

As Mr. Gaskin testified in his deposition, "the purpose of a conjoint is not to entirely replicate a shopping experience. It focuses on certain aspects of it." Gaskin Tr. at 59:15-17; *see also id.* at 62:5-8 ("conjoint analyses, by their very nature, do not exactly assemble a real-shopping experience, but they capture what they need to capture for their purpose"). Nevertheless, Mr. Gaskin's survey is properly designed to "roughly simulat[e] marketplace conditions." *Troublé*, 179 F. Supp. 2d at 308. Notably, major businesses like Kellogg and Marriott regularly use conjoint analysis to make important business decisions even though it does not, by necessity, mimic a real-life shopping experience. *See* Gaskin Reply Decl. ¶ 44; Wilcox Tr. at 68:13-69:8.

Kellogg nevertheless complains that "Mr. Gaskin's choice-based conjoint survey fails to show the actual product packaging," for example its "layout and design, its color, [and] all the images or the text that appear on the packaging," Mot. at 10. In criticizing Mr. Gaskin for not proposing to use actual packaging, neither Kellogg nor its experts identify any academic literature supporting the need to do so, nor any case striking a conjoint survey on this basis—because none exists. Gaskin Reply Decl. ¶ 29. To the contrary, Kellogg and Simonson fail to acknowledge the substantial problems that presenting full packaging to respondents in a conjoint survey causes, and ignore the important principle that, in designing a conjoint survey, one "should make sure not to overburden respondents because this can lead to poor results," since "[w]hen faced with too much information, respondents often resort to simplification strategies to deal with the difficulty of the task." *Id.* (quoting Orme, Conjoint Analysis at 54).

First, because the conjoint survey produces product profiles that, while plausible, do not actually exist, for many profiles, there is no packaging that could be shown (or alternatively, Mr. Gaskin would have to make one up and thereby choose the context in which to present the claims, which is an even worse solution). *Id.* ¶ 30. Second, as Dr. Simonson points out, "[c]ereal packages . . . present a great deal of information." Simonson Report ¶ 184. Each choice exercise presents the survey taker with 3 product profiles, and respondents are asked to engage in 12 such exercises. A cereal box contains six panels, and some packages contain hundreds of words. It would not only be impractical as a matter of screen real estate, but would cause near-immediate cognitive overload to present respondents, on the same screen, with three

16

full cereal packages. As Orme explains, conjoint survey questions "are usually answered in 12-15 seconds after respondents are warmed up." Gaskin Reply Decl. ¶ 30 (quoting Orme, Conjoint Analysis at 130). Including full packaging for three product profiles containing hundreds of words would take a respondent that reads at an average rate of 250 words per minute as much as five minutes just to read the labels. This would inevitably lead to shortcutting methods of responding, depriving the study of its predictive power. *Id.* For these reasons, the literature is clear that presenting attributes in a textual manner is the preferred method to carry out a conjoint survey.[4] *Id.*

Moreover, although Kellogg argues that not showing the entire packaging will focus respondents on the challenged claims, overvaluing them, Kellogg ignores that the label attributes include distractor claims specifically to avoid inappropriately focusing respondents on the challenged claims. *See* Gaskin Reply Decl. ¶ 31. For example, the Raisin Bran conjoint survey will appropriately give no more attention to the challenged statement, "Invest in Your Health, Invest in Yourself" than the distractor claim "EXCELLENT SOURCE OF FIBER." *See* Gaskin Reply Decl. ¶ 31.

