1  **THE LAW OFFICE OF JACK FITZGERALD, PC**
   JACK FITZGERALD (SBN 257370)
2  *jack@jackfitzgeraldlaw.com*
   TREVOR M. FLYNN (SBN 253362)
3  *trevor@jackfitzgeraldlaw.com*
   MELANIE PERSINGER (SBN 275423)
4  *melanie@jackfitzgeraldlaw.com*
   Hillcrest Professional Building
5  3636 Fourth Avenue, Suite 202
   San Diego, California 92103
6  Phone: (619) 692-3840
   Fax: (619) 362-9555
7
8  *Counsel for Plaintiff and the Putative Class*

9                    **UNITED STATES DISTRICT COURT**
10                   **NORTHERN DISTRICT OF CALIFORNIA**

11  STEPHEN HADLEY, on behalf of himself, all       Case No. 5:16-cv-04955-LHK-HRL
    others similarly situated, and the general public,
12                                                    **PLAINTIFF'S OPPOSITION TO KELLOGG'S**
13          Plaintiff,                                **MOTION TO EXCLUDE OPINION**
                                                      **TESTIMONY OF COLIN B. WEIR**
14                  v.
                                                      Judge:     Hon. Lucy H. Koh
15  KELLOGG SALES COMPANY,                           Date:      November 8, 2018
                                                      Time:      1:30pm
16          Defendant.                                Location:  Courtroom 8

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................ii

INTRODUCTION ............................................................................................................... 1

FACTS ................................................................................................................................ 1

ARGUMENT ...................................................................................................................... 3

I.      MR. WEIR'S HEDONIC REGRESSION AND UNDERLYING DATA ARE
        RELIABLE ...................................................................................................... 4

        A.      Mr. Weir's Hedonic Regression Considered the Appropriate Independent
                Variables ............................................................................................... 4

                1.      It is Economically Improper to Include Advertising as an
                        Independent Variable in Hedonic Regression.............................. 5

                2.      Economic Literature Supports Inclusion of Fat Calories but not
                        Total Calories............................................................................... 7

                3.      Subjective Taste Cannot Be Captured, But Objective Indicia of
                        Taste are Included in Mr. Weir's Hedonic Regression Model ....... 8

                4.      The Economic Literature Does Not Support the Inclusion of
                        Saturated Fat and Cholesterol ..................................................... 9

                5.      Mr. Weir Accounted for Whole Grain by Including Grain Type
                        and Fiber ...................................................................................... 9

        B.      Mr. Weir Does not Cherry-Pick or Miscode Data .................................. 10

        C.      Plaintiff's Damages Models Account for the Effect of Multiple Labeling
                Claims .................................................................................................. 13

II.     MR. WEIR IS QUALIFIED TO OFFER HIS OPINIONS ................................. 14

III.    BECAUSE RULE 26 DISCLOSURES ARE DUE IN SEPTEMBER, MR. WEIR
        MAY OF COURSE AMEND HIS REPORT ...................................................... 16

CONCLUSION ................................................................................................................... 17

*Hadley v. Kellogg Sales Company*, No. 16-cv-4955-LHK-HRL
PLAINTIFF'S OPPOSITION TO KELLOGG'S MOTION TO EXCLUDE OPINION TESTIMONY OF COLIN B. WEIR

1

**TABLE OF AUTHORITIES**

2

**Cases**

3

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002) ................................................................................................. 4

4

*Bazemore v. Friday*,

5

    478 U.S. 385 (1986) ............................................................................................................. 4

6

*Bickerstaff v. Vassar Coll.*,

7

    196 F.3d 435 (2d Cir. 1999) ............................................................................................... 10

8

*Brazil v. Dole Packaged Foods, LLC*,
    2014 WL 5794873 (N.D. Cal. Nov. 6, 2014) ....................................................... 6, 7, 11, 16

9

*Chavez v. Blue Sky Natural Beverage Corp.*,

10

    268 F.R.D. 365 (N.D. Cal. 2010) ................................................................................. 11, 16

11

*Chen-Oster v. Goldman, Sachs & Co.*,

12

    114 F. Supp. 3d 110 (S.D.N.Y. 2015) ................................................................................. 3

13

*Daubert v. Merrell Dow Pharms., Inc.*,

14

    509 U.S. 579 (1993) ............................................................................................................. 3

15

*Dukes v. Wal-Mart, Inc.*,
    222 F.R.D. 189 (N.D. Cal. 2004) ........................................................................................ 3

16

*Dzielak v. Whirlpool Corp.*,

17

    2017 WL 1034197 (D.N.J. Mar. 17, 2017) ....................................................................... 16

18

*Ellis v. Costco Wholesale Corp.*,

19

    240 F.R.D. 627 (N.D. Cal. 2007) ........................................................................................ 3

20

*Grayson v. Gen. Elec. Co.*,
    2017 WL 923907 (D. Conn. Mar. 7, 2017) ....................................................................... 16

21

22

*Guido v. L'Oreal, USA, Inc.*,
    2014 WL 6603730 (C.D. Cal. July 24, 2014) .................................................................... 11

23

*Hadley v. Kellogg Sales Co.*,

24

    273 F. Supp. 3d 1052 (N.D. Cal. 2017) .............................................................................. 9

25

*Hughes v. The Ester C Co.*,

26

    317 F.R.D. 333 (E.D.N.Y. 2016) ...................................................................................... 16

27

*In re ConAgra Foods, Inc.*,
    90 F. Supp. 3d 919 (C.D. Cal. 2015) ................................................................................ 15

28

ii

*In re Dial Complete Mktg. & Sales Practices Litig.*,
    2013 WL 6798929 (D.N.H. Dec. 20, 2013) ............................................................3

*In re Zurn Pex Plumbing Prods. Liab. Litig.*,
    644 F.3d 604 (8th Cir. 2011) .................................................................................3

*Jinro Am. Inc. v. Secure Invests., Inc.*,
    266 F.3d 993 (9th Cir. 2001) .................................................................................3

*Langan v. Johnson & Johnson Consumer Cos., Inc.*,
    2017 WL 985640 (D. Conn. Mar. 13, 2017) ...............................................10, 12, 13

*Laumann v. Nat'l Hockey League*,
    117 F. Supp. 3d 299 (S.D.N.Y. 2015) ...................................................................15

*Restivo v. Hessemann*,
    846 F.3d 547 (2d Cir. 2017) ..................................................................................4

*Rogers v. Raymark Indus., Inc.*,
    922 F.2d 1426 (9th Cir. 1991) ...............................................................................15

