UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| STEPHEN HADLEY,<br><br>        Plaintiff,<br><br>    v.<br><br>KELLOGG SALES COMPANY,<br><br>        Defendant. | Case No. 16-CV-04955-LHK<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR CLASS CERTIFICATION; DENYING DEFENDANT'S MOTION TO EXCLUDE OPINION TESTIMONY OF STEVEN P. GASKIN**<br><br>Re: Dkt. Nos. 129, 167 |

Plaintiff Stephen Hadley ("Plaintiff") brings the instant putative class action against Defendant Kellogg Sales Company ("Kellogg") for allegedly misleading statements on Kellogg's food product packaging. Before the Court are (1) Plaintiff's motion for class certification; and (2) Kellogg's motion to exclude the opinion testimony of Steven P. Gaskin. Having considered the parties' briefing, the relevant law, and the record in this case, the Court GRANTS in part DENIES in part Plaintiff's motion for class certification, and DENIES Kellogg's motion to exclude the opinion testimony of Steven P. Gaskin.

## I.    BACKGROUND

### A. Factual Background

Kellogg is a "multi-billion dollar food company that manufactures, markets, and sells a wide variety of cereals and bars, among other foods." ECF No. 62, Second Amended Complaint ("SAC") ¶ 108. Plaintiff alleges that Kellogg has "positioned itself in the market as a purportedly 'healthy' brand of processed food, by using various labeling statements to suggest its foods, especially its cereals and bars, are healthy choices." *Id.* ¶ 112.

Plaintiff "has been a frequent cereal eater for many years." *Id.* ¶ 249. Over the past several years, Plaintiff has purchased Kellogg's breakfast cereals and cereal bars. *Id.* ¶ 250–51. During that time period, Plaintiff allegedly "tried to choose healthy options, and has been willing to pay more for cereals he believes are healthy." *Id.* ¶ 249.

This case concerns statements on the packaging for breakfast cereals and cereal bars sold by Kellogg that indicate that Kellogg's products are healthy when excess added sugar allegedly causes those products to be unhealthy. Plaintiff alleges that eight of Kellogg's product lines are sold with misleading packaging. *See* SAC ¶¶ 120–23. Four of those product lines are relevant to the instant order: (1) Kellogg's Raisin Bran; (2) Kellogg's Frosted Mini-Wheats; (3) Kellogg's Smart Start—Original Antioxidants; and (4) Nutri-Grain Soft-Baked Breakfast Bars. *See id.*; ECF No. 129 at 1.

In general, Kellogg's products are alleged to contain 9 to 16 grams of total sugar per serving and are 18% to 40% added sugar by calorie. *See* SAC App. 1. Plaintiff alleges that the consumption of added sugar can have significant health impacts on individuals. Specifically, Plaintiff states that people in the United States consume excess added sugar, that people can become addicted to added sugar, and that excess added sugar consumption has been empirically linked to metabolic syndrome, type 2 diabetes, cardiovascular disease, liver disease, obesity, inflammation, high cholesterol, hypertension, Alzheimer's disease, and some cancers. SAC ¶¶ 9–107.

Moreover, Plaintiff alleges that the American Heart Association ("AHA") has found that a

person is "safe" to consume up to 5% of his or her daily calories in added sugar, which amounts to approximately 25 grams of added sugar on a 2000 calorie diet. *Id.* ¶ 26. On the other hand, the United States Food and Drug Administration ("FDA") has concluded that the Daily Recommended Value ("DRV") of added sugars is 10% of a person's daily calories, or approximately 50 grams of added sugar. Based on these values, Plaintiff alleges that Kellogg's products are unhealthy because they contain a higher percentage of added sugar (18%–40% of total calories per serving) than the daily "safe" percentage of added sugar recommended by the AHA or the DRV recommended by the FDA.

Plaintiff asserts that the packaging for Kellogg's products displays multiple statements touting the health and wellness benefits of consuming Kellogg's products that are misleading (the "challenged statements" or "challenged health statements"). Specifically, Plaintiff challenges Kellogg's use of statements that contain the terms "healthy," "nutritious," or "wholesome." SAC ¶ 186–89. Plaintiff alleges that these statements assert that Kellogg's products are healthy when they are in fact not healthy because of the presence of added sugar. *Id.* ¶ 189. Further, Plaintiff alleges that a number of statements, such as "lightly sweetened," imply that Kellogg's products are lower in sugar, when they actually are composed of 18% to 40% added sugar. *Id.* ¶¶ 215–19.

Some of the products at issue allegedly display multiple challenged health statements. For example, Plaintiff states that the packaging for Raisin Bran displays "HEART HEALTHY," "Start with a healthy Spoonful," and "Invest in your health invest in yourself." *Id.* ¶ 128. On the other hand, other products only have a single challenged statement. For example, on the packaging for Nutri-Grain Soft-Baked Breakfast Bars, Plaintiff only challenges the statement "wholesome goodness." *See* ECF No. 130 Exhs. 19–22.

### B. Procedural History

On August 29, 2016, Plaintiff filed a complaint. ECF No. 1. On October 31, 2016, Kellogg filed a motion to dismiss. ECF No. 22. In lieu of filing a response, on November 14, 2016, Plaintiff filed a First Amended Complaint ("FAC"). ECF No. 27.

3

On December 8, 2016, Kellogg filed a motion to dismiss the FAC. ECF No. 44. On January 5, 2017, Plaintiff filed an opposition, ECF No. 49, and on January 19, 2017, Kellogg filed a reply. ECF No. 50. On March 21, 2017, the Court granted Kellogg's motion to dismiss Plaintiff's FAC. ECF No. 56.

On April 5, 2017, Plaintiff filed a second amended complaint ("SAC"). *See* SAC. Plaintiff's SAC alleges five causes of action, including (1) violation of the California False Advertising Law ("FAL"); (2) violation of the California Consumers Legal Remedies Act ("CLRA"); (3) violation of the California Unfair Competition Law ("UCL") under the fraudulent, unfair, and unlawful prongs; (4) breach of express warranty; and (5) breach of the implied warranty of merchantability. *Id.*

On April 19, 2017, Kellogg filed a motion to dismiss Plaintiff's SAC. ECF No. 62. On May 3, 2017, Plaintiff filed an opposition, ECF No. 65, and on May 10, 2017, Kellogg filed a reply. ECF No. 66. On August 10, 2017, the Court granted in part and denied in part Kellogg's motion to dismiss Plaintiff's SAC. ECF No. 76.

On April 30, 2018, Plaintiff filed a motion for class certification. ECF No. 129 ("Mot."). Plaintiff seeks to certify the following class, which is composed of four subclasses, under Federal Rule of Civil Procedure 23(b)(3):

> [A]ll persons in California who, on or after August 29, 2012, purchased for household use and not for resale or distribution:
>
> **Raisin Bran Subclass:** Kellogg's Raisin Bran (including Omega-3) or Kellogg's Raisin Bran Crunch Cereals in a 13.7 oz., 14.3 oz., 18.2 oz., 18.7 oz., 23.5 oz., 24.8 oz., 29 oz., 30.3 oz., 43.3 oz., 56.6 oz., or 76.5 oz. package stating "heart healthy."
>
> **Smart Start Subclass:** Kellogg's Smart Start Original Antioxidants cereal in a 17.3 oz. package.
>
> **Frosted Mini-Wheats Subclass:** Kellogg's Frosted Mini-Wheats Bite Size (Original, Maple Brown Sugar, Strawberry, or Blueberry varieties), Big Bites (Original variety), Little Bites (Chocolate or Cinnamon Roll varieties), or Touch of Fruit in the Middle (Mixed Berry and Raspberry varieties) cereals in a 15.2 oz., 15.5 oz., 15.8 oz., 16.5 oz., 18 oz., 21 oz., or 24 oz. package.

4

**Nutri-Grain Soft-Baked Breakfast Bar Subclass:** Kellogg's Nutri-Grain Soft-Baked Breakfast Bars (Blueberry, Strawberry, Cherry, Raspberry, and Variety Pack varieties), in 8-bar, 9-bar, 16-bar, or 24-bar counts with packaging stating, "the wholesome goodness you need to shine your brightest!"

*Id.* at 1.

Kellogg filed an opposition to Plaintiff's motion for class certification on June 11, 2018, ECF No. 159 ("Opp."), and Plaintiff filed a reply on July 2, 2018. ECF No. 194 ("Reply").

Kellogg also filed a motion based on *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), to exclude the opinion testimony of one of Plaintiff's damages experts, Steven P. Gaskin, on June 11, 2018. ECF No. 167 ("Gaskin Daubert Mot."). Plaintiff filed an opposition to Kellogg's *Daubert* motion on June 25, 2018, ECF No. 181, and Kellogg filed a reply on July 2, 2018. ECF No. 188.

## II.     LEGAL STANDARD

Class actions are governed by Rule 23 of the Federal Rules of Civil Procedure. Rule 23 does not set forth a mere pleading standard. To obtain class certification, plaintiffs bear the burden of showing that they have met each of the four requirements of Rule 23(a) and at least one subsection of Rule 23(b). *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186, *amended by* 273 F.3d 1266 (9th Cir. 2001). "A party seeking class certification must affirmatively demonstrate . . . compliance with the Rule[.]" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

Rule 23(a) provides that a district court may certify a class only if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). That is, the class must satisfy the requirements of numerosity, commonality, typicality, and adequacy of representation to maintain a class action. *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012).

5

If all four prerequisites of Rule 23(a) are satisfied, the Court must also find that the plaintiff "satisf[ies] through evidentiary proof" at least one of the three subsections of Rule 23(b). *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). The Court can certify a Rule 23(b)(1) class when plaintiffs make a showing that there would be a risk of substantial prejudice or inconsistent adjudications if there were separate adjudications. Fed. R. Civ. P. 23(b)(1). The Court can certify a Rule 23(b)(2) class if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Finally, the Court can certify a Rule 23(b)(3) class if the Court finds that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

"[A] court's class-certification analysis must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim[.]'" *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 465–66 (2013) (quoting *Dukes*, 564 U.S. at 351); *see also Mazza*, 666 F.3d at 588 ("'Before certifying a class, the trial court must conduct a 'rigorous analysis' to determine whether the party seeking certification has met the prerequisites of Rule 23.'" (quoting *Zinser*, 253 F.3d at 1186)). This "rigorous" analysis applies to both Rule 23(a) and Rule 23(b). *Comcast*, 569 U.S. at 34 (stating that Congress included "addition[al] . . . procedural safeguards for (b)(3) class members beyond those provided for (b)(1) or (b)(2) class members (e.g., an opportunity to opt out)" and that a court has a "duty to take a 'close look' at whether common questions predominate over individual ones").

Nevertheless, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen*, 568 U.S. at 466. "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* If a court concludes that the moving party

6

has met its burden of proof, then the court has broad discretion to certify the class. *Zinser*, 253 F.3d at 1186.

## III. DISCUSSION

As discussed above, Plaintiff seeks class certification under Rule 23(b)(3). Kellogg does not contest that Plaintiff has satisfied the numerosity and commonality requirements of Rule 23(a), as evidenced by the fact that Kellogg's opposition to Plaintiff's motion for class certification does not meaningfully address these requirements. *See generally* Opp. The Court agrees that Plaintiff has satisfied the numerosity and commonality requirements of Rule 23(a). First, with regards to numerosity, Plaintiff has provided evidence that "the unit and dollar sales" of the Kellogg products at issue in the instant case "suggest at least thousands of Class Members" bought these products during the class period. Mot. at 16; *see Twegbe v. Pharmaca Integrative Pharmacy, Inc.*, 2013 WL 3802807, *3 (N.D. Cal. July 17, 2013) ("[T]he numerosity requirement is usually satisfied where the class comprises 40 or more members."). Second, as to commonality, the Court finds that there are numerous common questions of law and fact, such as whether the challenged health statements are unlawful, unfair, deceptive, or misleading when affixed to products containing 9 to 16 grams of sugar per serving (or "an average of 12.2 grams of added sugar" per serving, Opp. at 18). *See Jones v. ConAgra Foods, Inc.*, 2014 WL 2702726, at *5 (N.D. Cal. June 13, 2014) (finding that class claims had common issue of "whether the '100% natural' and 'free of artificial ingredients & preservatives' labels are unlawful, unfair, deceptive, or misleading when affixed to products containing citric acid and/or calcium chloride").

Kellogg also does not contest that Plaintiff has satisfied the superiority requirement of Rule 23(b)(3). The Court agrees that superiority is met in the instant case. As Plaintiff correctly observes, individual class members are likely to have little "interest in controlling individual actions because the product[s]" at issue in the instant case cost "under about $5." Mot. at 25; *see Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (stating that "[w]here recovery on an individual basis would be dwarfed by the cost of litigating on an

7

individual basis, this factor weighs in favor of" finding that the superiority requirement is satisfied). Further, no significant manageability concerns are apparent, and in any event, there is a "'well-settled presumption that courts should not refuse to certify a class merely on the basis of manageability concerns.'" *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1128 (9th Cir. 2017) (quoting *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 663 (7th Cir. 2016)); *see also In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 141 (2d Cir. 2001) (listing "management tools available to" district courts).

