**THE LAW OFFICE OF JACK FITZGERALD, PC**
JACK FITZGERALD (SBN 257370)
*jack@jackfitzgeraldlaw.com*
TREVOR M. FLYNN (SBN 253362)
*trevor@jackfitzgeraldlaw.com*
MELANIE PERSINGER (SBN 275423)
*melanie@jackfitzgeraldlaw.com*
Hillcrest Professional Building
3636 Fourth Avenue, Suite 202
San Diego, California 92103
Phone: (619) 692-3840
Fax: (619) 353-0404

**JACKSON & FOSTER, LLC**
SIDNEY W. JACKSON, III (*pro hac vice*)
75 St. Michael Street
Mobile, Alabama 36602
Phone: (251) 433-6699
Fax: (251) 433-6127

***Counsel for Plaintiffs & the Settlement Class***

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| STEPHEN HADLEY, MELODY DIGREGORIO, ERIC FISHON, KERRY AUSTIN, and NAFEESHA MADYUN, on behalf of themselves, all others similarly situated, and the general public,<br><br>     Plaintiffs,<br><br>          v.<br><br>KELLOGG SALES COMPANY,<br><br>     Defendant. | Case No. 5:16-cv-04955-LHK<br><br>**PLAINTIFFS' NOTICE OF MOTION AND RENEWED MOTION FOR PRELIMINARY APPROVAL**<br><br>[Fed. R. Civ. P. 23(e)]<br><br>Judge:   Hon. Lucy H. Koh<br>Date:    November 12, 2020<br>Time:    1:30 p.m.<br>Location:  Courtroom 8 – 4th Floor |

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES .................................................................................................iii

NOTICE OF MOTION....................................................................................................... 1

ISSUES TO BE DECIDED ................................................................................................ 1

MEMORANDUM ............................................................................................................ 2

    I.     INTRODUCTION ................................................................................................ 2

    II.    ARGUMENT ........................................................................................................ 3

        A.    The Court Should Certify the Settlement Class................................................ 3

            1.    The Requirements of Rule 23(b)(3) are Satisfied ............................. 3

                a.    The Settlement Class's Claims are—Properly—Broader than the Claims on which Mr. Hadley Moved for Class Certification ..................................................................... 4

                b.    Predominance is Satisfied with Respect to the Settlement Class's Claims ................................................................. 6

            2.    The Requirements of Rule 23(a) are Satisfied ................................ 14

        B.    The Court Should Approve the Proposed Settlement ................................... 14

            1.    The Release Should Not Prevent the Court from Approving the Settlement ................................................................. 14

            2.    The Reversionary Aspect of the Settlement's Voucher Component is Appropriate......................................................... 15

                a.    The Reversionary Aspect of the Settlement Does Not Indicate Collusion .......................................................... 15

                b.    An Estimate of the Potential Range of Reversion ............................. 19

            3.    Revised Forms and Notices are Proper........................................ 20

a.     The Revised Claim and Opt-Out Forms Provide Adequate Notice .................................................................. 20

b.     The Revised Long- and Short-Form Notices are Proper ................... 22

c.     The Updated Notice Plan is Proper ..................................................... 23

4.     Revised Procedures for Opting Out and Objecting are Appropriate ............ 23

5.     Plaintiffs' Counsel will Apply for Fees in Compliance with 28 U.S.C. § 1712 .......................................................................... 23

a.     Option 1: The Lodestar Method ......................................................... 24

b.     Option 2: The Common Fund Method .............................................. 25

III.     CONCLUSION ................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**

*Allen v. Bedolla*,
  787 F.3d 1218 (9th Cir. 2015) ........................................................................... 18

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) ................................................................... 6, 7, 12, 14

*Bradach v. Pharmavite, LLC*,
  735 Fed. Appx. 251 (9th Cir. 2018) ............................................................. 8, 13

*Broomfield v. Craft Brew Alliance, Inc.*,
  2020 WL 1972505 (N.D. Cal. Feb. 5, 2020) ........................................................ 8

*Butler v. Porsche Cars N. Am., Inc.*,
  2017 WL 1398316 (N.D. Cal. Apr. 19, 2017) ..................................................... 11

*Campbell v. Facebook, Inc.*,
  951 F.3d 1106 (9th Cir. 2020) ................................................................. 16, 17

*Carlotti v. ASUS Computer Int'l*,
  2019 WL 6134910 (N.D. Cal. Nov. 19, 2019) .................................................... 19

*Castro v. Paragon Indus., Inc.*,
  2020 WL 1984240 (E.D. Cal. Apr. 27, 2020) ...................................................... 7

*Class Plaintiffs v. City of Seattle*,
  955 F.2d 1268 (9th Cir. 1992) ....................................................................... 5

*Cortes v. Nat'l Credit Adjusters, L.L.C.*,
  2020 WL 3642373 (E.D. Cal. July 6, 2020) ......................................................... 7

*Daugherty v. Am. Honda Motor Co.*,
  144 Cal. App. 4th 824 (2006) ...................................................................... 12

*Figueroa v. Sharper Image Corp.*,
  517 F. Supp. 1292 (S.D. Fla. 2007) ................................................................ 16

*Gonzalez v. BMC W., LLC*,
  2018 WL 6318832 (C.D. Cal. Nov. 19, 2018) .................................................... 19

*Hadley v. Kellogg Sales Co.*,
  2019 WL 3804661 (N.D. Cal. 2019) ................................................................. 4

*Hadley v. Kellogg Sales Co.*,
  2019 WL 3804661 (N.D. Cal. Aug. 13, 2019) .................................................... 11

iii

*Hadley v. Kellogg Sales Co.*,
   2020 WL 836673 (N.D. Cal. Feb. 20, 2020) ...................................................................... passim

*Hadley v. Kellogg Sales Co.*,
   273 F. Supp. 3d 1052 (N.D. Cal. 2017) ...................................................................... 5, 10

*Hadley v. Kellogg Sales Co.*,
   324 F. Supp. 3d 1084 (N.D. Cal. 2018) ...................................................................... 11, 12, 14

*Hale v. Manna Pro Prods., LLC*,
   2020 WL 3642490 (E.D. Cal. July 6, 2020) ...................................................................... 8, 17

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998) ...................................................................... 6, 7

*Harris v. Vector Mktg. Corp.*,
   2011 WL 1627973 (N.D. Cal. Apr. 29, 2011) ...................................................................... 17

*Hendricks v. Ference*,
   754 Fed. App'x 510 (9th Cir. 2018) ...................................................................... 22

*Hilsley v. Ocean Spray Cranberries, Inc.*,
   2020 WL 520616 (S.D. Cal. Jan. 31, 2020) ...................................................................... 8

*Hodsdon v. Mars, Inc.*,
   891 F.3d 857 (9th Cir. 2018) ...................................................................... 12

*In re Am. Int'l Group Inc. Secs. Litig.*,
   689 F.3d 229 (2d Cir. 2012) ...................................................................... 12

*In re Bluetooth Headset Prods. Liability Litig.*,
   654 F.3d 935 (9th Cir. 2011) ...................................................................... 17

*In re Chinese-Manufactured Drywall Prods. Liability Litig.*,
   424 F. Supp. 3d 456 (E.D. La. 2020) ...................................................................... 16, 17

*In re Domestic Air Transp. Antitrust Litig.*,
   148 F.R.D. 297 (N.D. Ga. 1993) ...................................................................... 19

*In re Easysaver Rewards Litig.*,
   2020 WL 2097616 (S.D. Cal. May 1, 2020) ...................................................................... 24

*In re Easysaver Rewards Litig.*,
   906 F.3d 747 (9th Cir. 2018) ...................................................................... 24

*In re Hyundai & Kia Fuel Economy Litig.*,
   926 F.3d 539 (9th Cir. 2019) ...................................................................... passim

*In re Janney Montgomery Scott LLC Fin. Consulting Litig.*,
  2009 WL 2137224 (E.D. Pa. July 16, 2009).................................................................7

*In re Linerboard Antitrust Litig.*,
  305 F.3d 145 (3d Cir. 2002).............................................................................................7

*In re Literary Works in Elec. Databases Copyright Litig.*,
  654 F.3d 242 (2d Cir. 2011).............................................................................................5

*In re NJOY, Inc. Consumer Class Action Litig.*,
  120 F. Supp. 3d 1050 (C.D. Cal. Aug. 14, 2015) .........................................................11

*In re Online DVD-Rental Antitrust Litig.*,
  779 F.3d 934 (9th Cir. 2015) .........................................................................................22

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*,
  261 F.3d 355 (3d Cir. 2001).............................................................................................5

*In re Tobacco II Cases*,
  46 Cal. 4th 298 (2009) ...............................................................................................7, 13

*In re Valeant Pharms. Int'l, Inc. Secs. Litig.*,
  2020 WL 3166456 (D.N.J. June 15, 2020) ......................................................................7

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prods. Liab. Litig.*,
  895 F.3d 597 (9th Cir. 2018) ....................................................................15, 16, 18, 25

*In re Zynga Inc. Secs. Litig.*,
  2015 WL 6471171 (N.D. Cal. Oct. 27, 2015) ...............................................................17

*Jimenez v. Allstate Ins. Co.*,
  765 F.3d 1161 (9th Cir. 2014) .........................................................................................6

*Johns v. Bayer Corp.*,
  280 F.R.D. 551 (S.D. Cal. 2012) .....................................................................................7

*Kelly v. Wengler*,
  822 F.3d 1085 (9th Cir. 2015) .......................................................................................24

*Krommenhock v. Post Foods, LLC*,
  2018 WL 1335867 (N.D. Cal. Mar. 15, 2018)................................................................6

*Krommenhock v. Post Foods, LLC*,
  2020 WL 2322993 (N.D. Cal. May 11, 2020) ..............................................................14

*Krommenhock v. Post Foods, LLC*,
  255 F. Supp.3d 938 (N.D. Cal. 2017) ...........................................................................10

*Krommenhock v. Post Foods, LLC*,
    334 F.R.D. 552 (N.D. Cal. 2020) ........................................................................... 10, 13, 14

*Kutzman v. Derrel's Mini Storage, Inc.*,
    2020 WL 406768 (E.D. Cal. Jan. 24, 2020) ...................................................................... 7

*Lane v. Facebook, Inc.*,
    696 F.3d 811 (9th Cir. 2012) .......................................................................................... 22

*Moreno v. Beacon Roofing Supply, Inc.*,
    2020 WL 1139672 (S.D. Cal. Mar. 9, 2020) ................................................................... 7

