1   **JENNER & BLOCK LLP**
Dean N. Panos (*pro hac vice*)
2   dpanos@jenner.com
353 N. Clark Street
3   Chicago, IL 60654-3456
Phone:       (312) 222-9350
4   Facsimile:   (312) 527-0484

5

6   **JENNER & BLOCK LLP**
Kate T. Spelman (Cal. Bar No. 269109)
7   kspelman@jenner.com
Alexander M. Smith (Cal. Bar No. 295187)
8   asmith@jenner.com
633 West 5th Street Suite 3600
9   Los Angeles, CA 90071-2054
Phone:       (213) 239-5100
10  Facsimile:   (213) 239-5199

11  Attorneys for Defendant
Kellogg Sales Company
12

13                  UNITED STATES DISTRICT COURT

14                  NORTHERN DISTRICT OF CALIFORNIA

15

16  STEPHEN HADLEY, et al., on behalf of           Case No. 5:16-cv-04955 LHK
themselves, all others similarly situated, and the
17  general public,                                The Honorable Lucy H. Koh

18                      Plaintiffs,                **KELLOGG'S OPPOSITION TO
                                                   PLAINTIFFS' MOTION TO ENFORCE
19          v.                                     THE SETTLEMENT AGREEMENT**

20  KELLOGG SALES COMPANY,                         Hearing Date:    November 12, 2020

21                      Defendant.                 Hearing Time:    1:30 p.m.

22                                                 Courtroom:       8 (San Jose)

23

24

25

26

27

28

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................1

BACKGROUND .........................................................................................................................3

    I.     After Over Three Years of Litigation, the Parties Reached a Settlement in September 2019. .......................................................................................................3

    II.    This Court Rejects the Parties' Settlement Agreement and Denies Preliminary Approval. ...................................................................................................................6

    III.   The Parties Cannot Reach Agreement on How to Revise the Settlement Agreement. .................................................................................................................7

ARGUMENT ..............................................................................................................................8

    I.     The Terms of the Settlement Agreement Are No Longer Binding or Enforceable. ...........8

    II.    The Court Cannot Enforce the Settlement Agreement Without Changing Its Material Terms. .........................................................................................................11

         A.    The Court Cannot Modify the Release, Which Is a Material Term of the Agreement. ............................................................................................12

         B.    Even if the Release Were Modified, the Parties Have Not Reached Agreement on How to Revise the Remaining Terms of the Settlement. ...............15

    III.   Kellogg Did Not Breach Its Duty to Negotiate in Good Faith. ........................................16

         A.    Plaintiffs' Claim of Bad Faith Is Based on Confidential Mediation Communications, Which California Law and the Mediation Agreement Bar Plaintiffs from Disclosing. .....................................................................17

         B.    Kellogg Did Not Act in Bad Faith by Refusing to Agree to Plaintiffs' Proposed Settlement Terms. ....................................................................21

CONCLUSION ..........................................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*Abbott Labs. v. Alpha Therapeutic Corp.*,
  164 F.3d 385 (7th Cir. 1999) .................................................................13

*Ambat v. City & County of San Francisco*,
  No. 07-3622, 2011 WL 2118576 (N.D. Cal. May 27, 2011) ...............................8

*Apollo Educ. Grp., Inc. v. Nat'l Union Fire Ins. Co.*,
  784 F. App'x 500 (9th Cir. 2019) ...........................................................18

*Banc of Am. Strategic Solutions, Inc. v. Mohamed*,
  No. 07-446, 2008 WL 2756602 (S.D. Cal. July 14, 2008) ..............................13

*Benesch v. Green*,
  No. 07-3784, 2009 WL 4885215 (N.D. Cal. Dec. 17, 2009) .........................17

*Chavez v. PVH Corp.*,
  No. 13-1797, 2014 WL 6617142 (N.D. Cal. Nov. 20, 2014) ....................17, 19

*City of El Cajon v. El Cajon Police Officers Ass'n*,
  49 Cal. App. 4th 64 (1996) ..................................................................11

*Clover v. Shiva Realty of Mulberry, Inc.*,
  No. 10-1702, 2011 WL 1832581 (S.D.N.Y. May 13, 2011) .........................17

*Collins v. Thompson*,
  679 F.2d 168 (9th Cir. 1982) ........................................................1, 9, 11

*Custom LED, LLC v. eBay, Inc.*,
  No. 12-350, 2013 WL 6114379 (N.D. Cal. Nov. 20, 2013) .........................14

*Der-Hacopian v. Darktrace, Inc.*,
  No. 18-6726, 2020 WL 1904471 (N.D. Cal. Apr. 17, 2020) ........................14

*Ehrheart v. Verizon Wireless*,
  609 F.3d 590 (3d Cir. 2010).........................................................2, 9, 11

*Eisendrath v. Superior Court*,
  109 Cal. App. 4th 351 (2003) ...............................................................17

*Facebook, Inc. v. Pac. Nw. Software, Inc.*,
  640 F.3d 1034 (9th Cir. 2011) ..............................................................18

*First Graphics, Inc. v. M.E.P. Cad, Inc.*,
  No. 00-2524, 2002 WL 1858791 (N.D. Ill. Aug. 13, 2002) .........................17

*Foxgate Homeowners Ass'n, Inc. v. Bramalea Cal., Inc.*,
    26 Cal. 4th 1 (2001) ...........................................................................................................17, 18

*Galinis v. Bayer Corp.*,
    No. 09-4980, 2020 WL 1865286 (N.D. Cal. Apr. 14, 2020) ................................................13

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) ........................................................................................12, 14

*Hoppe v. Great W. Bus. Servs., LLC*,
    536 F. Supp. 2d 888 (N.D. Ill. 2008) .........................................................................8, 9, 10

*In re Deepwater Horizon*,
    732 F.3d 326 (5th Cir. 2013) .................................................................................................9

*In re Delta Air Lines, Inc.*,
    374 B.R. 516 (S.D.N.Y. 2007)..............................................................................................14

*In re Frascella Enters., Inc.*,
    No. 06-101, 2008 WL 2051115 (Bankr. E.D. Pa. May 8, 2008) ..........................................10

*In re Marriage of Davenport*,
    194 Cal. App. 4th 1507 (2011) ............................................................................................19

*In re Specialty Equip. Cos.*,
    3 F.3d 1043 (7th Cir. 1993) ..................................................................................................14

*Inamed Corp. v. Kuzmak*,
    275 F. Supp. 2d 1100 (C.D. Cal. 2002) ...............................................................................13

*Jones v. Metropolitan Life Ins.*,
    No. 08-3971, 2010 WL 4055928 (N.D. Cal. Oct. 15, 2010) ...............................................19

*Lesley v. Spike TV, Inc.*,
    No. 04-2758, 2005 WL 8156246 (C.D. Cal. July 26, 2005)................................................17

*Liberty Mut. Fire Ins. Co. v. Bosa Dev. Cal. II, Inc.*,
    No. 17-666, 2019 WL 3306304 (S.D. Cal. July 23, 2019) ..................................................20

*Officers for Justice v. Civil Serv. Comm'n of City & Cty. of S.F.*,
    688 F.2d 615 (9th Cir. 1982) ...........................................................................................12, 14

*Pac. Marine Ctr., Inc. v. Philadelphia Indem. Ins. Co.*,
    No. 13-992, 2015 WL 1565362 (E.D. Cal. Apr. 8, 2015) ...................................................21

*Perez v. Indian Harbor Ins. Co.*,
    --- F. Supp. 3d ----, 2020 WL 2322996 (N.D. Cal. 2020)............................................18, 21

*Phillips v. Pilgrim Creek Estates Homeowners Ass'n*,
  No. 19-102, 2020 WL 995862 (S.D. Cal. Mar. 2, 2020) ...................................................14

*Ramirez v. DeCoster*,
  142 F. Supp. 2d 104 (D. Me. 2001) .........................................................................13

Reid v. I.C. System Inc.,
  No. 12-2661, 2015 WL 12979110 (D. Ariz. Aug. 27, 2015).....................................10

*Sanders v. Connan's Paint & Body Shop, LLC*,
  No. 14-1725, 2015 WL 5692542 (S.D. Ind. Sept. 28, 2015).....................................15

*Schaeffer v. Litton Servicing, LP*,
  No. 05-7673, 2012 WL 10274678 (C.D. Cal. Nov. 13, 2012) ...................................13

*SEC v. Randolph*,
  736 F.2d 525 (9th Cir. 1984) ....................................................................................9

*Sherman v. CLP Resources, Inc.*,
  No. 12-8080, 2015 WL 13542762 (C.D. Cal. Feb. 4, 2015) .....................................10

*Shine v. Williams-Sonoma, Inc.*,
  23 Cal. App. 5th 1070 (2018) ..................................................................................11

*Silicon Storage Tech v. Nat'l Union Fire Ins. Co.*,
  No. 13-5658, 2015 WL 4347711 (N.D. Cal. July 15, 2015) .....................................17

*Trustees of Operating Engineers Pension Trust v. Smith-Emery Co.*,
  No. 09-1476, 2017 WL 275599 (C.D. Cal. Jan. 19, 2017).......................................13

*Unicolors, Inc. v. Yang*,
  No. 17-4473, 2017 WL 10436063 (C.D. Cal. Oct. 3, 2017)......................................19

*United States v. Ward Baking Co.*,
  376 U.S. 327 (1964)..................................................................................................8

*Willner v. Manpower Inc.*,
  No. 11-2846, 2014 WL 4370694 (N.D. Cal. Sept. 3, 2014) .....................................14

*Wimsatt v. Superior Court*,
  152 Cal. App. 4th 137 (2007) ..................................................................................17

**STATUTES**

Cal. Civ. Code § 1438.......................................................................................................9

Cal. Civ. Code § 1641.....................................................................................................11

Cal. Evid. Code § 1119 ...............................................................................17, 18, 20, 21

**OTHER AUTHORITIES**

13 WILLISTON ON CONTRACTS § 38:9 (4th ed.) ............................................................................9

OPPOSITION TO PLAINTIFFS' MOTION TO ENFORCE THE SETTLEMENT AGREEMENT

1

## <u>INTRODUCTION</u>

2   After the parties reached a carefully negotiated settlement, this Court denied preliminary approval

3   and rejected at least three of the settlement's key material terms — the scope of the settlement class, the

4   use of vouchers for certain Kellogg products that expire after four months, and the language of the release.

