**THE LAW OFFICE OF JACK FITZGERALD, PC**
JACK FITZGERALD (SBN 257370)
*jack@jackfitzgeraldlaw.com*
TREVOR M. FLYNN (SBN 253362)
*trevor@jackfitzgeraldlaw.com*
MELANIE PERSINGER (SBN 275423)
*melanie@jackfitzgeraldlaw.com*
Hillcrest Professional Building
3636 Fourth Avenue, Suite 202
San Diego, California 92103
Phone: (619) 692-3840
Fax: (619) 353-0404

**JACKSON & FOSTER, LLC**
SIDNEY W. JACKSON, III (*pro hac vice*)
75 St. Michael Street
Mobile, Alabama 36602
Phone: (251) 433-6699
Fax: (251) 433-6127

*Counsel for Plaintiffs and the Settlement Class*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEPHEN HADLEY, MELODY DIGREGORIO, ERIC FISHON, KERRY AUSTIN, and NAFEESHA MADYUN, on behalf of themselves, all others similarly situated, and the general public,<br><br>Plaintiffs,<br><br>v.<br><br>KELLOGG SALES COMPANY,<br><br>Defendant. | Case No. 5:16-cv-04955-LHK<br><br>**REPLY IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT AGREEMENT (DKT. NO. 346) AND RENEWED MOTION FOR PRELIMINARY APPROVAL (DKT. NO. 347)**<br><br>Judge:     Hon. Lucy H. Koh<br>Date:      November 12, 2020<br>Time:      1:30 p.m.<br>Location:  Courtroom 8 – 4th Floor |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................................ ii

INTRODUCTION ........................................................................................................................... 1

SPECIFIC RESPONSES TO KELLOGG'S POINTS ..................................................................... 2

    I.    PLAINTIFFS' ANALYSIS DID NOT SUGGEST, MUCH LESS INSIST ON "MATERIALLY WORSE" TERMS FOR KELLOGG ............................................ 2

    II.    KELLOGG CLEARLY *DID* REPUDIATE THE SETTLEMENT, CLAIMING EVEN NOW THAT THE SETTLEMENT AGREEMENT HAS NO FORCE AND EFFECT ............................................................................................................. 4

    III.    THE COURT DID NOT REJECT THREE "KEY MATERIAL TERMS" ............................ 5

    IV.    THE DENIAL OF PRELIMNARY APPROVAL DID NOT VOID THE SETTLEMENT AGREEMENT, BECAUSE PARAGRAPH 50 REQUIRED THE PARTIES TO "REVISE *THE AGREEMENT*" UPON DENIAL ........................... 9

    V.    PLAINTIFFS DID NOT ACT IMPROPERLY IN RELYING ON RELEVANT COMMUNICATIONS NOT SUBJECT TO THE PROTECTIONS KELLOGG CLAIMS ................................................................................................................... 10

    VI.    KELLOGG HAS PROVIDED THE COURT A CLEAR PATH TO APPROVING THE SETTLEMENT ............................................................................ 12

CONCLUSION ............................................................................................................................. 13

i

*Hadley et al. v. Kellogg Sales Company*, No. 16-cv-4955-LHK
REPLY IN SUPPORT OF MOTIONS TO ENFORCE SETTLEMENT AGREEMENT & FOR PRELIMINARY APPROVAL

## TABLE OF AUTHORITIES

**Cases**

*Chavez v. PVH Corp.*,
　2014 WL 6617142 (N.D. Cal. Nov. 20, 2014) ................................................................... 11

*Ehrheart v. Verizon Wireless*,
　609 F.3d 590 (3d Cir. 2010) ............................................................................................ 8, 9

*Hadley v. Kellogg Sales Co.*,
　2020 WL 836673 (N.D. Cal. Feb. 20, 2020) ............................................................... 5, 6, 7

*Ibarra v. Texas Employment Comm'n*,
　823 F.2d 873 (5th Cir.1987) .................................................................................................. 8

*In re Marriage of Davenport*,
　194 Cal. App. 4th 1507 (2011) ............................................................................................ 11

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*,
　330 F.R.D. 11 (E.D.N.Y. 2019) ........................................................................................... 12

*Jabbari v. Farmer*,
　--- F.3d ----, 2020 WL 4046029 (9th Cir. July 20, 2020) ................................................... 12

*Long Beach Memorial Med. Ctr. v. Super. Ct.*,
　172 Cal. App. 4th 865 (2009) .............................................................................................. 11

*Pac. Marine Ctr., Inc. v. Philadelphia Indem. Ins. Co.*
　2015 WL 1565362 (E.D. Cal. Apr. 8, 2015) ........................................................................ 11

*Perez v. Indian Harbor Ins. Co.*,
　--- F. Supp. 3d ----, 2020 WL 2322996 (N.D. Cal. May 11, 2020) ...................................... 11

*Rawa v. Monsanto Co.*,
　934 F.3d 862 (9th Cir. 2019) ................................................................................................. 8

*Reid v. I.C. System Inc.*,
　2015 WL 12979110 (D. Ariz. Aug. 27, 2015) ..................................................................... 10

*Reid v. I.C. System Inc.*,
　2015 WL 12990169 (D. Ariz. July 9, 2015) ........................................................................ 10

*Secs. Exch. Comm'n v. Randolph*,
　736 F.2d 525 (9th Cir. 1984) ................................................................................................. 9

# INTRODUCTION

Plaintiffs will respond shortly to Kellogg's accusations regarding their own behavior, and address Kellogg's legal arguments. But they wish the Court and Kellogg to know that their goal in filing their Enforcement Motion is not to win the blame game, or to cast Kellogg in a negative light gratuitously, but only to fully and finally resolve this case as efficiently and expeditiously as possible on behalf of the Settlement Class, ensuring that the Class receives the very significant settlement benefits Plaintiffs and their counsel labored strenuously to obtain.