### B. Packaging Context

Kellogg argues it is a "fatal flaw" that Mr. Gaskin does not propose showing the ingredient statement and nutrition information to respondents of his conjoint surveys. *See* Mot. at 13 (citing Simonson Report ¶ 184). Kellogg's argument, and Dr. Simonson's opinion, depend on Kellogg's pervasive mischaracterization that plaintiff alleges Kellogg tricked the class merely as to the *amount* of sugar in the products. *See, e.g.*, Dkt. No. 113 Ex. 5, Special Master Order on Motion Priority No. 7 at 2 ("Kellogg's summary of the claims as alleging that a reasonable consumer would be misled into believing that its products were low in sugar . . . is largely inaccurate."). Because plaintiff alleges Kellogg made claims to convince consumers its products were healthy *notwithstanding* their added sugar content, disclosing that content to consumers is neither necessary nor appropriate. Kellogg's argument, moreover, runs afoul of the decision in *Williams v. Gerber Prods. Co.*, 552 F.3d 934 (9th Cir. 2008), in which the Ninth Circuit held that food manufacturers may not

---

[4] Conjoint surveys have been used to test things that could not possibly be represented in a survey other than through text descriptions, like the extent to which an automobile's value would diminish if exhaust were leaking into the cabin, *see Sanchez-Knutson v. Ford Motor Co.*, No. 14-cv-61344 (S.D. Fla.), or the extent to which misrepresented battery life would affect the price of a laptop, a device with numerous attributes that are important to consumers, *see In re Lenovo Adware Litig.*, No. 15-md-02624 (N.D. Cal.).

rely on "small print on the side of the box," like that in an ingredients list or Nutrition Facts box, to "provide a shield for liability for the deception." *See id.* at 939; *compare* Mot. at 13 ("In real life, a consumer who wanted to assess the meaning of 'lightly sweetened' may have looked at the ingredient list or the Nutrition Facts panel (or the front of the Frosted Mini-Wheats box, which prominently discloses the amount of sugar.") Given the holding in *Williams*, Mr. Gaskin's damages surveys need not, as Kellogg would like, attempt to effectively disclaim for Kellogg the truth of the challenged labeling claims.

### C.    Exclusion of Taste, Product Names, and Promotions

One of Kellogg's experts, Dr. Wilcox, opines that "[t]he very essence of a conjoint analysis is that it includes the attributes that are important drivers of choice," Mot. at 14 (quoting Wilcox Report ¶ 87). Its other expert, Dr. Simonson, similarly opines (though less vaguely) that such a study must "include *all* of the important attributes/features," *id.* (emphasis added) (quoting Simonson Report ¶ 170). Leveraging this testimony, Kellogg argues that Mr. Gaskin's proposed conjoint analysis is "inadmissible because it fails to account for numerous factors that consumers consider in making purchasing decisions." *Id.* But Kellogg only claims three attributes are missing: taste, market-correct product names, and price promotions, like a "sale" or "deal." *See id.* at 15-16. Kellogg's argument is misplaced for several reasons.

<u>First</u>, the premise is wrong. While including important attributes in a conjoint study is necessary, "[t]he attributes and levels included in the conjoint tasks do not need to include every possible feature of the cereals and breakfast bars at issue; in fact, it would be infeasible and contrary to best practices to do so." Gaskin Decl. ¶ 23. Instead, "[t]he main purpose" of using multiple attributes and levels "is to provide a reasonable and engaging task, and to help disguise the fact that our chief interest is in respondents' reactions to the affirmative misrepresentations." *Id.* Even Dr. Simonson hedges his criticism by noting that "it is usually not practical to include all product attributes in these hypothetical [choice set] configurations," and stating only that "the most important attributes should be explicitly included," Simonson Report ¶ 171.

<u>Second</u>, Kellogg's criticism is wrong, as neither taste, nor product name, nor promotion is an important attribute that has been excluded from Mr. Gaskin's proposed surveys.

*Taste* is an important characteristic of a food in terms of consumer choice, but, although not included as an express attribute, it is not excluded from the survey. Rather, as Mr. Gaskin explains, he will have "told [respondents] the brand of the cereal. If they have eaten the cereal, or are familiar with the brand, this will

give them some idea of the taste." Gaskin Reply Decl. ¶ 21; *see also* Gaskin Tr. at 170:20-171:1; Weir Tr. at 61:1-9; Weir Reply Decl. ¶ 71. Taste will thus be reflected in the survey exactly the way it is in real life: those familiar with the product will be familiar with the taste and can incorporate that into their purchase decision, while those unfamiliar will have to make decisions without the benefit of taste, which we all do at the grocery store all the time. Moreover, after individual utilities are collected in the survey, "[a]s recommended by Sawtooth Software, brand is held constant in the market simulation calculations, so the partworths resulting from respondents' impressions of the taste of a product option based on its brand do not affect the final reduction in market value calculations." Gaskin Reply Decl. ¶ 21.