*Romero v. S. Schwab Co., Inc.*,
    2017 WL 5885543 (S.D. Cal. Nov. 29, 2017) .........................................................15

*Sanchez-Knutson v. Ford Motor Co.*,
    310 F.R.D. 529 (S.D. Fla. 2015) ......................................................................11, 16

*Tait v. BSH Home Appliances Corp.*,
    289 F.R.D. 466 (C.D. Cal. 2012) ...........................................................................3

*Wolf v. Hewlett Packard Co.*,
    2016 WL 7743692 (C.D. Cal. Sept. 1, 2016) ..........................................................14

*Zakaria v. Gerber Prods. Co.*,
    2016 WL 6662723 (C.D. Cal. Mar. 23, 2016) .....................................................11, 16


**Rules**

Fed. R. Evid. 702 ......................................................................................................3, 16


**Other Authorities**

Adam Drewnowski and Eva Almiron-Roig, Fat Detection: Taste, Texture, and Post Ingestive
    Effects, Chapter 11 Human Perceptions and Preferences for Fat-Rich Foods (2010) ..............8

iii

Karen J. Morgan, et al., "An Hedonic Index for Breakfast Cereals," Journal of Consumer
     Research 6, no. 1, June 1979...............................................................................................5

*Hadley v. Kellogg Sales Company*, No. 16-cv-4955-LHK-HRL
PLAINTIFF'S OPPOSITION TO KELLOGG'S MOTION TO EXCLUDE OPINION TESTIMONY OF COLIN B. WEIR

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## INTRODUCTION

Colin B. Weir is an eminently qualified economic and damages expert whose classwide damages calculations have led several courts to certify consumer fraud classes. Not only do Kellogg's criticisms of his proposed hedonic regression model in this case primarily go to weight rather than admissibility, but they are misguided. The Court should deny Kellogg's motion to exclude Mr. Weir's testimony in considering class certification.

## FACTS

Colin B. Weir is Vice President at Economics and Technology, Inc., a research and consulting firm specializing in economics, statistics, regulation and public policy. Weir Decl. at 1. Mr. Weir holds a Masters of Business Administration with honors from the High Technology program at Northeastern University, in Boston, Massachusetts, and a Bachelor of Arts in Business Economics *cum laude* from the College of Wooster, in Wooster, Ohio. *Id.* ¶ 1. Mr. Weir has provided expert testimony before federal and state courts, the Federal Communications Commission, and state and regulatory commissions. *Id.* Moreover, he has specific experience with work involving cereal prior to his engagement in this case. Persinger Decl. Ex. 5, Weir Tr. at 95:3-23.

Mr. Weir was asked "to ascertain whether it would be possible to determine damages on a class-wide basis using evidence common to Class members, and, if so, to provide a framework for the calculation of damages suffered by the class as a result of the allegedly false and misleading Claims." Weir Decl. ¶ 3. To that end, Mr. Weir designed and implemented a preliminary hedonic regression to demonstrate that the model can reasonably calculate damages in this case, which showed a 5.17% premium for "heart health" claims on Raisin Bran and Smart Start. *See id.* ¶¶ 8-9, 31-95.

"A regression analysis is an econometric tool commonly used by economists," that "identifies and quantifies the relationship between two or more variables." *Id.* ¶ 31. The analysis "is used to identify the variation in the so-called 'dependent variable' (such as the price of a cereal) through its relationship with one or more 'independent' or 'explanatory' variables (such as, *e.g.*, a Heart Health Claim or the brand)." *Id.* This technique "can identify both whether a particular effect is present (such as to confirm that a Heart Health claim does increase the price of a Product) and the overall amount of such an effect (by how much such a claim increases the price of a Product). *Id.* Hedonic regression "measure[s] the value of various

1

attributes," and "is based on the concept that each product attribute has a different and measurable impact on aggregate consumer utility." *Id.* ¶ 32. "[T]here are numerous studies that apply the hedonic regression technique to myriad consumer products, and the practice has been adopted by statistical agencies with a focus on measuring consumer prices," *id.* ¶ 33; *see also id.* ¶¶ 36-42 (providing examples of published hedonic regressions in the consumer product mass markets). "Hedonic regression also has a long history of use for determining damages in class action litigation." *Id.* ¶ 34; *see also id.* ¶ 24 & n.25 (collecting cases in which hedonic regression was approved to measure damages in consumer fraud class actions).

"The hedonic regression analysis is conducted using actual aggregated pricing and product attribute information." *Id.* ¶ 43. It effectively takes a "snapshot" of the market as it existed during the relevant time period, in this case, the class period. "In this litigation, the hedonic regression can be specified to separate out the prices that consumers pay and/or the amount of revenue or profit that Defendant will glean, for the Health Claims." *Id.* ¶ 45. This "is an ideal technique for calculating the price difference between the value of the Kellogg Cereals with and without the Health Claims." *Id.* ¶ 50.

In collecting market data, "[t]he time periods, geographies, and relevant Cereal attributes are easily identifiable and determinable," *id.* ¶ 51. Using such information already collected relating to 524 distinct cereals, *see id.* ¶¶ 57-62, 64, 82-85, Mr. Weir designed his preliminary hedonic regression to control for: (i) Heart Health Claims, (ii) Brand, (iii) Sold on Promotion, (iv) Number of Servings, (v) Calories from Fat (% Calories per Serving), (vi) Fiber (% of Serving Size), (vii) Sugar (% of Serving Size), (viii) Protein (% of Serving Size), (ix) Vitamins and Minerals, (x) Grain Type, (xi) Cereal Type, (xii) Natural Claim, (xiii) Non-GMO Claim, (xiv) Organic Claim, (xv) Contains Fruit, (xvi) Contains Nuts, and (xvii) Time Period. *Id.* ¶ 51. Each of these categories includes either various levels (for example, there are 17 different Brands), or are coded as "yes" or "no." *See id.* ¶¶ 65-79.

Once carried out, the regression "produces statistical measures, such as the R-squared statistic, the F-statistic, and T-statistic, all of which can be used to evaluate the reliability of the results of the study." *Id.* ¶ 53; *see also id.* ¶¶ 54-56 (explaining these statistical measures in more detail). Mr. Weir carried out his preliminary hedonic regression[1] and found that it "confirms the existence of a price premium attributable to

---

[1] The regression is preliminary in large part because both Kellogg and Kashi, a company owned by Kellogg, refused in response to plaintiff's discovery requests and subpoenas to provide historical labels for any

2

the Heart Health Claims." *Id.* ¶ 80. In fact, "[t]he preliminary model produced robust results" according to various statistical measures. *Id.* ¶ 87 & Ex. 3; *see also id.* ¶¶ 89-90. Specifically, Mr. Weir's hedonic regression demonstrates that "[c]ereal with a Heart Health Claim carries a 5.17% price premium over cereal with no such claim." *Id.* ¶ 88.