Kellogg opposes Plaintiff's motion for class certification on nearly every other front. Kellogg first asserts a handful of arguments for why Plaintiff has failed to establish Rule 23(b)(3) predominance. *See* Opp. at 12–34. Then, Kellogg briefly argues that Plaintiff does not satisfy the typicality and adequacy requirements of Rule 23(a). *See id.* at 34–35. The Court addresses these arguments in turn.

### A. Rule 23(b)(3) Predominance

Under Rule 23(b)(3), plaintiffs must show "that the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). The Rule 23(b)(3) predominance requirement is "even more demanding" than Rule 23(a)'s commonality counterpart. *Comcast*, 569 U.S. at 34. Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623 (citation omitted). The Ninth Circuit has held that "there is clear justification for handling the dispute on a representative rather than an individual basis" if "common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication." *Hanlon*, 150 F.3d at 1022. As the United States Supreme Court recently explained, "[t]he predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (quoting 2 W. Rubenstein, Newberg on Class Actions § 4:49 (5th ed. 2012)). "When 'one or more of the central

8

issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'" *Id.* (quoting 7AA C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1778 (3d ed. 2005)).

Plaintiff argues that common issues predominate in the instant class action for each of Plaintiff's four theories of liability. First, with regards to Plaintiff's theory that the challenged health statements amount to affirmative misrepresentations that violate California's FAL, CLRA, and the UCL's "fraudulent" prong (the "affirmative misrepresentation theory"), Plaintiff points out that under these statutes, the issue of whether a particular statement on a product's packaging or labeling is "either actually misleading or . . . has a capacity, likelihood or tendency to deceive or confuse the public," *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008) (internal quotation marks omitted), is "judged by the effect [that statement] would have on a reasonable consumer." Mot. at 18 (quoting *Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496, 506–07 (2003)). In other words, "California's UCL, 'FAL and CLRA rely on the same *objective* test." *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 480 (C.D. Cal. 2012) (emphasis added). This objective test focuses on the "reasonable consumer," *Lavie*, 105 Cal. App. 4th at 507, or, put another way, on whether "members of the public are likely to be deceived." *In re Tobacco II Cases*, 46 Cal. 4th 298, 312 (2009). Further, Plaintiff cites cases that affirm that "[t]his objective test renders claims under the UCL, FAL, and CLRA ideal for class certification because they will not require the court to investigate class members' individual interaction with the product." Mot. at 19 (quoting *Tait*, 289 F.R.D. at 480 (internal quotation marks omitted)).

Second, Plaintiff's theory that Kellogg deceptively "hides" and "omits . . . information regarding the products' high sugar content" in violation of the FAL, CLRA, and the UCL's "fraudulent" prong (the "deceptive omission theory"), SAC ¶ 209, is subject to the same objective test. Plaintiff states that he "has substantial common evidence on which to bring the Class's

9

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR CLASS CERTIFICATION; DENYING DEFENDANT'S MOTION TO EXCLUDE OPINION TESTIMONY OF STEVEN P. GASKIN

[deceptive] omission claims to trial," including common evidence "of Kellogg's knowledge" and "that the omitted information was material." Mot. at 20.

Third, as to Plaintiff's theory that "certain labeling claims" on the products at issue in the instant case "violate[] FDA regulations" and therefore violate the UCL's "unlawful" prong (the "unlawful misbranding theory"), Plaintiff argues that "Kellogg's liability for such misbranding is a predominating common question because 'proving the . . . unlawful prong of the UCL . . . does not depend upon any issues specific to individual consumers.'" Mot. at 20 (quoting *Lilly v. Jamba Juice Co.*, 308 F.R.D. 231, 242 (N.D. Cal. 2014)) (alterations adopted). "Rather, 'the label is either illegal or it is not,' and that determination will apply to all Class Members the same." *Id.* (quoting *Ang v. Bimbo Bakeries USA, Inc.*, 2014 WL 1024192, at *8 (N.D. Cal. Mar. 13, 2013)) (alteration adopted).

Fourth, regarding Plaintiff's theory that the challenged statements amounted to warranties that were breached by Kellogg (the "breach of warranty theory"), Plaintiff states that "'[w]hether such statements constitute an express warranty, and whether that warranty was breached . . . are issues subject to common and generalized proof.'" *Id.* at 21 (quoting *Martin v. Monsanto Co.*, 2017 WL 1115167, at *7 (C.D. Cal. Mar. 24, 2017)) (alterations adopted). Further, Plaintiff asserts that "'because reliance is not an element of express warranty claims under California law, common questions predominate and class action treatment is appropriate.'" *Id.* (quoting *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 411 (S.D.N.Y. 2015)) (alteration adopted).

Additionally, Plaintiff argues that the three damages models proposed by Plaintiff are "consistent with [Plaintiff's] theories of liability, and capable of measuring classwide damages." *Id.* at 21–25.

Kellogg advances five arguments for why common issues do not predominate over individual ones in the instant case. First, Kellogg argues that "individual issues predominate because most people never saw the challenged statements." Opp. at 12–16. Second, Kellogg asserts that "individual issues predominate because the health impact of consuming added sugar—

10

and thus the alleged falsity of the challenged statements—differs for each consumer." *Id.* at 16–20. Third, Kellogg contends that "Plaintiff's proposed damages models cannot competently assess class-wide damages." *Id.* at 20–29. Fourth, Kellogg argues that "Plaintiff has not provided any evidence of classwide deception or materiality." *Id.* at 29–32. Finally, Kellogg asserts that "Plaintiff's alternative theories of liability"—that is, Plaintiff's deceptive omission, unlawful misbranding, and breach of warranty theories of liability—"are also not subject to common proof." *Id.* at 32–34. The Court addresses each of Kellogg's arguments in turn.

### 1. Exposure to Challenged Statements

Kellogg first argues that "most people" who bought the Kellogg products at issue in the instant case "never saw the challenged statements." *Id.* at 12. Based on this assertion, Kellogg's appears to argue that Plaintiff cannot satisfy the predominance requirement because, according to Kellogg, the Court would have to determine which consumers actually saw the challenged statements on an individualized, consumer-by-consumer basis in order to determine the exact scope of Kellogg's liability. Kellogg's argument proceeds in two parts. First, Kellogg asserts that "Kellogg consumers were not uniformly exposed to the challenged statements over the class period for Raisin Bran, Nutri-Grain, and Smart Start." *Id.* Second, Kellogg argues that "there is no indication that every consumer—let alone most consumers—saw or relied upon" either (1) the "lightly sweetened" statement displayed "on the front of each package of Frosted Mini-Wheats and Smart Start"; or (2) the "wholesome goodness" statement displayed on the back panel of some Nutri-Grain boxes. *Id.* at 15–16 & n.5. The Court considers these assertions in turn.

#### a. Lack of Uniform Exposure to Challenged Statements on Packaging for Raisin Bran, Nutri-Grain, and Smart Start

Kellogg points out that many of the "challenged statements did *not* appear on the packaging for a substantial portion . . . of the class period." *Id.* at 13. Specifically, Kellogg states that during the class period, (1) "Invest in Your Health, Invest in Yourself" appeared on only 17.6% of all Raisin Bran and Raisin Bran Crunch packages; (2) "the 'heart health' statement did

United States District Court
Northern District of California

11

*not* appear on versions of the packaging for a significant portion of Raisin Bran and Raisin Bran Crunch products from January 2014 to February 2015; May 2016 to October 2016; and April 2017 to present—a total of *33 months and counting* during the class period"; (3) "Start with a Healthy Spoonful" appeared on only 13.9% of all Raisin Bran and Raisin Bran Crunch packages; (4) 55.3% of Nutri-Grain boxes "did not have the 'wholesome goodness' text"; (5) "Invest in Your Health, Invest in Yourself" appeared on only 27.3% of all Smart Start packages; and (6) "Nutrients for Every Day" appeared on less than 15% of all Smart Start packages. *Id.* at 13–14. Kellogg asserts that under Ninth Circuit law, "such a lack of uniform and consistent exposure dooms class certification." *Id.* at 14; *see In re Hyundai and Kia Fuel Economy Litig.*, 881 F.3d 679, 705 (9th Cir. 2018) (reversing class certification because "factual differences regarding [the class members'] exposure to the misleading statements translate into significant legal differences regarding the viability of these class members' claims"); *Mazza*, 666 F.3d at 596 (holding that "[i]n the absence of [a] massive advertising campaign" "where there was little doubt that almost every class member had been exposed to defendants' misleading statements," "the relevant class must be defined in such a way as to include only members who were exposed to advertising that is alleged to be materially misleading").

However, Kellogg acknowledges that Plaintiff "sidestep[s]" this "lack of uniform and consistent exposure" problem "by defining the subclasses to include only those individuals who purchased versions of the products that included the challenged statements on the packaging." Opp. at 14. For example, in order to account for the fact that not all Raisin Bran and Raisin Bran Crunch packaging displayed a "heart healthy" statement during the class period, Plaintiff has defined the Raisin Bran Subclass to include only the "persons in California" who bought Raisin Bran or Raisin Bran Crunch in a "package *stating 'heart healthy.'*" Mot. at 1 (emphasis added). By defining the Raisin Bran Subclass in this way, Plaintiff has ensured that all Raisin Bran Subclass members were *by definition* exposed to a "heart healthy" statement, and has thereby eliminated all "factual differences regarding . . . exposure" to that statement that could give rise to

12

United States District Court
Northern District of California

predominance issues. *In re Hyundai*, 881 F.3d at 705.

Kellogg argues that Plaintiff should not be allowed to define the subclasses in this way because such an allowance would enable Plaintiff to "effectively evade a lack of uniform exposure by gerrymandering the class to encompass only those individuals who saw specific advertisements and labels over a years-long period while excluding those who did not." Opp. at 14. However, Kellogg marshals no persuasive arguments or case law to demonstrate why narrowly defining classes in fraudulent product labeling cases "to encompass only those individuals who saw [the] specific" challenged health statements is inappropriate. *Id.* On the contrary, this appears to be an accepted and uncontroversial approach to class definition. *See Astiana v. Kashi Co.* 291 F.R.D. 493, 500 (S.D. Cal. 2013) (certifying a class of "all [California] customers who purchased Kashi products during the class period that were labeled as containing 'Nothing Artificial.'"); *cf. Inland Empire—Immigrant Youth Collective v. Nielsen*, 2018 WL 1081408, at *8 (C.D. Cal. Feb. 26, 2018) ("As for the requirement that class members 'have suffered the same injury,' *Dukes*, 565 U.S. at 349–50, the narrow tailoring of the class definition—to include only those individuals who lost their DACA without notice and did not commit disqualifying criminal offenses—ensures commonality of injury."). Indeed, Plaintiff's allegedly improper "gerrymandering" of the class definitions in the instant case—for example, defining the Raisin Bran Subclass to include only those California consumers who bought Raisin Bran or Raisin Bran Crunch in a "package stating 'heart healthy,'" Mot. at 1—appears to align neatly with the Ninth Circuit's directive in *Mazza* that "the relevant class must be defined in such a way as to include only members who were exposed to advertising that is alleged to be materially misleading." 666 F.3d at 596.

The only case that Kellogg cites in support of its argument is this Court's order denying class certification in *Bruton v. Gerber Products Co.*, 2018 WL 1009257 (N.D. Cal. Feb. 13, 2018). In particular, Kellogg asserts that in *Bruton*, "[t]his Court rejected th[e] precise [class definition] tactic" used by Plaintiff in the instant case because "even though the plaintiffs' counsel [in *Bruton*] tried to define the class to include only those who purchased products labeled with 'one or more of

13

the following [challenged] claims,' this Court nonetheless held that individual issues predominated because the Court would need to determine whether each consumer purchased a product with one of the challenged statements." Opp. at 14 (quoting *Bruton*, 2018 WL 1009257 at *2). Kellogg misreads this Court's *Bruton* class certification order. In that order, while discussing the viability of the plaintiff's proposed damages model, the Court did note that 66 of the 69 products at issue "had multiple label iterations with material variation—some labels contained the challenged statements, some did not." *Id.* at *10 (internal quotation marks omitted). The Court concluded that this was problematic *for the proposed damages model* because "the proposed [damages model] presumes [that the plaintiff] will be able to determine precisely when consumers were buying Gerber products *with* the challenged label statements, and when consumers were buying Gerber products *without* the challenged label statements," but that assumption was "mistaken." *Id.* at *11. Thus, in *Bruton*, the Court clearly did not disapprove of how the plaintiff narrowly defined the class to include only those California consumers who purchased products labeled with "one or more" of the challenged statements at issue in that case. *Id.* at *2. Instead, the Court merely determined that the plaintiff's proposed damages model was rendered unworkable by the fact that some of the products at issue in *Bruton* did not display the challenged statements for some stretches of time during the class period. *See id.* at *11. As discussed below, Kellogg raises this issue with regards to Plaintiff's proposed hedonic regression damages model.