*Nur v. Tatitlek Support Servs., Inc.*,
    2016 WL 3039573 (C.D. Cal. Apr. 25, 2016) ............................................................... 16

*Officers for Justice v. Civil Service Comm'n of City & County of San Francisco*,
    688 F.2d 615 (9th Cir. 1982) ............................................................................................ 5

*Rapuano v. Trs. of Dartmouth College*,
    --- F.R.D. -----, 2020 WL 475630 (D.N.H. Jan. 29, 2020) ............................................ 12

*Rawa v. Monsanto Co.*,
    934 F.3d 862 (8th Cir. 2019) .......................................................................................... 24

*Rodriguez v. W. Pub'g Corp.*,
    563 F.3d 948 (9th Cir. 2009) .......................................................................................... 18

*Roes, 1-2 v. SFBSC Mgmt., LLC*,
    944 F.3d 1035 (9th Cir. 2019) ........................................................................ 6, 15, 16, 18

*Schneider v. Chipotle Mexican Grill, Inc.*,
    2020 WL 511953 (N.D. Cal. Jan. 31, 2020) ............................................................... 8, 14

*Sherman v. CLP Res., Inc.*,
    2020 WL 2790098 (C.D. Cal. Jan. 30, 2020) ............................................................. 8, 17

*Shin v. Plantronics, Inc.*,
    2020 WL 1934893 (N.D. Cal. Jan. 31, 2020) .................................................................. 8

*State Farm v. Super. Ct.*,
    45 Cal. App. 4th 1093 (1996) ......................................................................................... 13

*Tait v. BSH Home Appliances Corp.*,
    289 F.R.D. 466 (C.D. Cal. Dec. 20, 2012) .................................................................... 13

*TBK Partners, Ltd. v. Western Union Corp.*,
    675 F.2d 456 (2d Cir. 1982) ............................................................................................. 5

*Torres v. Mercer Canyons Inc.*,
   835 F.3d 1125 (9th Cir. 2016) ............................................................ 6, 12, 14

*True v. Am. Honda Motor Co.*,
   749 F. Supp. 2d 1052 (C.D. Cal. 2010) ............................................................ 16

*Tyson Foods, Inc. v. Bouaphakeo*,
   --- U.S. ----, 136 S. Ct. 1036 (2016) ............................................................ 6, 7

*Vinole v. Countrywide Home Loans*,
   571 F.3d 935 (9th Cir. 2009) ............................................................ 7, 8

*Vizcaino v. Microsoft Corp.*,
   290 F.3d 1043 (9th Cir. 2002) ............................................................ 24

*Waller v. Hewlett-Packard Co.*,
   295 F.R.D. 472 (S.D. Cal. 2013) ............................................................ 13

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
   396 F.3d 96 (2d Cir. 2005) ............................................................ 5

*Zinser v. Accufix Research Inst.*,
   253 F.3d 1180 (9th Cir. 2001) ............................................................ 7

**Statutes**

28 U.S.C. § 1712(c) ............................................................ 23

**Regulations**

21 C.F.R. § 1.21(a)(2) ............................................................ 12

**Treatises**

4 Alba Conte & Herbert Newberg, Newberg on Class Actions § 12:15 (4th ed. 2002) ............................... 5

7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* §
   1777 (2d ed. 1986) ............................................................ 6

*Hadley et al. v. Kellogg Sales Company*, No. 16-cv-4955-LHK
RENEWED MOTION FOR PRELIMINARY APPROVAL

## NOTICE OF MOTION

TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT, pursuant to Fed. R. Civ. P. 23(e) and the Northern District of California's Procedural Guidelines for Class Action Settlements ("Settlement Guidelines"), on November 12, 2020, at 1:30 p.m., or as soon thereafter as may be heard, Plaintiffs will move the Court, the Honorable Lucy H. Koh presiding, for an Order preliminarily approving a proposed nationwide class action settlement.

The Motion is based upon this Notice of Motion; the below Memorandum; the previously-filed Motion for Preliminary Approval (Dkt. No. 325, "PA Mot."), including the previously-filed declarations of Jack Fitzgerald (Dkt. No. 325-1, "PA1 Fitzgerald Decl."), Hon. James F. Holderman (Ret.) (Dkt. No. 325-2, "Holderman Decl."), Colin B. Weir (Dkt. No. 325-3, "PA1 Weir Decl."), and Brandon Schwartz (Dkt. No. 325-4, "PA1 Schwartz Decl."), and all exhibits thereto; the concurrently-filed Omnibus Declaration of Jack Fitzgerald ("Omnibus Fitzgerald Decl."), Declaration of Colin Weir ("Weir Decl."), and Declaration of Brandon Schwartz ("Schwartz Decl."), and all exhibits thereto; the concurrently-filed [Proposed] Order Granting Preliminary Approval ("Proposed Order"); all prior pleadings and proceedings, including Plaintiffs' concurrently-filed Motion to Enforce Settlement Agreement ("Mot. to Enforce"); and any additional evidence and argument submitted in support of the Motion.

Plaintiffs seek an Order certifying the Settlement Class and appointing Class Representatives and Class Counsel; granting preliminary approval to the proposed nationwide class Settlement; approving the proposed Notice Plan and directing Class Notice to be made; and setting schedules and procedures for effecting Class Notice, making claims, opting out, objecting, and conducting a Final Approval Hearing.

## ISSUES TO BE DECIDED

1.     Whether to certify the proposed Settlement Class and appoint Plaintiffs Class Representatives and their counsel Class Counsel.

2.     Whether the proposed Settlement falls within the range of reasonableness, such that preliminary approval is warranted.

3.     Whether the proposed Notice and Notice Plan are appropriate and should be implemented.

4.     The appropriate schedule and procedures for making Class Notice; for Class Members making claims, opting out, and objecting; and for the Court conducting a Final Approval Hearing.

1

## **MEMORANDUM**

## I.   **INTRODUCTION**

In September 2019, after more than three years of hotly-contested litigation and three months before trial, Plaintiffs obtained a Settlement providing $20.25 million in direct, compensatory monetary benefits for a nationwide Settlement Class, and substantial injunctive likely to save the Class millions more. *See* PA1 Fitzgerald Decl. Ex. A ("Settlement Agreement" or "SA"); PA Mot. at 1, 3-6, 15-19. In October 2019, Plaintiffs moved for preliminary approval, and Kellogg filed a non-opposition. Dkt. Nos. 325, 329.

In February 2020, the Court issued an Order denying preliminary approval without prejudice (the "Preliminary Approval Order") "on several bases." *See Hadley v. Kellogg Sales Co.*, 2020 WL 836673, at *2 (N.D. Cal. Feb. 20, 2020) (Koh, J.) ["*Hadley V*"]. The Court explained:

> First, the release of the claims is overbroad. Second, it is unclear whether certification of the settlement class is appropriate under Federal Rule of Civil Procedure 23(b)(3). Third, the parties fail to provide sufficient information to justify a proposed reversion to Kellogg. Fourth, the claim form, opt-out form, and notice forms contain numerous errors that result in inadequate disclosure of various aspects of the settlement to class members. Fifth, the settlement structure is currently inconsistent with the fact that the voucher portion of the settlement constitutes a coupon settlement under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1712.

*Id.*

The Settlement Agreement provides that if it is "not given preliminary or final approval by the Court, the Parties will seek in good faith to revise the Agreement as needed to obtain Court Approval." SA ¶ 50 ("Paragraph 50"). Accordingly, the parties represented that, "[f]or assistance in addressing the issues the Court raised, the parties agreed to attend another mediation in Chicago before the Honorable James F. Holderman (Ret.)," and that they were "[h]opeful they will be able to resolve the issues the Court raised." Dkt. No. 341 at 1. Due to the COVID-19 pandemic and a personal emergency of Kellogg's counsel, however, the mediation did not take place until June 18, 2020. Omnibus Fitzgerald Decl. ¶¶ 5, 10.

Notwithstanding the parties' representations to the Court and their obligations under the Settlement Agreement, during the mediation, Kellogg purported to repudiate the Settlement Agreement and would only negotiate a *new* settlement. *Id.* ¶ 13. Accordingly, the parties did not agree on any revised terms. *Id.*

Given Kellogg's purported repudiation, Plaintiffs have concurrently filed a Motion to Enforce the Settlement Agreement ("Enforcement Motion" or "Enf. Mot."). In combination, Plaintiffs' motions

demonstrate that the Settlement Agreement *in its current form* is enforceable and approvable.[1] But if the Court disagrees, the Enforcement Motion asks the Court to enforce Paragraph 50 by ordering Kellogg to exercise "good faith" to "revise the Agreement as needed to obtain Court approval." Enf. Mot. at 23-25.

## II.   ARGUMENT

### A.   The Court Should Certify the Settlement Class

#### 1.   The Requirements of Rule 23(b)(3) are Satisfied

The Court's Preliminary Approval Order questioned whether Rule 23(b)(3)'s predominance requirement is satisfied. First, the Court noted that in the litigation context, it had found predominance satisfied "because the proposed subclass definitions contained only those individuals who purchased versions of the products that included the challenged statements on the packaging," so that "class certification would avoid the individualized issues that would have otherwise arisen from the variations in the packaging," *Hadley*, 2020 WL 836673, at *2. Because the Settlement Class includes "various sizes and varieties of six different Kellogg products" without reference to specific label claims, however, the Court found it was "no longer limited to individuals who purchased products that contain the challenged statements." *Id.*, at *3-4. Second, the Court noted it "declined to certify the Nutri-Grain subclass because the challenged statement on the product's packaging was not sufficiently prominently displayed to warrant an inference of class-wide exposure." *Id.*, at *3 (quotation marks and record citation omitted). Because Plaintiffs' initial preliminary approval motion "d[id] nothing to reconcile the settlement class definition with the Court's previous decision," *id.*, at *4, the Court found it was "unclear whether certification of the settlement class is appropriate," *id.*, at *2, and admonished the parties, "[i]n any subsequent motion for preliminary approval," to "more clearly explain how the settlement class satisfies the predominance requirement," *id.*, at *4.