5   Relying on a cherry-picked, improperly-disclosed sampling of the parties' communications in connection

6   with the most recent mediation, Plaintiffs claim that Kellogg has now "repudiated" the settlement and

7   refused to negotiate in good faith.  The reality, however, is different.  Since the Court denied preliminary

8   approval, Plaintiffs have not offered to settle on the same terms to which they agreed last year; instead,

9   they proposed to "revise" the settlement by offering terms that were materially worse for Kellogg than the

10   prior agreement.  Kellogg attempted to reach a new settlement with Plaintiffs, but Plaintiffs rejected —

11   and indeed, even refused to discuss — Kellogg's proposals.  Left at an impasse, the parties did not settle.

12   The parties' settlement agreement expressly contemplated the current situation: if the Court rejects

13   the settlement (which it did), and the parties are unable to reach an agreement that addresses the Court's

14   reasons for denying approval (which they are), the agreement provides that "the terms and provisions of

15   this Agreement will have no further force or effect" and that the parties "will be restored to their respective

16   places in the litigation."  Settlement Agreement ¶ 50.[1]  Instead of abiding by that provision, Plaintiffs

17   moved to "enforce" the agreement this Court rejected, while simultaneously urging the Court to modify its

18   material terms.  Plaintiffs claim that Kellogg acted in "bad faith" by "repudiating" their settlement.

19   That is false.  After the Court rejected the settlement agreement, Plaintiffs *never* proposed that the

20   parties re-present their settlement to the Court.  Instead, they insisted on fundamentally different settlement

21   terms.  Their accusation of "bad faith" rests on an inaccurate, self-serving account of the parties' settlement

22   negotiations — which Plaintiffs have improperly disclosed to the Court in violation of California law and

23   the parties' mediation agreement.  This motion is meritless, potentially sanctionable, and must be denied.

24   At the outset, the basic premise of Plaintiffs' motion — that there is an enforceable settlement

25   agreement — is wrong.  The Ninth Circuit has made clear that a settlement requiring court approval, such

26   as a class-wide settlement, is "subject . . . to the condition subsequent of judicial disapproval."  *Collins v.*

27

28   [1] A true and correct copy of the settlement agreement is attached as Exhibit A to the October 21, 2019 Declaration of Jack Fitzgerald (ECF No. 325-1).

1   *Thompson*, 679 F.2d 168, 173 (9th Cir. 1982); *accord Ehrheart v. Verizon Wireless*, 609 F.3d 590, 593 (3d

2   Cir. 2010) ("[J]udicial approval of a class action settlement is a condition subsequent . . . .").  In other

3   words, under black-letter contract law principles, this Court's denial of preliminary approval — and,

4   importantly, its rejection of multiple material settlement terms — discharged Kellogg from its obligations

5   under the settlement and triggered the provisions of paragraph 50.  Plaintiffs' recitation of the generic,

6   uncontroversial propositions that settlement agreements are generally enforceable and that a party cannot

7   unilaterally back out of a class-wide settlement agreement simply because it had a change of heart do not

8   help their cause.  The cases Plaintiffs cite do not address the pertinent question here: whether a class-wide

9   settlement agreement remains enforceable *after* the Court has rejected its material terms.  And Plaintiffs'

10  contention that the Court did not reject the settlement's material terms is manifestly false: Plaintiffs admit

11  on the first page of their motion that the parties would need to "*revise the Agreement* to obtain preliminary

12  approval."  ECF No. 346 ("Mot.") at 2 (emphasis added).

13         Plaintiffs' assertion that the Court may somehow modify by fiat the most important terms of the

14  settlement agreement — including the release — because Kellogg *actually* intended to agree to whatever

15  release this Court would approve is similarly baseless.  The Ninth Circuit forbids courts from simply

16  rewriting material terms of a class-wide settlement, and this Court cannot "enforce" the parties' agreement

17  without doing so.  The broad scope of the release is the essence of Kellogg's agreement; it would not have

18  agreed to settle on the terms it did without obtaining the broad release this Court rejected, and it will not

19  agree to a narrower release without receiving concessions in return.  Moreover, this Court has expressed

20  skepticism other material terms of the settlement other than the release — including the scope of the

21  settlement class and the use of vouchers with expiration dates.  While Kellogg is open to the possibility of

22  a settlement structure that employs a narrower release, an all-cash common fund, vouchers with longer

23  expiration dates and fewer restrictions, or a smaller settlement class, it is not willing do so without

24  corresponding changes to the settlement's economic terms.

25         Plaintiffs' assertion that Kellogg breached the settlement agreement by negotiating in "bad faith"

26  is even more specious.  Simply failing to reach a settlement is not — and cannot be — evidence of bad

27  faith.  The only evidence Plaintiffs offer to support their claim of bad faith is a series of confidential emails

28  between Plaintiffs' counsel, Kellogg's counsel, and the mediator regarding the parties' settlement position.

Needless to say, it is improper and potentially sanctionable for Plaintiffs to submit those emails in a court filing. Those emails are squarely protected by California's mediation privilege (and the parties' Mediation Agreement), and this Court should disregard Plaintiffs' "bad faith" argument for that reason alone.

More importantly, Plaintiffs' account of the parties' settlement negotiations since the Court denied preliminary approval is false.[2] For example, while Plaintiffs assert that Kellogg wrongfully insisted on "new" settlement terms, Plaintiffs *never* offered to settle on the same terms on which they settled last year; instead, they offered terms that were materially worse. Indeed, Plaintiffs selectively chose *not* to submit to the Court the settlement "analysis" they sent to Kellogg in May 2020 — despite submitting other settlement communications — because it confirms that their narrative of the parties' settlement negotiations is blatantly false. It is true that Kellogg refused to settle on the materially worse terms Plaintiffs offered during the recent mediation. While Plaintiffs may not like that outcome, Kellogg's refusal to capitulate to Plaintiffs' demands is not bad faith.

If Plaintiffs were serious about resolving this case, they would have worked with Kellogg to reach new settlement terms that were acceptable to all parties, addressed the Court's concerns, and accounted for the risks both parties face if they continue to litigate. Instead of doing so, Plaintiffs ask this Court to enforce a settlement agreement that it rejected — or, alternatively, order Kellogg to settle on terms to which it never agreed. This Court should reject Plaintiffs' my-way-or-the-highway settlement tactics and should deny this motion.

## BACKGROUND

### I.   After Over Three Years of Litigation, the Parties Reached a Settlement in September 2019.

Since June 2018, the parties have invested considerable time and effort to settle this case. To that end, the parties have attended a total of seven mediations — one before a Court-sponsored mediator, and six before the Honorable James F. Holderman (Ret.), who is the former Chief Judge of the U.S. District

---

[2] Kellogg believes Plaintiffs' conduct in disclosing settlement communications is improper. Kellogg urges the Court not to consider them, and it consequently makes no similar disclosures in this brief. However, if the Court is inclined to evaluate the parties' settlement communications, Kellogg is willing to provide a declaration setting forth the details of each offer made by Plaintiffs, as well as Kellogg's counter-offers, along with a complete collection of the emails documenting those settlement negotiations. This Court also has other options at its disposal. For example, the Court could convene an evidentiary hearing to determine what happened in the parties' settlement negotiations.

Court for the Northern District of Illinois and who is now associated with JAMS.  *See* Panos Decl. ¶ 2.

The parties attended four mediations before Judge Holderman without reaching a settlement.  On September 9, 2019 — following their fifth mediation before Judge Holderman and their sixth mediation overall — the parties reached a settlement in principle.  *See id.* ¶ 3.  After Kellogg's Board of Directors approved the parties' term sheet (which stated that the settlement was contingent on Board approval), the parties memorialized their agreement in the October 25, 2019 settlement agreement Plaintiffs now seek to enforce.  *See id.* ¶¶ 8-13.