Plaintiffs regret that their initial preliminary approval motion did not provide the Court sufficient information for it to find the Settlement fundamentally fair, adequate, and reasonable. But Plaintiffs very much believe the Settlement is so, and worked hard to address the Court's concerns as comprehensively as possible in their Renewed Motion for Preliminary Approval ("Renewed Motion"). Significantly, notwithstanding Kellogg's position that, as of February 20, it was "discharged . . . from its obligations under the settlement," Opp. at 2, Kellogg states that "if the Court is inclined to grant preliminary approval of the settlement agreement as it is currently drafted," it "does not oppose Plaintiffs' motion . . . and will abide by the settlement agreement Plaintiffs presented to the Court for approval." Dkt. No. 358, Statement of Non-Opposition ("Non-Opp.") at 1; *see also* Opp. at 16, 24.

This concession presents the Court with an efficient and practical solution if the Court finds, in light of the additional information Plaintiffs provided, that the Settlement Agreement should be given preliminary approval: the Court can grant Plaintiffs' Renewed Motion, and deny their Enforcement Motion as moot, thereby avoiding the necessities of wading into the parties' factual dispute, and resolving the complex legal issues raised in Plaintiffs' Enforcement Motion. In fact, the whole purpose of Plaintiffs' motion was to provide the Court a legal basis for "consider[ing] Plaintiffs' concurrently-filed Renewed Motion for Preliminary Approval, *even if Kellogg does not join in or opposes the motion*." Enf. Mot. at 1 (emphasis added). Kellogg's decision not to oppose the Renewed Motion, and its promise to abide by the Settlement Agreement if approved—thereby waiving any argument that the Agreement is no longer binding if approved—in effect provides a substitute legal basis for the Court's considering the Renewed Motion. Thus, Plaintiffs' Enforcement Motion has already had its intended practical effect.

That can be the end of the story, but Plaintiffs now address below Kellogg's opposition arguments.

1

*Hadley et al. v. Kellogg Sales Company*, No. 16-cv-4955-LHK
REPLY IN SUPPORT OF MOTIONS TO ENFORCE SETTLEMENT AGREEMENT & FOR PRELIMINARY APPROVAL

**SPECIFIC RESPONSES TO KELLOGG'S POINTS**

I. **PLAINTIFFS' ANALYSIS DID NOT SUGGEST, MUCH LESS INSIST ON "MATERIALLY WORSE" TERMS FOR KELLOGG**

Kellogg claims Plaintiffs' post-Preliminary Approval Order analysis offered "materially worse" terms for Kellogg, and that Plaintiffs "selectively chose *not* to submit to the Court the settlement 'analysis' . . . because it confirms that their narrative of the parties' settlement negotiations is blatantly false." *See id.* at 3; *see also id.* at 7-8 (asserting that the analysis contained "proposed settlement terms" that "differed significantly from the terms on which the parties had agreed in their earlier settlement agreement, and . . . were far less favorable to Kellogg"); *id.* at 8 n.5 (asserting that Plaintiffs "did not submit this 'analysis'" "because it confirms that Plaintiffs' proposed settlement terms materially differed from the terms to which the parties agreed in their settlement agreement last year"); *id.* at 22 ("Plaintiffs did not submit that 'analysis' to the Court . . . because it confirms that the terms Plaintiffs offered materially differed from the terms on which the parties agreed in 2019."); Panos Decl. ¶ 17.

Kellogg is wrong, and to demonstrate this, Plaintiffs now provide their analysis to the Court. Fitzgerald Reply Decl. Ex. 1 ("Analysis").[1] As the Analysis demonstrates, regarding the *release*, Plaintiffs suggested "[u]s[ing] release language approved by Judge Koh" in other cases, "which is *functionally equivalent* to what the parties previously agreed on[.]" *Id.* at 1 (emphasis added). Thus, Plaintiffs were not suggesting materially worse terms for Kellogg.[2]

Regarding *predominance*, Plaintiffs suggested (i) "submitting labels for any additional products or box sizes and better explain[ing] consistency in challenged claims that got dismissed (like WGC Stamp)"; (ii) "[b]etter explain[ing] that [a] settlement class need not mirror [a] certified class, but rather is compromised [sic] of disputed and non-final claims"; (iii) "[r]ely[ing] on the March 9, 2020 decision in *Krommenhock* on [the] exposure issue"; and (iv) "[d]rop[ping] any new products or sizes Kellogg can live without[.]" Analysis at 1. Thus, Plaintiffs were not insisting on materially worse terms for Kellogg, but

---

[1] Plaintiffs did not previously provide the document because it is innocuous, and—unlike the substance of the emails themselves—Plaintiffs did not believe the analysis's substance added to the motion beyond identifying the general subject matter discussed therein, *see* Enf. Mot. at 6.

[2] This further demonstrates, as Plaintiffs argued, that it was always the parties' intent that the release regard the factual predicate pleaded in the *Hadley* and *DiGregorio* actions. *See* Enf. Mot. at 14-18.