*Market-Realistic Product Names*, as Kellogg argues should be used in the conjoint survey, *see* Mot. at 16, are simply not necessary for conjoint analysis. As Mr. Gaskin explained in his deposition, "our chief focus is the tradeoff between the attribute of interest and price. The other attributes are there to make it a plausible exercise and disguise . . . what we're after." Gaskin Tr. at 121:23-122:3. Kellogg notes cereals called Total Raisin Bran and Cinnamon Toast Crunch Blasted Shred, asserting that these are General Mills' analogues to Kellogg's Raisin Bran and Frosted Mini-Wheats, and complaining that "Mr. Gaskin simply refers to them as 'General Mills Raisin Bran' and 'General Mills Frosted Mini Wheats.'" Mot. at 16.

 Kellogg misunderstands the exercise. Mr. Gaskin is not referring to any particular cereals. Rather, he has set various attributes, each with various levels, and in the choice-based exercise, respondents are presented with profiles randomly generated from those levels. Thus, for the Raisin Bran conjoint, the "brand" attribute includes levels for Kellogg's, General Mills, Post, and Store Brand, and the "flavor" attribute includes "Raisin Bran," "Raisin Bran Crunch," "Raisin Bran with Cranberries," and "Raisin Bran Omega-3." Kellogg, Post, and many store brands have a "Raisin Bran" cereal, and so when a profile is generated matching one of those brands with the "Raisin Bran" flavor, the product reflects a real-world product. When the "General Mills" level of the "brand" attribute is matched with "Raisin Bran," however, the product profile created does not reflect a real-world product. This is, however, of no import.

As Mr. Gaskin explained during his deposition, "we had to make names that could plausibly apply to all the different manufacturers listed, the brands listed. So we tried not to be too specific. We tried to make sure it applied to Kellogg's, but could plausibly apply to the others as well." Gaskin Tr. at 120:24-121:5. If the design included "Total Raisin Bran" as a product name (or "flavor" in Mr. Gaskin's conjoint),

the problem of which Kellogg complains—the lack of a corresponding real-world product—would be amplified, since there are no Kellogg, Post, or Store Brand "Total Raisin Bran" cereals. As Mr. Gaskin testified, his conjoint design does not use Total Raisin Bran "[s]imply because it wouldn't make sense to say 'Total Raisin Bran' and together with Kellogg's, for example. So we just kept it as 'Raisin Brain.'" *Id.* at 121:14-19. Mr. Gaskin further explained that ensuring that all product profiled generated in the survey reflected exactly real-world products is "not critical to the analysis" because "our chief focus is the tradeoff between the attribute of interest and price. The other attributes are there to make it a plausible exercise and disguise . . . what we're after." *Id.* at 121:20-122:3; *see also id.* 122:8-13 ("I'm not trying to forecast a market share for Total Raisin Bran. I'm trying to look at the tradeoff between the attribute of interest and the price. And the exact choice of other attributes and their levels does not have an effect on my calculations."); *see also* Wilcox Tr. at 69:25-70:16.

     *Price promotions* are important to some buyers, and they are accounted for in the proposed conjoint surveys. That is because those surveys use price points derived from actual marketplace data, which itself is broken down into normal and promotional pricing data. This informed the range of prices in the survey. Thus, more price sensitive respondents used to waiting for promotions to pay a smaller price are likely to give smaller prices greater than average weight in the survey. *Compare* Simonson Report ¶ 47 (where "respondents have purchased the same cereals/breakfast bars before," they can "base their decisions on their prior experience and general price knowledge"). The extent and degree to which respondents prefer smaller, or promotional pricing, to the challenged claims (or vice versa) is exactly the question the surveys are designed to measure. Moreover, the phenomenon is also controlled for by the application of the conjoint results *back* to the real world market data.