## ARGUMENT

Pursuant to Federal Rule of Evidence 702:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Under Rule 702, the court is charged with a "gatekeeping" obligation, to ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). "Rule 702 is applied consistent with the liberal thrust of the Federal Rules and their general approach of relaxing the traditional barriers to opinion testimony." *Jinro Am. Inc. v. Secure Invests., Inc.*, 266 F.3d 993, 1004 (9th Cir. 2001). As a result, "the burden is not especially onerous," *In re Dial Complete Mktg. & Sales Practices Litig.*, 2013 WL 6798929, at *2 (D.N.H. Dec. 20, 2013) (internal quotations and citations omitted). Moreover, "the scope of the *Daubert* analysis is cabined by its purpose at this stage: the inquiry is limited to whether or not the expert reports are admissible to establish the requirements of Rule 23." *Chen-Oster v. Goldman, Sachs & Co.*, 114 F. Supp. 3d 110, 114 (S.D.N.Y. 2015) (internal quotation and citation omitted); *accord Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 489-96 (C.D. Cal. 2012). "At this early stage, robust gatekeeping of expert evidence is not required," and "the court should ask only if the expert evidence is 'useful in evaluating whether class certification requirements have been met,'" *Ellis v. Costco Wholesale Corp.*, 240 F.R.D. 627, 635-36 (N.D. Cal. 2007) (quoting *Dukes v. Wal-Mart, Inc.*, 222 F.R.D. 189, 191 (N.D. Cal. 2004)); *see also In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604 (8th Cir. 2011).

---

products not at issue in this lawsuit. Kellogg did stipulate, however, that such information was available, and that it would provide historical labels for all of its cereals if the Court certifies the Class based, at least in part, on Mr. Weir's hedonic regression model. *See* Weir Reply Decl. ¶ 96.

*Hadley v. Kellogg Sales Company*, No. 16-cv-4955-LHK-HRL
PLAINTIFF'S OPPOSITION TO KELLOGG'S MOTION TO EXCLUDE OPINION TESTIMONY OF COLIN B. WEIR

In undertaking the *Daubert* inquiry, "the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002). "Frequently . . . gaps or inconsistencies in the reasoning leading to [the expert's] opinion . . . go to the weight of the evidence, not to its admissibility." *Restivo v. Hessemann*, 846 F.3d 547, 577 (2d Cir. 2017) (quotation omitted).

## I.   MR. WEIR'S HEDONIC REGRESSION AND UNDERLYING DATA ARE RELIABLE

### A.   Mr. Weir's Hedonic Regression Considered the Appropriate Independent Variables

Kellogg asserts that Mr. Weir's hedonic regression is "unreliable and fundamentally flawed" because "he failed to take into account several major factors that undoubtedly affect the price of the challenged products" Mot. at 5 (header capitalization omitted): (1) advertising (*id.* at 5-7), (2) calories (*id.* at 7-8), (3) taste (*id.* at 8-9), (4) saturated fat and cholesterol (*id.* at 9-10), and (5) whether a product is made of whole grain (*id.* at 10). Kellogg is wrong.

<u>First</u>, the premise is wrong. While "[o]mitted variable bias *may* occur when a relevant variable that is correlated with the main variable of interest is not included in a regression model," "not all omitted variables cause bias." Weir Reply Decl. ¶ 22 (emphasis added). Instead, bias "exists only when an omitted variable is strongly correlated with the main variable of interest *and* when economic theory suggests that the omitted variable has an effect on the dependent variable (i.e. the variable is 'relevant')." *Id.* ¶ 29. Here, however, neither Kellogg nor its experts offer any evidence that the supposed omitted variables have an effect on the price premium estimate for Heart Health; their theories are untested *id.* ¶ 32 and unsupported by the economic literature *id.* ¶¶ 33-41. And in any event, "[w]hile the omission of variables from a regression analysis may render the analysis less probative than it otherwise might be," such omission does not usually render an analysis inadmissible. *Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (Brennan, J., concurring).

The Reference Guide on Multiple Regression makes clear that "***[n]ot all possible variables that might influence the dependent variable can be included if the analysis is to be successful***; some cannot be measured, and others may make little difference [and] ***the inclusion of explanatory variables*** that are irrelevant (i.e., not correlated with the dependent variable) ***reduces the precision of the regression results***." *Id.* ¶ 34 (citation omitted). Thus, the consensus is that while "[r]esearchers can often identify many variables

4

that may be important predictors, . . . *they should narrow these down to the most effective predictors* that can be measured . . . ." *Id.* ¶ 35 (citation omitted); *see also id.* ¶ 87 (discussing why it is "not necessary to include every conceivable variable in a regression analysis" and noting that "[t]extbooks warn against it" and "[t]he peer reviewed literature contains numerous studies that do not include all possible elements or attributes of consumer behavior").) Mr. Weir has narrowed the variables in his regression here to the most effective predictors by consulting relevant economic literature that shows general agreement on the inclusion of many of the variables included in his model, and even more agreement as to the exclusion of the variables suggested by Kellogg and its experts. *See* Weir Decl. ¶¶ 36-37, 93; Weir Reply Decl. ¶¶ 33, 38-41, 46, 56, 68, 73, 75, 80, 83, 87.

Second, the criticism is wrong, as neither advertising, calories, saturated fat and cholesterol, or whole grain content is an important and excluded attribute.

### 1. It is Economically Improper to Include Advertising as an Independent Variable in Hedonic Regression

Kellogg's first argument—that a regression model cannot competently assess class-wide damages if it does not control for the effect of advertising on the price of the challenged products" (Mot. at 5-6) "relies on excessive sleight of hand, because there are *no hedonic models that control for advertising overtly using an independent variable in the specification of the model*" Weir Reply Decl. ¶ 43. Instead, "the way to control for advertising in a hedonic model is through the use of appropriate product attributes, and sales data reflecting real world market data." *Id.* Mr. Weir explained this at length in his opening declaration. *See* Weir Decl. ¶¶ 91-95.