In sum, the Court concludes that, contrary to Kellogg's view, Plaintiff properly defined the subclasses narrowly in order to avoid the individualized issues that would have otherwise arisen from the variations in the packaging for Raisin Bran, Nutri-Grain, and Smart Start during the class period.

### b. "Lightly Sweetened" and "Wholesome Goodness"

Kellogg points out that although "each package of Frosted Mini-Wheats and Smart Start" sold during the class period displayed a "lightly sweetened" statement "as part of the phrase 'lightly sweetened whole grain cereal' or 'lightly sweetened, toasted multi-grain flakes,'" that

14

statement only "appear[ed] in miniscule font" and was "not featured or highlighted—whether measured by size, unique font, placement, coloring, or any other metric." Opp. at 15. Similarly, Kellogg further states that "the phrase 'wholesome goodness' appeared only on the back panel of some Nutri-Grain boxes." *Id.* at 16 n.5. Kellogg asserts that this is significant for class certification purposes because "[c]ourts have . . . h[e]ld that class certification is inappropriate if some class members may not have *seen* the allegedly misleading statement, even if it appeared on each package." *Id.* at 15. In other words, the crux of Kellogg's argument is that because the "lightly sweetened" and "wholesome goodness" statements were not sufficiently prominently displayed on the packaging for Frosted Mini-Wheats, Smart Start, and Nutri-Grain, class certification is inappropriate for those statements and/or products.

However, the only case that Kellogg cites to reinforce its argument—this Court's order denying class certification in *Philips v. Ford Motor Co.*, 2016 WL 7428810 (N.D. Cal. Dec. 22, 2016)—plainly does not support Kellogg's assertion that "class certification is inappropriate if some class members may not have *seen* the allegedly misleading statement, even if it appeared on each package." Opp. at 15. The key predominance issue in *Philips* was not about whether certain allegedly misleading statements were sufficiently prominently displayed on product *packaging*. Instead, the plaintiffs in *Philips* alleged that Ford fraudulently concealed a power steering defect in certain vehicles, and this Court concluded that the plaintiffs could not satisfy the predominance requirement because "an unknown number of class members saw warnings regarding [the alleged power steering defect] in the owner's manual" for the vehicles, and therefore "the Court would be forced to conduct individual inquiries to discover which class members read the owner's manual and which did not." *Philips*, 2016 WL 7428810 at *23. Exposure to statements displayed on the outside of a product's packaging is clearly more likely, and therefore much easier to infer, than exposure to statements buried in the middle of an owner's manual. Indeed, courts have repeatedly recognized that "[w]here the alleged misrepresentation appears on the label or packaging of each item being sold, class-wide exposure to it may be inferred." *Zakaria v. Gerber*, 2016 WL

15

6662723, at *8 (N.D. Cal. Mar. 23, 2016); *see Ehret v. Uber Techs., Inc.*, 148 F. Supp. 3d 884, 895 (N.D. Cal. 2015) ("On the other hand, in numerous cases involving claims of false-advertising, class-wide exposure has been inferred because the alleged misrepresentation is on the packaging of the item being sold. In such a case, given the inherently high likelihood that in the process of buying the product, the consumer would have seen the misleading statement on the product and thus been exposed to it, exposure on a classwide basis may be deemed sufficient."); *see also Tait*, 289 F.R.D at 482 ("Thus, *Mazza* stands for the unremarkable proposition that it is difficult to certify a class where the class members are not all exposed to the same representations. This proposition has no relevance to the present case, where Plaintiffs' theory is that Defendant's *omissions* violated the UCL, FAL, and CLRA and that partial representations *on the product itself* are misleading.").

That being said, the court in *Zakaria* also recognized that an inference of class-wide exposure to an alleged misrepresentation affixed to a product's packaging might not be warranted if the alleged misrepresentation is not sufficiently prominently displayed on the packaging. Specifically, the *Zakaria* court observed that one of the alleged misrepresentations in that case—a statement claiming that Gerber's "Good Start Gentle" product could reduce "the risk of atopic dermatitis"—was displayed "in small font" in the middle of a block of text "on the back . . . cover" of the product. 2016 WL 6662723 at *8. The court found that because this alleged misrepresentation was not "prominently displayed," "it cannot be inferred that there is a 'high likelihood that in the process of buying the product, the consumer would have seen the misleading statement on the product and thus been exposed to it.'" *Id.* (quoting *Ehret*, 2015 WL 7759464 at *8). Subsequently, the *Zakaria* court contrasted this alleged misrepresentation with another alleged misrepresentation—a statement claiming that Gerber's "Good Start Gentle" could reduce the risk of developing allergies—and found that an inference of class-wide exposure to the allergy statement was warranted because the allergy statement was "displayed prominently on the top front of the Good Start Gentle containers." *Id.*

16

In the instant case, the Court finds that class-wide exposure to the "wholesome goodness" phrase on Nutri-Grain packaging cannot be inferred. Much like the "atopic dermatitis" statement in *Zakaria*, "wholesome goodness" only appeared (1) on the back panel of the Nutri-Grain packaging; (2) "in small font"; and (3) in the middle of a block of text. 2016 WL 6662723 at *8; *see* ECF No. 160-7; ECF No. 130 Exhs. 19–22. Thus, the "wholesome goodness" phrase on Nutri-Grain packaging was not sufficiently "prominently displayed" to warrant an inference of class-wide exposure. *Zakaria*, 2016 WL 6662723 at *8.

However, the Court cannot say the same for the "lightly sweetened" statement displayed on the packaging for Frosted Mini-Wheats and Smart Start. Although this statement does appear in relatively small font "as part of the phrase 'lightly sweetened whole grain cereal' or 'lightly sweetened, toasted multi-grain flakes,'" Opp. at 15, it is displayed in the *center* of the *front* panel of the packaging for Frosted Mini-Wheats and Smart Start, and is not located in the middle of a block of text. *See* ECF Nos. 160-5 & 160-6. As a result, the Court cannot conclude that an inference of class-wide exposure to the "lightly sweetened" statement is unwarranted.

Because class-wide exposure to the "wholesome goodness" phrase on Nutri-Grain packaging cannot be inferred, in order to resolve Kellogg's liability for that phrase, the Court would have to engage in individualized inquiries to discover which members of the Nutri-Grain Soft-Baked Breakfast Bar Subclass actually saw "wholesome goodness" and which did not. Additionally, the "wholesome goodness" phrase is the only statement on the packaging for Nutri-Grain Soft-Baked Breakfast Bars that Plaintiff challenges as misleading. *See* ECF No. 130 Exhs. 19–22. As a result, Plaintiff fails to meet Rule 23(b)(3)'s predominance requirement for his proposed Nutri-Grain Soft-Baked Breakfast Bar Subclass. Accordingly, the Court DENIES Plaintiff's motion for class certification as to the proposed Nutri-Grain Soft-Baked Breakfast Bar Subclass.

### 2. Individualized Health Effects

Kellogg's second argument against predominance is that "the alleged falsity of the

Case No. 16-CV-04955-LHK
ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR CLASS
CERTIFICATION; DENYING DEFENDANT'S MOTION TO EXCLUDE OPINION TESTIMONY OF STEVEN
P. GASKIN

challenged statements" "differs for each consumer" because "the health impact of consuming [the] added sugar" in the Kellogg products at issue in the instant case varies person-by-person, depending on, inter alia, a person's "age, gender, metabolism, general eating habits, activity level, genetic factors, and other health conditions." Opp. at 16–17. Kellogg asserts that "the challenged statements are false" or misleading to a particular person only if "the amount of added sugar [in the products at issue] causes *physical harm*" to that specific person "in the form of increased risk of diabetes, heart disease, and other ailments." *Id.* at 16 (emphasis added). Therefore, Kellogg states that "if consumption of Kellogg'[s] . . . cereal has no negative impact on a specific person's health, then the challenged statements (such as 'wholesome goodness' or 'heart health') are not false as to that person." *Id.*

Kellogg's argument is not well-taken. As mentioned above, under the FAL, CLRA, and the "fraudulent" prong of the UCL, the issue of whether a particular statement on a product's packaging or labeling is false, deceptive, or materially misleading is evaluated according to an objective "reasonable consumer" standard. *Lavie*, 105 Cal. App. 4th at 507; *see Yumul v. Smart Balance, Inc.*, 733 F. Supp. 2d 1117, 1125 (C.D. Cal. 2010) (explaining that a "reasonable consumer" standard applies to product mislabeling claims under FAL, CLRA, and UCL). Thus, contrary to Kellogg's view, the actual physical "impact" of the products at issue on any "specific [class member's] health" has no bearing on whether the challenged health statements are false, deceptive, or materially misleading under the FAL, CLRA, or the "fraudulent" prong of the UCL. Opp. at 16. Instead, the falsity or deceptiveness of the challenged health statements on the products at issue will be determined based solely on whether the health statements are likely to deceive or mislead a hypothetical *reasonable consumer* in light of the amount of added sugar that Kellogg puts into those products. As a result, "the alleged falsity of the challenged statements" will not "differ[] for each consumer" based on that consumer's individual health circumstances, and thus there will be no need to inquire into each class member's "unique circumstances." Opp. at 16.

Kellogg's unpersuasive argument appears to stem from a mistaken assumption that the injury that Plaintiff is seeking to redress in the instant case is physical in nature. For example, Kellogg relies on two false advertising cases, *Gartin v. S & M NuTec LLC*, 245 F.R.D. 429 (C.D. Cal. 2007), and *Pelman v. McDonald's Corp.*, 272 F.R.D. 82 (S.D.N.Y 2010), in which the plaintiffs sought to recover for physical harms caused by the allegedly false advertising on behalf of putative classes. Opp. at 17; *see Gartin*, 245 F.R.D. at 432–33 (explaining that the plaintiffs alleged that the defendant failed to "disclose certain dangers associated with" defendant's dog treats, and that the plaintiffs sought to recover for the physical harms suffered by their dogs as a result of the defendant's failure to disclose these risks); *Pelman*, 272 F.R.D. at 84–85 ("Plaintiffs claim that the effect of Defendant's affirmative representations and material omissions throughout this marketing scheme—from 1985 until the filing of this case in 2002—was to mislead consumers into falsely believing that Defendant's food products may be consumed on a daily basis without incurring any adverse health effects, and that, as a result of this marketing scheme, Plaintiffs and putative class members suffered *injury in the form of, inter alia, the development of certain adverse medical conditions*."(emphasis added)). In both *Gartin* and *Pelman*, class certification was denied because individual factual issues regarding whether the challenged products actually caused physical harm to each of the class members would predominate over common questions. *See Gartin*, 245 F.R.D. at 436 ("Individual factual issues are likely to predominate the disposition of the class members' claims. For example, individual factual issues will predominate the determination of whether any alleged defects in Greenies proximately caused putative class members' pets' injuries. . . . Other unique factors will also affect the causation analysis, such as the dog's unique medical history, environment, age, and diet."); *Pelman*, 272 F.R.D. at 94 ("The court therefore concludes that, because factual questions with regard to, at the very least, the nutritional composition of food products consumed by each plaintiff from sources other than Defendant's facilities, as well as the level of regular physical activity engaged in by each plaintiff, predominate in the inquiry with respect to an essential element of Plaintiffs' cause

19

of action, this case is not appropriate for adjudication on a class-wide basis."). Kellogg relies on both *Gartin* and *Pelman* to argue that the predominance requirement has not been satisfied in the instant case. *See* Opp. at 17.

However, as Plaintiff points out, the instant action does not seek redress for any physical harms caused by Kellogg's packaging statements. Instead, Plaintiff "is seeking to recover for the *economic* injury caused by Kellogg representing that its . . . foods are healthy." Reply at 4. *Chacanaca v. Quaker Oats Co.*, 752 F. Supp. 2d 1111 (N.D. Cal. 2010), a case that involved health statements that are similar to those in the instant case, is instructive on this point. In *Chacanaca*, the plaintiffs brought a putative class action asserting that the defendant violated the FAL, CLRA, and UCL by "label[ing] and market[ing]" "defendant's Chewy Bars product . . . to suggest that they are in fact wholesome and healthful" even though the Chewy Bars contained "dangerous amounts of trans fat." *Id.* at 1114. The defendant in *Chacanaca* argued that the plaintiffs failed to "establish[] an injury in fact" for Article III standing purposes because they "categorically failed to plead any health-related ailments or impact from consumption of the trans fat-laden snacks." *Id.* at 1124–25. The court rejected this argument, explaining that the plaintiffs "correctly point out that the particular harm for which they seek redress is not health related. Rather, the claims sound in deception, unfairness and false advertising." *Id.* at 1125. The *Chacanaca* court further explained that "[t]he injury alleged here is the *purchase* of food products that contain an ingredient the plaintiffs find objectionable." *Id.* As in *Chacanaca*, "the particular harm for which" Plaintiff "seek[s] redress" in the instant case "is not health related" in any relevant sense. *Id.* Instead, like the plaintiff in *Chacanaca*, Plaintiff seeks redress for economic injuries caused by Kellogg's challenged health statements. As a result, both *Gartin* and *Pelman* are inapposite and do not have any bearing on whether the predominance requirement of Rule 23(b)(3) is satisfied in the instant case.