---

[1] As argued in Plaintiffs' Enforcement Motion, the Court's previous order denying preliminary approval without prejudice primarily found deficiencies in Plaintiffs' motion, rather than the Settlement itself. Although some concerns the Court raised would have been easier to address with Kellogg's cooperation, Plaintiffs believe they can adequately address those concerns based on the current Settlement Agreement and without Kellogg's help. Because the Settlement Agreement has not changed, much of Plaintiffs' previous argument in support of preliminary approval remains true and applicable. *See*, *e.g.*, PA Mot. at 3-6 (describing Settlement Class and benefits); *id.* at 11-12 (arguing Rule 23(a) criteria are satisfied); *id.* at 15-17, 20-24 (arguing Settlement's relief is fair); *id.* at 24-25 (arguing Notice Plan is appropriate). Rather than repeat background information or reargue items with which the Court took no issue, Plaintiffs' address in this brief as directly and comprehensively as possible the concerns the Court raised in its Preliminary Approval Order, while relying on their previous showing with respect to these other items.

a.      **The Settlement Class's Claims are Broader than the Claims on which Mr. Hadley Moved for Class Certification**

The contours of the class Hadley proposed for litigation were limited by a number of legal, practical, and strategic considerations that do not similarly limit the Settlement Class. *See* Omnibus Fitzgerald Decl. ¶¶ 14-18. Hadley could only move for certification based on products and claims that were still live, but the Court had previously dismissed his challenges to several label claims. Dkt. Nos. 56, 76. Then, "after reviewing sales figures and other information provided by Kellogg," Hadley "advised Kellogg that he would no longer pursue class claims against *Crunchy Nut Cereal*, *Nutri-Grain Cereal Bars*, and *Nutri-Grain Fruit & Oat Harvest Bars*," though he "reserved his right to challenge on appeal specific labeling claims for these products that were dismissed, and to pursue class claims regarding the products in the future if the dismissal with respect to any such labeling claim is reversed on appeal." Dkt. No. 101 at 1 & n.1.

Even then, "the Court noted that the number of products and product claims in the case were excessive," and "ordered the parties to file . . . a stipulation identifying what products and product claims the parties agreed to dismiss with prejudice," and which "remained in the case after the Court's . . . orders on the motions to dismiss," *see Hadley v. Kellogg Sales Co.*, 2019 WL 3804661, at *7 (N.D. Cal. 2019) (Koh, J.) ["*Hadley IV*"]. In doing so, "following review of information provided by Kellogg," Hadley "elect[ed] not to pursue certain misrepresentations despite that they survived dismissal." Dkt. No. 108 at 1 n.1.[2]

Hadley's certification motion was also limited by strategic decisions about how to satisfy *Comcast* in the context of a contested motion, and how to allocate resources vis-à-vis his damages models. *See* Omnibus Fitzgerald Decl. ¶ 17; *cf. Hadley IV*, 2019 WL 3804661, at *11 (Plaintiff "made the decision to limit the claims tested in the actual conjoint surveys based on [his] understanding that Kellogg's preemption defense had been dismissed with prejudice and could not be reasserted." (citing Dkt. No. 106, Fitzgerald Decl. ¶ 5)).

But the considerations that limited the scope of Hadley's certification request do not similarly limit the Settlement Class. "Practically speaking, '[c]lass action settlements simply will not occur if the parties cannot set definitive limits on defendants' liability.'" *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96,

---

[2] *See also* Dkt. No. 106 at 1 (dismissing certain claims but noting Hadley "reserves and does not waive his right to challenge on appeal specific labeling claims for these products which were dismissed in the Court's March 21, 2017 and August 10, 2017 Orders (Dkt. Nos. 56 & 76), and to pursue class claims regarding these products in the future if the dismissal with respect to any such labeling claims is reversed on appeal.").

106 (2d Cir. 2005) (quoting *Stephenson v. Dow Chem. Co.*, 273 F.3d 249, 254 (2d Cir. 2001)). Thus, "[t]he breadth of negotiations is not necessarily strictly confined by the pleadings." *Officers for Justice v. Civil Service Comm'n of City & County of San Francisco*, 688 F.2d 615, 636 n.18 (9th Cir. 1982). Rather, it is well-settled that "a federal court may release not only those claims alleged in the complaint, but also a claim 'based on the identical factual predicate as that underlying the claims in the settled class action even though the claim was not presented and might not have been presentable in the class action.'" *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1287 (9th Cir. 1992) (quoting *TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456, 460 (2d Cir. 1982)). This rule "serves the important policy interest of judicial economy by permitting parties to enter into comprehensive settlements that prevent relitigation of settled questions at the core of a class action." *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 261 F.3d 355, 366 (3d Cir. 2001) (internal quotation marks and citation omitted). As a result, "[p]arties often reach broad settlement agreements . . . in order to achieve comprehensive settlement of class actions, particularly where a defendant's ability to limit his future liability is an important factor in his willingness to settle." *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 247-48 (2d Cir. 2011) (citations omitted).

If a class settlement may release claims not presented in a Complaint, it must also be able to release claims that *were* presented, even if dismissed on an interlocutory basis. *Cf.* 4 Alba Conte & Herbert Newberg, Newberg on Class Actions § 12:15, at 312 (4th ed. 2002) ("The scope of a judgment [pursuant to a settlement] must be limited to the claims that *were asserted* or that may arise out of the transactions or events pleaded in the complaint . . . ." (emphasis added)). Here, the parties' Term Sheet, which "set[] forth the material terms of the Settlement," Omnibus Fitzgerald Decl. Ex. 1, Term Sheet at 7 ¶ 5.4, expressly provided that "[t]he release includes all labeling statements challenged in the Actions, regardless of their status (i.e., even if dismissed by the Court or voluntarily)," *id.* at 6 ¶ 4. And, in recognition of this, in addition to providing *monetary consideration* to purchasers of *all* Class Products—not just those for which Hadley obtained certification of a California class—Kellogg has agreed to refrain from using "Healthy," "Wholesome," "Nutritious," "Benefits," and "No High Fructose Corn Syrup" on *all* Class Products. *See* SA ¶¶ 38, 40-41. This is despite the Court dismissing Hadley's challenge to "No High Fructose Corn Syrup" on Nutri-Grain. *Hadley v. Kellogg Sales Co.*, 273 F. Supp. 3d 1052, 1080-81 (N.D. Cal. 2017) (Koh, J.) ["*Hadley II*"].

"[C]ertification [of a settlement class] pursuant to Rule 23(b)(3) . . . is appropriate 'whenever the

actual interests of the parties can be served best by settling their differences in a single action.'" *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998) (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 1777 (2d ed. 1986)). It is reasonable for Kellogg to want, and for the Class to provide finality regarding allegations that Kellogg labeled the cereals challenged in the Actions with misleading health and wellness claims. If the parties were limited to settling only claims the Court certified—based on a motion that was limited by considerations that do not apply to the Settlement Class—Kellogg might be subject to relitigating with a new plaintiff those products and labeling claims the Court dismissed or found unsuitable for certification. Were that true, Kellogg would have little incentive to settle. For example, in *Krommenhock v. Post Foods, LLC*, the Honorable William H. Orrick allowed challenges to "No High Fructose Corn Syrup," 2018 WL 1335867, at *5 (N.D. Cal. Mar. 15, 2018), giving a subsequent plaintiff a basis for challenging Nutri-Grain products if they are not included in the Settlement.

   In evaluating predominance, the Court should thus consider not just those specific challenges Hadley advanced to obtain certification of a California litigation class, but *all* claims asserted *at any time* by Hadley or the New York plaintiffs.[3] Viewed through this lens, there can be no doubt common questions predominate.

### b.   Predominance is Satisfied with Respect to the Settlement Class's Claims

   "The 'predominance inquiry tests whether the proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Tyson Foods, Inc. v. Bouaphakeo*, --- U.S. ----, ----, 136 S. Ct. 1036, 1045 (2016) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)). Courts must "make a global determination of whether common questions prevail over individualized ones," meaning predominance "is not . . . a matter of nose-counting." *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016) (citing *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1165 (9th Cir. 2014)). Instead, "more important questions apt to drive the resolution of the litigation are given more weight . . . over individualized questions which are of considerably less significance to the claims of the class." *Id.* "Therefore, even if just one common question predominates, 'the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately.'" *In re Hyundai & Kia Fuel Economy Litig.*, 926 F.3d 539, 557 (9th Cir.

---

[3] This is especially true since the Court characterized the nationwide Settlement as "negotiate[d] . . . before the class has been certified," thereby "requir[ing] a higher standard of fairness and a more probing inquiry than may normally be required under Rule 23(e)." *Hadley V*, 2020 WL 836673, at *1 (quoting *Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1060 (9th Cir. 2019) ["*SFBSC Mgmt.*"]).

2019) ["*Hyundai*"] (quoting *Tyson Foods*, 136 S. Ct. at 1045).

"In evaluating predominance, courts look to whether the focus of the proposed class action will be on the words and conduct of the defendants rather than on the behavior of the individual class members." *Kutzman v. Derrel's Mini Storage, Inc.*, 2020 WL 406768, at *7 (E.D. Cal. Jan. 24, 2020) (citation omitted); *accord In re Valeant Pharms. Int'l, Inc. Secs. Litig.*, 2020 WL 3166456, at *5 (D.N.J. June 15, 2020) ("[C]ommon issues predominate where [ ] 'the inquiry necessarily focuses on defendants' conduct'" (quoting *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 163 (3d Cir. 2002))). "Class actions in which a defendant's uniform policies are challenged generally satisfy the predominance requirement of Rule 23(b)(3)." *Castro v. Paragon Indus., Inc.*, 2020 WL 1984240, at *10 (E.D. Cal. Apr. 27, 2020) (citations omitted); *accord Moreno v. Beacon Roofing Supply, Inc.*, 2020 WL 1139672, at *3 (S.D. Cal. Mar. 9, 2020) (satisfied where "liability would be determined by looking at Beacon's uniform policies and practices"); *In re Janney Montgomery Scott LLC Fin. Consulting Litig.*, 2009 WL 2137224, at *5 (E.D. Pa. July 16, 2009) ("satisfied when plaintiffs have alleged a common course of conduct on the part of the defendant.").

"A finding of a 'common nucleus of facts and potential legal remedies' is sufficient to establish predominance," *Cortes v. Nat'l Credit Adjusters, L.L.C.*, 2020 WL 3642373, at *5 (E.D. Cal. July 6, 2020) (quoting *Hanlon*, 150 F.3d at 1022), which "is a test readily met in certain cases alleging consumer . . . fraud," *Amchem*, 521 U.S. at 625, because "the crux of each consumer's claim is that a company's mass marketing efforts, common to all consumers, misrepresented the company's product," so that a "cohesive group of individuals suffered the same harm in the same way because of the [defendant's] alleged conduct." *See Hyundai*, 926 F.3d at 559 (predominance satisfied where "class members were exposed to uniform fuel-economy misrepresentations and suffered identical injuries with only a small range of damages").