Although Kellogg regards Plaintiffs' claims as meritless, it nonetheless agreed to pay a total of $12 million in cash and $8.25 million in vouchers to settle this lawsuit.  Settlement Agreement ¶¶ 29-30.  Kellogg also agreed to limit or eliminate its use of several of the labeling claims at issue in this lawsuit — including the claims that Raisin Bran and Smart Start are "heart healthy," that Frosted Mini-Wheats are "lightly sweetened," and that its products are "healthy," "wholesome," and "nutritious."  *Id.* ¶¶ 37, 39, 41.  In fact, Kellogg even agreed to limit its use of labeling claims the Court held *not* to be actionable — including by agreeing not to state that certain products contain "no high fructose corn syrup" if they derive more than 10% of their total calories from added sugar.  *Id.* ¶ 40.  To obtain this package of relief, Plaintiffs made three key concessions:

First, Plaintiffs agreed that the monetary relief would not consist exclusively of cash; instead of accepting a lower all-cash settlement, Plaintiffs agreed that $12 million of the settlement benefits would consist of cash and that $8.25 million would consist of vouchers that class members could redeem for Kellogg products.  *See* Settlement Agreement ¶¶ 29-30.  Plaintiffs also agreed that the vouchers would expire after four months and that they could only be used for certain Kellogg products.  *See id.*  Kellogg's agreement to use vouchers, and the restrictions on the vouchers' use, was a business decision that reflected an array of complex economic and accounting considerations.  Indeed, the economic cost to Kellogg of the vouchers, given their anticipated redemption rate, was significantly less than their $8.25 million face value.  *See* Panos Decl. ¶¶ 4-5.  In other words, the settlement did not "cost" Kellogg $20.25 million, and Kellogg would not have accepted a settlement that required it to pay $20.25 million in cash.  *See id.* ¶ 6.

Second, Plaintiffs agreed that the settlement would cover a broad, nationwide class of Kellogg consumers.  *See* Settlement Agreement ¶ 4 (defining the class to include "all persons in the United States

who, between August 29, 2012 and the date a motion for preliminary approval is filed (the 'Class Period'), purchased in the United States . . . one of the Class Products").  Even though the Court had only certified a California class for litigation purposes, Kellogg — facing a copycat class action in New York and the potential of similar "added sugar" lawsuits elsewhere — wished to buy global peace and finality by reaching a nationwide class settlement.  *See* Panos Decl. ¶ 9.  Likewise, even though the claims pertaining to many of the products at issue in this case were dismissed by the Court, voluntarily dismissed by Plaintiffs, or found not to be susceptible to class-wide treatment, Kellogg wished to include consumers of these products in the settlement class to ensure that the settlement would end any litigation challenging the labeling of those products once and for all.  *See id.*  To that end, the parties agreed that the settlement would encompass a wide array of Kellogg products — including Raisin Bran, Krave, Frosted Mini-Wheats, Smart Start, and Crunchy Nut cereals, as well as several varieties of Nutri-Grain bars.  *See* Settlement Agreement, Appendix A.

Third, the settlement agreement includes a broad release.  It applies to:

[A]ny and all claims, demands, rights, suits, liabilities, injunctive and/or declaratory relief, and causes of action of every nature and description whatsoever, including costs, expenses, penalties, and attorney's fees, whether known or unknown, matured or unmatured, at law or in equity, existing under federal or state law, that any Class member has or may have had against the Released Kellogg Persons arising out of or related in any way to the transactions, occurrences, events, behaviors, conduct, practices, and policies alleged in the Actions regarding the Class Products, which have been, or which could have been asserted in the Actions, and in connection with the conduct of the Actions, that have been brought, could have been brought, or are currently pending in any forum in the United States.

Settlement Agreement ¶ 51.  The breadth of the release was designed to ensure that the settlement would not only resolve the claims asserted in this lawsuit and the companion *DiGregorio v. Kellogg Sales Company* litigation in the Northern District of New York, but also protect Kellogg against any copycat class actions related to the products at issue in those cases.

The parties agreed that they would submit the settlement agreement to the Court for preliminary approval pursuant to Rule 23(e).  *See* Settlement Agreement ¶ 48.  However, the settlement agreement contemplated the possibility that the Court might deny preliminary approval.  To that end, the settlement agreement includes a provision titled "Failure to Obtain Approval."  *Id.* ¶ 50.  It reads:

OPPOSITION TO PLAINTIFFS' MOTION TO ENFORCE THE SETTLEMENT AGREEMENT

1

**50. Failure to Obtain Approval.** If this Agreement is not given preliminary or final approval by the Court, the Parties will seek in good faith to revise the Agreement as needed to obtain Court approval. **Failing this, the parties will be restored to their respective places in the litigation. In such event, the terms and provisions of this Agreement will have no further force or effect with respect to the Parties and will not be used in this or any other proceeding for any purposes . . .** The Parties agree that, in the event of any such occurrence, the Parties shall stipulate or otherwise take all necessary action to resume in the Northern District of New York the *DiGregorio* action for all further pre-trial and trial proceedings, and to resume the action at the procedural posture as though this Agreement had never been reached.

2

3

4

5

6

7

Settlement Agreement ¶ 50 (emphasis added).[3]  In other words, the settlement agreement required

8

Plaintiffs to return to litigation not only in this case, but also in the *DiGregorio* case — where Kellogg's

9

fully-briefed motion to dismiss the New York claims was pending at the time of the settlement.  *See* Panos

10

Decl. ¶ 13.

11

## II.     This Court Rejects the Parties' Settlement Agreement and Denies Preliminary Approval.

12

Plaintiffs filed their initial motion for preliminary approval on October 21, 2019.  *See* ECF No. 325.

13

Kellogg did not oppose Plaintiffs' motion for preliminary approval.  *See* ECF No. 329.  The Court

14

nonetheless denied Plaintiffs' motion for preliminary approval on February 20, 2020.  *See* ECF No. 339

15

("Order").  In its Order, the Court denied preliminary approval for five separate reasons, three of which

16

implicate material terms of the settlement.[4]

17

<u>First</u>, the Court held that "the proposed release is overbroad" and "conflicts with Ninth Circuit

18

precedent, which only allows release of claims where the identical claims are based on the identical factual

19

predicate as that underlying the claims in the settled class action."  Order at 3 (citations, internal quotation

20

marks, alterations, and capitalization omitted).  The Court concluded that the "sweeping language" of the

21

release caused it to run afoul of the "identical factual predicate" requirement and stated that "[t]he parties

22

23

---

[3] Although Plaintiffs repeatedly accuse Kellogg of violating this provision, it is telling that Plaintiffs never quote this provision in its entirety; instead, knowing that it fatally undermines their argument, they conceal the portion of Paragraph 50 requiring the parties to return to litigation if they cannot agree upon how to revise the settlement.

24

25

26

[4] The Court also denied preliminary approval for two other reasons: (1) the claim form, opt-out form, and notice forms provided inadequate notice to class members (Order at 9-13); and (2) the vouchers constitute coupons under CAFA, which precluded the Court from assessing Plaintiffs' request for attorney's fees until after the vouchers were distributed (*id.* at 13-17).  Kellogg does not contend that these reasons for denying preliminary approval implicate material terms of the settlement.

27

28

1  must narrow the scope of the release consistent with Ninth Circuit law *in any future settlement*." *Id.* at 4

2  (emphasis added).

3      Second, the Court held that it "cannot determine whether the settlement class satisfies the

4  predominance requirement of Federal Rule of Civil Procedure 23(b)(3). *Id.* at 4-5. The Court noted that

5  the "settlement class is significantly broader than the classes the Court previously certified" and that it

6  included products and packaging sizes that the Court expressly found *not* to satisfy the predominance

7  requirement due to variations in the packaging over time. *See id.* at 6-7. "In light of Plaintiffs' and

8  Kellogg's representations about variations of the packaging of the Class Products over the course of the

9  more than seven year class period, the Court's previous decisions on predominance, and the increased

10  breadth of the settlement class," the Court determined that it "cannot conclude that the settlement class

11  satisfies the predominance requirement of Rule 23(b)(3)." *Id.* at 7.

12      Third, the Court held that the $8.25 million voucher component of the settlement "contains

13  reversionary aspects," as those vouchers would expire after four months if not redeemed. *Id.* at 8. As a

14  result, the Court found that "the value of the voucher effectively 'reverts' to Kellogg, as Kellogg is then

15  under no obligation to make any payment." *Id.* Although the Court noted that the Ninth Circuit does not

16  outright prohibit the use of reversionary settlements, it concluded that Plaintiffs had not provided sufficient

17  information to permit an assessment of the settlement's adequacy and had not complied with the Northern

18  District of California's procedural guidance regarding the use of reversionary settlements. *Id.* at 9.

19  **III.   The Parties Cannot Reach Agreement on How to Revise the Settlement Agreement.**

20      After the Court denied preliminary approval, the parties scheduled another mediation with Judge

21  Holderman. *See* Panos Decl. ¶ 15. Although the parties initially scheduled the mediation for April 23, it

22  was postponed until May 19 and then again until June 9 in light of the COVID-19 pandemic. *Id.* The

23  parties subsequently agreed to postpone the mediation until June 18 to accommodate a medical emergency

24  involving one of Kellogg's lead counsel's family members. *Id.*

25      On May 12, 2020, Plaintiffs' counsel sent Kellogg's counsel an email with his "analysis" of the

26  issues raised by the Court's order denying preliminary approval. *Id.* ¶ 17. The email included not only a