2

*Hadley et al. v. Kellogg Sales Company*, No. 16-cv-4955-LHK
REPLY IN SUPPORT OF MOTIONS TO ENFORCE SETTLEMENT AGREEMENT & FOR PRELIMINARY APPROVAL

instead only suggesting that Kellogg *voluntarily* "drop" products or box sizes it could "live without"—if any—to simplify a subsequent preliminary approval motion.³

Regarding *issues arising from the Settlement's vouchers*—namely, that (i) the parties had not estimated the reversion to Kellogg, (ii) the proposed claim form gave misleading notice to class members, and (iii) the vouchers were coupons under CAFA—Plaintiffs suggested an "[a]ll-cash common fund," Analysis at 2-3, as this would obviously simplify many aspects of the Settlement. *Compare* Opp. at 2 (Kellogg noting it is "open to the possibility of . . . an all-cash common fund"); *id.* at 8 (claiming Kellogg itself made "proposals [that] did not require the use of vouchers"). But contrary to Kellogg's claim, nowhere in the Analysis did Plaintiffs even suggest, much less insist that "Kellogg . . . pay $20.25 million in cash . . . to settle this case." Opp. at 16. Thus, by suggesting that the parties monetize the vouchers by negotiating an all-cash common fund in lieu of $12 million in cash and $8.25 million in vouchers, Plaintiffs were not suggesting materially worse terms for Kellogg.⁴

As with Plaintiffs' Analysis, Kellogg mischaracterizes other relevant events and settlement negotiations following the Court's February 2020 Preliminary Approval Order. *E.g.*, Opp. at 3; Panos Decl. ¶¶ 18-20. If necessary, Plaintiffs and their counsel would welcome an opportunity to "provide a declaration setting forth the details of each offer made by Plaintiffs, as well as Kellogg's counter-offers," as well as "a

---

³ Notably, Plaintiffs employed their other three suggestions in their Renewed Motion for Preliminary Approval (Dkt. No. 347, "Ren. PA Mot."). They attached many product labels and emphasized Kellogg's use of the Whole Grains Council Stamp. *See* Ren. PA Mot. at 9-11 (citing, inter alia, Omnibus Fitzgerald Decl. ¶¶ 22-23, Tables 1-5 & Exs. 11-39). They better explained why the Settlement Class need not mirror the class certified for litigation, especially in light of the many issues still subject to appeal. *See id.* at 4-6, 8, 13. And they cited the *Krommenhock* decision in their discussion about why the lack of a final judgment mitigates in favor of certifying a Settlement Class that includes Nutri-Grain notwithstanding the Court's denial of certification to a Nutri-Grain Subclass during the *Hadley* litigation. *See id.* at 13-14.

⁴ Patently, the cash-equivalent value of the $8.25 million in vouchers is between $0 and $8.25 million (representing 0% to 100% redemptions, *see* Ren. PA Mot. at 25), such that, with the $12 million in cash already agreed upon, if the parties were to negotiate *in good faith* an all-cash common fund in lieu of the Settlement Agreement's current compensatory relief, the fund would reasonably have to fall somewhere between $12 million and $20.25 million. Thus, for example, if the parties were discussing this possibility, it would be bad faith for Plaintiffs to demand *more* than $20.25 million as a starting demand, or for Kellogg to offer *less* than $12 million as a starting offer, *i.e.*, for either party to refuse to negotiate in the bracket of $12 to $20.25 million. Moreover, such a refusal by one party would make it pointless to discuss things like the release's language, since the parties would not even be talking about the same settlement, but instead an entirely new agreement with materially worse terms for the party not acting in bad faith.

complete collection of the emails documenting those settlement negotiations," and would also welcome "an evidentiary hearing to determine what happened in the parties' settlement negotiations." Opp. at 3 n.2; *see also id.* at 21; Panos Decl. ¶ 21. But as stated above, Plaintiffs are less interested in continued litigation and finger-pointing, and more interested in a fair and proper resolution of the action through the Settlement.

## II. KELLOGG CLEARLY *DID* REPUDIATE THE SETTLEMENT, CLAIMING EVEN NOW THAT THE SETTLEMENT AGREEMENT HAS NO FORCE AND EFFECT

Kellogg claims it "never repudiated the parties' earlier settlement." Opp. at 23; *see also id.* at 1 (claiming it is "false" that "Kellogg acted in 'bad faith' by 'repudiating' their [sic] settlement"). Yet, it argues that "[t]he [t]erms of the Settlement Agreement [a]re [n]o [l]onger [b]inding or [enforceable]." *Id.* at 8; *see also id.* at 11 ("Once the Court" denied preliminary approval "the terms of the settlement agreement ceased to be binding on the parties."); *id.* at 24 ("the parties do not have a binding and enforceable settlement agreement"). It is precisely because Kellogg believed it was "discharged from its obligations under the settlement agreement," *id.* at 2, that it felt emboldened to leverage intervening events to "insist[] that the parties negotiate a completely new agreement, with substantially different material terms," Enf. Mot. at 3 (citing Omnibus Fitzgerald Decl. ¶ 13).

Even now, Kellogg asserts that "[i]f Plaintiffs were serious about resolving the case" following the Court's non-prejudicial denial of preliminary approval, they would "account[] for the risks . . . if they continue to litigate." Opp. at 3; *see also id.* at 23 (asserting that "the possibility of an unfavorable ruling for Plaintiffs in the *Truxel* appeal" "could have profound consequences for Plaintiffs' claims in this case," and that Kellogg was "within its rights to consider the possibility of favorable legal developments in assessing the terms on which it is willing to enter into a future settlement," and therefore generous even to "engage[] Plaintiffs in . . . settlement discussions" after the Court denied preliminary approval without prejudice).