     <u>Third</u>, even if one of Kellogg's criticisms was valid, it does not show that the proposed methodology of conjoint analysis is either untethered to plaintiff's theory of liability, or incapable of measuring classwide damages, and thus provides no salient reason for denying class certification. *See*, *e.g.*, *In re MyFord,* 291 F. Supp. 3d 936.. To the extent Kellogg has identified a valid issue, however, Mr. Gaskin is at liberty to address it when he conducts the surveys in preparation for his Rule 26 report due in September. For example, having not yet run his conjoint studies, Mr. Gaskin has also not yet pretested them. Pretesting may either bolster the validity of the design choices made, give credence to some of Kellogg's design criticisms, or reveal

other potential issues that may need to be addressed before executing the full study. *See* Gaskin Tr. at 122:19-123:1 (responding to question about choice not to use "Total Raisin Bran" in survey, noting "these attributes are chosen to be independent of each other," but "[i]f they're not, we'll find that out in the analysis, and we can model that with interaction effects," so "I'll see what happens with the data."); *compare Dial*, 320 F.R.D. at 332-33 ("Dial . . . argues, plausibly, that, by limiting the attributes surveyed to four (five, including price), Boedeker's model fails to adequately take into account and properly weight other attributes that may well be very important to liquid hand soap consumers (e.g., brand name, or scent, or shape, or color of the product). . . . As plaintiffs correctly note, those issues—and the myriad others identified by Dial—are either curable, or go to the weight, not admissibility, of Boedeker's testimony.").

<u>Fourth</u>, even setting aside that Mr. Gaskin will be able to address any valid design criticisms or weaknesses before implementing the full surveys, the issues Kellogg raises all merely go to the weight of the proposed conjoint analyses, not their admissibility. *See Dial*, 320 F.R.D. at 332 ("Dial's motion to strike is based on its view that Boedeker's model, while of the type generally accepted in the field, nevertheless, suffers from a number of fatal deficiencies, and, therefore, is not sufficiently reliable. The court is unpersuaded that any of the described deficiencies rise to the level of rendering Boedeker's model even close to 'junk' science. Dial's criticisms (though not obviously invalid) generally go to the weight, not the admissibility, of Boedeker's testimony."); *Zakaria*, 2017 WL 9512587, at *13 (experts alleged "[f]ailure to [a]ccount for [p]roduct [a]ttributes" went "to weight, not admissibility"); *Sanchez-Knutson v. Ford Motor Co.*, 181 F. Supp. 3d 988, 995 (S.D. Fla. 2016) ("Ford challenges Gaskin's [conjoint survey] methodology, including but not limited to . . . the variables he used). . . . These arguments go to the weight of the survey, not its admissibility, and may be addressed by cross-examination and the presentation of contrary evidence at trial[.]" (citing *Khoday v. Symantec Corp.*, 93 F. Supp. 3d 1067, 1083 (D. Minn. 2015) ("The Court will allow Gaskin to testify to his conclusions reached by applying a conjoint analysis, and Defendants may cross-examine Gaskin to attempt to address the weaknesses they perceive in his analysis.").

### D.    Measuring for Repeat Purchasers

Citing only the testimony of its own employees, Kellogg argues that "approximately half of Kellogg's sales come from repeat purchases by consumers," and that "repeat purchasers exhibit distinctive purchasing behavior," namely, "[i]n contrast to first-time buyers, who might look more closely at the label,

21

repeat buyers will often buy specific products based on just pure habit." Mot. at 17 (citations and quotation omitted). Kellogg then claims Mr. Gaskin "admitted that conjoint surveys cannot accurately measure willingness-to-pay for 'repeat purchase' products." Mot. at 17 (header capitalization disregarded). It further claims Mr. Gaskin "conceded that one of the 'major limitations' of his proposed model is that it 'doesn't address repeat purchases,'" *id.* (citing Gaskin Tr. at 69:6-7, 19-20). This mischaracterizes his testimony.