Despite that Kellogg relies on his opinion to support its argument, even Dr. Wilcox is not aware of any peer reviewed hedonic regression that overtly includes advertising as an independent variable in the specification and in fact, did not even search for any such articles before offering his opinion on the matter. *See* Persinger Decl. Ex. 3, Wilcox Tr. at 26:6-15. Had Dr. Wilcox done "even a cursory review of the economic literature," he would have learned "that advertising is not included in hedonic regression models" as an independent variable. Weir Reply Decl. ¶ 46. Indeed, "[e]ven the article specific to cereal relied upon by Wilcox himself does not include advertising as a variable in the hedonic model." *Id.* (citing Karen J. Morgan, et al., "An Hedonic Index for Breakfast Cereals," Journal of Consumer Research 6, no. 1, June 1979,

pp. 67–75). A review of an additional five published hedonic regression studies reveals "not one of them controls for advertising using an independent variable." *Id.* ¶ 47; *see also* Weir Decl. ¶ 93 ("In my personal review of the literature, I have never seen advertising included in a hedonic model."). This is because doing so would be "economically inappropriate," Weir Decl. at p. 24 (header emphasis omitted).

The possible effects of advertising confirm the economic impropriety of separately accounting for advertising as an independent variable. Specifically, as explained in Mr. Weir's initial declaration, "[a]dvertising may have two possible effects: changes in the number of units sold, or changes in price per unit." *Id.* ¶ 93.  Both are accounted for in calculating damages based on a price premium. "To the extent that advertising caused an increase in the number of units sold, the results of the hedonic model, multiplied by total sales, takes this effect into account." *Id.* And "[t]o the extent that advertising caused an increase in the price of the product, this too is accounted for in the hedonic model" through each product's pricing. *Id.* ¶ 94.

Kellogg's example of the hypothetical $5 and $10 General Mills cereals is unrealistic and incomplete. It is unrealistic because the arbitrary prices selected by Kellogg are not the market, whereas the prices in Mr. Weir's hedonic regression were actual market prices set by the demand and supply side characteristics of the market. In reality, a $10 cereal would have virtually no chance of remaining competitive and surviving in the market and, accordingly, no company would price their product so high. In addition, the proposed hedonic regression looks at many variables aside from the presence or absence of a "heart health" claim, yet Kellogg's example omits the entire regression specification, including all of the control variables. It is these omitted variables which control for advertising. In essence, Kellogg removes the variables which control for advertising and then complains advertising costs would be wrongly attributed to the heart health claim. Finally, Kellogg attempts to use the shelf price differential as the measure of the price premium, without controlling for any other differences. Mr. Weir's hedonic regression, however, measures the price premium solely attributable to Kellogg's conduct on a *percentage* basis. *See* Weir Reply Decl. ¶¶ 49-55.

Kellogg's reliance on *Brazil v. Dole Packaged Foods, LLC*, 2014 WL 5794873 (N.D. Cal. Nov. 6, 2014), Mot. at 6, is misplaced. There, the Court found important the expert's initial promise to account for advertising in his damages model, and subsequent failure to do so. *Id.* at *11. Additionally, while the expert suggested that he would control for advertising in a "before and after" regression model that studied the effect of the "Natural" labeling Claim on the amount of *sales*, *id.* at *5, *11, it does not appear he made any

such promise to control for advertising in a hedonic regression model studying changes in *price*. Ultimately, despite promising to control for advertising, the expert "admit[ted] that he did not control for [that] variable" and "[h]is expert report never mention[ed] why he chose not to do so." *Id.* at *11. Here, by contrast, Mr. Weir has twice explained in detail his decision not to include advertising as an independent variable Weir Decl. ¶¶ 91-95; Weir Reply Decl. ¶¶ 41-48, a decision supported by peer reviewed literature, and the testimony of Kellogg's own expert, Dr. Wilcox. Weir Decl. ¶ 93; Weir Reply Decl. ¶¶ 44-45.

### 2. Economic Literature Supports Inclusion of Fat Calories but not Total Calories

Next, Kellogg asserts that because "calories per serving ha[ve] a profound influence on food purchasing," Mr. Weir erred by not including an independent variable for total calories. Mot. at 7-8. Yet Kellogg's own expert found a regression result for calories per serving of 0.0027, Wilcox Tr. at 7:2-8:4, suggesting a less than three-tenths of one percent impact on price. Weir Reply Decl. ¶ 60.

Although Kellogg criticizes Mr. Weir's reliance on a study published in 1991 to support his position that calories per serving need not be included in a hedonic regression (*see* Mot. at 7-8), its own expert cited only a single article published in 1979. Notably, unlike Dr. Wilcox's 1979 study, Mr. Weir's cited study was published after the NLEA was enacted in 1990, changing the way packaged food products are labeled, making Mr. Weir's article a more relevant and reliable source regarding which independent variables to consider in a hedonic regression relating to labeling of packaged food products. *See* Weir Reply Decl. ¶¶ 57-58. But even if Kellogg's criticism had merit, it would not apply to the highly-respected and often-cited studies of the ready-to-eat cereal market published in 2000 and 2001, which include "fat calories" but not "calories per serving" in the model for consumer demand for cereal. *See id.* ¶ 59. In short, Kellogg's position is simply not supported by the recent state of literature on this subject. *Id.*

Moreover, including both calories per serving and percent calories from fat, as Dr. Wilcox did, leads to double counting of calories and thereby introduces avoidable multicollinearity into his regression model. *Id.* ¶¶ 62-64 (citing Wilcox Report ¶¶ 43-45). As a result of the relationship between the two attributes (when calories from fat increase, so do calories per serving), this could—and does—lead to "'estimation problems' both for the measure of calories and the Heart Health claims." *See id.* Indeed, despite claiming that the 1991 study "does not remotely support his position" (Mot. at 8), it expressly declined to consider total calories because "including them would cause serious multicollinearity problems" as they were already "determined

7

*Hadley v. Kellogg Sales Company*, No. 16-cv-4955-LHK-HRL
PLAINTIFF'S OPPOSITION TO KELLOGG'S MOTION TO EXCLUDE OPINION TESTIMONY OF COLIN B. WEIR

by other variables included in the function" Dkt. No. 171-4, Ex. 28 to the Omnibus Decl. of Kenneth K. Lee in Supp. of Mots. To Exclude, at 538. In contrast, the author declined to include fat as an independent variable only "because the fat content varies little among cereals," a fact which may have been true in 1991, but is not true today.[2]