Kellogg's reliance on *In re Vioxx Class Cases*, 180 Cal. App. 4th 116 (2009), Opp. at 17, is also unavailing. In *Vioxx*, the plaintiffs brought a putative class action alleging that Merck

20

violated the FAL, CLRA, and UCL because it "knew about" certain "dangers of Vioxx"—"a pain-relieving drug" manufactured and marketed by Merck—but nonetheless "engaged in a campaign to hide or explain away those risks." 180 Cal. App. 4th at 120. The *Vioxx* court denied class certification in part because "the materiality of any" alleged misrepresentations by Merck about the risks of Vioxx could not "be presumed" on a class-wide basis, and instead had to be evaluated on an individualized basis. *Id.* at 134. According to the *Vioxx* court, this was because (1) consumers could only obtain Vioxx through a prescription from a physician; and therefore (2) in addition to Merck's representations about the risks of Vioxx, "physicians consider many patient-specific factors in determining" whether to prescribe Vioxx, "including the patient's history and drug allergies, the condition being treated, and the potential for adverse reactions with the patient's other medications." *Id.* Thus, because "all of these patient-specific factors are a part of" a physician's decision to prescribe Vioxx, a court would have to engage in individualized patient-by-patient inquiries to determine whether Merck's representations about the risks of Vioxx were actually material "to any particular prescribing decision." *Id.*

In contrast to *Vioxx*, access to the cereal products at issue is not similarly restricted and is generally available to all consumers. Thus, access is in no way determined on an individualized basis by third-party medical professionals who are required to take patient-specific factors into account when making prescription decisions. In other words, in the instant case, because consumers do not need to obtain Kellogg's cereal products by prescription, there is no risk that the materiality of the challenged statements will vary from class member to class member because of the patient-specific determinations inherent in any physician's prescription decision-making process.

For these reasons, the Court disagrees with Kellogg's contention that "individual issues predominate" in the instant case "because the health impact of consuming added sugar . . . differs for each consumer." Opp. at 16.

### 3. Damages Models

Case No. 16-CV-04955-LHK
ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR CLASS CERTIFICATION; DENYING DEFENDANT'S MOTION TO EXCLUDE OPINION TESTIMONY OF STEVEN P. GASKIN

Although individual damages calculations alone do not make class certification

inappropriate under Rule 23(b)(3), *see Leyva v. Medline Indus., Inc.*, 716 F.3d 510, 514 (9th Cir.

2013) ("[T]he amount of damages is invariably an individual question and does not defeat class

action treatment."), the United States Supreme Court has held that the plaintiff bears the burden of

providing a damages model showing that "damages are susceptible of measurement across the

entire class for purposes of Rule 23(b)(3)." *Comcast*, 569 U.S. at 35. The damages model "must

measure only those damages attributable to" the plaintiff's theory of liability. *Id.* If the plaintiff

does not offer a plausible damages model that matches her theory of liability, "the problem is not

just that the Court will have to look into individual situations to determine the appropriate measure

of damages; it is that Plaintiffs have not even told the Court what data it should look for." *In re

MyFord Touch Consumer Litig.*, 2016 WL 7734558, at *15 (N.D. Cal. Sept. 14, 2016) ("*MyFord

Touch I*").

Kellogg's third predominance argument is that none of Plaintiff's proposed damages

models satisfy the requirements set forth in *Comcast*. *See* Opp. at 20–29. Plaintiff proposes three

damages models: (1) a "[c]onjoint analysis"; (2) a "hedonic regression"; and (3) an "advantage

realized model." Mot. at 22–25. Plaintiff states that both the conjoint analysis and the hedonic

regression correspond with Plaintiff's affirmative misrepresentation theory of liability, while the

advantage realized model corresponds with Plaintiff's deceptive omission theory of liability. *See

id.* The Court considers each of these damages models in turn.

### a. Conjoint Analysis

As discussed above, Plaintiff's affirmative misrepresentation theory of liability is that (1)

the challenged health statements amount to affirmative misrepresentations that violate the FAL,

the CLRA, and the UCL's "fraudulent" prong; and (2) these misrepresentations caused consumers

(including Plaintiff) to "pa[y] more for the Kellogg cereals and bars" than they otherwise would

have. SAC ¶ 273. In other words, consumers "would only have been willing to pay less" for

these Kellogg products—or would have been "unwilling to purchase them at all"—"absent the

[challenged health] statements" identified by Plaintiff. *Id.* Accordingly, one of Plaintiff's damages experts, Steven Gaskin, proposes a "choice-based conjoint analysis" damages model. ECF No. 134 ("Gaskin Decl.") at 4. As Gaskin notes, "[t]he general idea behind conjoint analysis is that the market value for a particular product is driven by features or descriptions of features embodied in that product." *Id.* at 7. Survey respondents are therefore asked to choose between different sets of product attributes, the responses are aggregated, and statistical methods are then used to determine the value (often termed "partworth") that consumers attach to each specific attribute. *Id.* at 7–10; *In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1073 (C.D. Cal. 2015) (discussing conjoint analysis).

In the instant case, Gaskin proposes to ask survey respondents to choose between hypothetical cereal or breakfast bar products that differ in brand, flavor, labeling statements, price, and, for the survey corresponding to Kellogg's Frosted Mini Wheats, biscuit size. Gaskin Decl. at 16–21. Gaskin states that "[t]he range of prices [he] propose[s] to use in this conjoint analysis mirrors those actually observed in the market and is based on actual sales data." *Id.* at 12. Gaskin also proposes to use in his conjoint analysis quantity figures that reflect the quantities of the challenged products that were actually sold during the class period, in order to further "account[] for appropriate market considerations, including the fact that the number of Kellogg's Raisin Bran, Frosted Mini Wheats, [and] Smart Start . . . purchased is fixed as a matter of history, which is to say that their sale is a matter of historical fact." *Id.* at 11. Additionally, Gaskin explains that the set of labeling statements shown to survey respondents will be comprised of a mixture of the alleged affirmative misrepresentations (for example, "Heart Healthy") and some "distractor" statements (for example, "Excellent Source of Fiber"). *Id.* at 17–21.

Gaskin states that, based on these survey inputs, the conjoint analysis will yield estimates of the "market price premia" associated with the alleged affirmative misrepresentations in the instant case. *Id.* at 11. In other words, the conjoint analysis will isolate the monetary value that consumers in the cereal market (as it existed over the class period) attached to the alleged

23

affirmative misrepresentations. It is well-established that the "'price premium' attributable to" an alleged misrepresentation on product labeling or packaging is a valid measure of damages in a mislabeling case under the FAL, CLRA, and UCL. *Brazil v. Dole Packaged Foods, LLC*, 660 F. App'x 531, 534 (9th Cir. 2016); *see Werdebaugh v. Blue Diamond Growers*, 2014 WL 2191901, at *22 (N.D. Cal. May 23, 2014) ("The proper measure of restitution in a mislabeling case is the amount necessary to compensate the purchaser for the difference between a product as labeled and the product as received."). Accordingly, Plaintiff asserts that Gaskin's proposed conjoint analysis satisfies *Comcast*'s requirement that Plaintiff's damages model must "measure only those damages attributable to" Plaintiff's affirmative misrepresentation theory of liability. 569 U.S. at 35; *see* Mot. at 24.

Kellogg advances two sets of arguments against Gaskin's proposed conjoint analysis. First, Kellogg argues that the conjoint analysis fails to satisfy *Comcast* because it only seeks to measure people's subjective willingness to pay, or demand, without considering the supply side of the equation—or, put another way, "other market factors that determine a product's price." Opp. at 21–23. Second, Kellogg asserts that the conjoint analysis "suffers from egregious methodological flaws that doom it under" *Daubert*, and explicitly references its motion to exclude Gaskin's opinion testimony under *Daubert*. Opp. at 23–24 (citing Gaskin Daubert Mot. at 9–19). The Court addresses these arguments in turn.

### i. Supply-Side Factors

As discussed above, Kellogg argues that Gaskin's proposed conjoint analysis measures "consumers' subjective willingness to pay for the challenged statement[s]"—or in other words, consumer demand—without considering the supply side of the equation. Opp. at 21. Consequently, according to Kellogg, the conjoint analysis cannot possibly "calculate the price premium charged by Kellogg for the challenged statement[s]" because "'the ultimate price of a product is a combination of market demand and market supply.'" *Id.* (quoting *Apple, Inc. v. Samsung Elecs. Co.*, 2014 WL 976898, at *2 (N.D. Cal. Mar. 6, 2014). Kellogg relies on two

cases in particular, *In re NJOY* and *Saavedra v. Eli Lilly & Co.*, 2014 WL 7338930 (C.D. Cal. Dec. 18, 2014), *see* Opp. at 22–23, both of which rejected proposed conjoint analyses because those analyses looked "only 'to the demand side of the market equation,' converting what is properly 'an objective evaluation of relative fair market values into a seemingly subjective inquiry of what an average consumer wants.'" *In re NJOY*, 120 F. Supp. 3d at 1119 (quoting *Saavedra*, 2014 WL 7338930 at *5); *see also id.* (stating that the damages expert's conjoint analysis "provide[d] only a model for testing what a consumer is willing to pay, without considering other factors in a functioning marketplace"); *id.* at 1122 ("[T]he willingness to pay for products with or without the message . . . does not permit the court to calculate the true market price of NJOY e-cigarettes absent the purported misrepresentations. Plaintiffs' damages methodology is therefore deficient under *Comcast*[.]").

Kellogg is correct that, in cases where price premia are the relevant measure of damages, courts have repeatedly rejected conjoint analyses that only measure demand-side willingness-to-pay. However, courts have also found that conjoint analyses can adequately account for supply-side factors—and can therefore be utilized to estimate price premia without running afoul of *Comcast*—when (1) the prices used in the surveys underlying the analyses reflect the actual market prices that prevailed during the class period; and (2) the quantities used (or assumed) in the statistical calculations reflect the actual quantities of products sold during the class period. For example, in *In re Dial Complete Marketing and Sales Practices Litigation*, 320 F.R.D. 326 (D.N.H. 2017), the court approved a proposed conjoint analysis where the plaintiffs argued that the conjoint analysis had adequately "account[ed] for the supply side" because "the supply element of the supply and demand price function is fixed" in the analysis "and is set, or included, *in the [market] price[s] paid for*" the product at issue. *Id.* at 334 (emphasis added). The court further noted that the proposed conjoint analysis was "one in which quantity (the number of products with the offending claims actually sold) *is held constant* . . . in determining" the price premium, *id.* at 336 (emphasis added), which means that the conjoint analysis used a "quantity"

United States District Court
Northern District of California

figure that matched the quantity of the challenged product that was actually sold during the class period.  The court explained that the reason the proposed conjoint analysis "held" quantity "constant" in this manner was because the conjoint analysis sought to calculate the price premium attributable to the challenged labeling statement by first "calculat[ing] the highest price in the actual market at which Dial could have sold *the same number* of products without the challenged [statement]."  *Id.* (emphasis added); *see also In re MyFord Touch Consumer Litig.*, 291 F. Supp. 3d 936, 969–71 (N.D. Cal. 2018) ("*MyFord Touch II*") (approving a nearly identical proposed conjoint analysis from the same expert and finding that the conjoint analysis adequately accounted for supply-side factors "by assuming that the supply—the quantity—was fixed"); *Davidson v. Apple, Inc.*, 2018 WL 2325426, at *22 (N.D. Cal. May 8, 2018) (finding that a proposed conjoint analysis from the same expert adequately "account[ed] for the supply side of the equation" by holding supply (and therefore quantity) constant).

Similarly, in *Fitzhenry-Russell v. Dr. Pepper Snapple Group, Inc.*, 2018 WL 3126385 (N.D. Cal. June 26, 2018), the court rejected the defendant's argument that the plaintiffs' proposed conjoint analysis ignored supply-side factors and "only considered a consumer's *willingness to pay* in the conjoint survey."  *Id.* at *8.  The court concluded that, contrary to the defendant's position, the proposed conjoint analysis "calculated the price premium consumers paid for the [challenged] claim, and not just a theoretical willingness to pay," because, among other things, the conjoint survey (1) "used *actual market-clearing prices* as the basis for the prices in the survey"; and (2) "took into account the *fixed quantity of supply* of [the product] because *those sales occurred in the past.*"  *Id.* at *8 (emphases added) (internal quotation marks omitted).  Likewise, in *In re Lenovo Adware Litigation*, 2016 WL 6277245 (N.D. Cal. Oct. 27, 2016), the court found that a proposed conjoint analysis adequately "ensure[d] that the results [of the conjoint analysis] would 'reflect the market'"—and not just demand-side willingness-to-pay—by (1) incorporating the market "'pric[es] of the [products] at issue [and of] comparable [products]'" into the survey; and (2) holding quantity constant "because all sales of the [products] at issue have occurred in the

26

past." *Id.* at *21 (internal quotation marks omitted).