Moreover, "a central concern of the Rule 23(b)(3) predominance test is whether 'adjudication of common issues will help achieve judicial economy.'" *Vinole v. Countrywide Home Loans*, 571 F.3d 935, 944 (9th Cir. 2009) (quoting *Zinser v. Accufix Research Inst.*, 253 F.3d 1180, 1189 (9th Cir. 2001)). "Judicial economy weighs in favor of a class action where . . . liability turns on whether advertisements were false or misleading." *Johns v. Bayer Corp.*, 280 F.R.D. 551, 559 (S.D. Cal. 2012). This is because such claims "focus on the defendant's conduct, rather than the plaintiff's damages," *In re Tobacco II Cases*, 46 Cal. 4th 298, 312 (2009), and do "not require the court to investigate class members' individual interaction with the

7

product," *Bradach v. Pharmavite, LLC*, 735 Fed. Appx. 251, 255 (9th Cir. 2018) (quotation omitted); *accord Sherman v. CLP Res., Inc.*, 2020 WL 2790098, at *6 (C.D. Cal. Jan. 30, 2020) ("[P]redominance is satisfied" where "the case requires determination of whether Defendants' uniformly-applied policies were lawful under California law," because "adjudication of these common issues 'will help achieve judicial economy,' further the goal of efficiency, and 'diminish the need for individual inquiry'" (quoting *Vinole*, 571 F.3d at 939)). As a result, courts regularly find predominance satisfied in settlements of consumer fraud class actions.[4]

Here, whatever nuanced questions of fact might exist with respect to individual product labels at a summary judgment type stage, the Complaint alleges and challenges Kellogg's "policy and practice of marketing high-sugar cereals and bars with health and wellness claims" that "are deceptive because they are incompatible with the dangers of the excessive sugar consumption to which these foods contribute," Dkt. No. 324, Third Am. Compl. ¶ 2, and alleges the policy is uniform, *see id.* ¶¶ 118-19 ("Regardless of" "occasional changes in product offerings . . . and product labeling and packaging," "Kellogg has maintained . . . a policy and practice of labeling high-sugar cereals and bars . . . with various health and wellness claims that suggest the cereals and bars are healthy, when they are not."). Indeed, Plaintiffs allege that "[a]lthough [they] were the victim[s] of Kellogg's longtime and general policy and practice with respect to the cereals and bars they purchased and labels they saw, this Complaint and [their] claims are not so limited; rather, plaintiffs seek . . . to enjoin Kellogg's *policy and practice generally*, including but not necessarily limited to the products, labels, and label claims challenged herein." *Id.* ¶ 122; *compare* Dkt. No. 1, Compl. ¶¶ 2, 116-20 (same). Predominance is satisfied by these allegations. Moreover, as demonstrated below, label claims Hadley or the New York plaintiffs challenged appear on all products included in the Settlement Class.

---

[4] *See*, *e.g.*, *Hale v. Manna Pro Prods., LLC*, 2020 WL 3642490, at *6 (E.D. Cal. July 6, 2020) (Alleged false advertising of pet food "establish[ed] a common nucleus of facts and potential legal remedies that dominate[d] the litigation"); *Broomfield v. Craft Brew Alliance, Inc.*, 2020 WL 1972505, at *4 (N.D. Cal. Feb. 5, 2020) (predominance satisfied where "Plaintiffs allege that all Settlement Class Members were exposed to CBA's representations on the packaging of Kona Beers, which Plaintiffs allege are deceptive and material"); *Schneider v. Chipotle Mexican Grill, Inc.*, 2020 WL 511953, at *6 (N.D. Cal. Jan. 31, 2020) ("[F]or purposes of settlement, common questions predominate here because the Settlement Class Members were exposed to uniform representations . . . and suffered the same injuries."); *Shin v. Plantronics, Inc.*, 2020 WL 1934893, at *2 (N.D. Cal. Jan. 31, 2020) ("whether . . . Plantronic's representations were misleading" involved "common questions [that] are central to this lawsuit and predominate over individual questions"); *Hilsley v. Ocean Spray Cranberries, Inc.*, 2020 WL 520616, at *2 (S.D. Cal. Jan. 31, 2020) ("common questions of law and fact" that "predominate over individual questions" included, *inter alia*, "whether Ocean Spray's representations . . . were false and misleading or reasonably likely to deceive consumers").

i.       **Challenged Claims *Do* Appear on *Every* Label, so the Settlement Class *Was* Uniformly Exposed Kellogg's Alleged Misconduct**

When moving for certification of a California litigation class, Hadley included label limiters in two of his subclass definitions, Raisin Bran and Nutri-Grain, to "avoid including in the Class occasional packaging in which, typically, promotional items took the place of the challenged claims," Dkt. No. 194, Class Cert. Reply at 3. His decision to define those subclasses in that manner was a function of the then-live claims for which Hadley, considering a variety of factors, chose to move for certification. *See* Omnibus Fitzgerald Decl. ¶¶ 14-18. This was a conservative approach to damages; Hadley would have been justified defining those subclasses without label limiters for several reasons.

Price premia occur in marketplaces over time due to practices that affect the market. When practices momentarily cease, this does not immediately change the market price, which needs time to react. Thus, as Hadley's damages expert explained, even as to promotional Raisin Bran packaging temporarily lacking a "heart health" claim, consumers were injured because they paid "the flat rate market price that exist[s] because of the ongoing use of the Heart Health claim." *See* Dkt. No. 157-3 at 57 (filed under seal), Weir Dep. Tr. at 220:10-17 (In response to the question, "So even though Kellogg is selling products without Heart Health claim[s], they are still charging for Heart Health claim[s]?"). Moreover, Kellogg represented that "on any given day, a consumer could have purchased a Raisin Bran *with* the 'heart health' statement, but also could have purchased [a box] *without* it." Dkt. No. 159, Class Cert. Opp. at 13. Hadley pointed out that:

> If, as Kellogg claims, promotional boxes really were on the shelf next to "regular" boxes touting the "heart health" claim, then common sense dictates that even purchasers of such promotional packaging will have been exposed to the misrepresentation since a reasonable consumer would see the promotional material and assume that is the reason that particular box does not have a "heart health" claim . . . . Accordingly, excluding from plaintiff's damages calculations those time periods when the promotional material covered the "heart health" claim, is a *conservative* approach to damages.

Class Cert. Reply at 3 n.3 (internal record citation omitted). There was also evidence that most consumers are repeat purchasers. *See* Omnibus Fitzgerald Decl. ¶ 19 & Ex. 8-9. Thus, someone who purchased a box of Raisin Bran containing promotional material likely was previously exposed to a "heart health" claim through an earlier purchase, presumptively influencing the later purchase since a "heart health" claim is material. And even when heart health claims were temporarily displaced on the packaging, Kellogg made such claims in nationwide advertising. *See* Dkt. No. 129, Class Cert. Mot. at 5 ("Kellogg bolstered Raisin Bran's heart

9

health labeling with online, print, television, and point-of-purchase advertising." (citing Fitzgerald Decl. Exs. 34-38)). As such, even purchasers of packaging lacking heart health claims were likely injured by Kellogg's long-time "heart health" representations on the product labels and in a variety of advertising media.

This is somewhat academic, though, because every indication is that at least one challenged in Plaintiffs' lawsuits appeared on every box included in the Settlement Class. *See* Omnibus Fitzgerald Decl. ¶¶ 22-33, Tables 1-5 & Exs. 11-39.

In contrast to Hadley's certification motion here, in *Krommenhock*, he and his co-plaintiff did *not* define subclasses with label limiters. *See Krommenhock v. Post Foods, LLC*, 334 F.R.D. 552, 561-62 (N.D. Cal. 2020) ["*Krommenhock III*"]. This was because of one simple distinction between the cases: Judge Orrick had allowed the plaintiffs to challenge the Whole Grains Counsel Stamp ("WGC Stamp"), whereas this Court did not. *See Krommenhock v. Post Foods, LLC*, 255 F. Supp.3d 938, 957-58 (N.D. Cal. 2017); *Hadley II*, 273 F. Supp. 3d at 1077-78 (concluding "claim[s] about tout the health benefits of fiber . . . implying in the context of the product packaging that the product contains fiber and is healthier as a result" are preempted).[5]

Because the WGC Stamp is typically always present, even when promotional material might occasionally cover other challenged labeling claims, a "label limiter" was unnecessary to ensure *Krommenhock* class members were exposed to a uniform practice of Post's, that is, Post placing at least one challenged claim on the label of each product included in the class.[6] The same is true here. As in *Krommenhock*, Hadley and the New York plaintiffs challenged the WGC Stamp's use on Raisin Bran, Krave, Frosted Mini-Wheats, and Smart Start cereals, and Nutri-Grain Cereal bars.[7] While the Court dismissed Hadley's challenge, there has not been a final adjudication of his claim, and he retains appeal rights, while

---

[5] *Compare* Dkt. No. 27-1 (FAC Appx. 1 showing challenges to WGC Stamp) *with* Dkt. No. 62-1 (SAC Appx. 1 with WGC Stamp challenges removed).

[6] In *Krommenhock*, marketing expert, Bruce G. Silverman, who also provided testimony here, *see* Dkt. No. 131, noted that challenged claims on the "top flap" of the box, including the WGC Stamp, "despite [their] small size," were strategically colored and positioned to catch the consumer's attention" because "a consumer *must* look at the top of the box, if not in the store, then later, at home (giving the consumer reassurance for the subsequent purchases)." *See* Omnibus Fitzgerald Decl. Ex. 10, Silverman Report ¶ 248.