27  summary of the issues raised by the Court's order, but proposed settlement terms that purported to address

28  those issues. *Id.* The terms Plaintiffs' counsel proposed in that email differed significantly from the terms

1  on which the parties had agreed in their earlier settlement agreement, and they were far less favorable to

2  Kellogg than the terms of the settlement the parties reached.[5]  *Id.*

3        In an effort to reach a settlement, Kellogg proposed two separate settlement frameworks.  One

4  framework was a nationwide class that would address the Court's Order by, among other things, reducing

5  the number of products included in the settlement class definition.  Kellogg also proposed an alternative

6  framework whereby the parties would limit the settlement class to the class the Court certified for litigation

7  purposes.  *Id.* ¶ 18.  That proposal served two critical purposes: it would obviate the Court's concerns about

8  predominance (since the Court had already certified that class), and it would permit Kellogg to fashion a

9  release using the class and products that this Court had already certified.  *See id.*  Kellogg's proposals also

10  did not require the use of vouchers, thereby addressing this Court's concerns about reversion.  *See id.*

11  Plaintiffs refused to consider these proposals.  Instead, they continued to insist that the parties settle on a

12  nationwide basis — even though the terms of that settlement would necessarily differ from the terms the

13  parties reached in 2019 .  *See id.*

14        The parties attended a mediation with Judge Holderman on June 18.  *Id.* ¶ 19.  At no point in the

15  mediation did Plaintiffs offer to settle on the same terms to which they agreed last year.  *Id.*  Instead, they

16  continued to insist on terms that were materially worse for Kellogg.  *Id.*  Despite Kellogg's best efforts,

17  Plaintiffs unilaterally ended the mediation; as a result, the parties found themselves at an impasse, and they

18  were unable to reach a settlement.  *Id.*  Plaintiffs filed this motion, along with a renewed motion for

19  preliminary approval, approximately a month later.  *See* ECF Nos. 346, 347.

20  ## ARGUMENT

21  **I.  The Terms of the Settlement Agreement Are No Longer Binding or Enforceable.**

22        It is axiomatic that this Court "cannot enforce a settlement agreement where none exists."  *Ambat*

23  *v. City & County of San Francisco*, No. 07-3622, 2011 WL 2118576, at *2 (N.D. Cal. May 27, 2011)

24  (citing *United States v. Ward Baking Co.*, 376 U.S. 327, 334 (1964)); *cf. Hoppe v. Great W. Bus. Servs.,*

25  *LLC*, 536 F. Supp. 2d 888, 889 (N.D. Ill. 2008) (holding that a motion to enforce a class-wide settlement

---

[5] Tellingly, even though Plaintiffs refer to this "analysis" in their motion and submitted other settlement communications to the Court, they did not submit this "analysis."  That is because it confirms that Plaintiffs' proposed settlement terms  materially differed from the terms to which the parties agreed in their settlement agreement last year.

1    agreement "cannot be granted if the agreement is no longer operative").  Here, the Settlement Agreement

2    Plaintiffs seek to enforce has no legal effect because the Court has rejected its material terms.

3         Federal Rule of Civil Procedure 23(e) provides that a certified class action "may be settled,

4    voluntarily dismissed, or compromised only with the court's approval."  Fed. R. Civ. P. 23(e); *see also In*

5    *re Deepwater Horizon*, 732 F.3d 326, 343 (5th Cir. 2013) ("A class settlement is not a private agreement

6    between the parties.  It is a creature of Rule 23, which authorizes its use to resolve the legal claims of a

7    class 'only with the court's approval.'").  If a court rejects a proposed class settlement, the terms of that

8    settlement cannot bind the parties and the class.

9         In other words, while a class settlement may remain enforceable and binding on the parties *until*

10   the court decides to grant or withhold approval, an order denying judicial approval functions as a "condition

11   subsequent" to the agreement.  *Collins*, 679 F.2d at 173; *Ehrheart*, 609 F.3d at 593.  Like any condition

12   subsequent, an order denying judicial approval of a class settlement "discharges the parties from their

13   otherwise binding agreement."  13 WILLISTON ON CONTRACTS § 38:9 (4th ed.); *see also* Cal. Civ. Code §

14   1438 ("A condition subsequent is one referring to a future event, upon the happening of which the

15   obligation becomes no longer binding upon the other party, if he chooses to avail himself of the

16   condition.").  And to that end, the Ninth Circuit has recognized that "without court approval" parties to a

17   settlement requiring court approval — such as a consent decree or a class-wide settlement — can "claim

18   the right to withdraw their consent to the agreement."  *SEC v. Randolph*, 736 F.2d 525, 528 (9th Cir. 1984).

19        Plaintiffs rely primarily on *Hoppe v. Great Western Business Services, LLC* — an out-of-circuit,

20   non-binding district court case — to argue that the denial of preliminary approval does not function as a

21   condition subsequent and does not render the settlement agreement unenforceable.  *See* Mot. at 11-12.  But

22   *Hoppe* is easily distinguishable.  There, the court "denied the motion for preliminary approval on mootness

23   grounds" and made "luminously clear that [it] was neither approving nor disapproving the settlement

24   agreement, but was merely postponing any merits-based evaluation because of a perceived procedural

25   irregularity."  536 F. Supp. 2d at 891-92.  Because the court had not evaluated the substantive terms of the

26   parties' proposed settlement, it concluded that the denial of preliminary approval did not function as a

27   condition subsequent and did not render the settlement unenforceable.  The court emphasized, however,

28   that the result would be different had it rejected the settlement on substantive grounds: "[I]f the settlement

agreement is ultimately *evaluated* and found wanting under Rule 23, GWBS will have no obligation to pay the agreed upon settlement or do anything further." *Id.* at 896 (emphasis in original).

Here, the Court did exactly what the district court did not do in *Hoppe*: it "evaluated" the settlement and "found [it] wanting."[6]  *Id.*  For example, the Court held that the settlement class was "significantly broader than the classes the Court previously certified" and that "Plaintiffs do nothing to reconcile the settlement class definition with the Court's previous decision."  Order at 6-7.  The Court also noted that, absent additional explanation, the use of vouchers that expire after four months ran afoul of the Northern District of California's procedural guidance for class action settlements and Ninth Circuit case law disfavoring reversions.  *Id.* at 8-9.  And it concluded that the settlement's release of claims was fundamentally deficient because it "releases claims that are not based on the identical factual predicate as that underlying the claims in the settled class action."  Order at 4 (citation and internal quotation marks).  Critically, the Court emphasized that the parties could not remedy this defect without "narrow[ing] the scope of the release . . . in any *future settlement*."  *Id.* (emphasis added).  Plaintiffs' claim that the parties' agreement is "alive and well" is manifestly false.  *See* Mot. at 11 (citing *Hoppe*, 536 F. Supp. 2d at 896).

The facts here are far more similar to *Reid v. I.C. System Inc.* — an in-circuit case Plaintiffs fail to cite.  No. 12-2661, 2015 WL 12979110 (D. Ariz. Aug. 27, 2015).  There, after the court denied the plaintiff's motion for preliminary settlement approval, the plaintiff stated that he "intended to pursue further litigation" and the defendant filed a motion to enforce the settlement agreement.  *Id.* at *1.  The court denied the defendant's motion to enforce the settlement agreement.  In so holding, it rejected the defendant's argument that "the Court did not actually deny the motion for preliminary approval but rather deferred ruling," and it emphasized that "the Court denied approval after reviewing the substance of the Agreement."  *Id.* at *2.  While the defendant cited *Hoppe* to argue that the denial of preliminary approval did not render the settlement unenforceable, the court disagreed.  "[U]nlike *Hoppe*," the court explained, "the Court here evaluated the proposed settlement on the merits and denied preliminary approval."  *Id.*

---

[6] The Court's substantive evaluation and rejection of the parties' settlement also renders Plaintiffs' other cited cases distinguishable.  *See Sherman v. CLP Resources, Inc.*, No. 12-8080, 2015 WL 13542762, at *15 (C.D. Cal. Feb. 4, 2015) (noting that the court had not evaluated the substance of the settlement or whether it merited preliminary approval); *In re Frascella Enters., Inc.*, No. 06-101, 2008 WL 2051115, at *9 (Bankr. E.D. Pa. May 8, 2008) (noting that the court "never disapproved the Settlement Agreement").

---

10

1    And even though the court provided plaintiff another opportunity to submit a revised motion for

2    preliminary approval, the court held that this did "not alter the fact that Plaintiff's motion was denied" or

3    preclude the plaintiff from choosing to litigate instead of negotiating a new settlement.  *Id.*

4        Here, as in *Reid*, the Court "evaluated the proposed settlement on the merits and denied preliminary

5    approval."  *Id.*  Once the Court did so, the terms of the settlement agreement ceased to be binding on the

6    parties.  It is irrelevant that the parties agreed to negotiate in good faith to revise the settlement agreement

7    if the Court denied preliminary approval.  Far from establishing that the settlement agreement is *still*

8    enforceable, the obligation to "revise" the settlement confirms that the parties must attempt to reach a

9    *different* agreement.  Until and unless the parties reach such an agreement, the Court's denial of preliminary

10   approval functions as a condition subsequent and renders the terms of the settlement void and

11   unenforceable.  *See Collins*, 679 F.2d at 173; *Ehrheart*, 609 F.3d at 593.