This strategy is contrary to the clear law Plaintiffs cited, and contrary to the parties' contract. The whole point of Paragraph 50 was to give each party, after all its hard work to reach the Settlement, the assurance that, even if the Court denied approval based on issues that did not require the parties to fundamentally alter the Settlement terms that were in fact material, the other party could not use intervening events to leverage a better result. Thus, unless and until the Court affirmatively finds the proposed Settlement's material terms unfair, inadequate, or unreasonable—which it did not do here—anything

4

favorable to Kellogg that occurred after September of 2019 when the parties reached their Agreement, is *irrelevant*, and Kellogg should not be allowed, in order to get a better deal on material terms with which the Court took no issue, to leverage interim events against Plaintiffs.

### III. THE COURT DID NOT REJECT THREE "KEY MATERIAL TERMS"

Kellogg asserts that in its Preliminary Approval Order, the Court "rejected at least three . . . key material terms—the scope of the settlement class, the use of vouchers for certain Kellogg products that expire after four months, and the language of the release." Opp. at 1. However, Kellogg's argument that the court "rejected" "the scope of the settlement class" and "the use of vouchers" is unfounded.

As Plaintiffs demonstrated, *see* Enf. Mot. at 12-13—and as is obvious based on the plain language of the Court's Preliminary Approval Order—the Court did no such thing. *See Hadley v. Kellogg Sales Co.*, 2020 WL 836673, at *2, *4-5 (N.D. Cal. Feb. 20, 2020) (Koh, J.)20, 2020) (Koh, J.) (finding it was "*unclear* whether certification for the settlement class is appropriate under [Rule] 23(b)(3)," and advising parties to *either* "more clearly explain how the settlement class satisfies the predominance requirement" *or* "define the settlement class more narrowly"; and noting that "the Ninth Circuit does not disallow reversionary settlements outright" while advising that, "in order to allow the Court to determine whether the instant settlement is fundamentally fair, adequate, and reasonable . . . the parties must provide the reversion information outlined in the Northern District of California's procedural guidance."[5] (emphasis added)). Indeed, Kellogg elsewhere admits the Court merely "expressed skepticism" about these matters. Opp. at 2; *see also id.* at 7 (noting that "the Court held that it cannot determine whether the settlement class satisfies the predominance requirement," and "concluded that Plaintiffs had not provided sufficient information"

---

[5] Kellogg's filing is the first time Plaintiffs have heard that Kellogg "worked with a third-party clearinghouse that is experienced in modeling redemption rates for vouchers and coupons to model the value of vouchers and to estimate how changes to the expiration date and/or products . . . would affect the redemption rate." Panos Decl. ¶ 4. Kellogg knew just as well as Plaintiffs that the initial preliminary approval motion was subject to the Northern District of California's Settlement Guidelines, including its requirement that the parties provide an estimate of any proposed reversion. Nevertheless, Kellogg chose not to share this information with Plaintiffs or the Court. *Compare Hadley*, 2020 WL 836673, at *5 (denying approval because "the parties must provide the reversion information outlines in the Northern District of California's procedural guidance"). Because the Settlement Agreement requires the parties to cooperate in good faith to seek preliminary approval Kellogg should produce the information in its exclusive custody, control, and possession going directly to a requirement under the Settlement Guidelines.

about the voucher component "to *permit an assessment* of the settlement's adequacy" (internal quotation and record citation omitted; emphasis added)).

Kellogg argues that Plaintiffs' acknowledgment "that the parties would need to '*revise the Agreement* to obtain preliminary approval,'" necessarily demonstrates that the Court rejected material terms. Opp. at 2 (quoting Enf. Mot. at 2 and adding emphasis). Not so. For example, the Court rejected certain aspects of the claim form, opt-out form (an exhibit to the Settlement Agreement), and notice forms (also exhibits), but Kellogg agrees those holdings did *not* "implicate material terms of the Settlement." Opp. at 6 n.4.

Plaintiffs have acknowledged that the Court found "the release of claims is overbroad," Enf. Mot. at 13 (quoting *Hadley*, 2020 WL 836673, at *2). But they demonstrated why—as with the claim form, opt-out form, and notices—the specific finding the Court made about the release's language also did not implicate material terms of the Settlement. *See* Enf. Mot. at 14-20. Kellogg's filings bolster this conclusion, demonstrating the truth of Plaintiffs' contention that the parties "intended to limit the release to the same factual predicate as the Complaint." Enf. Mot. at 16.

For example, Kellogg says it wanted "to ensure that the settlement would end any litigation *challenging the labeling of those products* once and for all." Opp. at 5 (citing Panos Decl. ¶ 9) (emphasis added). It says that "[t]he breadth of the release was designed to ensure that the settlement would not only resolve the claims asserted in this lawsuit and the companion *DiGregorio* [ ] litigation in . . . New York, but also protect Kellogg against any *copycat* class actions *related to the products at issue in those cases*." Opp. at 5 (emphasis added); *see also* Panos Decl. ¶ 10 (same). It says it "required a broad release that would cover any claim conceivably *related to the claims Plaintiffs assert in this lawsuit*." *Id.* at 12-13 (emphasis added). And it agrees that "the parties anticipated the Court would approve their proposed settlement" because "many other courts, including in this district, have found similar language sufficiently narrow," Opp. at 13 n.9 (internal quotation marks and citation omitted), again demonstrating their intent that the release was *not* so broad as to intentionally exceed the identical factual predicate doctrine.