When asked if there are any limitations to conjoint, Mr. Gaskin noted that "[e]very mathematical model is an abstraction of reality," so "of course there are." Gaskin Tr. at 68:24-69:5. When asked broadly and without context "what are some of the major limitations of using a conjoint analysis," Mr. Gaskin noted that "it asks what people would purchase at one point in time – a specific purchase opportunity. It doesn't address repeat purchases, for example." *Id.* 69:17-20. When asked what he meant by the comment, Mr. Gaskin said he meant that conjoint "doesn't explicitly address repeat purchases. . . . A conjoint analysis doesn't really specify whether it's a trial or repeat purchase. It just asks you, of these products, which would you buy?" *Id.* at 70:4-16. He later clarified that "[a] conjoint is dealing with one purchase. That might be a trial purchase. It might be a repeat purchase. The fact that cereal is largely repeat purchased, it's not a problem for conjoint." *Id.* 74:22-75:2. Mr. Gaskin now further clarifies that what he meant by his initial testimony is that conjoint analysis does not forecast the rate of repeat purchases over time, which is what a volumetric model is designed to forecast. This does not mean conjoint is inappropriate for what it has been asked to do, which is measure a price premium (something a volumetric model cannot do). Gaskin Reply Decl. ¶ 18. Moreover, a representative sample of consumers taking the conjoint surveys will, in any event, including repeat purchasers.

In any event, the sample for the surveys includes past three-month purchasers of the products. These purchaser-respondents will presumably reflect a cross-section of first-time and repeat purchasers, ensuring the class-wide measure reflects both demographics.

### E.    Focalism bias

Kellogg accuses Mr. Gaskin's proposed conjoint surveys of "pervasive focalism bias," Mot. at 18 (header capitalization disregarded). Specifically, it argues "the survey telegraphs to respondents that the survey is testing the weight attributable to certain health and nutrition statements," because "[a]lmost all of

22

the 'distractor' statements used in the survey related [sic] to the ingredients, nutritional benefits, or health properties of the challenged products," *id.*

If only the challenged claims but not distractor claims related to health and wellness, this would create far more focalism bias, by focusing respondents on the specific claims of interest. It is a *benefit* of the design that distractor claims are also health and wellness claims likely to be important to consumers in choosing products. On the other hand, Kellogg's suggested alternatives, like "Rise Eat Shine Repeat," are in many cases meaningless puffery. Nevertheless, pretesting will help determine whether the particular distractor claims chosen reveal to respondents too much about the purpose of the study, and if they do, these claims can easily be revised, including to some of those Kellogg suggests, *see* Mot. at 19.

## IV.   Mr. Gaskin's Demand Modeling Survey is Reliable

Kellogg's primary criticism of Mr. Gaskin's demand survey is that it did not show respondents the full packaging, including the ingredients and nutrition facts. *See* Mot. at 20-21. For example, Kellogg argues that because "respondents do not have access to the Nutrition Facts label or any other information, . . . they do not know the actual amount of sugar in Raisin Bran and have no way to determine for themselves if the amount is high." *Id.* at 20. Kellogg speculates that "[h]ad survey respondents been told that the amount of added sugar in Raisin Bran is 9 grams, many respondents likely would have disagreed with the warning's assessment that the amount is 'high.'" *Id.* This is just Kellogg arguing the merits. Any damages analysis, however, assumes *a priori*, that liability has been established. *See* Weir Reply Decl. ¶ 24. Moreover, Mr. Gaskin's demand survey was not intended to determine respondents' subjective notions of the relative sugar in Raisin Bran (which plaintiff alleges they *cannot* do in a valid manner for lack of adequate knowledge), but to determine how the disclosure used affected respondents' future consumption. For this test, *no* stimulus is needed other than the warning. In fact, the only reason the Test and Control groups were also shown the challenged claims is because it was Kellogg's utterance of those claims that, as alleged by plaintiff, gave rise to the obligation to make the disclosure. *See* Gaskin Tr. at 192:23-193:13.

Kellogg complains about the particular warning shown, arguing it is not scientifically valid, inflammatory, and biased, but these are merely merits arguments and criticisms of methodology that go to weight. These arguments do not demonstrate that the proposed method is inappropriate to find a change in demand attendant to a disclosure of the type plaintiff alleges should have been made. Moreover, as Mr.