Without explanation, Kellogg argues that "calories per serving is critical to Plaintiff's contention that he . . . faces increased risk of disease," but, as Kellogg admits, "the gravamen of his lawsuit is that calories *from excessive sugar*" causes disease, Mot. at 8 (emphasis added), and Mr. Weir's hedonic regression includes "sugar" as a "[percentage] of Serving Size." Weir Decl. ¶ 51. Kellogg's reliance on the FDA's *proposal* to remove "calories from fat" information from labels, Mot. at 8, is similarly misplaced. That the FDA may believe calories from fat is not useful in helping consumers "judge the healthfulness of a product," Mot. at 8 (quotation omitted), does not mean that it does not affect product pricing or consumer choice, let alone that it is improper to include in a hedonic regression. For example, "fat contributes to the texture, flavor, and aroma of a wide variety of foods" and "[i]n general, the most palatable foods are those that are both energy-dense and high in fat content." Persinger Decl. Ex. 7, Adam Drewnowski and Eva Almiron-Roig, Fat Detection: Taste, Texture, and Post Ingestive Effects, Chapter 11 Human Perceptions and Preferences for Fat-Rich Foods (2010). This fact also undermines Kellogg's argument that taste was not accounted for in Mr. Weir's hedonic regression. *See* Mot. at 8-9.

### 3.   Subjective Taste Cannot Be Captured, But Objective Indicia of Taste are Included in Mr. Weir's Hedonic Regression Model

Taste is of course an important characteristic of a food in terms of consumer choice, but, although not included as an express attribute, it is not excluded from the hedonic regression. First, as even Dr. Wilcox acknowledges, taste is a subjective attribute, Wilcox Tr. at 30:20-23, and thus cannot be included as an independent attribute. Indeed, "there is no support in the economic literature for the inclusion of a subjective measure of taste in a hedonic regression as its own variable," including in the article relied on by Dr. Wilcox. Weir Reply Decl. ¶¶ 67-68. Rather, as Mr. Weir explains, taste "must be controlled for indirectly." *Id.* ¶ 70.

---

[2] For example, Kellogg's Cracklin' Oat Bran has seven grams of fat per serving, while cereals like Kellogg's Corn Flakes have none . *See* https://www.kelloggs.com/en_US/products/kellogg-s-cracklin-oat-bran-cereal-product.html#nutrition-modal;   https://www.kelloggs.com/en_US/products/kellogg-s-corn-flakes-cereal-product.html.

Mr. Weir did this by including brand as an independent attribute, as is "often" done in a regression analysis. *Id.* ¶ 71-72. Other objective indicia of taste were also included in Mr. Weir's hedonic regression, such as grain type, cereal type, whether it contains fruits or nuts, fiber content, sugar content, and, as discussed above, calories from fat. Weir Decl. ¶ 51; *see also* Weir Reply Decl. ¶¶ 66-67; Weir Tr. at 119:3-13; Dkt. No. 171-4, at Table 1 (type of grain, type of cereal, grams of sweeteners, grams of fiber all account for taste). Tellingly, neither Kellogg nor its experts suggest any method for including taste beyond these objective indicia of taste, which were already included in Mr. Weir's hedonic regression.

### 4. The Economic Literature Does Not Support the Inclusion of Saturated Fat and Cholesterol

Like the other attributes Kellogg argues were excluded, the economic literature does not support inclusion of saturated fat or cholesterol as an independent variable in a hedonic regression model, Weir Reply Decl. ¶¶ 73-76, and saturated fat is redundant of the "calories-from-fat" variable, *id.* ¶ 73; *see also* Weir Tr. 135:19-136:9, and thus its inclusion would create multicollinearity issues similar to accounting for both total calories and calories from fat. Moreover, all 524 cereals included in Mr. Weir's hedonic regression have zero cholesterol per serving. "[T]he use of a variable in a hedonic regression is to control for that underlying variation," so when "there is a product attribute that has no variation, as is the case for cholesterol per serving, there is no need to include a separate variable." Weir Reply Decl. ¶ 77.[3]

### 5. Mr. Weir Accounted for Whole Grain by Including Grain Type and Fiber

While Kellogg points out that Mr. Weir did not include an independent variable for whether a cereal "prominently touts" that the "product is made of whole grain," Kellogg does not explain why it believes such a variable should be included or how omitting it renders Mr. Weir's hedonic regression model unreliable. *See* Mot. at 10 In any event, Mr. Weir's "regression includes numerous controls for grain type through the use of a series of 'grain type' variables. Weir Reply Decl. ¶ 79; *see also* Weir Decl. ¶¶ 51, 65, 72. Mr. Weir

---

[3] FDA regulations regarding the term "heart healthy" are beside the point. The Court has already ruled that Kellogg "has not shown that the heart healthy statements are authorized by the FDA regulations," *Hadley v. Kellogg Sales Co.*, 273 F. Supp. 3d 1052, 1076 (N.D. Cal. 2017), *see also* Dkt. No. 123 at 3 (striking preemption affirmative defense; *see also* Persinger Decl. Ex. 8, March 7, 2018 Hr'g Tr., at 38:21-23 ("anything that's left in the case after the second round of motions to dismiss, which was filed on August 10, 2017, I found is not preempted"); *id.* at 39:23-24 ("I already ruled on them as a matter of law that there's no preemption."); *id.* at 40:2-7 ("the fifth defense is . . . stricken with prejudice").)

also included a variable for fiber content. Weir Reply Decl. ¶ 78; Weir Decl. ¶ 51.

In sum, almost all of the variables identified by Kellogg are already controlled for by other variables included in the hedonic regression, with the sole exception of cholesterol, which does not vary at all among the 524 cereals included in the analysis, and Mr. Weir's inclusion of some variables and exclusion of others is supported in the economic and hedonic regression literature. Accordingly, the Court should conclude that Mr. Weir did not omit any major variables that would render his proposed hedonic regression unreliable. *Cf. Langan v. Johnson & Johnson Consumer Cos., Inc.*, 2017 WL 985640, at *6 (D. Conn. Mar. 13, 2017) (finding admissible Weir's testimony regarding a hedonic regression model because "[w]hether or not Weir made the perfect or best possible methodological choice with respect to all these variables, [the Court was] convinced that he did not omit 'the major variables' that would warrant preclusion of his analysis at trial." (citing *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999))).