In the instant case, the Court finds that, contrary to Kellogg's view, Gaskin's proposed conjoint analysis adequately accounts for supply-side factors and does not merely measure demand-side willingness-to-pay. Like the conjoint analyses in *Dial*, *MyFord Touch II*, *Davidson*, *Fitzhenry-Russell*, and *Lenovo Adware*, Gaskin's proposed conjoint analysis (1) utilizes prices that "mirror[] those actually observed in the market" and that are "based on actual sales data," Gaskin Decl. at 12; and (2) holds quantity constant—by using the quantities of the challenged products that were actually sold during the class period—in order to "account[]" for "the fact that the number of Kellogg's Raisin Bran, Frosted Mini Wheats, [and] Smart Start . . . purchased is fixed as a matter of history, which is to say that their sale is a matter of historical fact." *Id.* at 11. Plaintiff explains that these measures adequately account for supply-side market factors because "all the factors that affected Kellogg's willingness to sell"—i.e., supply—"during the class period, like cost of goods, are reflected in the sales [quantity] and prices that were actually extant in the market during that time." Reply at 16. Consequently, Gaskin's proposed conjoint analysis is materially distinguishable from the conjoint analyses that were rejected in *In re NJOY* and *Saavedra* for failure to account for supply-side factors. *See In re NJOY*, 120 F. Supp. 3d at 1119 (rejecting conjoint analysis damages model because it "completely ignores the price for which NJOY is willing to sell its products"); *Saavedra*, 2014 WL 7338930 at *5 (rejecting conjoint analysis model because it failed to consider "willingness to sell"). Accordingly, Kellogg's argument that Gaskin's proposed conjoint analysis fails to satisfy *Comcast* because it "only seeks to measure people's willingness-to-pay" is unavailing. Opp. at 21.

### ii. *Daubert* Arguments

Kellogg also argues that Gaskin's proposed conjoint analysis "suffers from egregious methodological flaws that doom it under" *Daubert*, and explicitly references Kellogg's motion to exclude Gaskin's expert testimony based on *Daubert*. Opp. at 23–24 (citing Gaskin Daubert Mot. at 9–19). However, whether Gaskin's proposed conjoint analysis is sufficiently reliable from a

27

methodological standpoint—and therefore admissible under *Daubert*—is a different issue from whether the conjoint analysis satisfies *Comcast*. *See In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 946 (C.D. Cal. 2015) ("Admissibility [under *Daubert*] turns on whether [an expert's] methodology is sufficiently reliable; whether it satisfies *Comcast* and shows that a class should be certified is another question altogether."). Nonetheless, the Court will rule on Kellogg's motion to exclude Gaskin's opinion testimony under *Daubert* (ECF No. 167) in this order. The Court deems this necessary because if Gaskin's opinion testimony regarding his proposed conjoint analysis is found to be inadmissible, and if his conjoint analysis turns out to be the only damages model that satisfies *Comcast*, then a class cannot be certified in the instant case.

Federal Rule of Evidence 702 allows admission of "scientific, technical, or other specialized knowledge" by a qualified expert if it will "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Expert testimony is admissible pursuant to Rule 702 if it is both relevant and reliable. *Daubert*, 509 U.S. at 589. An expert witness may provide opinion testimony if: (1) the testimony is based upon sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702. "The duty falls squarely upon the district court to 'act as a gatekeeper to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards.'" *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (quoting *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011)). However, this duty "is to evaluate the soundness of the expert's methodology, not the correctness of the expert's conclusions." *Fitzhenry-Russell*, 2018 WL 3126385 at *2 (citing *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010)). Moreover, the inquiry into admissibility of expert opinion is a "flexible one," where "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564 (citing *Daubert*, 509 U.S. at 594, 596). In other words, "[t]he Court has broad discretion and flexibility in assessing an expert's reliability." *Fitzhenry-*

*Russell*, 2018 WL 3126385 at *2 (citing *Estate of Barabin*, 740 F.3d at 463).

In its motion to exclude Gaskin's opinion testimony regarding his proposed conjoint analysis, Kellogg does not appear to dispute "that conjoint analysis is a well-accepted economic methodology." *In re Dial*, 320 F.R.D. at 331; *Miller v. Fuhu Inc.*, 2015 WL 7776794, at *21 (C.D. Cal. Dec. 1, 2015) (stating that "numerous courts . . . have accepted" conjoint analyses "as reliable methodologies for calculating price premiums on a classwide basis in consumer class actions"); *Odyssey Wireless, Inc. v. Apple Inc.*, 2016 WL 7644790, at *9 (S.D. Cal. Sept. 14, 2017) ("Further, a conjoint analysis is a generally accepted method for valuing the individual characteristics of a product."); *Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482, 551 (E.D.N.Y. 2017) (stating that conjoint analyses "have previously been approved in consumer class actions as reliable methodologies available for calculating the price premium attributable to a product characteristic"). Instead, Kellogg asserts that the particular way in which Gaskin proposes to conduct the consumer surveys for his conjoint analysis is "plagued by numerous" methodological "defects." Gaskin Daubert Mot. at 2.

However, the Ninth Circuit has stated that as a general matter, "[c]hallenges to survey methodology go to the weight given the survey, not its admissibility." *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir. 1997); *see also Microsoft Corp. v. Motorola, Inc.*, 904 F. Supp. 2d 1109, 1120 (W.D. Wash. 2012) ("Microsoft's criticisms of Mr. Sukumar's survey go to issues of methodology, survey design, reliability . . . [and] critique of conclusions, and therefore go to the weight of the survey rather than its admissibility.") (internal quotation marks omitted). In the instant case, although Kellogg appears to raise a number of valid concerns about Gaskin's survey methodology, the Court finds that these alleged defects neither individually nor collectively render Gaskin's proposed conjoint analysis inadmissible under *Daubert*.

Kellogg's first two arguments are that Gaskin's proposed conjoint survey fails to adequately mimic "real-life shopping experience[s]" because it (1) "fails to show the actual product packaging and instead highlights several challenged statements that survey respondents

29

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR CLASS CERTIFICATION; DENYING DEFENDANT'S MOTION TO EXCLUDE OPINION TESTIMONY OF STEVEN P. GASKIN

must read"; and consequently (2) fails to show "the Nutrition Facts panel or ingredient list" that appeared on all product packaging in the instant case. Gaskin Daubert Mot. at 2, 9–14. However, the Ninth Circuit has held that criticisms about a survey's "fail[ure] to replicate real world conditions"—"valid as they may be"—"go to 'issues of methodology, design, reliability, . . . and critique of conclusions,' and therefore 'go to the weight of the survey rather than its admissibility.'" *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1037–38 (9th Cir. 2010) (quoting *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1263 (9th Cir. 2010)). Thus, while the Court understands Kellogg's point that Gaskin's failure to show Nutrition Facts to survey respondents may deprive respondents of real-life "context to the meaning of the challenged [health] statements," Gaskin Daubert Mot. at 2, Kellogg's criticisms about the ways in which Gaskin's proposed conjoint surveys deviate from real-world shopping conditions do not render Gaskin's conjoint analysis excludable. Instead, Kellogg will be free to attack Gaskin's conjoint analysis on these grounds at trial. *See Classic Foods Int'l Corp. v. Kettle Foods, Inc.*, 2006 WL 5187497, *7 (C.D. Cal. Mar. 2, 2006) ("Any survey is of necessity an imperfect mirror of actual customer behavior under real life conditions. Any flaws in the survey may be elucidated on cross-examination, so that the finder of fact can appropriately adjust the weight it gives to the survey's results." (internal quotation marks omitted and alteration adopted)).

Kellogg's third argument is that Gaskin's proposed conjoint survey fails to include other "critical" attributes "that consumers consider" when purchasing breakfast products. Gaskin Daubert Mot. at 2, 14–16. Kellogg specifically identifies "three key factors" that Gaskin "failed to consider": taste, product names, and promotions. *Id.* at 15. Kellogg argues that Gaskin's failure to include these key attributes in his proposed conjoint surveys "will artificially inflate the importance of the attributes that *are*" included, which in turn will render the results of his analysis unreliable. *Id.* at 14. But once again, even though Kellogg's critiques about Gaskin's failure to include certain attributes in his conjoint survey may be valid, it is well-established that these types of critiques merely go to the weight, but not to the admissibility, of survey-based analyses. *See In*

30

*re Dial*, 320 F.R.D. at 332–33 ("Dial also argues, plausibly, that by limiting the attributes surveyed to four (five, including price), Boedeker's model fails to adequately take into account and properly weigh other attributes that may well be very important to liquid hand soap consumers (*e.g.*, brand name, or scent, or shape or color of the product). However, . . . those issues—and the myriad others identified by Dial—are either curable, or go to the weight, not admissibility, of Boedeker's testimony."); *Zakaria*, 2017 WL 9512587 at *13 (finding that the defendant's objections regarding an expert's failure to account for certain important product attributes in his conjoint surveys "go to weight, not admissibility"); *Sanchez-Knutson v. Ford Motor Co.*, 181 F. Supp. 3d 988, 995 (S.D. Fla. 2016) ("Ford challenges Gaskin's methodology, including but not limited to . . . the variables he used [in his conjoint survey]. These arguments go to the weight of the survey, not its admissibility, and may be addressed by cross-examination and the presentation of contrary evidence at trial[.]"). As a result, Gaskin's purported failure to account for key product attributes in his conjoint survey does not render his opinion testimony inadmissible under *Daubert*.

Next, Kellogg's fourth argument is that Gaskin's proposed conjoint analysis "fail[s] to account for the distinct purchasing behaviors of repeat buyers." Gaskin Daubert Mot. at 17. Kellogg argues that this is important because "Kellogg derives a significant portion of its sales from repeat consumers." *Id.* However, Plaintiff vigorously contests Kellogg's claim that Gaskin's conjoint analysis fails to account for the behavior of repeat purchasers. ECF No. 181 at 21–22. Specifically, Plaintiff points out that under Gaskin's proposed methodology, the sample of survey respondents will include only consumers who have recently purchased the Kellogg products at issue, and will therefore "presumably reflect a [representative] cross-section of first-time *and* repeat purchasers." *Id.* at 22 (emphasis added); *see* Gaskin Decl. ¶ 36 ("Respondents must indicate that they have purchased either Kellogg's Frosted Mini Wheats, Kellogg's Smart Start, or Kellogg's Nutri-Grain Soft-Baked Breakfast Bars in the past three months to qualify for the survey."). In turn, this will "ensur[e]" that "the class-wide measure[s]" for the market price

31

premia generated by Gaskin's conjoint analysis will accurately "reflect[] both demographics"—that is, first-time and repeat purchasers alike. *Id.* The Court is inclined to agree with Plaintiff that Gaskin's proposed conjoint analysis adequately accounts for the behavior of repeat purchasers by including both first-time and repeat purchasers in the pool of survey respondents (and by *not* actively seeking to bias the pool towards either of these demographics). Further, and in any event, even if Kellogg's repeat-purchaser criticism were valid, it would only go to the weight, and not to the admissibility, of Gaskin's proposed conjoint analysis. The practical effect of any failure to account for repeat purchasers would be an overestimation of the market price premia attributable to the challenged health statements at issue in the instant case. "Yet just because the conjoint survey may result in overestimating the value consumers placed on" the challenged health statements "does not necessarily render the survey excludable." *Fitzhenry-Russell*, 2018 WL 3126385 at *6. Instead, Kellogg "will be free to attack [Gaskin's] conjoint study as inflating the price premium at trial." *Id.*; *see also Estate of Barabin*, 740 F.3d at 463 ("Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion.").

Kellogg's fifth and final methodological argument is that Gaskin's proposed conjoint survey "suffers from pervasive focalism bias." Gaskin Daubert Mot. at 3, 18–19. Kellogg explains that a conjoint survey suffers from focalism bias if it "telegraph[s] to respondents that they are only being tested about a [particular] attribute" or set of attributes. *Id.* at 18. Kellogg further explains that focalism bias leads to "demand effects," "whereby survey respondents use cues provided by the survey procedure and questions to figure out the purpose of the survey and what they perceive to be the 'correct' answers to the questions they are asked." *Id.* Then, Kellogg asserts that Gaskin's proposed conjoint survey "telegraphs to respondents that the survey is testing the weight attributable to certain health and nutrition statements" because "[a]lmost all of the 'distractor' statements used in the survey related to the ingredients, nutritional benefits, or health properties of the challenged products." *Id.* Kellogg insists that Gaskin "could easily have avoided

32

this problem" by using distractor statements that "have nothing to do with [the product's] ingredients, [] nutritional qualities, or [] purported health benefits." *Id.* at 19.