[7] *See* Dkt. No. 1, Compl. ¶¶ 129(o), 132(j), 134(b), 136(h), 138(j), 141(d), 144(e), 146(c), 148(c), 150(d), 152(e), 154(c), 156(c), 158(d), 160(d), 162(c), 166(d), 168(c), 170(f), 175(e), 177(e), 179(e), 181(e), 183(e), 185(b), 204(e), 206(e), 265-70; *see also* Omnibus Fitzgerald Decl. Ex. 11, NY Compl. ¶¶ 144(k), 147(d), 148(d), 152(e), 188-93.

the New York Plaintiffs' challenges are still live. The WGC Stamp has seemingly appeared consistently on the label of these products, even those excluded from the label-based Subclass Definitions. *See* Omnibus Fitzgerald Decl. ¶¶ 25-32, Tables 1-5 & Exs. 13-39.[8] Similarly, Crunchy Nut is included in the Settlement Class, even though Hadley did not move for certification of a Crunchy Nut subclass.[9] Among other statements, Hadley challenged this product's claim, "Nuts in Every Bite!," *see* Compl. ¶ 172(a), which appeared front-and-center on every Crunchy Nut label included in the Settlement Class. *See* Omnibus Fitzgerald Decl. Table 5 & Ex. 32. Since every Settlement Class Member who purchased Crunchy Nut was exposed to a Kellogg representation Hadley alleged was misleading, common questions predominate.

### ii.      The Settlement Class was also Uniformly Exposed to Kellogg's Deceptive Omissions

Hadley "also assert[ed], inter alia, a deceptive omission theory of liability" alleging "that Kellogg deceptively 'hides' and 'omits . . . information regarding the products' high sugar content' in violation of the FAL, CLRA, and the UCL's 'fraudulent' prong'." *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1099-1100 (N.D. Cal. 2018) (Koh, J.) ["*Hadley III*"] (citing SAC ¶ 209). As this Court has held, uniform exposure to an *omission* can present predominating common questions in a consumer fraud case. *See Butler v. Porsche Cars N. Am., Inc.*, 2017 WL 1398316, at *10 (N.D. Cal. Apr. 19, 2017) (Koh, J.) ("exposure and reliance suitable for class-wide resolution . . . where the class was defined as all purchasers" and plaintiffs' "claims were based on information omitted from the product's packaging."). "In these cases, all class members were 'necessarily exposed' to the defendant's omissions on the package prior to purchase . . . ." *Id.* (citing *In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1105 (C.D. Cal. 2015) (collecting cases)). This is true even absent uniform exposure to an affirmative misrepresentation. In *Torres*, for example, the

---

[8] The Court's Preliminary Approval Order notes that, "the parties represented to the Court that the statements on these additional packaging sizes varied across the more than seven year class period," *Hadley*, 2020 WL 836673, at *4. Such general variation, however, does not preclude the possibility that one or more challenged statements appeared uniformly across all relevant packaging, which is the case here. When the Court asked Plaintiffs' counsel during the hearing whether "the new sizes that you've added" had "uniform packaging throughout the entire class period," counsel responded, "[a]s I stand here . . . I can't really say I can answer that definitively one way or another." Dkt. No. 338, Feb. 6, 2020 Hrg. Tr. at 2:18-23.

[9] As Hadley explained, "after reviewing sales figures and other information produced by Kellogg," he "advised Kellogg that he would no longer pursue class claims against *Crunchy Nut*," *Hadley v. Kellogg Sales Co.*, 2019 WL 3804661, at *7 (N.D. Cal. Aug. 13, 2019) (Koh, J.) (quoting Dkt. No. 101 at 1).

Ninth Circuit held that where "the crux of Plaintiffs' legal challenge involves a common failure to disclose information, and not merely a disparate series of affirmative statements," the "conduct at issue "[wa]s reasonably uniform," so that common questions predominated," 835 F.3d at 1137-38. Accordingly, even if the labels included in the Settlement Class varied and did not uniformly contain challenged affirmative misrepresentations—which they do—the Court should still find common questions predominate by virtue of the omission claims, including under 21 C.F.R. § 1.21(a)(2). *See* SAC ¶¶ 209, 215, 223; NY Compl. ¶ 203; *compare Hodsdon v. Mars, Inc.*, 891 F.3d 857, 861 (9th Cir. 2018) ("Omissions may be the basis of claims under California consumer protections laws," where "'contrary to a representation actually made" or "a fact the defendant was obliged to disclose.'" (added emphasis omitted) (quoting *Daugherty v. Am. Honda Motor Co.*, 144 Cal. App. 4th 824 (2006)).[10]

### iii.   The Manageability Concern that Led the Court to Deny Certification to the Nutri-Grain Subclass is Now Irrelevant

The Court denied certification to a Nutri-Grain Subclass for litigation purposes because the only remaining challenged claim Hadley believed could reasonably be tested for damages, "wholesome goodness," was not sufficiently prominent. *See Hadley III*, 324 F. Supp. 3d at 1099-1100. This presented a manageability problem because, the Court found, "in order to resolve Kellogg's liability for that phrase," it "would have to engage in individualized inquiries to discover which members . . . actually saw 'wholesome goodness' and which did not." *Id.* at 1100.

But "manageability is not a concern in certifying a settlement class where, by definition, there will be no trial." *Hyundai*, 926 F.3d at 556-57. Thus, while "a litigation class's failure to qualify for [a] presumption [of reliance] typically renders trial unmanageable, precluding a finding that common issues predominate. . . . with a settlement class, the manageability concerns posed by numerous individual questions of reliance disappear." *In re Am. Int'l Group Inc. Secs. Litig.*, 689 F.3d 229, 241 (2d Cir. 2012) (citing *Amchem*, 521 U.S. at 620); *accord Rapuano v. Trs. of Dartmouth College*, --- F.R.D. -----, ----, 2020 WL

---

[10] In the context of his certification motion on behalf of a litigation class, class members' uniform exposure to Kellogg's deceptive omissions could not salvage Hadley's Nutri-Grain Subclass because the Court found his corresponding damages model was flawed. *See Hadley*, 324 F. Supp. 3d at 1111-14 (Concluding that "Plaintiff has failed to offer any damages model for Plaintiff's deceptive omission theory of liability that satisfies *Comcast*."). But the Settlement Class is being compensated for Kellogg's alleged deceptive omissions through the Settlement's claims process.

475630, at *11 (D.N.H. Jan. 29, 2020) (Litigating "each class members' subjective perception . . . would likely present manageability issues at trial. Here, however, the proposed settlement will obviate the need to litigate this individualized issue . . . ." (citing *Hyundai*, 926 F.3d at 558 (courts "regularly certify settlement classes that might not have been certifiable for trial purposes because of manageability concerns")).

Moreover, the Court's decision declining to certify a Nutri-Grain Subclass is interlocutory and subject to appeal. The Ninth Circuit recently held it was "an error of law and . . . per se abuse of discretion" to deny class certification based on a purported need "'to investigate class members' individual interaction with the product,'" *see Bradach*, 735 Fed. Appx. at 254-55 (quoting *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 480 (C.D. Cal. Dec. 20, 2012)); *accord In re Tobacco II Cases*, 46 Cal. 4th at 320 ("[R]elief under the UCL is available without individualized proof of deception, reliance, and injury."); *State Farm v. Super. Ct.*, 45 Cal. App. 4th 1093, 1105 (1996) (UCL violation "can be shown even if no one was actually deceived, relied upon the fraudulent practice, or sustained any damage"); *Waller v. Hewlett-Packard Co.*, 295 F.R.D. 472, 476 (S.D. Cal. 2013) ("there are no reliance and causation elements to a UCL claim").

Citing the Ninth Circuit's decision in *Bradach*, Judge Orrick recently disagreed that a challenged claim's lack of prominence can defeat predominating questions about a defendant's conduct that underlie a consumer fraud case, holding that where "there is evidence that the representation was consistently made on a product's label, the only question is whether it was objectively material to a reasonable consumer," and that "[w]hen relevant, prominence goes to the materiality and misleading questions to be resolved by the jury." *Krommenhock III*, 334 F.R.D. at 565 (citing *Bradach*, 735 Fed. App'x at 254).[11] Indeed, predominance is primarily a question of whether a defendant's *behavior* is uniform as to class members, and there can be no question a defendant's behavior is uniform when, like Kellogg here, it makes the same statement on the packaging of every product, even if the statement is in small print or an obscure location—in that case, the variation is in the *impact* of the defendant's uniform behavior in making the statement, *i.e.*, damages.

The Settlement Agreement is properly a compromise of Hadley's appeal rights. If Hadley's claims concerning Nutri-Grain are not permitted to be resolved by the Settlement, there is a risk that, after trial, Hadley could obtain reversal of the denial of certification to the Nutri-Grain Subclass, and bring Kellogg

---

[11] *See also Krommenhock* Dkt. No. 193, Pl. Reply in Supp. of Class Cert. at 1-6 (plaintiffs' detailed argument regarding exposure and prominence that persuaded Judge Orrick to find in their favor on this issue).

*Hadley et al. v. Kellogg Sales Company*, No. 16-cv-4955-LHK
RENEWED MOTION FOR PRELIMINARY APPROVAL

back for a second trial. It is therefore reasonable and appropriate for the parties to want to include Nutri-Grain products in the Settlement to ensure there is a final resolution of all pending issues.

Moreover, in *Hyundai*, the Ninth Circuit rejected an argument that "including used car purchasers in the class creates a factual issue precluding predominance" because they "may not have seen the automakers' fuel efficiency representations," since stickers appeared only on new cars. 926 F.3d at 560. Noting that—like here—"the alleged misrepresentations" were also made "in 'nationwide advertising,'" the court held that "[w]hether or not [defendants'] advertising was substantial enough[12] to support an inference of reliance," any "potential individual questions of reliance for used-car purchasers do not predominate in the context of" settlement because "individual [reliance] question[s] would only apply to a subset of the class (used-car purchasers) and would primarily implicate trial management issues, which we do not consider when conducting a predominance analysis for a settlement class." *Id.* (citing *Amchem*, 521 U.S. at 620).

### 2.      The Requirements of Rule 23(a) are Satisfied

Plaintiffs previously argued the Rule 23(a) requirements were satisfied, PA Mot. at 11-12, and the Court did not hold otherwise. *See generally Hadley V*, 2020 WL 866373; *see also Hadley III*, 324 F. Supp. 3d at 1093-94; *compare Schneider*, 2020 WL 511953, at *5 (The court's "prior analysis under Rule 23(a)," in certifying several state classes, "also applies to the [nationwide] Settlement Class"). Plaintiffs will not repeat their arguments, but note with respect to their request that Sidney W. Jackson be appointed co-Class Counsel, *see* PA Mot. at 12, that Mr. Jackson has continued to work on the case, participating in the June 18 mediation, and working on the present motions. *See* Omnibus Fitzgerald Decl. Ex. 61 at 11. He was also appointed co-Class Counsel in *Krommenhock v. Post Foods, LLC*, with Judge Orrick finding he "would adequately represent the class and is qualified to do so." 2020 WL 2322993, at *3 (N.D. Cal. May 11, 2020).