12       Moreover, even if there were any doubt about the occurrence of a legal condition subsequent, the

13   parties specifically agreed what would happen in the event the Court denied preliminary approval.

14   Paragraph 50 provides that if the parties cannot in good faith agree on how to revise the settlement

15   agreement, its terms shall "have no further force and effect" and the parties shall be "restored to their

16   respective places in the litigation" — including, among other things, by dismissing the claims of the New

17   York plaintiffs and returning to litigation in the Northern District of New York.  *See* Settlement Agreement

18   ¶ 50.  Plaintiffs' reading — under which they can "enforce" the settlement even after the Court rejects it

19   — renders that provision ineffectual and violates the cardinal rule that every provision of a contract must

20   be given effect.[7]  Plaintiffs have agreed to return to litigation if the parties cannot reach a consensus about

21   how to revise the settlement agreement.  They cannot ignore that agreement simply because they fear that

22   they will obtain a less favorable result if they litigate this case to completion.

23   **II.   The Court Cannot Enforce the Settlement Agreement Without Changing Its Material Terms.**

24       Plaintiffs are mistaken in arguing that this Court can simply rewrite the release, which is

25   indisputably a material term of the settlement.  But Plaintiffs' extensive discussion of the release is also a

---

[7] *See* Cal. Civ. Code § 1641 ("The whole of a contract is to be taken together, so as to give effect to every part . . . ."); *Shine v. Williams-Sonoma, Inc.*, 23 Cal. App. 5th 1070, 1080 (2018) ("[T]he language of a settlement agreement must be viewed in its entirety, and, if possible, every provision must be given effect.") (citing *City of El Cajon v. El Cajon Police Officers Ass'n*, 49 Cal. App. 4th 64, 71 (1996)).

1   red herring: even if the parties reached agreement on how to narrow the release, the parties fundamentally

2   disagree on how to revise other aspects of the settlement agreement to address the Court's other concerns

3   —including the definition of the settlement class, the products the settlement will encompass, the use of

4   vouchers to compensate class members, and the calculation of fees for class counsel.  *See* Order at 4-9, 13-

5   17.  The Court should reject Plaintiffs' effort to insert the Court into their settlement negotiations and their

6   request to have the Court rewrite the parties' bargain.

7       **A.      The Court Cannot Modify the Release, Which Is a Material Term of the Agreement.**

8           Plaintiffs do not dispute that the Court rejected the release in the Settlement Agreement and stated

9   that the parties "must narrow" the release to obtain Court approval.  *See* Order at 4.  Plaintiffs nonetheless

10  assert that the Court can unilaterally modify the language of the release — or order Kellogg to modify the

11  language of the release — so that the settlement only releases claims arising from the "identical factual

12  predicate" as the claims Plaintiffs asserted in this lawsuit.[8]  *See* Mot. at 14-20.  But district courts have no

13  authority to do that.  "Neither the district court nor this court is empowered to rewrite the settlement agreed

14  upon by the parties."  *Officers for Justice v. Civil Serv. Comm'n of City & Cty. of S.F.*, 688 F.2d 615, 630

15  (9th Cir. 1982).  Their role is limited to determining "whether the proposed settlement is fundamentally

16  fair, adequate and reasonable."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998), *overruled*

17  *on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011).  This Court "may suggest

18  modifications, but ultimately, it must consider the proposal as a whole and as submitted."  *Officers for*

19  *Justice*, 688 F.2d at 630; *see also Hanlon*, 150 F.3d at 1026 (noting that a court does not "have the ability

20  to delete, modify, or substitute certain provisions" of a class settlement agreement, which "must stand or

21  fall in its entirety") (citations and internal quotation marks omitted).

22          Kellogg insisted on the broad language used in the release, and it does not dispute the Court's

23  conclusion that the release is "sweeping."  Order at 4.  That was by design: given the monetary and

24  injunctive relief Kellogg agreed to provide in connection with the settlement, Kellogg required a broad

---

[8] As an alternative to rewriting the release, Plaintiffs urge the Court to approve the current release language
by interpreting it to comply with the "identical factual predicate" rule.  *See* Mot. at 14-18.  Plaintiffs also
argue that the "identical factual predicate" doctrine does not invalidate the release because it merely limits
the preclusive effect of a release and does not implicate the adequacy of the settlement itself.  *See id.* at 20-
22.  Kellogg takes no position on whether the Court can approve the release in its current form
notwithstanding the "identical factual predicate" rule.

release that would cover any claim conceivably related to the claims Plaintiffs assert in this lawsuit. Kellogg fully anticipated that the Court would approve the settlement despite this broad release.[9]  But that does not mean that Kellogg would have agreed to a narrower release — at least not without corresponding changes to the economic terms of the settlement.

Plaintiffs argue that the "precise language" of the release is not a material term, and they urge the Court to re-write the release to conform to the parties' supposed intent.  Mot. at 20.  But given that the *entire purpose* of a class settlement agreement is to release class members' claims, "the details of . . . release provisions . . . in settlement agreements are inherently material." *Abbott Labs. v. Alpha Therapeutic Corp.*, 164 F.3d 385, 388 (7th Cir. 1999); *see also, e.g.*, *Inamed Corp. v. Kuzmak*, 275 F. Supp. 2d 1100, 1125 (C.D. Cal. 2002) ("There is no doubt that release provisions are generally thought to be material terms of any settlement agreement."); *Banc of Am. Strategic Solutions, Inc. v. Mohamed*, No. 07-446, 2008 WL 2756602, at *3 (S.D. Cal. July 14, 2008) (noting that "both California and federal law have indicated that release provisions are material terms to a settlement agreement" and collecting cases).

Plaintiffs rely on *Schaeffer v. Litton Servicing, LP*, No. 05-7673, 2012 WL 10274678 (C.D. Cal. Nov. 13, 2012), to argue that the "precise release language" of the settlement agreement is not material. Mot. at 20.  But in contrast to *Schaeffer*, where the parties never finalized their agreement and never reached agreement on the scope of a release, the parties' agreement to settle here was expressly conditioned on the breadth of the release — whose language they negotiated and incorporated into the settlement agreement Plaintiffs presented to the Court for approval.[10]  *See Schaeffer*, 2012 WL 10274678, at *15.  Absent that broad release, Kellogg either would not have settled, would have reduced the size of the common fund, or

---

[9] Plaintiffs correctly note that "many courts, including in this district, have found similar language sufficiently narrow" to satisfy Rule 23.  Mot. at 17 (collecting cases).  But all that proves is that the parties anticipated the Court would approve their proposed settlement.  It is not "evidence of the parties' intent" to agree upon whatever release the Court would approve, no matter how broad or narrow.  *Id.*

[10] That distinction also applies to *Ramirez v. DeCoster*, 142 F. Supp. 2d 104 (D. Me. 2001), *Galinis v. Bayer Corp.*, No. 09-4980, 2020 WL 1865286 (N.D. Cal. Apr. 14, 2020), and *Trustees of Operating Engineers Pension Trust v. Smith-Emery Co.*, No. 09-1476, 2017 WL 275599 (C.D. Cal. Jan. 19, 2017). In all three cases, the parties never finalized a settlement agreement and never reduced the language of the release to writing.  *See Ramirez*, 142 F. Supp. 2d at 114; *Galinis*, 2020 WL 1865286, at *1-2; *Smith-Emery*, 2017 WL 275599, at *9.  Here, in contrast, the parties not only agreed to the general scope of a release, but negotiated precise release language as part of an integrated, complete settlement agreement.

would have modified the allocation of voucher and cash relief. Accordingly, the Court cannot modify the release without fundamentally rewriting the terms of the settlement — which the Ninth Circuit has expressly prohibited. *See Hanlon*, 150 F.3d at 1026; *Officers for Justice*, 688 F.2d at 630.

Plaintiffs attempt to circumvent this prohibition by urging the Court to "enforce paragraph 50 of the Settlement Agreement" and order Kellogg to rewrite the release, and they suggest that the court can "dicta[e] the exact language the parties are to use in revising the release consistent with paragraph 50's requirement." Mot. at 18. But that would fundamentally "upset the bargain already struck." *In re Specialty Equip. Cos.*, 3 F.3d 1043, 1049 (7th Cir. 1993) (holding that modifying releases presented to the court for approval, without additional changes to the parties' agreement, "would amount to imposing a different plan of reorganization on the parties"); *see also In re Delta Air Lines, Inc.*, 374 B.R. 516, 524 (S.D.N.Y. 2007) (declining to modify releases in court-approved settlement order because "those releases were an integral part of the entire Settlement and cannot equitably be undone in isolation").[11] Kellogg would reasonably expect quid pro quo changes to other settlement terms in exchange for any narrowing of the release.

The cases Plaintiffs cite do not support the proposition that the Court can force parties to modify a release in isolation from the rest of the settlement agreement. Even if the *parties* to a class action settlement can voluntarily agree to narrow the language of a release to obtain preliminary approval, that does not establish that *this Court* can force them to do so.[12] Likewise, while a court may be able to enforce a settlement agreement when the parties *never agreed* upon the terms of a release, that does not establish that this Court should or may dictate materially different language to the parties after they have already negotiated and agreed on the release's wording. *See Phillips v. Pilgrim Creek Estates Homeowners Ass'n*,

---

[11] Although *In re Specialty Equipment* and *In re Delta* arise in the bankruptcy context, they are nonetheless instructive — particularly since an agreement that compromises claims in a bankruptcy proceeding, like a class settlement agreement, requires court approval.