Kellogg also says it does not oppose the Court "approv[ing] the current release language by interpreting it to comply with the 'identical factual predicate' rule," or by finding "that the 'identical factual predicate' doctrine does not invalidate the release because it merely limits the preclusive effect of a release and does not implicate the adequacy of the settlement itself." *Id.* at 12 n.8 (citing Enf. Mot. at 14-18, 20-22).

Thus, any claim by Kellogg that it would be in a materially different position if the release were revised or interpreted to comply with the identical factual predicate doctrine, is not genuine. Indeed, Kellogg agrees to Plaintiffs' Renewed Motion as filed, which includes notice provisions clarifying that the release should be read to comply with the identical factual predicate doctrine. Despite this, Kellogg says a few times it would not agree to a narrower release without concessions from Plaintiffs. Opp. at 2, 13-14. But an important distinction needs to be drawn here because Kellogg is conflating two "scope" issues.

Plaintiffs agree that the parties bargained for $12 million in cash and $8.25 million in vouchers for releases relating to 6 products challenged in the *Hadley* and *DiGregorio* actions: Raisin Bran, Smart Start, Frosted Mini-Wheats, Krave, Crunchy Nut, and Nutri-Grain. And Plaintiffs agree that if the Court ultimately refused to allow the parties to settle one of those products, like Nutri-Grain, the fact that Kellogg could obtain finality only as to fewer products would mean the scope of the release would need to be narrowed, which narrowing would fairly call for a concomitant reduction in the monetary relief. Thus, Plaintiffs agree with Kellogg that "[i]f the parties agree to settle on behalf of a narrower settlement class," in the sense of "one including fewer products and fewer consumers who purchased those products," then "a commensurate reduction of the size of the common fund" would be reasonable, since that would be a *material* difference in the parties' expectations. *See* Opp. at 15.[6]

But that is not what the Court meant when it said the parties "must narrow the scope of the release consistent with Ninth Circuit law," *Hadley*, 2020 WL 836673, at *2; *compare* Opp. at 10, 12. Instead, it was addressing the *breadth* of the release vis-à-vis the identical factual predicate doctrine articulated in *Hesse*. In contrast to an adjustment of the *products covered by the* release, an adjustment to the release language to clarify the *types of claims* released would *not* be a material difference in the parties' expectations, as demonstrated by Kellogg's own concessions noted above. Indeed, the parties' Term Sheet reflects what was material: that the release comprise a "full resolution of all matters relating to the marketing, sale and distribution of the Class Products during the Class Period, which were or could have been alleged in the

---

[6] In reality, parties almost always settle entire actions to avoid trials. *Compare id.* (noting that "if the settlement class is smaller and encompasses fewer products, Kellogg would be subjected to the possibility of future claims that the earlier settlement resolved"). If there were some immovable obstacle to the parties here settling one of the challenged products with live claims—like Nutri-Grain, since Hadley has individual claims alive and would try them, then appeal the certification denial—the result would not be a settlement for only some products, but no settlement at all.

7

*Hadley et al. v. Kellogg Sales Company*, No. 16-cv-4955-LHK
REPLY IN SUPPORT OF MOTIONS TO ENFORCE SETTLEMENT AGREEMENT & FOR PRELIMINARY APPROVAL

Actions," and specifically "all labeling statements challenged in the Actions," Dkt. No. 349-1, Omnibus Fitzgerald Decl. Ex. 1, Term Sheet at 6 ¶ 4.

Thus, the Court should reject Kellogg's argument that "it would not have agreed to settle on the terms it did without obtaining the broad release this Court rejected," and that it can accordingly in good faith demand "concessions in return" for "agree[ing] to a narrower release," *see* Opp. at 2; *see also id.* at 12-13 (arguing Kellogg "insisted on the broad language used in the release," which was "'sweeping[]' . . . by design," to "cover any claim conceivably related to the claims Plaintiffs assert in this lawsuit,"[7] and asserting it would not "agree[] to a narrow release . . . without corresponding changes to the economic terms of the settlement." (citation omitted)).[8]

Kellogg three times cites *Ehrheart v. Verizon Wireless*, 609 F.3d 590 (3d Cir. 2010), for the proposition that the Court's Preliminary Approval Order "function[ed] as a 'condition subsequent' to the agreement" that "discharge[d] the parties from their otherwise binding agreement." Opp. at 9 (citations and internal quotation marks omitted); *see also id.* at 2, 11. But *Ehrheart* actually supports Plaintiffs' position, explaining on the page after the one Kellogg cites that:

> The reason for judicial approval is to ensure that other unrepresented parties (absent class members) and the public interest are fairly treated by the settlement reached between the class representatives and the defendants. . . . Here, the District Court's own local rules specifically establish this fiduciary relationship by requiring parties to class action settlements to give the court "sufficient information for the Court to make findings with respect to the fairness and reasonableness of the settlement *to the class.*" Local Rule of the United States District Court for the Western District of Pennsylvania 23(i) (emphasis added). We make clear that this fiduciary protection does not extend to defendants in a class action, who are in a position to protect their own interests during negotiations. *See Ibarra v. Texas Employment Comm'n,* 823 F.2d 873, 878 (5th Cir. 1987).