23

1   Gaskin explains, the warning was chosen for its scientific validity based on the opinion of plaintiff's expert,

2   Dr. Lustig, and is on the conservative end of the spectrum, since it would be possible to place a lengthier

3   warning on a cereal box. Gaskin Reply Decl. ¶ 34; *see also* Gaskin Tr. 194:3-12. Of course, the method is

4   flexible, and could test any valid, court-approved warning or disclosure. *See* Gaskin Tr. at 200:17-201:21.

5   **V.      Mr. Gaskin is Qualified to Render his Opinions**

6           At the end of its motion, in a throw-away argument, Kellogg argues that Mr. Gaskin "should not

7   even been accepted as an expert witness in light of his lack of expertise in consumer behavior," Mot. at 22

8   (header capitalization disregarded). Mr. Gaskin, however, has been accepted as a market research and survey

9   expert under similar circumstances on many occasions. *See supra* n.1; *see also* Gaskin Tr. at 53:8-23. He is

10  eminently qualified to have designed and run the surveys he did.

11  **VI.     Rule 26 Disclosures are Due in September**

12          Kellogg says Mr. Gaskin "may attempt to submit an amended report that attempts to remedy the

13  deficiencies Kellogg has identified," imploring the Court "not [to] permit him to do so." Mot. at 23. But

14  Kellogg seems to forget the current procedural posture.

15          We are at the class certification stage, where plaintiff's burden is to "present a *likely* method for

16  determining class damages," which he need not "show . . . will work with certainty." *Chavez v. Blue Sky*

17  *Natural Beverage Corp.*, 268 F.R.D. 365, 379 (N.D. Cal. 2010) (emphasis added, quotation omitted).

18  Accordingly, the class certification standard itself contemplates that expert testimony may be of a

19  preliminary, "proof of concept" or proposal nature, with more substantive work to come following

20  certification. *See*, *e.g.*, *Brazil v. Dole Packaged Foods, LLC*, 2014 WL 5794873, at *5 (N.D. Cal. Nov. 6,

21  2014) (Koh, J.) ("In granting class certification, the Court relied on Dr. Capps' representation that he would

22  be conducting this type of before-and-after analysis once Dole provided him the necessary discovery.");

23  *Sanchez-Knutson*, 310 F.R.D. at 539 ("[T]he Court disagrees with Defendant that Mr. Gaskin[] must have

24  already performed his proposed conjoint analysis for the Court to consider the proffered methodology."

25  (citing *Guido*, 2014 WL 6603730, at *8 (rejecting argument that plaintiff's expert must have already

26  performed his proposed conjoint analysis testimony should be inadmissible because plaintiff's expert had

27  not yet performed the conjoint analysis in that case)); *Zakaria*, 2016 WL 6662723, at *16 ("Plaintiff here

28

has not completed the damages calculations. But, this does not preclude a finding of predominance. The theories of liability and proposed methods for calculating damages are sufficient.").

Consistent with these requirements, Mr. Gaskin fully designed and thoroughly described his proposed conjoint surveys, but has not yet executed them. Thus, he is *of course* going to provide a more fulsome expert report later in the litigation—just as the Scheduling Order contemplates. Dkt. No. 80 at 2 (Opening Expert Reports due September 20, 2018).

## **CONCLUSION**

The Court should deny Kellogg's motion in its entirety.

Dated: June 25, 2018

Respectfully Submitted,

/s/ Jack Fitzgerald

**THE LAW OFFICE OF**
**JACK FITZGERALD, PC**
JACK FITZGERALD
*jack@jackfitzgeraldlaw.com*
TREVOR M. FLYNN
*trevor@jackfitzgeraldlaw.com*
MELANIE PERSINGER
*melanie@jackfitzgeraldlaw.com*
Hillcrest Professional Building
3636 Fourth Avenue, Suite 202
San Diego, CA 92103
Phone: (619) 692-3840
Fax: (619) 362-9555

***Attorneys for Plaintiff and the***
***Proposed Class***