## B.   Mr. Weir Does not Cherry-Pick or Miscode Data

Kellogg makes three arguments in support of its assertion that "Mr. Weir's underlying data is unreliable, miscoded, and riddled with errors: (1) that Mr. Weir "'cherry-pick[ed] the time-frame or data points so as to make [his] ultimate conclusion stronger, Mot. at 10-12 (quotation omitted), (2) that Mr. Weir did not "apply an objective, consistent definition of 'heart healthy,'" Mot. at 12-13, and (3) that Mr. Weir's coding system "does not adequately take into account the variations within each category that could explain price differentials," Mot. at 13. None supports the conclusion that Mr. Weir's testimony in support of class certification is unreliable.

First, Kellogg exaggerates the extent to which some labels did not contain a heart health claim, pointing to a single promotional period for Cheerios that featured Ellen DeGeneres, labels for which are dated between September 14, 2017 and November 12, 2017, showing the promotion lasted no more than two months. Persinger Decl. Ex. 9, GMIHADLEY18. Kellogg's arguments regarding Malt-O-Meal labels omits that there are bagged and boxed versions of these cereals. As Kellogg's exhibits demonstrate, the bagged versions of these cereals had the heart health claim. *See* Dkt. Nos. 166-2, 166-4. That the boxed versions did not have the claim does not show that it did not remain on the bagged version. Regarding Quaker Life Original and Alpen Muesli, Kellogg relies on undated and unverified images obtained from Amazon.com in June of 2018, which only include the front of the box. Kellogg's All-Bran label dated November 13, 2017 is

10

similarly not proof that All-Bran never bore a Heart Healthy claim during the class period.

In any event, these small errors relating to the dates each heart health claim was in use do nothing to invalidate the method used by Mr. Weir. At the class certification stage, plaintiff need only "present a *likely* method for determining class damages," and "it is not necessary to show that this method will work with certainty," *Chavez v. Blue Sky Natural Beverage Corp.*, 268 F.R.D. 365, 379 (N.D. Cal. 2010) (emphasis added, quotation omitted).

Mr. Weir's testimony is needed only to show that the proposed hedonic regression is a reliable and likely *method* for determining classwide damages and to "demonstrate[e] the design and functionality of the hedonic regression model, the data need not be fully coded." Weir. Reply Decl. ¶ 97. Small errors in data entry that can be easily fixed[4] do not invalidate the entire method Mr. Weir used, which does in fact code for products over time, Weir Reply Decl. ¶¶ 95-101, but instead at most imply that the data will need to be updated, which the class certification standard itself contemplates by allowing certification based on proposed damages models. *See, e.g., Brazil*, 2014 WL 5794873, at *5 ("In granting class certification, the Court relied on Dr. Capps' representation that he would be conducting this type of before-and-after analysis once Dole provided him the necessary discovery."); *Sanchez-Knutson v. Ford Motor Co.*, 310 F.R.D. 529, 539 (S.D. Fla. 2015) ("[T]he Court disagrees with Defendant that Mr. Gaskin[] must have already performed his proposed conjoint analysis for the Court to consider the proffered methodology." (citing *Guido v. L'Oreal, USA, Inc.*, 2014 WL 6603730, at *8 (C.D. Cal. July 24, 2014) (rejecting argument that plaintiff's expert must have already performed his proposed conjoint analysis testimony should be inadmissible because plaintiff's expert had not yet performed the conjoint analysis in that case)); *Zakaria v. Gerber Prods. Co.*, 2016 WL 6662723, at *16 (C.D. Cal. Mar. 23, 2016) ("Plaintiff here has not completed the damages calculations. But, this does not preclude a finding of predominance. The theories of liability and proposed methods for calculating damages are sufficient.").

In short, plaintiff needs only show a likely method for calculating classwide damages, and Kellogg's attacks on the precise dates a small group of labels were in use does nothing to undermine Mr. Weir's

---

[4] *See* Weir Reply Decl. ¶ 107 ("even if the empirical evidence suggested that it was important to control for changes to product labels over time, it is entirely possible to incorporate this information into my regression model if the class is certified").

testimony regarding the methodology proposed for calculating classwide damages. *See* Weir Reply Decl. ¶¶ 102-107. *See also Langan*, 2017 WL 985640, at *6 (rejecting argument that Weir's report was unreliable because "Weir had access to incomplete data and labels" since "tweaking the model to account for these dates would not substantially affect the calculated price premium" and "the fact that Weir did have complete access to the labelling information of every relevant product [did not] render the entire study unreliable" and concluding that "[t]hese are comparatively minor concerns that can be pursued at trial").

Moreover, "the effects of label changes over time have a *de minimis* impact on the calculation of the Heart Health Claim price premium, especially where changes over time, such as those identified by Defendant, tend to be promotional in nature, and as such fleeting and impermanent." *Id.* ¶ 100; *see also* Weir Tr. at 193:6-11 (data" does not need to be perfectly accurate to get statistically precise results from the regression"). To demonstrate, Mr. Weir re-ran his preliminary regression model by removing entirely the historic changed labels for the challenged products over time. *Id.* ¶ 108. This change resulted in less than a 0.2% change in the price premium associated with the "heart healthy" claim. *See id.* ¶¶ 106-107.

Next Kellogg argues that Mr. Weir did not "apply an objective, consistent definition of 'heart healthy' when coding" the products, complaining that he does not "explain the criteria he used when determining whether a cereal had a 'heart healthy' statement." *See* Mot. at 12. But as even Kellogg acknowledges, in grouping heart health claims, Mr. Weir looked for "whether . . . the product connoted heart healthiness or referenced that it could potentially provide some amount of Heart Health." *Id.* (quoting Weir Tr. at 188:4-11). As he testified, Mr. Weir based his grouping of heart health claims on "a review of plaintiff's allegations in this case, the theory of liability, a review of many of these Heart Health claims, and [his] past experience in understanding consumer behavior and perception as it relates to the similarity of these types of claims where [he's] made similar groupings of claims." Weir Tr. at 189:7-17. Such groupings are necessary in performing hedonic regressions and are supported by economic and hedonic regression literature. *See* Weir Reply Decl. ¶ 108. "[V]ariables in a regression are by their nature representative, and . . . any meaningful data analysis requires some level of abstraction." *Id.* ¶ 111. Accordingly, "in the hedonic regression literature it is common to group together like product attributes into a single variable describing those attributes." *Id.* ¶ 113; *see also id.* ¶¶ 113-15 (describing hedonic literature that groups product attributes, including "any

natural claims" and "promote[s] the grouping of every type of labeling claim").[5] Thus the Court should reject Kellogg's argument that Mr. Weir's grouping of heart health claims somehow renders his hedonic regression unreliable. *See Langan*, 2017 WL 985640, at *6 (rejecting argument that Mr. Weir improperly grouped "claims such as 'health,' 'healthy,' 'safe,' and 'clinically proven,' under the one variable of 'health claims'" because "to make a workable regression analysis . . . some judgment is required to consider similar-but-not-identical claims together in order to find sufficiently robust results" and "Weir made a reasonable methodological choice that does not render the analysis so unreliable that [the court] must exclude it.").