The Court is not persuaded by Kellogg's focalism bias argument. As Plaintiff correctly explains, the fact that the distractor claims are similar to the challenged health statements—in that the distractor claims are "also health and wellness claims likely to be important to consumers in choosing products"—makes it *harder*, not easier, for survey respondents to figure out which specific health statements are being tested by the survey. ECF No. 181 at 23. In other words, if "only the challenged claims but not [the] distractor claims related to health and wellness"—as recommended by Kellogg—"this would create far more focalism bias[] by focusing respondents on the specific claims of interest." *Id.* Gaskin's entire purpose for including these "distractor claims" was to "obscure which [statements] are of primary interest in the surveys." Gaskin Decl. ¶ 24. The Court agrees with Plaintiff that Gaskin's proposed distractor claims are better-suited for this task than Kellogg's recommended distractor claims. Further, and in any event, like all of Kellogg's other survey methodology concerns, Kellogg's focalism bias objection goes to the weight, and not to the admissibility, of Gaskin's proposed conjoint analysis. *See Morales v. Kraft Foods Grp., Inc.*, 2017 WL 2598556, at *15–16 (C.D. Cal. June 9, 2017) ("Defendant also argues that Bodapati failed to conduct a blind survey and instead telegraphed to respondents the purpose of the survey. . . . This phenomenon is known as 'focalism.' . . . This is another matter that goes to the weight, not the admissibility of the challenged survey.").

In sum, as the Court noted above, conjoint analysis is widely-accepted as a reliable economic tool for isolating price premia, and the concerns that Kellogg raises are nowhere near severe enough to turn Gaskin's conjoint analysis into unreliable "junk science." *Estate of Barabin*, 740 F.3d at 463. Although some of Kellogg's critiques regarding Gaskin's survey methodology appear to be valid, all of them go to the weight, and not to the admissibility, of Gaskin's proposed conjoint analysis.

Relatedly, towards the end of Kellogg's motion to exclude Gaskin's opinion testimony,

Kellogg briefly argues that Gaskin "should not even be accepted as an expert witness in light of his lack of expertise in consumer behavior." Gaskin Daubert Mot. at 22. Kellogg's argument is not well-taken. "Gaskin" is "an expert in the fields of market research and marketing science models." *Sanchez-Knutson*, 181 F. Supp. 3d at 995; *see* Gaskin Decl. Exh. 1-1 (curriculum vitae of Gaskin showing that Gaskin is a principal of "a marketing research and consulting organization" and has almost forty years of quantitative marketing research experience and training). As such, Gaskin's conjoint analyses have been accepted by federal courts on many occasions, and for a variety of markets and industries. *See, e.g.*, *Sanchez-Knutson*, 181 F. Supp. 3d at 995 (automobiles); *Lenovo Adware*, 2016 WL 6277245 at *21 (laptops); *Khoday v. Symantec Corp.*, 93 F. Supp. 3d 1067, 1082–83 (D. Minn. 2015) (internet security software). Thus, the Court rejects Kellogg's assertion that Gaskin lacks sufficient "expertise in consumer behavior" to be qualified as an expert witness in the instant case. Gaskin Daubert Mot. at 22; *see also* ECF No. 177-4 at 53 (deposition testimony of Gaskin stating that "for many years I've worked on new product forecasting, which involves consumer behavior," as well "other techniques that attempt to measure consumer preferences and behavior" in order to "forecast future behavior").

Accordingly, the Court DENIES Kellogg's motion to exclude Gaskin's expert testimony insofar as it relates to Gaskin's proposed conjoint analysis.

### b. Hedonic Regression

As discussed above, Plaintiff also offers a regression model to measure class-wide damages for Plaintiff's affirmative misrepresentation theory of liability. Specifically, one of Plaintiff's other damages experts, Colin Weir, proposes a "hedonic regression" damages model to measure the price premia attributable to the challenged health statements in the instant case. ECF No. 143-1 ("Weir Decl.") ¶ 29. "Regression analysis" is an "econometric technique" that "identifies and quantifies the relationship between two or more variables." *Id.* ¶ 31. According to Weir, "hedonic regression is an application of standard regression techniques" that can be used to "measure the value of various product attributes"—or in other words, the relationship between a

particular product attribute and that product's price. *Id.* ¶ 32. As such, "[h]edonic regression is based on the concept that each product attribute has a different and measurable impact on aggregate consumer utility." *Id.* Weir further notes that "hedonic regression is now widely used by economists" and "has a long history of use for determining damages in class action litigation." *Id.* ¶¶ 33–34.

Weir states that "[h]edonic regression is an ideal technique for calculating the price difference between the value of the Kellogg Cereals with and without the" challenged health statements. *Id.* ¶ 50. Weir proposes a hedonic regression that estimates the price premia attributable to the challenged health statements while controlling for many other product attributes that might have affected price, including brand, promotions, and nutrient content. *See id.* ¶ 51. Further, Weir stresses that hedonic regression is an "iterative" process that requires "multiple regressions" to "help determine" all the factors that may have affected price. *Id.* ¶ 52. Weir proposes to run his hedonic regression using a "dataset [that] includes" both the challenged Kellogg products and a set of comparable breakfast products from 16 other "major brands"—including Kellogg's "three primary competitors, General Mills, Post[,] and Quaker." *Id.* ¶ 66.

Like with the proposed conjoint analysis discussed above, Kellogg advances two sets of arguments against Weir's proposed hedonic regression damages model: one asserting that it fails to satisfy *Comcast*, and another asserting that it is inadmissible under *Daubert*. *See* Opp. at 24–28. However, because the Court concluded above that Gaskin's conjoint analysis—which, like Weir's hedonic regression, corresponds with Plaintiff's affirmative misrepresentation theory of liability—satisfies *Comcast* and is admissible under *Daubert*, Plaintiff has already established that one of his proposed damages models can validly support his affirmative representation theory of liability on a class-wide basis. Further, in its motion to exclude Weir's expert testimony, Kellogg raises the same sets of arguments against Weir's proposed hedonic regression model, and in fact discusses them in greater detail. ECF No. 169. Thus, the Court finds that it need not address Kellogg's *Comcast* and *Daubert* arguments against Weir's proposed hedonic regression damages

35

model in this class certification order. Instead, the Court will defer ruling on those arguments until the hearing on Kellogg's motion to exclude Weir's expert testimony, which is currently set for November 8, 2018, at 1:30 p.m.

### c. Advantage Realized Model

Aside from his affirmative misrepresentation theory of liability, Plaintiff also asserts, inter alia, a deceptive omission theory of liability against Kellogg. Plaintiff's deceptive omission theory is that Kellogg deceptively "hides" and "omits . . . information regarding the products' high sugar content" in violation of the FAL, CLRA, and the UCL's "fraudulent" prong. SAC ¶ 209. In other words, Plaintiff "alleges that Kellogg was under a duty to disclose material information about the negative health implications of the added sugar in its products," and that "by failing to do so, [Kellogg] distorted the market demand for its product." Mot. at 24.

Plaintiff states in his motion for class certification that he can provide a damages model that is "consistent with [Plaintiff's] deceptive omission theory of liability," and points to an "advantage realized model" proposed by Gaskin. Id. at 24–25. In turn, Gaskin states that his proposed advantage realized damages model utilizes "market research surveys and analyses" to "test the effect of the omitted information regarding the dangers of added sugar consumption" on consumption of, or demand for, the challenged products. Gaskin Decl. ¶ 8(b). Under Gaskin's proposed methodology for testing the effect of the omitted sugar warnings on demand for Raisin Bran, survey respondents will be randomly assigned to one of two groups—the "Test Group" or the "Control Group." Id. ¶ 55. Respondents in the Test Group will be shown a page that displays a message—"[s]uppose you see the following statements on the boxes of Raisin Bran that you can buy when you shop in the near future"—and subsequently lists five of the challenged health statements at issue in the instant case, including "HEART HEALTHY," "Start with a HEALTHY SPOONFUL," and "INVEST IN YOUR HEALTH, INVEST IN YOURSELF." Id. ¶ 66. In contrast, respondents in the Control Group will be shown the same page with one additional item: a warning statement that reads "WARNING: DUE TO ITS HIGH ADDED SUGAR CONTENT,

36

CONSUMPTION OF RAISIN BRAN MAY LEAD YOU TO EXCEED THE USDA'S RECOMMENDED DAILY ADDED SUGAR MAXIMUM, WHICH CAN CAUSE TYPE 2 DIABETES, HEART DISEASE, FATTY LIVER DISEASE, AND TOOTH DECAY." *Id.* Both Test Group and Control Group respondents will then be prompted to answer four questions that are designed to gauge how much Raisin Bran they intend to consume in the near future. The first question "present[s] respondents with three different bowl sizes and ask[s] respondents which bowl, if any, most closely matches in size and depth the bowl they will use when they eat Raisin Bran in the near future." *Id.* ¶ 68. Thereafter, the second question presents respondents with "photos of the bowl they chose in" the first question "filled to varying amounts of Raisin Bran," and asks respondents to choose the "serving size" that "most closely matches the amount of cereal you plan to pour in the bowl when you eat Raisin Bran in the near future." *Id.* ¶ 69. Then, the third question asks respondents to indicate "how often they plan to eat bowls of Raisin Bran like the [bowl] they chose in" the second question "in the near future," *id.* ¶ 70, and the final question asks respondents "how many bowls they plan to eat, either per week or month in the near future." *Id.* ¶ 71.

Gaskin then proposes to calculate the difference in consumption between the Test and Control Groups and to use that difference as a measure of the market advantage that Kellogg gained by omitting information about the risks of added sugar consumption from Raisin Bran packaging. *See id.* ¶¶ 74, 77. Further, Gaskin notes that he has already "conducted" an advantage realized "survey for Kellogg's Raisin Bran as a proof of concept." *Id.* ¶ 52. The results of that survey "showed that those in the Test Group would have consumed 315.53 servings of Raisin Bran per year . . . and those in the Control Group would have consumed 259.22 servings of Raisin Bran per year." *Id.* ¶ 77. In other words, the results of Gaskins' preliminary advantage realized survey suggest that Kellogg would have sold 17.8% less Raisin Bran if Kellogg had disclosed "information regarding the dangers of sugar consumption" on its Raisin Bran packaging instead of omitting that information. *Id.* Plaintiff states that this "aggregate difference" can then be "applied

to the aggregate sales to determine classwide damages." Mot. at 24.

Kellogg asserts that Gaskin's proposed advantage realized model fails to satisfy *Comcast* because it can only measure the effect that a warning statement would have had on consumer demand for the challenged products, and that effect is unrelated to any class-wide remedy that might be available under Plaintiff's deceptive omission theory of liability. *See* Opp. at 28. For the reasons stated below, the Court agrees with Kellogg.

Under California law, there are two types of disgorgement remedies: "restitutionary disgorgement, which *focuses on the plaintiff's loss*, and nonrestitutionary disgorgement, which focuses on the defendant's unjust enrichment." *In re Tobacco Cases II*, 240 Cal. App. 4th 779, 800 (2015) (internal quotation marks omitted). Restitutionary disgorgement is available as a remedy for Plaintiff's mislabeling claims under the FAL, CLRA, and UCL. *See Chowning v. Kohl's Department Stores, Inc.*, 2018 WL 3016908, at *1 (9th Cir. June 18, 2018) ("The proper calculation of restitution in this case is price paid versus value received. Under California law, where a plaintiff obtains value from the product, the proper measure of restitution is 'the difference between what the plaintiff paid and the value of what the plaintiff received.'" (quoting *Vioxx*, 180 Cal. App. 4th at 131)). This explains why, as the Court observed above, the price premium attributable to an alleged misrepresentation on product packaging is a valid measure of damages in the affirmative misrepresentation context under the FAL, CLRA, and UCL. *See Brazil*, 660 F. App'x at 534. Such a price premium clearly "*focuses on the plaintiff's loss*," and therefore falls squarely within the category of restitutionary disgorgement. *In re Tobacco Cases II*, 240 Cal. App. 4th at 800; *see also Werdebaugh*, 2015 WL 2191901 at *22 ("The proper measure of restitution in a mislabeling case is the amount necessary to *compensate the purchaser* for the difference between a product as labeled and the product as received." (emphasis added)).