### B.      The Court Should Approve the Proposed Settlement

### 1.      The Release Should Not Prevent the Court from Approving the Settlement

Plaintiffs' Enforcement Motion argues why the Settlement Agreement's current release should not

---

[12] *Compare Krommenhock III*, 334 F.R.D. at 564 (finding "the majority of Challenged Statements were made consistently (or consistently enough) throughout the relevant time frames on the Products' packages"); *cf. Rapuano*, 2020 WL 475630, at *12 ("The law is clear . . . that the existence of a de minimis number of potentially uninjured class members will not defeat a finding of predominance." (citing, *inter alia*, *Torres*, 835 F.3d at 1136)).

prevent preliminary approval of the Settlement, especially in light of Kellogg's attempted repudiation. *See* Enf. Mot. at 14-22. Specifically, the Court can and should interpret the release's language sufficiently narrowly to obtain approval, *id.* at 14-18, or can summarily enforce paragraph 50 of the Settlement Agreement—or exercise its inherent power—and order Kellogg to cooperate with Plaintiffs in appropriately advising the language, *id.* at 18-20. Even absent these actions, the identical factual predicate doctrine does not, as a matter of law, prohibit preliminary approval of the Settlement Agreement. *See id.* at 20-22.

### 2.    The Reversionary Aspect of the Settlement's Voucher Component is Appropriate

Approximately 40% of the sizable Settlement Fund ($8.25 million of $20.25 million) is in the form of vouchers. Plaintiffs argued this is appropriate because it increased the benefit for the Class, and is just one optional form of relief. *See* PA Mot. at 17-18 (citing cases approving similarly-structured settlements).

The Court's Preliminary Approval Order found that the Settlement, by virtue of its Voucher Component, "contains reversionary aspects," but that Plaintiffs had "not include[d] any estimate of the amount of unclaimed vouchers that will expire after four months and thereby revert to Kellogg, nor . . . an explanation as to why a reversion is appropriate in the instant case," so that the Court was "unable to 'satisfy its procedural obligation to probe more closely the reversionary clauses, by investigating whether those clauses are justified by unique benefits to the class and supported by provisions that ameliorate concerns about perverse incentives.'" *Hadley*, 2020 WL 836673, at *5 (quoting *SFBSC Mgmt.*, 944 F.3d at 1060). The Court ordered that "[i]n any subsequent motion for preliminary approval" the parties specify "'whether and under what circumstances money originally designated for class recovery will revert to any defendant,[13] the potential amount or range of amounts of any such reversion, and an explanation as to why a reversion is appropriate in the instance case.'" *Id.*, at *5 (emphasis removed, quoting Settlement Guidelines).

### a.    The Reversionary Aspect of the Settlement Does Not Indicate Collusion

"A reversion can benefit both defendants and class counsel, and thus raise the specter of their collusion," *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prods. Liab. Litig.*, 895 F.3d 597, 611 (9th Cir. 2018) ["*Volkswagen*"]. "This is due to three common problems with coupon settlements: 'they often do not provide meaningful compensation to class members; they often fail to disgorge ill-gotten gains

---

[13] As the Court itself explained "[w]hen a voucher expires, the value of the voucher effectively 'reverts' to Kellogg, as Kellogg is then under no obligation to make any payment." *Id.*

from the defendant; and they often require class members to do future business with the defendant in order to receive compensation.'" *True v. Am. Honda Motor Co.*, 749 F. Supp. 2d 1052, 1069-70 (C.D. Cal. 2010) (quoting *Figueroa v. Sharper Image Corp.*, 517 F. Supp. 1292, 1302 (S.D. Fla. 2007) (citation omitted)).

"But reversion clauses can have perfectly benign purposes and impacts, and so are not per se forbidden." *Volkswagen*, 895 F.3d at 612; *see also Hadley*, 2020 WL 836673, at *5 ("the Ninth Circuit does not disallow reversionary settlements outright"); *cf. Nur v. Tatitlek Support Servs., Inc.*, 2016 WL 3039573, at *3 (C.D. Cal. Apr. 25, 2016) ("[C]laims-made settlements, with a reversion of unclaimed funds to the [defendant] are routinely approved by the Ninth Circuit and courts in California." (collecting cases)). Given the *potential* "'perverse incentives' for the parties" with reversionary clauses, "Ninth Circuit case law demands heightened scrutiny of reversionary clauses in settlements," *Hadley*, 2020 WL 836673, at *4 (quoting *SFBSC Mgmt.*, 944 F.3d at 1058). Here, giving the Settlement's vouchers heightened scrutiny, the Court should find "the reversionary component . . . is consistent with proper dealing," *see Volkswagen*, 895 F.3d at 612, and therefore appropriate, for several reasons.

First, the procedural posture, with settlement reached only after significant discovery, class certification and summary judgment orders, and with trial just three months away, demonstrates it resulted from arms'-length negotiations. *See Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1122, 1127 (9th Cir. 2020) (case being "nearly [at] the close of discovery" indicated "the settlement's substantive fairness"); *In re Chinese-Manufactured Drywall Prods. Liability Litig.*, 424 F. Supp. 3d 456, 486 (E.D. La. 2020) (

> Counsel on both sides have zealously advocated for their clients for . . . years, as evidenced by the extensive discovery, motions practice, and significant resources expended in this case. The parties entered the negotiation with the experience and institutional knowledge necessary to successfully negotiate on behalf of their clients, and the settlement was accordingly achieved as a result of the adversarial process.).

Moreover, while the Settlement Class is broader than the certified California class, Hadley's obtaining certification before negotiating a settlement demonstrates its substantive fairness. *See Campbell*, 951 F.3d at 1121-22 (Noting that the "case does not implicate the 'higher standard of fairness' that applies when parties settle a case before the district court has formally certified *a* litigation class," because the settlement was "'negotiated by *a* court-designated class representative'" (emphasis added) (quotation omitted)).

Second, the Settlement was negotiated over six mediations, with the assistance of Mark Petersen and Hon. James F. Holderman, *see* PA1 Fitzgerald Decl. ¶¶ 16-34, demonstrating its legitimacy. *See* Holderman

16

Decl. ¶ 11 ("Counsel conducted their mediated settlement negotiations at all times in an adversarial, arm's-length, good faith and non-collusive manner."); *compare Campbell*, 951 F.3d at 1122, 1125 ("that the settlement was the result of four in-person arms'-length mediations before two different mediators" and that the "case was extremely hard-fought, and settled at an advanced procedural stage, after multiple mediations" indicated "the settlement's substantive fairness" (internal quotation marks omitted)); *Hale*, 2020 WL 3642490, at *11 ("extensive discovery and arms-length, mediator-guided negotiations all suggest the settlement agreement is not the product of collusion"); *In re Zynga Inc. Secs. Litig.*, 2015 WL 6471171, at *9 (N.D. Cal. Oct. 27, 2015) (use of mediator and significant discovery practice "support the conclusion that the Plaintiff was appropriately informed in negotiating a settlement"); *Harris v. Vector Mktg. Corp.*, 2011 WL 1627973, at *8 (N.D. Cal. Apr. 29, 2011) (use of mediator "suggests that . . . [the settlement] was not the result of collusion or bad faith"); *Sherman*, 2020 WL 2790098, at *9 (

> Counsel . . . have vigorously litigated . . . resulting in over 570 docket entries . . . . have attended at least five mediations[,] and engaged in extensive settlement negotiations. The parties came to this settlement after conducting significant amounts of investigation and discovery, allowing them to fully assess the value of the claims involved. . . . In other words, only after significant discovery, the use of a mediator, and intense motions practice did the parties enter into the Settlement. That order and process matters . . . .).

Third, none of the three "subtle signs" of collusion the Ninth Circuit identified in *In re Bluetooth Headset Prods. Liability Litig.* are present. *See* 654 F.3d 935, 947 (9th Cir. 2011). Nothing in the Settlement Agreement purports to entitle counsel to "a disproportionate distribution of the settlement" (and class members *are* to "receive[] [a] monetary distribution"); nothing returns unawarded fees to Kellogg; and the Settlement Agreement includes no "clear sailing" agreement, instead providing only that counsel will apply to the Court for fees, and imposing no conditions on Kellogg's response. *See* SA ¶ 29.3. "[T]he prospect of fraud or collusion is substantially lessened where, as here, the settlement agreement leaves the determination and allocation of attorney fees to the sole discretion of the trial court." *Chinese Drywall*, 424 F. Supp. 3d at 486. Here, "[b]ecause the parties have not agreed to an amount of attorney fees and instead have merely petitioned the Court for an award they believe is appropriate, there is no threat of the issue tainting the fairness of the settlement negotiations." *See id.*; *Sherman*, 2020 WL 2790098, at *9 ("Attorneys' fees will be paid by . . . the Gross Settlement Amount, so the case does not present a 'clear sailing' arrangement.").

Fourth, the excellent nature of the Settlement, including its $12 million Cash Fund—which alone

would likely be fair, reasonable, and adequate—demonstrates it was achieved through Plaintiffs' vigorous litigation, rather than collusion, since "cash . . . is a good indicator of a beneficial settlement," *Rodriguez v. W. Pub'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009). Kellogg's apparent belief that it made a bad deal it wishes it could now undo further demonstrates Plaintiffs' counsel did not subvert the Class's interests to Kellogg's "in exchange for red-carpet treatment on fees," *Bluetooth*, 654 F.3d at 947 (quotation omitted).

Typical signs that a reversionary provision is collusive are thus absent. The Voucher Fund will not "giv[e] counsel an inflated common-fund value against which to base a fee motion," *see Volkswagen*, 895 F.3d at 611, because, as discussed *infra*, counsel will seek fees using either the lodestar method, without reference to the Settlement Fund, or using the common fund method applied to the gross settlement amount, ensuring fees are based only on the value the Settlement Class actually receives. *See SFBSC Mgmt.*, 944 F.3d at 1054. Moreover, no Settlement Class Member is required to do future business with Kellogg, since any may elect a cash remedy. Relatedly, the vouchers appear to have real value to at least some Settlement Class Members because a significant portion of survey respondents presented a similar choice elected a voucher remedy, even when warned that the voucher might be less than cash. *See* Weir Decl. ¶¶ 18, 28 & Table 1. Finally, the Settlement's substantial injunctive relief shows the Settlement is not collusive despite the reversionary aspect of the Voucher Fund. *See Allen v. Bedolla*, 787 F.3d 1218, 1225 (9th Cir. 2015).