[12] *See, e.g.*, *Der-Hacopian v. Darktrace, Inc.*, No. 18-6726, 2020 WL 1904471, at *2 (N.D. Cal. Apr. 17, 2020) (noting that "*the parties* agreed to narrow the scope of the release of claims") (emphasis added); *Custom LED, LLC v. eBay, Inc.*, No. 12-350, 2013 WL 6114379, at *7 (N.D. Cal. Nov. 20, 2013) (noting that "*[t]he parties* revised the scope of the release") (emphasis added). These cases merely stand for the proposition that the "excessive breadth" of a release "could be cured" by agreeing to a narrower one — not for the proposition that the Court should (or may) unilaterally modify the agreement instead of letting the parties reach agreement on their own. *Willner v. Manpower Inc.*, No. 11-2846, 2014 WL 4370694, at *7 (N.D. Cal. Sept. 3, 2014).

No. 19-102, 2020 WL 995862, at *9 (S.D. Cal. Mar. 2, 2020) (entering judgment after the plaintiff failed to execute settlement agreement he represented he would sign).  And no one disputes that a defendant can enforce a settlement when the plaintiff signs it, receives a settlement payment, and then fails to dismiss the claims he purportedly settled.  *See Sanders v. Connan's Paint & Body Shop, LLC*, No. 14-1725, 2015 WL 5692542, at *2 (S.D. Ind. Sept. 28, 2015).  None of these uncontroversial propositions have any bearing on the key question here — whether the Court can force Kellogg to re-write the release without upsetting the bargain the parties struck in their settlement agreement.  Because the Court cannot do so, it should deny Plaintiffs' motion to enforce the settlement agreement.

### B. Even if the Release Were Modified, the Parties Have Not Reached Agreement on How to Revise the Remaining Terms of the Settlement.

Even if this Court agreed that it could approve the release as written or modify the terms of the release, that would not resolve the parties' remaining issues as to how to revise the settlement agreement. Without divulging the substance of the parties' settlement negotiations, there are at least two remaining points of contention as the parties attempt to negotiate a new settlement:

First, the Court expressed skepticism about whether the settlement class, as presently defined, can satisfy Rule 23(b)(3)'s predominance requirement.  *See* Order at 4-7.  The parties have not reached an agreement as to whether (or how) they will limit the scope of the class products in light of the Court's reservations about the definition of the settlement class.  If the parties agree to settle on behalf of a narrower settlement class (*i.e.*, one including fewer products and fewer consumers who purchased those products), that will entail a commensurate reduction of the size of the common fund.  This is only logical: if the settlement class is smaller and encompasses fewer products, Kellogg would be subjected to the possibility of future claims that the earlier settlement resolved, and it should therefore should pay less money to settle.

Second, the Court expressed skepticism about the use of vouchers to compensate class members in light of their potential for reversion to Kellogg after the vouchers expire.  Order at 8-9.  The parties have not reached an agreement on whether to address this issue by using an all-cash common fund, vouchers that do not expire, or a combination of the two.  For many consumers, vouchers and cash are fungible; indeed, the settlement gives class members the option to receive cash or vouchers with double the face value, which many class members will use to purchase Kellogg products they would have purchased in

any event.  But they are not fungible to Kellogg, particularly if the vouchers do not expire.  *See* Panos Decl. ¶¶ 4-5.  Kellogg did not agree — and will not agree — to pay $20.25 million in cash, or vouchers with no expiration date, to settle this case.  If Plaintiffs want such a settlement, they will need to reach a new agreement with Kellogg — not move to enforce the settlement the Court rejected.

Kellogg would not object if this Court reconsidered its denial of preliminary approval and approved the settlement in its present form in its entirety.  Nonetheless, because the Court denied preliminary approval, and because the parties cannot agree on how to revise the agreement to obtain Court approval, the settlement agreement — by force of law and its own express terms — is of no effect.  *See infra* § I; *see also* Settlement Agreement ¶ 50.  Accordingly, this Court cannot "enforce" the settlement agreement; until and unless the parties reach a new agreement, Plaintiffs will need to resolve this case through litigation — not by asking this Court to rewrite the settlement agreement.

## III.  Kellogg Did Not Breach Its Duty to Negotiate in Good Faith.

Unable to establish that the settlement agreement is binding or enforceable in its current form, Plaintiffs assert that Kellogg breached its contractual duty to "seek in good faith to revise the Agreement as necessary to obtain Court approval."  Settlement Agreement ¶ 50.[13]  But Plaintiffs' allegations of bad faith are based largely on confidential mediation communications that Plaintiffs had no right whatsoever to disclose, and this Court should disregard their claim of bad faith for that reason alone.  Moreover, even if this Court reached the merits of Plaintiffs' argument, there is no evidence that Kellogg negotiated in bad faith or intended to repudiate the settlement.  Instead, the evidence confirms that the parties could not agree on the material terms of a revised settlement, which is not remotely enough to establish bad faith.

---

[13] Plaintiffs also claim that Kellogg breached Paragraph 55 of the settlement agreement, which represents that the parties "intend to implement the Agreement," requires them to "cooperate and assist with and undertake all reasonable actions and steps in order to accomplish all required events on the schedule set by the Court," and obligates them to "use reasonable efforts to implement all terms and conditions of this Agreement."  Settlement Agreement ¶ 55.  There is no conceivable basis for Plaintiffs' assertion that Kellogg breached this provision.  Kellogg intended to implement the Agreement upon its approval by the Court, took all steps necessary to comply with the Court's schedule and facilitate the filing of Plaintiffs' initial motion for preliminary approval, and remains willing to implement the settlement agreement if the Court grants preliminary approval.

1

2

**A.    Plaintiffs' Claim of Bad Faith Is Based on Confidential Mediation Communications, Which California Law and the Mediation Agreement Bar Plaintiffs from Disclosing.**

3

It is beyond dispute that a party's inability to reach a settlement, standing alone, is not evidence

4

that it negotiated in bad faith.[14]  *See, e.g.*, *Lesley v. Spike TV, Inc.*, No. 04-2758, 2005 WL 8156246, at *10

5

(C.D. Cal. July 26, 2005) ("[T]he fact that [a party] did not accept a settlement offer does not prove . . .

6

bad faith.  A multitude of reasons may exist for rejecting a settlement offer . . . .").  Plaintiffs attempt to

7

manufacture a claim of bad faith by discussing the parties' respective settlement positions leading up to

8

the June 18 mediation.  *See* Mot. at 5-8; Omnibus Fitzgerald Decl. Exs. 4-5 (settlement communications

9

cited in brief).  Leaving aside the many problems with their one-sided, self-serving account of the parties'

10

settlement negotiations, Plaintiffs had absolutely no right to disclose those communications.

11

As an initial matter, Plaintiffs' disclosure of these settlement communications — which occurred

12

in the weeks leading up to the June 18 mediation and concerned the terms of a potential settlement —

13

violates California's mediation confidentiality statute.  *See generally* Cal. Evid. Code § 1119.[15]  "[T]he

14

confidentiality rule in section 1119 sweeps broadly."  *Eisendrath v. Superior Court*, 109 Cal. App. 4th 351,

15

364 (2003).    It applies not only to communications made "in the course of" mediation, but to

16

communications that are "materially related to the mediation" or made "for the purpose of or pursuant to

17

mediation."  *Id.* (alterations, citations, and internal quotation marks omitted); *accord Wimsatt v. Superior*

18

*Court*, 152 Cal. App. 4th 137, 150-51 (2007).  And as the California Supreme Court has made clear, it does

19

not include an "exception for reporting bad faith conduct."  *Foxgate Homeowners Ass'n, Inc. v. Bramalea*

20

*Cal., Inc.*, 26 Cal. 4th 1, 17 (2001); *see also Benesch v. Green*, No. 07-3784, 2009 WL 4885215, at *4

21

---

22

23

24

[14] *See also*, *e.g.*, *Clover v. Shiva Realty of Mulberry, Inc.*, No. 10-1702, 2011 WL 1832581, at *3-4 (S.D.N.Y. May 13, 2011) (finding that, "[w]hile negotiations between the parties were not fruitful," the party who declined to settle was "within her rights to refuse the settlement" and had not acted in bad faith); *First Graphics, Inc. v. M.E.P. Cad, Inc.*, No. 00-2524, 2002 WL 1858791, at *3 (N.D. Ill. Aug. 13, 2002) ("[S]imply because [the plaintiff] considered its settlement offer to be favorable does not make it so, and the Court does not find that [the defendant's] rejection of the offer evidences bad faith.").

25

26

27

28

[15] Although section 1119 is a state statute, "the Court applies California law as to the scope of the mediation privilege" because this is a diversity action arising under California law.  *Chavez v. PVH Corp.*, No. 13-1797, 2014 WL 6617142, at *6 n.4 (N.D. Cal. Nov. 20, 2014) (Koh, J.); *see also Silicon Storage Tech v. Nat'l Union Fire Ins. Co.*, No. 13-5658, 2015 WL 4347711, at *2 (N.D. Cal. July 15, 2015) ("This case is a diversity action governed by California law.  As such, the court applies California's law as to the scope of the mediation privilege.").