---

[7] Contrary to these representations, *Plaintiffs' counsel* created the initial draft of the Settlement Agreement, including its release, copying the language from one of counsel's class action settlements in another case (which settlement was approved by the district court, and later affirmed by the Eighth Circuit in *Rawa v. Monsanto Co.*, 934 F.3d 862 (9th Cir. 2019)); Kellogg simply accepted the release as drafted, and the parties never discussed it again. Fitzgerald Reply Decl. ¶¶ 4-9 & Exs. 2-6. Thus, Kellogg had no role in "design[ing]" the release language, Kellogg never "insisted" on anything related to the release, and the parties never "negotiated" the language. *Compare* Opp. at 13.

[8] Plaintiffs think it significant that Kellogg's Non-Opposition to Plaintiffs' Renewed Motion said Kellogg would abide by the Settlement if it was approved with no changes to the release's "*scope*," rather than its precise "language." *See* Non-Opp. at 1. This suggests, notwithstanding its argument, that if necessary for approval, Kellogg *is* amenable to language changes that would not narrow release's scope beyond what the parties contemplated, but would clarify that the release is limited to the factual predicate in the Actions.

8

*Hadley et al. v. Kellogg Sales Company*, No. 16-cv-4955-LHK
REPLY IN SUPPORT OF MOTIONS TO ENFORCE SETTLEMENT AGREEMENT & FOR PRELIMINARY APPROVAL

> If Verizon's argument was accepted, and the District Court's action in vacating its preliminary approval affirmed, the settlement process would become meaningless since either party to a class action settlement (or any other type of settlement that requires court approval) could back out of an agreement at any time before court approval and avoid any legal repercussions for breaching the earlier offer and acceptance. Here, . . . Verizon bet on the certainty of settlement instead of gambling on the uncertainties of future legislative action. Verizon lost, and the District Court erred by letting it replay its hand.

609 F.3d at 594 (internal citation omitted).

Kellogg's reliance on *Secs. Exch. Comm'n v. Randolph*, 736 F.2d 525 (9th Cir. 1984), is similarly misplaced. *See* Opp. at 9. In that case, the Ninth Circuit *cautioned against* courts leaving parties on their own to enforce a settlement agreement through a separate contract action in situations like here, where "the contingent nature of the proposed" settlement requiring court approval means "parties might claim the right to withdraw their consent to the agreement." *See id.*, at 528; *compare* Enf. Mot. at 10 n.5.

## IV. THE DENIAL OF PRELIMNARY APPROVAL DID NOT VOID THE SETTLEMENT AGREEMENT, BECAUSE PARAGRAPH 50 REQUIRED THE PARTIES TO "REVISE *THE AGREEMENT*" UPON DENIAL

Kellogg argues that the "settlement agreement expressly contemplated the current situation: if the Court rejects the settlement (which it did), and the parties are unable to reach an agreement that addresses the Court's reasons for denying approval (which they are), the agreement provides that 'the terms and provisions . . . will have no further force or effect,'" Opp. at 1 (quoting SA ¶ 50). But Kellogg mischaracterizes the second step under Paragraph 50, which requires the parties to "seek in good faith to *revise the Agreement as needed* to obtain Court approval" if "this Agreement is not given preliminary or final approval," SA ¶ 50 (emphasis added).

"Agreement" is defined in the Settlement Agreement as "*this* Class Action Settlement Agreement." SA ¶ A.2 (emphasis added). Thus, the Settlement Agreement expressly contemplated that the denial of preliminary or final approval *for any reason* would *not* render the Settlement's provisions with "no further force or effect" *unless and until* the parties "seek in good faith to revise the Agreement as needed to obtain Court approval." *Compare* Opp. at 11 (incorrectly asserting that Paragraph 50 is "irrelevant" because "the obligation to 'revise' the settlement confirms that the parties must attempt to reach a *different* agreement"). That clearly has not happened here, since both parties accuse the other of acting in bad faith (*i.e.*, with Kellogg claiming Plaintiffs are at fault for the parties' failure to reach agreement because Plaintiffs supposedly

9
*Hadley et al. v. Kellogg Sales Company*, No. 16-cv-4955-LHK
REPLY IN SUPPORT OF MOTIONS TO ENFORCE SETTLEMENT AGREEMENT & FOR PRELIMINARY APPROVAL

"insisted on" "materially worse" terms, *see* Opp. at 8, 21). Contrary to Kellogg, if the preliminary approval order "render[ed] the terms of the settlement void," there would be no "settlement agreement" over which "the parties [could] in good faith agree" to revise. *See* Opp. at 11.

Paragraph 50 is also what distinguishes this case from *Reid v. I.C. System Inc.*, 2015 WL 12979110 (D. Ariz. Aug. 27, 2015), which Kellogg cites to argue it was free to withdraw from the Settlement following the Court's Preliminary Approval Order. *See* Opp. at 10. In *Reid*, "[t]he Agreement . . . allowed either side to 'unilaterally terminate' the agreement in the event it was not approved by the Court." 2015 WL 12979110, at *1.[9] And in contrast to this Court's Preliminary Approval Order, the *Reid* court did not deny preliminary approval based on question marks and non-material provisions, but found that, in light of "the very meager recovery," and "[w]ithout proof or at least evidence of a good faith effort to either compensate victims . . . or relieve them from the threat of similar conduct in the future . . . the settlement is inadequate," *Reid v. I.C. System Inc.*, 2015 WL 12990169, at *6 (D. Ariz. July 9, 2015). Thus, unlike this Court, which denied preliminary approval *non-prejudicially* and called for more information, the *Reid* court expressly found that the settlement as a whole affirmatively "inadequate."