Without support of any expert testimony, case law, or relevant literature, Kellogg argues Mr. Weir erred by coding cereals as having heart health claims "regardless of whether it appeared" on the front, side or back of box because "the location and prominence of that statement likely have an impact on the alleged price premium for that label." *See* Mot. at 13. While statements on different parts of the packaging may not be identical in the strictest sense, that does not mean that they are inappropriately grouped for purposes of running a hedonic regression, as the economic and hedonic regression literature demonstrate. *See* Weir Reply Decl. ¶¶ 111-12. Moreover, "if th[e] claims were too dissimilar in their impact in the marketplace, the regression would not be able to measure a statistically significant price premium as a result of them." Weir Tr. at 192:6-10.

**C.    Plaintiff's Damages Models Account for the Effect of Multiple Labeling Claims**

Kellogg asserts that Mr. Weir's regression model "is not capable of assessing the cumulative effect of multiple labeling claims . . . used together." Mot. at 14. However, both Mr. Weir and Mr. Gaskin "set forth methods that can be used to measure more than one attribute of a product at a time, as is evident by the long list of variables included in my regression analysis and claims to be tested in Gaskin's conjoint." Weir Reply Decl. ¶ 125. In short, plaintiff's proposed models are capable of measuring the impact of claims standing alone, or in combination, depending on what is determined to be legally and factually appropriate. *See id.* ¶ 126.

---

[5] Even if every single instance of supposed heart health claim miscoding identified by Kellogg and its experts were fixed in the manner Kellogg asserts is necessary, Mr. Weir re-ran the regression and concluded "changing the coding for these cereals either does not have a material impact on the results of the measurement of the Heart Health Claims, or is a favorable adjustment for the Plaintiff." Weir Reply Decl. ¶ 118. In fact, making the edits suggested by Kellogg results in a *higher* price premium for heart health claims. *See id.* & Table 5.

## II.     MR. WEIR IS QUALIFIED TO OFFER HIS OPINIONS

Kellogg argues that Mr. Weir is not qualified to offer his opinions because although "he has expertise in statistics," he "has no specialized training in consumer research or consumer behavior," Mot. at 14-15. This, however, is "a rather disingenuous statement." Weir Reply Decl. ¶ 127. In fact, Mr. Weir has "advanced educational training and professional experience in the relevant areas of [consumer research and consumer behavior]," *id.*, as he testified in detail at his deposition. *See* Weir Tr. at 29:10-31:1. In testifying that he had "expertise in . . . some sections of the marketing and consumer behavior disciplines," *id.* at 29:11-14, Mr. Weir explained that "a lot of [his] research focuses on product labeling and communications to consumers," and "that area of marketing is something that [he's] studied closely and analyzed closely for . . . 15 years," *id.* at 29:22-30:2. Mr. Weir has 11 years' experience with "[t]he technique of conjoint analysis," which "comes out of the marketing discipline," *id.* at 30:4-6, and "graduate-level training and postgraduate training in the design, execution, and analysis of conjoint surveys," *id.* at 30:16-18.

More specifically, his "undergraduate degree in business economics included multiple classes in marketing, survey research, and other consumer research areas on top of the usual curriculum including statistics and econometrics," and his "MBA . . . included training in marketing, survey research including conjoint analysis, and understanding the behavior of companies when they label their products," as well as "post-graduate training in conjoint analysis." Weir Reply Decl. ¶ 130. At deposition, Mr. Weir identified no less than *22 cases* in which he has been involved in the design, execution, or analysis of a conjoint survey. Weir Tr. at 32:19-37:1. Mr. Weir has also testified that he is an expert in hedonic regression analysis, *see id.* at 30:10-13, identifying 11 other cases in which he "submitted testimony about the results of a hedonic regression or the design of a hedonic regression," *id.* at 31:7-32:15. This case is thus a far cry from the situation in *Wolf v. Hewlett Packard Co.*, *see* Mot. at 15, where the expert had *no experience* with "consumer behavior prediction generally, [or] in the performance or analysis of conjoint studies," *see* 2016 WL 7743692, at *6 (C.D. Cal. Sept. 1, 2016).

Although Kellogg is dismissive of Mr. Weir's "career working for a single economic consulting firm," *see* Mot. at 15, "that career has been spent analyzing consumer purchasing behavior, and market pricing," including "giv[ing] public testimony in over sixty proceedings that relate to consumer purchases and market pricing," "dozens of other projects for private clients that have not resulted in public testimony,"

14

*Hadley v. Kellogg Sales Company*, No. 16-cv-4955-LHK-HRL
PLAINTIFF'S OPPOSITION TO KELLOGG'S MOTION TO EXCLUDE OPINION TESTIMONY OF COLIN B. WEIR

and "publish[ing] papers on how the pricing of various products affect the US economy," Weir Reply Decl. ¶ 131. It is precisely this experience, in combination with his education and training, which renders him qualified to offer his opinions in this matter. *See*, *e.g.*, *Romero v. S. Schwab Co., Inc.*, 2017 WL 5885543, at *12 (S.D. Cal. Nov. 29, 2017) ("A witness can qualify as an expert through practical experience in a particular field, not just through academic training." (quoting *Rogers v. Raymark Indus., Inc.*, 922 F.2d 1426, 1429 (9th Cir. 1991) (citation omitted)). Kellogg's argument is also odd in light of the fact that the expert it hired to rebut Mr. Weir's testimony, Dr. Wilcox, has a "background . . . similar to" Mr. Weir's, with "concentration in . . . marketing and econometrics." *See* Weir Reply Decl. ¶ 132 (quoting Wilcox Tr. at 58:17-18).

Taking a half sentence from Mr. Weir's deposition out of context, Kellogg alternatively asserts that Mr. Weir is not qualified to offer his opinions because he is "far removed from the cereal market." *See* Mot. at 15 (quoting Weir Tr. at 120:15-16). Mr. Weir actually testified only that he does not personally consume cereal and could not immediately remember during deposition which company manufactures Chex. Weir Reply Decl. ¶¶ 91-92. Yet while Mr. Weir is "removed from the cereal market to the extent that [he is] not a consumer of the product," he nevertheless "h[as] professional and educational experience that place[s] [him] square in the middle of the cereal market when it comes to measuring price and demand for cereals." *Id.* ¶ 93. Notably, Kellogg omits Mr. Weir's deposition testimony that Mr. Weir has "worked on several engagements relating to the cereal market . . . . analyzing price premium and demand for certain cereal products that relate to certain claims or product attributes." *Id.* at ¶ 94 (quoting Weir Tr. at 95:3-23).