On the other hand, it is well-established that nonrestitutionary disgorgement, "which focuses on the defendant's unjust enrichment," is "unavailable in a . . . class action" under the FAL, CLRA, and UCL. *In re Tobacco Cases II*, 240 Cal. App. 4th at 800; *see Madrid v. Perot*

38

*Sys. Corp.*, 130 Cal. App. 4th 440, 460 (2006) ("We disagree and shall conclude that *nonrestitutionary* disgorgement is not an available remedy in a UCL class action."); *Koehler v. Litehouse, Inc.*, 2012 WL 6217635, at *7 (N.D. Cal. Dec. 13, 2012) (prohibiting the plaintiff from seeking disgorgement of "ill-gotten gains" under the FAL because (1) this amounted to nonrestitutionary disgorgement; (2) nonrestitutionary disgorgement is not allowed under the UCL; and (3) "[t]he restitutionary remedies of the UCL and FAL . . . are identical and are construed in the same manner" (citing *Cortez v. Purolator Air Filtration Prods. Co.*, 23 Cal. 4th 163, 177 n.10 (2000))); *Ivie v. Kraft Foods Global, Inc.*, 2015 WL 183910, at *2 (N.D. Cal. Jan. 14, 2015) ("[N]onrestitutionary disgorgement is not a remedy under the UCL, FAL, or CLRA.").

As discussed above, Gaskin's proposed advantage realized model purports to measure how many fewer challenged products Kellogg would have sold if it had included "information regarding the dangers of sugar consumption" on the products' packaging. Gaskin Decl. ¶ 77. Put another way, in Plaintiff's words, Gaskin's advantage realized model seeks to "quantify[] the 'additional sales' Kellogg realized by virtue of its" allegedly deceptive omissions. Reply at 19. Thus, the advantage realized model appears to "focus[]" solely on Kellogg's "unjust enrichment"—i.e., the additional sales Kellogg gained from its allegedly deceptive omissions— and therefore seems to be capable of providing only a measure for *nonrestitutionary* disgorgement. *In re Tobacco Cases II*, 240 Cal. App. 4th at 800.

Plaintiff does not argue that Gaskin's proposed advantage realized model can be used to measure the loss incurred by the class—as opposed to the benefit gained by Kellogg—due to Kellogg's allegedly deceptive omissions. Indeed, Plaintiff makes no effort to explain how the advantage realized model is in any way related to "*the plaintiff[s'] loss.*" *In re Tobacco Cases II*, 240 Cal. App. 4th at 800. Instead, Plaintiff only argues that (1) nonrestitutionary disgorgement— or Kellogg's "ill-gotten gain[]," Reply at 19 (internal quotation marks omitted)—is an available class-wide remedy under the FAL, CLRA, and UCL; and (2) price premia are not "'the *only* proper measure of restitution'" in the instant case. *Id.* (quoting *Johns v. Bayer Corp.*, 2012 WL

39

1520030, at *5 (S.D. Cal. Apr. 30, 2012) (alteration adopted)). However, as the Court explained above, nonrestitutionary disgorgement is *not* a permissible class-wide remedy under the FAL, CLRA, or UCL, and therefore Plaintiff's first argument is legally erroneous. Further, as to Plaintiff's second argument, Plaintiff may be correct that price premia are not the *only* possible measures of restitutionary disgorgement in mislabeling cases under the FAL, CLRA, and UCL, but that does not change the fact that any alternative measure of restitutionary disgorgement must "*focus[] on the plaintiff's loss*," and not "on the defendant's unjust enrichment," in order to be valid. *In re Tobacco Cases II*, 240 Cal. App. 4th at 800. Again, Plaintiff neither argues nor provides any reason to believe that Gaskin's proposed advantage realized damages model measures or "focuses on" anything other than Kellogg's purportedly "unjust enrichment." *Id.*

Importantly, it is Plaintiff's burden to demonstrate that his deceptive omission theory of liability is suitable for resolution on a class-wide basis. *See Zinser*, 253 F.3d at 1186. Because Plaintiff makes no effort to explain how Gaskin's proposed advantage realized damages model can measure anything other than nonrestitutionary disgorgement, Plaintiff has failed to satisfy his burden to show that the advantage realized model "measure[s] only those damages attributable to" Plaintiff's deceptive omission theory of liability. *Comcast*, 569 U.S. at 35. Further, Plaintiff neither states nor makes any effort to demonstrate that either of his other damages models is "consistent with [Plaintiff's] deceptive omission theory of liability." Mot. at 24. As a result, Plaintiff has failed to offer any damages model for Plaintiff's deceptive omission theory of liability that satisfies *Comcast*.

### 4. Evidence of Deception and Materiality

Kellogg's fourth predominance argument is that Plaintiff "has not provided any evidence of classwide deception or materiality." Opp. at 29–32. In other words, Kellogg asserts that Plaintiff "has not provided *any* evidence that the challenged statements are either misleading" or "material." *Id.* at 29, 31 (emphasis added).

Kellogg's argument is unavailing for two reasons. First, it is simply not the case that

40

Plaintiff has completely failed to provide "*any* evidence" that the challenged health statements at issue were either misleading or material. *Id.* at 29 (emphasis added). With regards to deception, as Plaintiff explains in his reply, Plaintiff has "offered evidence of the nutritional content of the challenged products," as well as "the testimony of two scientific experts, Drs. Lustig and Greger, explaining the physiological effects of consuming the products and opining as to the veracity of their health and wellness claims in light of the best available science." Reply at 11. Additionally, as to materiality, Plaintiff has offered, inter alia, (1) the expert testimony of a marketing expert, Bruce Silverman, opining that "the challenged [health statements] convey a material health message, bolstered by the context in which they are presented," Mot. at 4; and (2) some of Kellogg's own internal documents, which, according to Plaintiff, show that Kellogg deliberately crafted and displayed these challenged health statements—after years of meticulously studying consumer behavior and preferences in the cereal market—as part of a full-scale advertising and marketing push to increase sales. *See id.* at 3–9. To the extent Kellogg argues that Plaintiff's expert testimony is weak or that Plaintiff lacks consumer survey evidence, *see* Opp. at 32 ("As indicated in Kellogg's *Daubert* motion, Mr. Silverman did not a survey or interview a *single* consumer to determine if the challenged statements are material."), that argument is without merit. California courts have explicitly "'reject[ed] [the] view that a plaintiff must produce'" extrinsic evidence "such as expert testimony or consumer surveys" in order "'to prevail on a claim that the public is likely to be misled by a representation'" under the FAL, CLRA, or UCL. *Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th 662, 681–82 (2006) (quoting *Consumer Advocates v. Echostar Satellite Corp.*, 113 Cal. App. 4th 1351, 1386 (2003)); *see also id.* at 682 ("[W]ith regard to the showing of deception, the primary evidence in a false advertising case is the advertising itself." (internal quotation marks omitted)).

Second, and more fundamentally, even if Kellogg is correct in its assertion that Plaintiff has failed to provide sufficient evidence of deception and materiality, that failure has no bearing on whether common questions will predominate over individual questions in the instant case. As

41

the Court has already explained, the questions of whether the challenged health statements were misleading and material must be evaluated according to an objective "reasonable consumer" standard. *See Lavie*, 105 Cal. App. 4th at 507; *Yumul v. Smart Balance, Inc.*, 733 F. Supp. 2d 1117, 1125 (C.D. Cal. 2010) (explaining that a "reasonable consumer" standard applies to product mislabeling claims under the FAL, CLRA, and UCL); *Racies v. Quincy Bioscience, LLC*, 2017 WL 6418910, at *3 (N.D. Cal. Dec. 15, 2017) ("California's consumer protection laws evaluate materiality under a reasonable person standard, not on an individualized basis."). Further, because deception and materiality under the FAL, CLRA, and UCL are objective questions, they are "ideal for class certification because they will not require the court to investigate class members' individual interaction with the [challenged] product[s]." *Tait*, 289 F.R.D. at 480 (internal quotation marks omitted). Put another way, because deception and materiality are objective questions, they are "'common question[s]' for purposes of Rule 23(b)(3)." *Amgen*, 568 U.S. at 467 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 242 (1988)). As a result, "[t]here is no risk whatever that a failure of proof on the common question[s] of [deception and] materiality will result in individual questions predominating." *Amgen*, 568 U.S. at 468. "Instead, the failure of proof on the element[s] of [deception and] materiality would end the case for one and for all; no claim would remain in which individual . . . issues could potentially predominate." *Id.*

Kellogg also makes the related argument that Plaintiff has failed to establish predominance under Rule 23(b)(3) because the evidence indicates that consumers of the products at issue did not have a uniform, "common understanding" of many of the challenged health statements. Opp. at 30. In other words, Kellogg asserts that because "consumers interpret" the challenged statements "in a wide variety of ways," the Court will be forced to inquire into each individual class member's subjective understanding of the challenged statements in order to determine Kellogg's liability. *Id.*

Once again, Kellogg's argument is defeated by the fact that deception and materiality under the FAL, CLRA, and UCL are governed by an objective "reasonable consumer" test.

42

Because deception and materiality are objective questions, Plaintiff "has no burden to establish that there is a uniform understanding among putative class members as to the meaning of" the challenged health statements, "or that all or nearly all of [the class members] shared any specific belief." *Pettit v. Procter & Gamble Co.*, 2017 WL 3310692, at *3 (N.D. Cal. Aug. 3, 2017). Instead, Plaintiff need only make "an objective showing of a probability that a 'significant portion' of the relevant consumers acting reasonably 'could be misled'" by the challenged statements. *Id.* (quoting *Ebner v. Fresh, Inc.*, 838 F.3d 958, 965 (9th Cir. 2016)). Indeed, the Ninth Circuit recently reversed a denial of class certification in a similar product mislabeling case where the district court found that the plaintiff had failed to satisfy predominance because he had not established that the alleged misrepresentation had a common understanding among consumers. Specifically, in *Bradach v. Pharmavite, LLC*, 2016 WL 7647661 (C.D. Cal. July 6, 2016), the district court found that the plaintiff had "offered no evidence that consumers uniformly interpret the statement" "Helps Maintain a Healthy Heart" "in a particular manner." *Id.* at *5. Based on this finding, the court concluded that Rule 23(b)(3)'s predominance requirement was not met because "an individualized inquiry into each consumer's interpretation of 'Helps Maintain a Healthy Heart' would be required to determine" both "materiality" and "whether each consumer ha[d] non-preempted claims" of falsity. *Id.* The Ninth Circuit promptly reversed the district court's denial of class certification in an unpublished opinion. *See Bradach v. Pharmavite, LLC*, 2018 WL 2250508 (9th Cir. May 17, 2018). With regards to the district court's uniform interpretation finding, the Ninth Circuit held that "the district court's conclusion that it would need to inquire into the motives of each individual class member was premised on an error of law" because "the standard in actions under both the CLRA and UCL is" an *objective* standard that focuses on "whether 'members of the public are likely to be deceived,'" and therefore "class members in CLRA and UCL actions are not required to prove their individual reliance on the allegedly misleading statements." *Id.* at *2 (quoting *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 951 (2002)).

Finally, Kellogg briefly argues that predominance is not met in the instant case because the evidence "shows that people buy Kellogg products for reasons other than 'health,'" "such as taste, price, brand loyalty, nostalgia, and convenience." Opp. at 31–32. However, under California law, Plaintiff is not required to prove that the challenged health statements were "'the sole or even the predominant or decisive factor influencing'" the class members' decisions to buy the challenged products. *In re Tobacco II Cases*, 46 Cal. 4th at 581 (quoting *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 977 (1997)). Further, and in any event, Plaintiff correctly observes that Kellogg's argument about "consumers hav[ing] a variety of reasons for purchasing cereal" is "a merits dispute as to materiality," and is therefore a dispute "that can be resolved classwide," Reply at 10, because, as discussed at length above, materiality is a "'common question' for purposes of Rule 23(b)(3)." *Amgen*, 568 U.S. at 467 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 242 (1988)).

Accordingly, the Court rejects Kellogg's assertion that Plaintiff has failed to satisfy Rule 23(b)(3)'s predominance requirement because Plaintiff lacks any evidence of deception or materiality.

### 5. Alternative Theories of Liability

Finally, Kellogg argues that Plaintiff's "alternative theories of liability"—that is, Plaintiff's deceptive omission, unlawful misbranding, and breach of warranty theories of liability—"are also not subject to common proof." Opp. at 32–34. The Court discusses each theory in turn.

First, as to Plaintiff's deceptive omission theory of liability, Kellogg argues that Plaintiff has provided no evidence that Kellogg either "'had exclusive knowledge of material facts not known to the plaintiff," "actively conceals a material fact from the plaintiff," or "makes partial representations but also suppresses some material fact." *Id.* at 32–33 (quoting *Falk v. Gen. Motors, Inc.*, 496 F. Supp. 2d 1088, 1095 (N.D. Cal. 2007)). However, the Court has already determined that Plaintiff has failed to provide a damages model for his deceptive omission theory of liability that satisfies *Comcast*. As a result, Kellogg's evidentiary argument against Plaintiff's

44

deceptive omission theory of liability is moot, and thus the Court need not address it.