Indeed, the public has reacted positively to the Settlement. The "leading online news source for the food industry," FoodNavigator.com, wrote that "any food manufacturer that doesn't want to be at the receiving end of a false advertising lawsuit should think extremely carefully about any claims they make on products containing added sugar," and that there is "[n]o question" the settlement "will get the attention of food manufacturers." Omnibus Fitzgerald Decl. Ex. 40. Another blog, FoodDive.com, stated that companies "might want to follow Kellogg's lead," since "[t]he terms that are now off-limits are those the lawsuit took issue with in the first place," "in effect validat[ing] the concerns that were brought before the court," and "show[ing] these claims may soon no longer be acceptable for other cereal manufacturers." *Id.* Ex. 41.

The legal community has also taken note. In a Law360 article, attorneys in Shook Hard & Bacon LLP's food and beverage litigation group—who regularly advise food manufacturers—noted that the Settlement "not only provides a settlement fund of more than $20 million . . . but it also provides for changes to labeling that underscore the plaintiffs' concerns regarding added sugar in the cereals." *Id.* Ex. 42 at 2. The

attorneys noted that "the cereals at issue were in line with the FDA's definition and guidance on 'healthy,'" but that "the litigation still resulted in a significant monetary settlement and labeling changes," *id.* at 3, which "may cause companies to question whether simply following regulations on sugar is worth the risk," *id.* at 1. The authors conclude that "the industry should be reviewing its labels to determine if the claims align with scientific consensus and consumer expectations," and "[i]f a product has added sugar, its manufacturer may benefit from evaluating whether claims about the health aspects of the product are appropriate and consistent with consumers' current understanding of the term." *Id.* at 3.

Given the totality of the circumstances demonstrating that the Settlement Agreement is not the product of collusion, but instead provides meaningful and substantial relief for the Class, the Court should find that the reversionary aspect is appropriate and does not preclude preliminary approval. *See Carlotti v. ASUS Computer Int'l*, 2019 WL 6134910, at *9 (N.D. Cal. Nov. 19, 2019); *Gonzalez v. BMC W., LLC*, 2018 WL 6318832, at *8 (C.D. Cal. Nov. 19, 2018).

### b.    An Estimate of the Potential Range of Reversion

Not much information is available regarding the redemption of vouchers in settlements where claimants are permitted to choose between a cash and voucher option. *See* Schwartz Decl. ¶ 20. But the fact of *self-selection* suggests that those who opt for vouchers are reasonably likely to use them—otherwise they would have chosen cash. As one court noted, Kellogg's marketing expert, Dr. Itamar Simonson, found that "certain factors enhance the likelihood that the class will use" vouchers, including "targeting of the actual users of the [product] in question," "[t]he[ir] . . . face value," and "the participation of all major" outlets offering the product. *See In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 322 (N.D. Ga. 1993) (record citations omitted). Here, these factors all point to an "enhance[d] . . . likelihood" of voucher use. Recipients will consist only of Class Members, i.e. "actual users" of Kellogg's products. Vouchers can be used at any retailer selling the products, and their value is estimated to range from $19.95 to $79.81 across the four buckets, *see* Omnibus Fitzgerald Decl. Table 6, which is "significant" in comparison to eligible products, ranging from $0.62 to $7.34 and averaging $3.55, thus representing between 5.6 and 22.5 boxes per voucher.

In Dr. Simonson's case, recipients did not self-select, but instead were given both cash and vouchers. Dr. Simonson testified that, while "impossible to derive a point estimate of the redemption rate," he

nevertheless "indentifie[d] a range . . . of fifty to seventy-five percent." *See Domestic Air Transp.*, 148 F.R.D. at 322 (record citation omitted). That estimate has been borne out in closely analogous settings. For example, one "retailer experimentation" involving loyalty programs reported "a 29% redemption rate of [purchase] points . . . into vouchers, of which *80% were themselves then redeemed*." Omnibus Fitzgerald Decl. Ex. 63, Smith (2009) at 205; *see also id.* at 205 (noting "a 47% redemption rate" of "retailer loyalty card coupons/vouchers" which is "much higher than general coupon redemption rates"). In another randomized controlled trial, the effect of health education on redemption rates of Farmers' Market Nutrition Program vouchers were studied, with rates ranging from 38% to 68% depending on the group. *See* Omnibus Fitzgerald Decl. Ex. 64, Di Noia (2017) at 8. This suggests high redemption rates among those who self-select vouchers.

Plaintiffs thus submit that a reasonable "potential amount or range of amounts of any . . . . reversion" to Kellogg, Settlement Guidelines ¶ 1(h), assumes that between 40% and 60% of the value of vouchers ($3.3 - $4.95 million) distributed to claimants is redeemed, reverting between $4.95 million and $3.3 million of the $20.25 million Settlement Fund (16.3% to 24.4%) to Kellogg.[14]

### 3. Revised Forms and Notices are Proper

The Court found that "the proposed claim form, opt-out form, and notice forms provide inadequate notice to class members," because "numerous errors in the proposed claim form, opt-out form, and notice forms render the proposed notice to class members misleading." *Hadley*, 2020 WL 836673, at *5. Plaintiffs have addressed these issues in the Revised Long-Form Notice, Revised Short-Form Notice, Revised Opt-Out Form, and Revised Claim Form filed with this motion. *See* Omnibus Fitzgerald Decl. Exs. 43-46.

### a. The Revised Claim and Opt-Out Forms Provide Adequate Notice

After carefully reviewing the transcript of the preliminary approval motion hearing, and the Court's Preliminary Approval Order, *see Hadley*, 2020 WL 836673, at *6-7, Plaintiffs have revised the claim and opt-out forms to eliminate inconsistencies and provide adequate and non-misleading notice to the Class.

First, the Opt-Out Form has been revised to be consistent with the Settlement Agreement by indicating that the person is "excluded from the Settlement" only. *See id.*, at *6; *compare* Omnibus Fitzgerald Decl. Ex. 45, Revised Opt-Out Form. Second, the Claim Form has been revised to make the claims process

---

[14] Where relevant, Plaintiffs use this range, and its average (50%) to predict outcomes of the claims process and making class notice. *See* Omnibus Fitzgerald Decl. ¶ 44(b) n.20 & Exs. 43-44.

clearer. Examining the previously-proposed claim form, "which require[d] members to repeatedly choose between cash and a voucher that is twice the value of the cash," the Court found that "the clear implication . . is . . that the choice of cash will result in receipt of a 50% *lower* amount than the choice of a voucher," and "[t]o the extent that the opposite is in fact true, the claim form is misleading to class members." *Hadley*, 2020 WL 836673, at *7. Plaintiffs have addressed this deficiency. The Claim Form is now clear that the amounts of voucher and cash provided "are initial offers only," that "[t]he amount of the Voucher or Cash you receive is subject to change," and that "[t]he proportion of Voucher-to-Cash value distributed to claimants is also subject to change." *See* Omnibus Fitzgerald Decl. Ex. 46, Revised Claim Form.

The Claim Form then provides information about what factors affect the amount of vouchers and cash distributed. *See id.* It states that "[a]ll claimants must choose either a Voucher Refund or Cash Refund." *Id.* It explains that "[t]he *amount* of Voucher or Cash Refund you actually receive may be lower or higher than the initial offer, depending on how many people make claims, and how many choose each option," and that "[t]he *proportion* of Voucher-to-Cash value distributed also depends on how many people make claims, and how many choose each option." *Id.* (emphasis added) It notes that "[i]f too many participants choose Vouchers, the value of the Vouchers distributed may be less than twice the value of the Cash distributed, whereas if too many participants choose Cash, the value of the Vouchers may be more than twice the value of the Cash." *Id.* And it warns that in a survey, 80% choose vouchers, resulting in a lower value than cash. *See id.*; *compare Hadley*, 2020 WL 836673, at *7 (noting "class members that select the cash refund [may] in fact receive a cash sum that is *higher* than the value of the corresponding voucher." (record citation omitted)).

To determine whether these revised disclosures were effective, Plaintiffs commissioned a survey similar to the one commissioned in connection with their first motion for preliminary approval. *See* Omnibus Fitzgerald Decl. ¶ 42 (citing Weir Decl. ¶¶ 8, 11-24; PA1 Weir Decl. ¶¶ 30-46). Previously, when offered vouchers of between 3 times and 9 times the value of cash, and no disclosures, about 80% of respondents chose vouchers regardless of the multiplier. *See* PA1 Weir Decl. ¶ 33-38 & Ex. 2. The present survey included a group given the same choice with a 2 times multiplier. On average, those respondents chose vouchers 60% of the time. Weir Decl. ¶ 29. Another group was given the same initial offer, as well as the disclosures noted above. *See id.* ¶¶ 18-19 & Ex. 2. On average, this group chose vouchers 44.6% of the time, demonstrating

that the disclosures alleviated some of the lopsidedness in the previous survey respondents' preference for vouchers. *See id.* ¶ 28, Table 1. This group was also asked questions afterward to determine whether they understood the disclosures. *Id.* ¶¶ 21-22. The vast majority understood that the initial cash and voucher amounts were subject to change, and that the final amounts and proportion of voucher-to-cash value depend on the number of claimants, and how many choose each option. *See id.* ¶¶ 33-34 & Table 2.

The same disclosures set forth in the Revised Claim Form have been incorporated into the Revised Long- and Short-Form Notices. *See* Omnibus Fitzgerald Decl. Exs. 43-44.

In *Hyundai*, the Ninth Circuit rejected an argument that the settlement was inadequate because "the notices did not explain in a 'step-by-step' formula how each class member's benefit is calculated," *see* 926 F.3d at 567. The court explained that the objectors "seek to impose a higher standard than is required," since "[a] settlement notice need not 'provide an exact forecast' of the award each class member would receive, let alone a detailed mathematical breakdown," but instead must "merely give class members 'enough information so that those with "adverse viewpoints" could investigate and "come forward and be heard."'" *Id.* at 567-68 (quoting *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 946–47 (9th Cir. 2015)) (quoting *Lane v. Facebook, Inc.*, 696 F.3d 811, 826 (9th Cir. 2012))); *see also Hendricks v. Ference*, 754 Fed. App'x 510, 512 (9th Cir. 2018) (A "notice [that] include[s] the total amount of the settlement and the formula that w[ill] be used to determine individual recoveries" "satisfy[ies] Rule 23 and due process.")