---

1 (N.D. Cal. Dec. 17, 2009) ("The broad policy of mediation confidentiality . . . is strictly enforced and the

2 California Supreme Court has refused to allow implied exceptions.").

3       Plaintiffs' disclosure of these communications also violated the parties' Mediation Agreement.  At

4 the outset of the mediation process, the parties (and Judge Holderman) agreed that, "[i]n order to promote

5 communication among the parties, counsel and the mediator and to promote settlement of the dispute, the

6 *entire mediation process* is confidential."  Fitzgerald Decl. Ex. 2, at 1 (emphasis added).  To that end, the

7 Mediation Agreement provides that "[a]ll statements made during the course of the mediation are

8 privileged settlement discussions" and "are inadmissible *for any purpose* in any legal proceeding."  *Id.*

9 (emphasis added).  There is no serious dispute that the Mediation Agreement restricts what the parties can

10 and cannot disclose; in fact, the Ninth Circuit has affirmed the exclusion of evidence based on the *exact*

11 *same* JAMS mediation confidentiality agreement the parties executed here.  *See Facebook, Inc. v. Pac.*

12 *Nw. Software, Inc.*, 640 F.3d 1034, 1041 (9th Cir. 2011); *see also Apollo Educ. Grp., Inc. v. Nat'l Union*

13 *Fire Ins. Co.*, 784 F. App'x 500, 501 (9th Cir. 2019) (affirming evidentiary ruling "precluding Apollo from

14 introducing in evidence documents covered by . . . the agreement between the parties governing the

15 mediation").  Even *Perez v. Indian Harbor Insurance Co.*, which Plaintiffs cite in their brief, confirms that

16 the confidentiality provisions in a mediation agreement are binding on the parties.  --- F. Supp. 3d ----,

17 2020 WL 2322996, at *7 (N.D. Cal. 2020) (holding that the "confidentiality agreement . . . applies in this

18 matter" and enforcing its terms).

19       Here, there can be no dispute that Plaintiffs' disclosure of the parties' settlement communications

20 violated both section 1119 and the parties' Mediation Agreement.  Plaintiffs' brief spends pages laying out

21 the parties' discussions about the terms of a potential settlement, as well as the parties' respective concerns

22 about the settlement terms proposed by the other side.  *See* Mot. at 5-8.  Plaintiffs even submitted two

23 email chains between Plaintiffs' counsel, Kellogg's counsel, and Judge Holderman regarding the terms of

24 a potential settlement.  *See* Fitzgerald Decl. Exs. 4-5.  These are precisely the sort of communications that

25 section 1119 and the Mediation Agreement are designed to keep confidential.  *See Foxgate*, 26 Cal. 4th at

26 14 ("[T]he purpose of confidentiality is to promote a candid and informal exchange . . . This frank exchange

27 is achieved only if participants know that what is said in the mediation will not be used to their detriment

28 through later court proceedings . . . .") (citations and internal quotation marks omitted).

Faced with similar disclosures of confidential mediation communications, other courts in California — including this Court — have chastised the lawyers who made these improper disclosures and have declined to rely on any information set forth in those communications.  *See e.g.*, *Chavez*, 2014 WL 6617142, at *6 (noting that the Court could not "rely[] on improperly disclosed privileged mediation communications"); *Unicolors, Inc. v. Yang*, No. 17-4473, 2017 WL 10436063, at *2 (C.D. Cal. Oct. 3, 2017) (emphasizing that it was "inappropriate for Plaintiff to include confidential settlement communications" in a court filing).  Indeed, courts have even sanctioned lawyers for violating the mediation privilege.  *See, e.g.*, *In re Marriage of Davenport*, 194 Cal. App. 4th 1507, 1532 (2011) (affirming imposition of sanctions against attorney who "violated the mediation privilege" by, among other things, submitting a declaration that "attached mediation-related documents, set forth what was done and purportedly said in mediation, and referred to agreements reached in mediation").

For example, in *Jones v. Metropolitan Life Ins. Co.*, the plaintiffs' attorney "knowingly and repeatedly disclosed mediation communications . . . in numerous court filings."  No. 08-3971, 2010 WL 4055928, at *11 (N.D. Cal. Oct. 15, 2010).  The court granted the defendant's motion to strike this evidence.  In so holding, the court emphasized that "it is beyond doubt that maintaining the confidentiality of mediation communications is a *sine qua non* for preserving the integrity of court-sponsored mediation sessions."  *Id.* at *10.  While the court did "not question that [the attorney's] disclosures were animated by his genuine, if misguided, belief that he was duty-bound to his client to act as he did," it nonetheless held that this fact did "not relieve [him] of his professional duty" to avoid disclosing mediation communications — particularly given that mediation confidentiality is "fundamental to the integrity and administration of the judicial system."  *Id.* at *13.  Absent any "legitimate basis for his disclosure of confidential settlement negotiations," the court refused to consider these settlement communications.  *Id.* at *14.

Here, while Plaintiffs concoct several excuses for submitting the parties' confidential mediation communications, there is similarly no "legitimate basis" for disclosing those communications in this case.  *Id.*  Every single one of those excuses is unpersuasive and unavailing:

Plaintiffs first assert that the mediation privilege does not apply because the parties were merely considering "whether the mediation should even go forward, and if so, its scope."  Mot. at 6 n.4.  That is flat-out false: indeed, even before the parties exchanged the settlement communications at issue here,

1   Plaintiffs submitted a Case Management Conference Statement on April 29 in which they represented that

2   the parties had scheduled a mediation with Judge Holderman.  *See* ECF No. 341.  Moreover, when the

3   parties have previously mediated and are actively discussing the terms of a settlement, there is no exception

4   to the mediation privilege simply because the parties have not yet confirmed that they will attend another

5   mediation session.  *See Liberty Mut. Fire Ins. Co. v. Bosa Dev. Cal. II, Inc.*, No. 17-666, 2019 WL 3306304,

6   at *3 (S.D. Cal. July 23, 2019) (noting that "there is no case law" supporting the proposition that "a

7   mediation needs to be scheduled for documents to then become privileged under § 1119" and that "there

8   is a large amount of support holding the opposite").  Furthermore, the emails Plaintiffs submitted to the

9   Court and excerpted in their brief are not simply broad discussions about whether to hold another

10  mediation.  Instead, they reflect substantive deliberation about the terms of a potential settlement, and their

11  substantive content is the reason Plaintiffs submitted them in the first place.  They are precisely the sort of

12  communications California law and the Mediation Agreement make confidential.

13       Plaintiffs then argue that the Mediation Agreement does not apply because the parties had already

14  reached a settlement.  Mot. at 6 n.4.  That is wrong.  Leaving aside the fact that the settlement was

15  contingent on Court approval (*see infra* § I), there is no language in the Mediation Agreement providing

16  that it terminates upon reaching a settlement.  Instead, the Mediation Agreement states that it terminates

17  only after a party gives notice to the mediator and the other parties of its intention to withdraw from the

18  mediation — which Plaintiffs had not (and still have not) done.  *See* Fitzgerald Decl. Ex. 2, at 1.

19       Finally, Plaintiffs claim that neither the mediation privilege nor the Mediation Agreement apply

20  because "the June 18 conference was really *not* in the nature of a true mediation."  Mot. at 6 n.4 (emphasis

21  added).  This does not pass the straight face test.  The parties arranged the June 18 mediation to discuss

22  whether (and how) they would revise the terms of the settlement, and they engaged the same mediator they

23  had used at five prior mediations to facilitate that discussion.  Plaintiffs' counsel explicitly admitted in his

24  declaration that the parties "scheduled another mediation" with Judge Holderman.[16]  Fitzgerald Decl. ¶ 5.

25  If that does not make the June 18 mediation a "true mediation," it is hard to imagine what would.

26

27  _____

28  [16] Moreover, Plaintiffs submitted multiple status reports in which they stated that the parties planned to attend another "mediation" with Judge Holderman.  *See* ECF Nos. 341, 344.  If Plaintiffs did not believe that they were attending a "mediation," they should not have made this representation to the Court.

In short, Plaintiffs' claim of bad faith hinges on settlement communications that this Court cannot consider — not only because California law prohibits this Court from doing so, but because Plaintiffs contractually agreed to keep these communications confidential.[17]  Absent these communications, the only inference the Court can draw from the parties' failure to reach a settlement is that they disagreed about the terms on which they were willing to settle.  That does not support a finding of bad faith.