## V. PLAINTIFFS DID NOT ACT IMPROPERLY IN RELYING ON RELEVANT COMMUNICATIONS NOT SUBJECT TO THE PROTECTIONS KELLOGG CLAIMS

Plaintiffs' counsel do not relish airing intra-counsel communications under any circumstances, and avoid doing so when not absolutely necessary. Here, though, Kellogg's conduct in refusing to even reply to Plaintiffs' Analysis, then purporting to withdraw material terms that were not at issue based on supposedly changed circumstances, placed Plaintiffs—in order to protect the interests of the Class in a settlement providing substantial monetary and injunctive relief—in the position of having to prove with supporting evidence Kellogg's repudiation of the Settlement Agreement, and its noncompliance with Paragraph 50. Nevertheless, understanding that such communications are sometimes protected, before submitting the communications supporting the Enforcement Motion, Plaintiffs' counsel did extensive research and internal editing, in an effort to present to the Court only material properly presentable. Fitzgerald Reply Decl. ¶ 3. In

---

[9] If anything, the fact that the parties had to *contract* for the right to *terminate* the agreement after a denial of preliminary approval demonstrates that, by default, settlement agreements are still binding, and not necessarily null and void, upon every denial of preliminary approval.

in their brief, they expressly justified each example—there were only two—with case law. *See* Enf. Mot. at 4 n.3, 6 n.4. Despite this, Kellogg asserts that Plaintiffs acted improperly. *See* Opp. at 1, 3 & n.2. Kellogg, who bears the burden of persuasion, *see Perez v. Indian Harbor Ins. Co.*, --- F. Supp. 3d ----, 2020 WL 2322996, at *8 (N.D. Cal. May 11, 2020), is wrong.[10]

"Even communications that would not have occurred 'but for' a mediation are not necessarily confidential—the relevant context and purpose of the communications must still be considered." *Perez*, 2020 WL 2322996, at *8 (citing *Pac. Marine Ctr., Inc. v. Philadelphia Indem. Ins. Co.* 2015 WL 1565362, at *7 (E.D. Cal. Apr. 8, 2015) ("Although the communications . . . would not have occurred but-for the prior mediations, that did not *automatically* extend the scope of the mediation confidentiality . . . . The same is true of the post-mediation communications . . . [.] [T]he mere fact that these communications arose as a result of the mediation and settlement does not mean they were made 'pursuant to' the mediation and are thus confidential." (citing *Long Beach Memorial Med. Ctr. v. Super. Ct.*, 172 Cal. App. 4th 865, 875 (2009)))).

For example "settlement offers [that] predate the mediation . . . are not subject to the California mediation privilege." *See id.*, at *9; *compare* Opp. at 17 (acknowledging communications "occurred in the weeks leading up to the June 18 mediation"). There are also exceptions when protecting communications would deprive a party of due process. *See Perez*, 2020 WL 2322996, at *8 n.5 (citations omitted).

Here, the parties' initial mediation ended when they reached the Settlement Agreement in September 2019. When the Court denied preliminary approval without prejudice, that did not terminate the Settlement Agreement, and thus any subsequent communications could not have been subject to a mediation privilege in the first place. Even if such a privilege might apply, though, it did not apply to the parties' communications

---

[10] Even where improper, the disclosure of communications protected by a mediation or similar privilege is generally not "sanctionable." *Compare* Opp. at 1, 3. Instead, as Kellogg's own cases demonstrate, the typical remedy in such a case is only for the court to ignore such material. *See id.* at 19; *see also Chavez v. PVH Corp.*, 2014 WL 6617142, at *6 n.4 (N.D. Cal. Nov. 20, 2014) (Koh, J.)) (Koh, J.) ("The Court . . . disregards . . improper disclosures of the actual contents of . . . written mediation statements."). Kellogg nevertheless cites *In re Marriage of Davenport*, 194 Cal. App. 4th 1507, 1532 (2011), for the proposition that "courts have even sanctioned lawyers for violating the mediation privilege," Opp. at 19. But in that case, the trial court "recited 15 findings setting forth various categories of things that supported section 271 fees and sanctions" because they "frustrated that statute's policy of promoting settlement of litigation and reducing its cost," and the appeals court affirmed, noting that, among many other things, "[t]here was also evidence [the party] violated the mediation privilege," causing the other party to "incur[] expenses in addressing these improper revelations." 194 Cal. App. 4th at 1531-32. Thus, the case is highly distinguishable.

regarding whether there was even common ground to negotiate further, and those are the only communications Plaintiffs disclosed. That was not improper.