Kellogg also cites *Laumann v. Nat'l Hockey League*, 117 F. Supp. 3d 299, 310 (S.D.N.Y. 2015), for the proposition that Mr. Weir "relie[d] too heavily on mathematical assumptions . . . and too little on actual data about consumers and their preferences," Mot. at 15. This argument ignores Mr. Weir's review of "detailed research by and on behalf of Kellogg as it relates to consumer behavior and response to health claims," and his reliance "on extensive data that reflects consumer behavior in the marketplace," which even Kellogg's expert, Dr. Wilcox, agrees is the "'gold standard' for understanding consumer behavior." Weir Reply Decl. ¶ 133; *see also* Dkt. No. 143-1, Weir Decl. Ex. 2 (listing documents considered).

Simply put, Mr. Weir is more than qualified by his education, training, and extensive experience to offer his opinions in this matter, as other courts have consistently found in cases in which Mr. Weir has offered similar testimony. *See*, *e.g.*, *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 943-48 (C.D. Cal. 2015)

15

*Hadley v. Kellogg Sales Company*, No. 16-cv-4955-LHK-HRL
PLAINTIFF'S OPPOSITION TO KELLOGG'S MOTION TO EXCLUDE OPINION TESTIMONY OF COLIN B. WEIR

1   (noting Weir's qualifications and denying motion to strike Weir's testimony because his methodology in

2   designing a hedonic regression was sufficiently reliable); *Dzielak v. Whirlpool Corp.*, 2017 WL 1034197, at

3   *21 (D.N.J. Mar. 17, 2017) (finding "Mr. Weir is sufficiently qualified" to opine on "price premium"

4   damages because "his education and experience have given him a specialized knowledge in damages

5   calculations that may help a jury understand the evidence or make a determination" (citing Fed. R. Evid.

6   702)); *Grayson v. Gen. Elec. Co.*, 2017 WL 923907, at *7 (D. Conn. Mar. 7, 2017) ("The Court notes that

7   previous courts have deemed Weir to be a qualified expert with regard to damages calculations." (citing

8   *Hughes v. The Ester C Co.*, 317 F.R.D. 333, 342 (E.D.N.Y. 2016) (collecting cases))).

9   **III.    BECAUSE RULE 26 DISCLOSURES ARE DUE IN SEPTEMBER, MR. WEIR MAY OF**

10          **COURSE AMEND HIS REPORT**

11          Kellogg says Mr. Weir "may attempt to submit an amended report that attempts to remedy the

12   deficiencies Kellogg has identified," and implores the Court "not [to] permit him to do so." Mot. at 16.

13   Kellogg seems to forget the current procedural posture.

14          We are at the class certification stage, where plaintiff's burden is to "present a *likely* method for

15   determining class damages," which he need not "show . . . will work with certainty." *Chavez*, 268 F.R.D. at

16   379 (emphasis added, quotation omitted). Accordingly, the class certification standard itself contemplates

17   that expert testimony may be of a preliminary, "proof of concept" or proposal nature, with more substantive

18   work to come following certification. *See*, *e.g.*, *Brazil*, 2014 WL 5794873, at *5; *Sanchez-Knutson*, 310

19   F.R.D. at 539; *Zakaria*, 2016 WL 6662723, at *16.

20          Consistent with these requirements, another of plaintiff's experts, Mr. Gaskin, designed and

21   thoroughly described his proposed conjoint surveys, but has not yet executed them. Accordingly, Mr. Weir

22   could not estimate the resulting damages, only that he will be able to do so on a classwide basis once Mr.

23   Gaskin's surveys were completed. Thus, he is *of course* going to provide a more fulsome expert report later

24   in the litigation—just as the Scheduling Order contemplates. Dkt. No. 80 at 2 (Opening Expert Reports due

25   September 20, 2018).

26          Similarly, in the interest of easing the discovery burden on Kellogg, plaintiff stipulated to staying a

27   request for the historical record of Kellogg's remaining cereals pending the outcome of the certification

28   motion, with Kellogg agreeing to produce those labels if Mr. Weir's hedonic model is certified. Kellogg's

16

*Hadley v. Kellogg Sales Company*, No. 16-cv-4955-LHK-HRL
PLAINTIFF'S OPPOSITION TO KELLOGG'S MOTION TO EXCLUDE OPINION TESTIMONY OF COLIN B. WEIR

counsel similarly represents Kashi, a Kellogg company and the recipient of a subpoena from plaintiff seeking its labels, but Kellogg's counsel similarly refused. Presumably, if Mr. Weir's hedonic regression model is certified, Kashi will withdraw its objections and also produce relevant labels. Plaintiff's counsel also has a similar agreement with Quaker, after reaching a compromise at this stage wherein Quaker provided only some labels for use in the preliminary hedonic regression for class certification purposes. Persinger Decl. ¶ 11. Thus, following class certification, Mr. Weir very much intends—by design and the parties' agreement—to update his model and provide a further report when due in September.

## CONCLUSION

The Court should deny Kellogg's motion in its entirety.


Dated: June 25, 2018                    Respectfully Submitted,
                                        /s/ Jack Fitzgerald

                                        **THE LAW OFFICE OF**
                                        **JACK FITZGERALD, PC**
                                        JACK FITZGERALD
                                        *jack@jackfitzgeraldlaw.com*
                                        TREVOR M. FLYNN
                                        *trevor@jackfitzgeraldlaw.com*
                                        MELANIE PERSINGER
                                        *melanie@jackfitzgeraldlaw.com*
                                        Hillcrest Professional Building
                                        3636 Fourth Avenue, Suite 202
                                        San Diego, CA 92103
                                        Phone: (619) 692-3840
                                        Fax: (619) 362-9555

                                        ***Attorneys for Plaintiff and the***
                                        ***Proposed Class***

17

*Hadley v. Kellogg Sales Company*, No. 16-cv-4955-LHK-HRL
PLAINTIFF'S OPPOSITION TO KELLOGG'S MOTION TO EXCLUDE OPINION TESTIMONY OF COLIN B. WEIR