Second, as to Plaintiff's unlawful misbranding theory of liability, Kellogg asserts that the allegedly unlawful challenged statements "are not unlawful," but rather "are 'expressly permitted under FDA regulations.'" Opp. at 33–34 (quoting *In re Quaker Oats Labeling Litig.*, 2012 WL 1034532, at *3 (N.D. Cal. Mar. 28, 2018)). In other words, Kellogg argues that Plaintiff is wrong on the merits of his unlawful misbranding theory of liability. Indeed, Kellogg even states that it intends to "move to dispose of" this theory of liability later in this litigation, which indicates that Kellogg understands this argument to be a merits argument. Opp. at 34 n.17. However, as discussed above, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen*, 568 U.S. at 466. Thus, "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* Kellogg's argument that its purportedly unlawful statements "are 'expressly permitted under FDA regulations'" raises a merits question that is completely unrelated to whether any of the Rule 23 requirements have been met in the instant case. Opp. at 34. As a result, at this stage of the proceedings, the Court cannot consider Kellogg's argument that its allegedly unlawful statements "are not [actually] unlawful." Opp. at 34.

Third, as to Plaintiff's breach of warranty theory of liability, Kellogg argues that this theory is "not susceptible to common proof for the same reasons that" Plaintiff's affirmative misrepresentation theory under the UCL is not. Opp. at 34. However, the Court has already rejected all of Kellogg's predominance arguments against Plaintiff's affirmative misrepresentation theory of liability, and has therefore determined that Plaintiff has met Rule 23(b)(3)'s predominance requirement for his affirmative misrepresentation theory. Consequently, the Court also rejects Kellogg's predominance arguments against Plaintiff's breach of warranty theory of liability, and instead concludes that predominance is satisfied as to that theory.

**6. Conclusion**

In sum, the Court finds that Plaintiff has failed to satisfy Rule 23(b)(3) predominance as to (1) Plaintiff's proposed Nutri-Grain Soft-Baked Breakfast Bar Subclass; and (2) Plaintiff's deceptive omission theory of liability. However, the Court also finds that Plaintiff has established Rule 23(b)(3) predominance as to the remainder of Plaintiff's proposed subclasses and theories of liability. Accordingly, the Court DENIES Plaintiff's motion for class certification only as to Plaintiff's proposed Nutri-Grain Soft-Baked Breakfast Bar Subclass and Plaintiff's deceptive omission theory of liability. Moreover, because the Court denies class certification as to Plaintiff's deceptive omission theory of liability, the Court DENIES as moot Kellogg's motion to exclude Gaskin's expert testimony to the extent that it concerns Gaskin's proposed advantage realized damages model. *See* Gaskin Daubert Mot. at 20–22.

### B. Typicality and Adequacy

Under Rule 23(a)(3), a representative party must have claims or defenses that are "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality is satisfied "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendants' liability." *Rodriguez v. Hayes*, 591 F.3d 1105, 1122 (9th Cir. 2010) (citations omitted). This requirement is "permissive and requires only that the representative's claims are reasonably co-extensive with those of the absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998). "[C]lass certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citations omitted). "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." *Id.*

Further, Rule 23(a)(4) requires "the representative parties [to] fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement turns upon resolution of two questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other

46

class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon*, 150 F.3d at 1020.

Plaintiff argues that "typicality exists, not just within each Subclass, but across the entire class," because (1) "Plaintiff alleges he was injured when he paid more for the challenged products due to the price premium [Kellogg's] false and material health and wellness claims demanded in the market"; and (2) "[t]hese are the same injuries each Class Member alleges based on the same Kellogg conduct." Mot. at 17. Additionally, Plaintiff asserts that he "is an adequate Class Representative because he is a *bona fide* purchaser with standing, has no conflicts, is aware of his obligations, and will continue to vigorously prosecute the case for the Class." *Id.* at 18 (citing ECF No. 135 ¶¶ 2–12). Plaintiff further states that he "has retained adequate proposed Class Counsel," and attaches a declaration from one of Plaintiff's lawyers, Jack Fitzgerald, detailing his (and his law firm's) extensive experience in prosecuting class actions and other complex cases. Mot. at 18 (citing ECF No. 30 ¶¶ 152–56).

For its part, Kellogg briefly raises three challenges to Plaintiff's typicality and adequacy as the named representative of the class at the end of its opposition to Plaintiff's motion for class certification. *See* Opp. at 34–35. The Court finds none of Kellogg's arguments to be persuasive, and discusses each of them in turn.

First, Kellogg argues that Plaintiff is an inadequate class representative because, although Plaintiff stated at his deposition that a Safeway store in Del Rey Oaks, California, was his "go-to" grocery store, the electronic record for his Safeway discount card does not reflect any purchases of the products at issue in the instant case. Opp. at 34–35. Kellogg asserts that this amounts to "strong evidence that Plaintiff never made the purchases he claims to have made," and therefore calls Plaintiff's credibility into question. *Id.* at 35.

However, Plaintiff's SAC alleges only that Plaintiff "believes" that he purchased Kellogg products from locations including, but not limited to, that particular Safeway store. SAC ¶¶ 252, 255, 257, 263. Further, it appears from Plaintiff's deposition that by confirming Kellogg's

47

counsel's query about whether the Safeway was "sort of [Plaintiff's] go-to shop," Plaintiff meant only that Safeway "was closest to where [Plaintiff] was living." *See* Reply at 21 (citing ECF No. 195-7 at 88–89). Additionally, Plaintiff testified that out of all the grocery stores Plaintiff identified in his complaint, Safeway was the most expensive. *See id.* (citing ECF No. 195-7 at 281–82). Relatedly, Plaintiff has submitted a declaration explaining that, while Safeway was where he "most frequently made quick purchases" due to its proximity to his house, Plaintiff "usually purchased cereal" on "more regular grocery shopping trips" to cheaper stores, like "Target, Wal-Mart, or especially Grocery Outlet," which he "believe[s] . . . is why records of [his] purchase history from Safeway do not show many cereal purchases." ECF No. 194-2 ¶ 2.

In light of these portions of the record regarding Plaintiff's cereal purchases, the Court cannot conclude that the absence of Kellogg products from Plaintiff's Safeway purchase records creates a concern about Plaintiff's credibility that is "'so sharp as to jeopardize the interests of absent class members.'" *Harris v. Vector Mktg. Corp.*, 753 F. Supp. 2d 996, 1015 (N.D. Cal. 2010) (quoting *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 177 (S.D.N.Y. 2008)); *see also id.* ("That being said, 'credibility problems do not automatically render a proposed class representative inadequate.'" (quoting *Ross v. RBS Citizens, N.A.*, 2010 WL 3980113, at *4 (N.D. Ill. Oct. 8, 2010))); *In re Computer Memories Secs. Litig.*, 111 F.R.D. 675, 682 (N.D. Cal. 1986) (stating that "questions of personal integrity are but one factor the Court must consider in making the adequacy determination"). Based on his deposition testimony, Plaintiff can plausibly maintain that Plaintiff did not mean to convey that Safeway was his "go-to" grocery store for all purchases. Further, Plaintiff has advanced a conceivable explanation for why there are no Kellogg products listed on Plaintiff's Safeway purchase records. Finally, and in any event, Plaintiff correctly notes that "the record leaves no doubt" about the most critical fact regarding Plaintiff's adequacy as a class representative in this lawsuit: that Plaintiff "was an avid cereal eater who regularly bought and consumed the products at issue here." Reply at 21 (citing ECF No. 195-7 at 77–78, 102–04, 125, 134–35, 154); *see Harris*, 753 F. Supp. 2d at 1015 (stating that "[t]here is 'inadequacy only

United States District Court
Northern District of California

where the representative's credibility is questioned on issues directly relevant to the litigation'" (quoting *Ross*, 2010 WL 3980113 at *4)).

Second, Kellogg argues that Plaintiff fails to meet the typicality requirement of Rule 23(a)(3) because "Plaintiff is subject to unique defenses because he engages in activities that dramatically increase his risk of suffering the harmful health effects he blames on the challenged products." Opp. at 35. However, as the Court explained above, none of Plaintiff's claims require Plaintiff to prove that he or any other class member was physically harmed as a result of Kellogg's alleged misconduct. Instead, Plaintiff "is seeking to recover for the *economic* injury caused by Kellogg representing that its . . . foods are healthy." Reply at 4. Thus, Plaintiff's claims will be evaluated according to an objective "reasonable consumer" standard. As a result, the "activities" in which Plaintiff engaged that might have physically affected Plaintiff are irrelevant to the resolution of any claims in the instant case, and therefore cannot render Plaintiff "subject to" any "unique defenses." Opp. at 35.

Third, and finally, Kellogg argues that Plaintiff's "interests do not overlap with those of other class members." *Id.* Specifically, Kellogg points to the fact that, "[o]n the same day he filed this lawsuit, Plaintiff also filed two other lawsuits in which he alleges that dozens of other breakfast products were mislabeled because of their supposedly 'excessive' added sugar content." *Id.* Thus, Kellogg asserts that "Plaintiff is not a proper class representative" because he is a "serial" cereal plaintiff. *Id.*

Kellogg's final argument lacks merit. The Ninth Circuit has stated that "the term 'professional,' as in 'professional plaintiff,' is not a 'dirty word' and should not itself undermine one's ability to seek redress for injuries suffered . . . ." *Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1056 (9th Cir. 2009) (internal citation omitted). As such, courts have rejected the notion that serial plaintiffs are inadequate and atypical class representatives solely by virtue of having served as named plaintiffs in other class actions. *See Patten v. Vertical Fitness Grp., LLC*, 2013 WL 12069031, at *9 (S.D. Cal. Nov. 8, 2013) (rejecting argument that the named plaintiff, Mr.

Van Patten, was inadequate due to his status "[a]s a professional plaintiff" and the resulting "concern that Mr. Van Patten is not truly representing the interests of the class, and is only interested in maximizing his own payout," noting that Mr. Van Patten "is perfectively entitled" to "bring other lawsuits," and finding that Mr. Van Patten was an adequate class representative because the Court saw "no conflict of interest . . . between Van Patten and other members of the class, nor d[id] it see any reason to believe that Van Patten won't prosecute this case vigorously" (internal quotation marks omitted)); *Bruno v. Quten Research Inst., LLC*, 280 F.R.D. 524, 534 (C.D. Cal. 2011) ("[T]his Court has already held that being a serial plaintiff is not a basis for finding that a plaintiff is atypical."). Kellogg offers no specific reason to think that Plaintiff's status as a class representative in two similar class actions against other large food-manufacturing corporations might put Plaintiff's interests at odds with those of the class in the instant case or cause Plaintiff to prosecute the instant case apathetically. Indeed, "the history of this case"—specifically, two rounds of hard-fought motion-to-dismiss disputes and the instant class certification row—suggests quite the opposite. *Patten*, 2013 WL 12069031 at *9.

In sum, the Court is not persuaded by any of Kellogg's arguments regarding Plaintiff's typicality and adequacy as a class representative in the instant case. Accordingly, the Court concludes that Plaintiff has satisfied Rule 23(a)'s typicality and adequacy requirements.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS in part and DENIES in part Plaintiff's motion for class certification, and DENIES Kellogg's motion to exclude the opinion testimony of Steven P. Gaskin under *Daubert*. The Court CERTIFIES the following Rule 23(b)(3) class, which is composed of three subclasses:

> All persons in California who, on or after August 29, 2012, purchased for household use and not for resale or distribution:
>
> **Raisin Bran Subclass:** Kellogg's Raisin Bran (including Omega-3) or Kellogg's Raisin Bran Crunch Cereals in a 13.7 oz., 14.3 oz., 18.2 oz., 18.7 oz., 23.5 oz., 24.8 oz., 29 oz., 30.3 oz., 43.3 oz., 56.6 oz., or 76.5 oz. package stating "heart healthy."

United States District Court
Northern District of California

**Smart Start Subclass:** Kellogg's Smart Start Original Antioxidants cereal in a 17.3 oz. package.

**Frosted Mini-Wheats Subclass:** Kellogg's Frosted Mini-Wheats Bite Size (Original, Maple Brown Sugar, Strawberry, or Blueberry varieties), Big Bites (Original variety), Little Bites (Chocolate or Cinnamon Roll varieties), or Touch of Fruit in the Middle (Mixed Berry and Raspberry varieties) cereals in a 15.2 oz., 15.5 oz., 15.8 oz., 16.5 oz., 18 oz., 21 oz., or 24 oz. package.

The Court APPOINTS Stephen Hadley as representative of the class. As Kellogg does not challenge the adequacy of proposed class counsel, the Court also APPOINTS Jack Fitzgerald of The Law Office of Jack Fitzgerald, P.C., as class counsel.

**IT IS SO ORDERED.**

Dated: August 17, 2018

_Lucy H. Koh_

LUCY H. KOH
United States District Judge

Case No. 16-CV-04955-LHK
ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR CLASS CERTIFICATION; DENYING DEFENDANT'S MOTION TO EXCLUDE OPINION TESTIMONY OF STEVEN P. GASKIN