Here, disclosures to be incorporated into the Class Notices and Claim Form gave survey respondents adequate explanation of the claims process, as evidenced by their more balanced choice between cash and vouchers, in turn making it more likely that the actual amounts distributed will be close to the 2:1 voucher-to-cash ratio set forth in the initial offers. *See* Omnibus Fitzgerald Decl. ¶¶ 43-46 & Ex. 47.[15]

**b.    The Revised Long- and Short-Form Notices are Proper**

The Court found the long-form notice insufficient because it "fails to disclose administrative and

---

[15] This updated analysis—which relies on a presumptive claims rate—also addresses the Court's finding that "Plaintiffs have failed to provide the claims rate information required by the Northern District of California's procedural guidance." *Hadley V*, 2020 WL 836673, at *7. Rather than now "assum[ing] a 10% claims rate," *id.*, Plaintiffs asked the Class Administrator to better estimate the likely class size, and accumulated information "from other recent settlements of similar cases," *id.* (quoting Settlement Guidelines ¶ 1(g)), to make a better prediction of the likely claims rate and number of claims. *See* Omnibus Fitzgerald Decl. ¶ 44(c) & Exs. 48-60. Plaintiffs also asked and the Class Administrator agreed to put caps on expenses at various potential claims rates up to 10%. *See id.* ¶ 44(a) n.20; *compare* Feb. 6, 2020 Hrg. Tr. at 45:6-9.

notice costs" and "fails to clearly disclose the identity of the individual Plaintiffs." *Hadley V*, 2020 WL 836673, at *7. It found the short-form notice insufficient because it "fails to inform class members of the $12,000,000 'cash component' of the settlement," and "fails to disclose the amount of attorney's fees, expenses, and administrative and notice costs that counsel will seek from the cash component of the settlement." *Id.* These issues have been addressed in the revised notice forms. *See* Omnibus Fitzgerald Decl. Ex. 43, Revised Long Form Notice at 11 (Question 22); *id.* Ex. 44, Revised Short Form Notice (under "Has the Court Approved the Settlement?").

### c.   The Updated Notice Plan is Proper

Class Administrator P&N previously described a proposed Notice plan in an October 2019 Declaration. *See* PA1 Schwartz Decl. ¶¶ 7-26. Given the passage of time and updated information about the class size, Plaintiffs requested and P&N has provided an updated Notice Plan, though it has not materially changed from that Plaintiffs previously argued was proper. *See* Schwartz Decl. ¶¶ 21-38; PA Mot. at 24-25.

### 4.   Revised Procedures for Opting Out and Objecting are Appropriate

The Court found that "the requirements for objecting to the settlement are inconsistent across forms," and that "requiring objectors to file their objections and to serve their objections on all counsel imposes an unnecessary burden on class members," *Hadley*, 2020 WL 836673, at *6. To address these issues, Plaintiffs propose that objectors need only mail their objections to the Class Administrator (with an option to file them directly), with Plaintiffs' counsel obligated to file those mailed objections. *See* Proposed Order ¶ 12; Omnibus Fitzgerald Decl. Ex. 43, Long Form Notice at 9-10 (Question 18); *id.* Ex. 44, Short Form Notice (under "What are Class Members' Other Options?").

The Court also found that "[t]he procedure for submission of the opt-out form is . . . needlessly burdensome for class members" because it "class members who wish to submit an opt-out form must 'download an Opt-Out Form from the Settlement Website . . . complete the form, and mail it to the Class Administrator.'" *Hadley*, 2020 WL 836673, at *8 (record citation omitted). To alleviate this burden, the Class Administrator can ensure that opt-out forms can be submitted directly online. *See* Schwartz Decl. ¶ 39; *compare* Proposed Order ¶ 11.

### 5.   Plaintiffs' Counsel will Apply for Fees in Compliance with 28 U.S.C. § 1712

Plaintiffs' counsel previously "anticipate[d] petitioning the Court for a fee award of $6,750,000,

23

based on the common fund method," representing "one-third (33⅓%) of the value of the Settlement Fund," PA Mot. at 19. The Court, however, found that the Settlement's vouchers are coupons under 28 U.S.C. § 1712, so that counsel's request for fees would have to be modified. *See Hadley*, 2020 WL 836673, at *8-10. To this end, Plaintiffs propose two options, each of which is proper.

This is a mixed settlement because, in addition to vouchers, it provides Settlement Class members a cash option, and includes prospective injunctive relief. *See* 28 U.S.C. § 1712(c). The Ninth Circuit has held that "in a mixed settlement, a district court may use the lodestar approach provided that it does so without reference to the dollar value of the settlement fund," or "may reference the dollar value of the settlement fund if it accounts for the redemption rate of the coupons in calculating that dollar value." *In re Easysaver Rewards Litig.*, 906 F.3d 747, 759 (9th Cir. 2018) ["*Easysaver*"]; *see also In re Easysaver Rewards Litig.*, 2020 WL 2097616 (S.D. Cal. May 1, 2020) (on remand, using lodestar to determine fees in mixed settlement).

### a. Option 1: The Lodestar Method

Plaintiffs believe the best approach in this case is for the Court to award fees using the lodestar method, without reference to the dollar value of the Settlement Fund because, if the Court awards fees using the common fund method based on the gross value of the $12 million Cash Fund and redeemed vouchers (the "gross settlement amount"), Class Members who choose cash will have to wait several additional months for their remedies. While vouchers could be distributed following final approval of the Settlement, the amount of cash remaining in the Cash Fund to divide among cash claimants could not be determined until the vouchers expire, Kellogg reports redemptions, and the Court awards fees. This would also require a fee application separate from the final approval motion, months later. *See Hadley*, 2020 WL 836673, at *10 (noting "the parties may consider bifurcation of the proposed fee award"). As a result, the Class may give less attention and scrutiny to the fee motion than if filed accompanying the final approval motion.

If the Court exercises its discretion to determine fees using the lodestar method, Plaintiffs' counsel will seek no more than $5.7 million, representing a multiplier of 2.0 on their current lodestar of over $2.78 million, *see* Omnibus Fitzgerald Decl. ¶¶ 44(b), 48-56, Table 11 & Exs. 61-62, which multiplier will decrease as counsel undertake additional work during the notice and claims and final approval periods. This is a reduction of more than 15%--over $1 million—from the $6.75 million fee counsel previously said it would seek. Such a request is reasonable, especially in light of the excellent result. *See Kelly v. Wengler*, 822 F.3d

1085, 1093, 1105 (9th Cir. 2015) (affirming lodestar multipliers of 2.0 and 1.3); *cf. Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 (9th Cir. 2002) (upholding lodestar multiplier cross-check showing a multiplier of 3.65); *Rawa v. Monsanto Co.*, 934 F.3d 862, 870 (8th Cir. 2019) (upholding lodestar multiplier cross-check showing a multiplier of 5.3, noting while "high, it does not exceed the bounds of reasonableness" especially in light of district court's findings regarding the excellent results and class notice).

### b.      Option 2: The Common Fund Method

Alternatively, if the Court prefers to calculate fees by using the common fund method on the gross settlement amount, counsel would await making a fee application until, following final approval, vouchers are distributed and expire, and Kellogg calculates and reports their redemptions.[16] Because vouchers expire four months after issuance, to build in some extra time for mailings and to report on redemptions, Plaintiffs suggest a deadline for a fee motion approximately six months after final approval, with an opportunity thereafter for Class Members to object. *See Volkswagen*, 895 F.3d at 615 ("[A]pproving a settlement before class counsel has filed a fee motion does not violate Rule 23(h)."); *compare* Proposed Order ¶ 15 [Alt. 2].[17]

If the Court intends to exercise its discretion to determine fees using this method, Plaintiffs' counsel will seek no more than 30% of the gross settlement amount, meaning the range of the fee request would be $3.6 million (0% redemptions and thus $12 million gross settlement amount) to $6,075,000 (100% redemptions and thus $20.25 million gross settlement amount). If vouchers are redeemed at a 50% rate as estimated above, this would result in a gross settlement amount of $16.125 million, and a fee request of $4.837 million. *See also* Omnibus Fitzgerald Decl. ¶ 44(b) n.20 (similar information for 20% and 80% rates).

### III.      CONCLUSION

The Court should grant the motion.

---

[16] Plaintiffs' counsel having to rely on Kellogg to accurately report voucher redemptions when Kellogg has purported to repudiate the Settlement Agreement, is another reason the lodestar method is preferable.

[17] The Settlement Agreement provides that "[t]he Class Administrator shall pay out Approved Claims . . . commencing ten (10) days after the Effective Date," which is "the date on which the Judgment approving this Agreement becomes final." *See* SA ¶¶ 10, 36. Thus, "[a]s the settlement is currently structured . . . the vouchers will not be distributed until after the entry of final judgment," thereby "contemplate[ing] that the motion for attorney's fees will be filed before . . . the Court has the opportunity to determine the portion 'of the coupons that are redeemed' by class members." *Hadley*, 2020 WL 836673, at *10 (quoting 28 U.S.C. § 1712(a), (b)). The Settlement Agreement, however, gives the Court discretion to "otherwise order[]" the timing of the "pay out [of] Approved Claims," that is the "[t]iming of [the] [d]istribution of [d]irect [m]onetary [r]elief." *See* SA ¶ 36. Accordingly, this proposed schedule is viable.

Dated: July 20, 2020

Respectfully Submitted,

/s/ Jack Fitzgerald

**THE LAW OFFICE OF
JACK FITZGERALD, PC**
JACK FITZGERALD
*jack@jackfitzgeraldlaw.com*
TREVOR M. FLYNN
*trevor@jackfitzgeraldlaw.com*
MELANIE PERSINGER
*melanie@jackfitzgeraldlaw.com*
Hillcrest Professional Building
3636 Fourth Avenue, Suite 202
San Diego, CA 92103
Phone: (619) 692-3840
Fax: (619) 362-9555

**JACKSON & FOSTER, LLC**
SIDNEY W. JACKSON, III
*sid@jacksonfosterlaw.com*
75 St. Michael Street
Mobile, Alabama 36602
Phone: (251) 433-6699
Fax: (251) 433-6127

***Counsel for Plaintiffs and the
Settlement Class***

*Hadley et al. v. Kellogg Sales Company*, No. 16-cv-4955-LHK
RENEWED MOTION FOR PRELIMINARY APPROVAL