### B.   Kellogg Did Not Act in Bad Faith by Refusing to Agree to Plaintiffs' Proposed Settlement Terms.

Plaintiffs' decision to submit the parties' mediation communications has placed Kellogg in an untenable position, as it cannot meaningfully respond to Plaintiffs' inaccurate, one-sided account of the parties' settlement negotiations without also violating the mediation privilege or the parties' Mediation Agreement.  If the Court desires to know what transpired during the mediation (and in the period leading up to the mediation), it has a number of options at its disposal.  For example, Kellogg could provide the Court with an account of Plaintiffs' settlement offers and Kellogg's counter-offers, as well as emails demonstrating that Plaintiffs' counsel insisted on different (and materially worse) settlement terms.  This Court can also hold an evidentiary hearing.  And because Plaintiffs opened the door and placed the parties' settlement negotiations at issue, Kellogg would not object if the Court took any steps it deemed appropriate to investigate what settlement offers Plaintiffs presented to Kellogg, as well as Kellogg's response to those offers.  Before availing itself of any of these options, however, the Court should consider whether the evidence Plaintiffs have submitted even *suggests* that Kellogg negotiated in bad faith.  It does not.

In their motion, Plaintiffs note that they sent Kellogg an "analysis" of the Court's order denying

---

[17] Plaintiffs' cited cases do not compel a different conclusion.  Although the court in *Perez* declined to strike statements that had no "nexus" to the mediation or that simply reflected the fact that the parties had held a mediation and did not reach a settlement, it *granted* the motion to strike statements made in anticipation of the mediation statements or that revealed the parties' settlement offers.  2020 WL 2322996, at *8-9.  And in *Pacific Marine Center, Inc. v. Philadelphia Indemnity Insurance Co.*, the court held that the "mere fact" that the parties communicated with each other and the mediator after the mediation had concluded did not trigger section 1119.  No. 13-992, 2015 WL 1565362, at *9 (E.D. Cal. Apr. 8, 2015).  Neither case stands for the proposition that parties can disclose the *substance* of their settlement negotiations — let alone in a public filing.

---

21

preliminary approval and a summary of their proposed revisions to the settlement.[18]   *See* Mot. at 5-6. Tellingly, Plaintiffs did not submit that "analysis" to the Court, despite submitting other confidential settlement communications, because it confirms that the terms Plaintiffs offered materially differed from the terms on which the parties agreed in 2019.  And Plaintiffs do not submit any evidence that they offered the same settlement terms to Kellogg that they offered last year, because there is no such evidence.  The terms Plaintiffs offered were materially worse than the terms they offered last year, and they were not acceptable to Kellogg.  That — not Kellogg's purported "bad faith" — is why the parties have not settled.

Plaintiffs suggest that Kellogg acted in bad faith by proposing a "new settlement" involving the "settlement of a California only class."  *See* Mot. at 6; Fitzgerald Decl., Ex. 4.  To be clear, Kellogg did not insist on a California-only class; to the contrary, it was willing to settle on either a California-only or a nationwide basis.  *See* Panos Decl. ¶ 18.  But the email Plaintiffs cite actually confirms that Kellogg was negotiating in good faith: given the Court's reservations about the use of vouchers and the scope of the settlement class, and in the interest of reaching a resolution, Kellogg proposed that the parties limit the settlement class to the class the Court previously certified for litigation purposes.  *See id.*  From Kellogg's perspective, this proposal would not only resolve the Court's concerns about predominance (since the Court had already concluded that this class satisfied Rule 23(b)(3)), but would also give the parties the ability to fashion a narrower release tied to the class the Court had previously certified.  *See id.*  While this settlement would offer Kellogg less protection than the initial settlement the parties negotiated, Kellogg nonetheless viewed it as a viable way to obtain Court approval.  *See id.*

Plaintiffs categorically refused to accept — or even discuss — this settlement proposal.  Instead, they insisted that the parties agree to another nationwide settlement, but with materially different terms that Kellogg could not accept.  *Id.*  Plaintiffs unilaterally ended the mediation after two hours, and the parties left the June 18 mediation without reaching a new agreement.  *Id.* ¶ 19.

Nothing about these facts suggests that Kellogg acted in bad faith.  Plaintiffs' elaborate description of their reasons for rejecting Kellogg's settlement proposal is beside the point.  Just as Kellogg was within

---

[18] Although Plaintiffs quibble with Kellogg's decision not to provide a written, point-by-point response to this analysis, there is no conceivable reason to believe that its failure to do so constitutes bad faith.  Indeed, Plaintiffs concede that Kellogg provided a written response — just not the one Plaintiffs wanted.  *See* Mot. at 6; Fitzgerald Decl. Ex. 4.

1   its rights to reject Plaintiffs' proposal, Plaintiffs were within their rights to reject Kellogg's.  But it is hardly

2   evidence of bad faith that Kellogg proposed a "new settlement" with "substantially different material

3   terms."  Mot. at 7.  Of course it did.  It had to: given that the Court had expressly rejected the settlement's

4   material terms, Kellogg had no choice but to propose new ones.  And Plaintiffs cannot fault Kellogg for

5   proposing new settlement terms when they did so as well.  *See* Panos Decl. ¶¶ 17-18.

6          Plaintiffs suggest Kellogg repudiated the parties' earlier settlement because it believes the law has

7   shifted in its favor.  Plaintiffs fault Kellogg for seeking reconsideration of the Court's order granting their

8   motion for partial summary judgment, and they suggest Kellogg did so to strengthen its negotiating

9   position.  *See* Mot. at 5 & 25 n.12.  Plaintiffs also suggest Kellogg changed its negotiating position in light

10  of the oral argument in *Truxel v. General Mills Sales, Inc.*, during which the panel expressed skepticism

11  about the plausibility of Plaintiffs' allegations.  *Id.* at 7.  But Kellogg never repudiated the parties' earlier

12  settlement.  To be sure, the possibility of an unfavorable ruling in *Truxel* places Plaintiffs in a very

13  precarious position.  If the Ninth Circuit affirms the dismissal of that lawsuit — a carbon copy "added

14  sugar" lawsuit brought by the same Plaintiffs' counsel and one of the same named Plaintiffs (Stephen

15  Hadley) against another cereal manufacturer — it could have profound consequences for Plaintiffs' claims

16  in this case.  But despite the possibility of unfavorable ruling for Plaintiffs in the *Truxel* appeal, Kellogg

17  *still* engaged Plaintiffs in good-faith, substantive settlement discussions — either on a nationwide or a

18  California-only basis — and Plaintiffs rejected those proposals out of hand.

19         Moreover, given the occurrence of the condition subsequent (the Court's rejection of the proposed

20  settlement) and the provisions of paragraph 50, Kellogg is entirely within its rights to proceed to litigate

21  by filing substantive motions, advancing its litigation positions in anticipation of trial, and protecting its

22  appeal rights.  Kellogg is also within its rights to consider the possibility of favorable legal developments

23  (such as an opinion affirming the dismissal of the *Truxel* lawsuit) in assessing the terms on which it is

24  willing to enter into a future settlement.  In reaching their prior settlement, both parties acknowledged the

25  risks they would face if they continued to litigate, and the terms of the settlement accounted for those risks.

26  In fact, Plaintiffs expressly acknowledged the possibility that an unfavorable outcome in *Truxel* could

27  "eliminate Plaintiffs' chances of recovery in this case" as one of the factors that justified preliminary

28  approval.  2019 Mot. for Prelim. Approval (ECF No. 325), at 22  If the parties must negotiate new

1    settlement terms to obtain Court approval, it is only appropriate that the parties continue to take stock of

2    the risks they will face if they do not reach a settlement.  It is not "bad faith" for Kellogg to account for the

3    risks Plaintiffs will face if they continue to litigate, and nothing in Plaintiffs' brief suggests otherwise.[19]

4                                              **CONCLUSION**

5            Kellogg does not oppose Plaintiffs' motion for preliminary approval and will abide by the

6    settlement it reached if the Court is now inclined to approve it in its entirety and in its current form.  In the

7    absence of an order approving all of the terms to which the parties agreed, the parties do not have a binding

8    and enforceable settlement agreement.  Accordingly, the Court should deny Plaintiffs' motion to enforce

9    the settlement agreement.[20]

10

11    Dated:  August 3, 2020                          JENNER & BLOCK LLP

12                                                    By: /s/  Dean N. Panos
13                                                         Dean N. Panos

14                                                    Attorneys for Defendant
15                                                    Kellogg Sales Company

16

17

18

19

20    _____

21    [19] Plaintiffs suggest in passing that Kellogg breached its duty of good faith by accepting the benefits of the
      settlement and then withdrawing from it.  *See* Mot. at 23.  Leaving aside the fact that Kellogg did *not*
22    "withdraw" from the settlement the parties reached, this argument also fails because Kellogg did not
      receive any benefits from the settlement.  Plaintiffs' concern about the sequencing of the trials in this case
23    and in *Krommenhock v. Post* rings hollow — particularly because Plaintiffs' counsel filed both lawsuits
      (as well as *Truxel v. General Mills*) on the same day.  Furthermore, one could just as easily argue that
24    Plaintiffs obtained a tactical advantage because their counsel is now able to try similar "added sugar"
      claims against Post before trying those same claims against Kellogg.
25
      [20] Plaintiffs suggest that the Court refer the parties to a magistrate judge for a settlement conference, and
26    they claim that the magistrate judge can report to the Court if Kellogg is negotiating in bad faith.  *See* Mot.
      at 23-25.  Kellogg disagrees with Plaintiffs' reasoning and their suggestion that it negotiated in bad faith,
27    and it questions whether a magistrate judge can disclose the substance of the parties' settlement
      negotiations to the Court.  Nonetheless, Kellogg does not object to attending a settlement conference with
28    a magistrate judge.