## VI. KELLOGG HAS PROVIDED THE COURT A CLEAR PATH TO APPROVING THE SETTLEMENT

Kellogg's present filings suggests that, like Plaintiffs, it too wants this case resolved in an expeditious manner, and recognizes that the Settlement the parties took so long and labored so hard to achieve should not be discarded merely by virtue of an improvidently-worded release, or an incomplete preliminary approval motion. Kellogg has therefore given the Court a path to doing so if the Court believes the Settlement should be approved. Now, without objection from Kellogg,[11] the Court can interpret the release language to comply with the identical factual predicate doctrine. Opp. at 12 n.8. Then, to cure any ambiguity, without objection from Kellogg—which agrees the "notice forms" are not material, *id.* at 6 n.4—the Court can require that the Class Notice clarify this limitation, as Plaintiffs suggested. *See* Enf. Mot. at 18 (citing *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 330 F.R.D. 11, 46-47 (E.D.N.Y. 2019)); Omnibus Fitzgerald Decl. Ex. 43, Proposed Revised Long-Form Notice at 4-5, response to Question 9 ("The Released Claims should be read to comply with the 'identical factual predicate doctrine'; that is, the Settlement only releases Class Member claims th[at] rely on the identical factual predicate as the Complaints filed by the Class Representatives in this action."). Finally, so long as the Court agrees with Plaintiffs' arguments for why the Settlement Class satisfies Rule 23(b)(3)'s predominance prong, *see* Ren. PA Mot. at 3-14,[12] such

---

[11] Given its waiver of objections, Kellogg is—quite significantly—expressly giving up the right to challenge on appeal the result dictated by the logic that follows, which allows the Court, as a practical matter, to enforce the Settlement Agreement notwithstanding Kellogg's position that it is unenforceable.

[12] On July 20, 2020—the day Plaintiffs filed their Renewed Motion—the Ninth Circuit issued another decision supporting the propriety of finding predominance satisfied here. In *Jabbari v. Farmer*, --- F.3d ---, 2020 WL 4046029 (9th Cir. July 20, 2020), the Ninth Circuit affirmed a district court's finding that a settlement class satisfied Rule 23(b)(3)'s predominance prong. The *Jabbari* court noted that the "task" of determining predominance "is not an exact science," and that it is "relevant . . . whether a district court certifies a class for settlement or trial," in that "[s]ettlement may obviate the need to litigate individualized issues that would make a trial unmanageable, making common questions more important in the relative analysis." *Id.*, at *2 (internal quotation marks, alteration, and citations omitted). Because of this, "the general rule [is] that predominance is easier to satisfy in the settlement context." *Id.*, at *3 (citation omitted). And the court noted that in *Hyundai*, because "a district court assessing predominance need not inquire whether the case, if tried, would present intractable management problems," the court "explained that common issues

that revisions to the scope of the Settlement Class *vis-à-vis the Class Products covered* are not necessary, Kellogg "does not oppose preliminary approval" and "will abide by the settlement agreement," Non-Opp. at 1; *see also* Opp. at 16, 24.

## CONCLUSION

The issue before the Court calls for a practical solution that Plaintiffs believe both parties welcome so that the action can finally be terminated. For the reasons Plaintiffs have argued, they strongly believe that the Court should preliminarily approve the Settlement as-is, and Kellogg is clearly on board with that too. The Settlement Agreement is on behalf of a proper Settlement Class, provides substantial relief, and offers a more than fair, reasonable, and adequate resolution to this vigorously-litigated case.

As a result, the Court should grant Plaintiffs' Enforcement Motion and consider and grant Plaintiffs' Renewed Preliminary Approval Motion. Alternatively, in light of Kellogg's representation that it will abide by the current Settlement Agreement if approved, the Court should grant Plaintiffs' unopposed Renewed Motion, and deny their Enforcement Motion as moot.

If the Court does not grant Plaintiffs' Renewed Motion for Preliminary Approval, the Court should facilitate the termination of this action by referring the parties, per their agreement,[13] to a Magistrate Judge, which, by its nature, will both incentivize each party to discharge its duty under Paragraph 50 to proceed in good faith, and allow each party to have as much confidence as reasonably possible that the other is doing so.

Dated: August 7, 2020

Respectfully Submitted,

/s/ Jack Fitzgerald

**THE LAW OFFICE OF
JACK FITZGERALD, PC**

---

like whether the fuel economy statements were inaccurate and whether the automakers knew about the inaccuracy were the sort of common course of conduct by a defendant that can establish predominance." *Id.*, at *4 (internal quotation marks, alteration, and citations omitted). Finally, the *Jabbari* court compared the claims before it, under the Fair Credit Reporting Act, with "consumer fraud cases where predominance is easier to prove," since an "FCRA claim is provable collectively," making the "FCRA claim important enough to bind the class together." *Id.*, at *4-5. Thus, the *Jabbari* decision reiterates the Ninth Circuit's broad view of predominance in the context of settlement classes, especially concerning consumer fraud claims.

[13] *See* Opp. at 24 n.20 (Kellogg agreeing to a conference with a magistrate judge if necessary).

JACK FITZGERALD
*jack@jackfitzgeraldlaw.com*
TREVOR M. FLYNN
*trevor@jackfitzgeraldlaw.com*
MELANIE PERSINGER
*melanie@jackfitzgeraldlaw.com*
Hillcrest Professional Building
3636 Fourth Avenue, Suite 202
San Diego, CA 92103
Phone: (619) 692-3840
Fax: (619) 353-0404

**JACKSON & FOSTER, LLC**
SIDNEY W. JACKSON, III
*sid@jacksonfosterlaw.com*
75 St. Michael Street
Mobile, Alabama 36602
Phone: (251) 433-6699

***Counsel for Plaintiffs and the Settlement Class***

14

*Hadley et al. v. Kellogg Sales Company*, No. 16-cv-4955-LHK
REPLY IN SUPPORT OF MOTIONS TO ENFORCE SETTLEMENT AGREEMENT & FOR PRELIMINARY APPROVAL